```
1                    IN THE UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF ILLINOIS
2

3    UNITED STATES OF AMERICA,   )
                                 )
4               Plaintiff,       )
                                 )
5    v.                          )  No. 4:18-cr-40043-JPG
                                 )  Benton, Illinois
6    KURT F. JOHNSON,            )
                                 )
7               Defendant.       )

8

9
                         TRANSCRIPT OF PROCEEDINGS
10              BEFORE THE HONORABLE J. PHIL GILBERT
                      UNITED STATES DISTRICT JUDGE
11
                           SEPTEMBER 14, 2018
12
```

13   ***FINAL PRETRIAL CONFERENCE/MOTION HEARING***

```
14
     APPEARANCES:
15
     FOR THE PLAINTIFF:     Michael J. Quinley, Esq.
16                          Assistant United States Attorney
                            #9 Executive Drive, Suite 300
17                          Fairview Heights, IL   62208
                            618-628-3700
18                          Michael.J.Quinley@usdoj.gov

19   FOR THE DEFENDANT:     Kurt F. Johnson
     (Pro Se)               13177-081
20                          U.S. Penitentiary
                            P.O. Box 1000
21                          Marion, IL   62959

22               Stephanie Rennegarbe, RDR, CRR, CBC
                         301 West Main Street
23                        Benton, IL   62812
                            618-439-7735
24            Stephanie_Rennegarbe@ilsd.uscourts.gov

25     (Recorded by mechanical stenography, produced by computer)
```

```
 1              (Proceedings began in open court at 10:03 a.m.)
 2              ****************************
 3         THE CLERK:  United States of America v. Kurt F.
 4   Johnson, case #18-40043.  This matter comes before the Court
 5   on a Final Pretrial Conference.  Are the parties ready?
 6         MR. QUINLEY:  The United States is ready, Your Honor,
 7   good morning, appearing this morning by Assistant United
 8   States Attorney Michael Quinley.  Present at counsel table
 9   with me, Your Honor, are Forensic Analyst Clinton Bigham of
10   the FBI, and an intern with the Southern District of Illinois,
11   Mr. Brian Earl.
12         THE COURT:  Let the record show that the Defendant,
13   Kurt F. Johnson is present Pro Se.  This matter comes before
14   this Court on a Final Pretrial.  Trial is scheduled for
15   September 24th.  Mr. Johnson, I think this is the first time
16   you have appeared before me, is that correct?
17         DEFT. JOHNSON:  Yes, but I would like to object to
18   the Pro Se --
19         THE COURT:  Can you speak into the mic?
20         DEFT. JOHNSON:  Yes, I would like to object to the
21   Pro Se, because we are still trying to determine, as far as
22   I'm concerned, the status of the accused.  I haven't been able
23   to --
24         THE COURT:  The status of what?
25         DEFT. JOHNSON:  Of the accused.  I brought this up at
```

1    the arraignment, which was the last time that, you know, I was

2    in this courtroom.

3            THE COURT:  The status of the accused.  Well, you are

4    the accused, you are the Defendant in this case.

5            DEFT. JOHNSON:  That's a presumption, as far as I'm

6    concerned.

7            THE COURT:  Well, that ship has sailed.  So, I guess

8    one question I'm going to ask you is do you wish -- can you

9    afford to hire legal counsel?  Do you wish the Court to

10   appoint legal counsel to represent you in this criminal

11   matter?

12           DEFT. JOHNSON:  I'm going to have to say that ship

13   has sailed.

14           THE COURT:  Can you move that mic down closer to his

15   mouth so I can -- There you go.

16           DEFT. JOHNSON:  I'm going to say that ship has

17   sailed.

18           THE COURT:  So, that ship has sailed, too.

19           DEFT. JOHNSON:  Yeah.

20           THE COURT:  Well, I can call that ship back to the

21   dock.

22           DEFT. JOHNSON:  Okay.

23           THE COURT:  Okay.  So, do you wish the Court to

24   appoint legal counsel to represent you, either as standby

25   counsel, if you want to -- You have the right to appoint

1    yourself *Pro Se*, I can appoint standby counsel to assist you

2    in things like jury selection, evidence presentation, or I can

3    -- or I could -- if you wish for legal counsel to be appointed

4    for you, I will do so.

5             DEFT. JOHNSON:  No, thanks.

6             THE COURT:  Pardon?

7             DEFT. JOHNSON:  No, thank you.

8             THE COURT:  No, thank you.  Okay.  Let me inquire as

9    to your -- Have you been in court before?  I mean, well,

10   obviously you have, because you are incarcerated.

11            Do you have any kind of legal training at all?

12            DEFT. JOHNSON:  No.

13            THE COURT:  Why do you want to represent yourself?

14            DEFT. JOHNSON:  Well, again, I'll object to that

15   status, but I don't need an attorney.  That's all.

16            THE COURT:  You just don't need an attorney?

17            DEFT. JOHNSON:  No.

18            THE COURT:  Have you been involved in any trials

19   before as a Defendant?

20            DEFT. JOHNSON:  Yes.

21            THE COURT:  Were you represented by counsel in those

22   cases?

23            DEFT. JOHNSON:  No.

24            THE COURT:  And how many trials have you been

25   involved in as a Defendant?

1          DEFT. JOHNSON:  A half a dozen or so.

2          THE COURT:  Half a dozen?

3          DEFT. JOHNSON:  Yeah.

4          THE COURT:  So, you are at least somewhat familiar

5    with court procedures, is that correct?

6          DEFT. JOHNSON:  That's correct.

7          THE COURT:  Have you been involved in a jury trial

8    before?

9          DEFT. JOHNSON:  Yes.

10         THE COURT:  Representing yourself?

11         DEFT. JOHNSON:  Yes.

12         THE COURT:  Okay.  So, you know the process of

13   selecting a jury?

14         DEFT. JOHNSON:  Yes.

15         THE COURT:  Okay.  Well --

16         DEFT. JOHNSON:  Again, this was affirmed on appeal.

17         THE COURT:  Pardon?

18         DEFT. JOHNSON:  I said the competency was affirmed on

19   appeal, so I think we are all right on that.

20         THE COURT:  Okay.  What is the level of your

21   education?

22         DEFT. JOHNSON:  7th grade.

23         THE COURT:  Have you had any education programs while

24   you have been incarcerated?

25         DEFT. JOHNSON:  No, thank you.

```
 1              THE COURT:  Obviously you can speak the English
 2    language.  Can you read and understand the English language?
 3              DEFT. JOHNSON:  Yes.
 4              THE COURT:  Are you on any medication?
 5              DEFT. JOHNSON:  No.
 6              THE COURT:  You don't take any medication?
 7              DEFT. JOHNSON:  No.
 8              THE COURT:  And how old are you now?
 9              DEFT. JOHNSON:  55.
10              THE COURT:  Okay.  And how long have you been
11    incarcerated?
12              DEFT. JOHNSON:  This is my 14th year.
13              THE COURT:  Your 14th year?
14              DEFT. JOHNSON:  Correct.
15              THE COURT:  Okay.  All right.  Well, the Court's
16    going to find that the Defendant has waived his -- does not
17    seek to have legal counsel represent him, that he is competent
18    to represent himself, he has had experience in courtroom
19    procedures before and having been involved in jury trials, and
20    so the Court's going to allow him to represent himself Pro Se.
21              We do have several motions pending.  There's a motion
22    to issue subpoenas.  First, I quashed many of the first
23    requests for subpoenas on August 21st.  Another batch came in
24    on August 24th, and then you filed another motion on August
25    30th that explains why each request on both batches is
```

1    necessary.  And I think with the exception of the subpoena of

2    your mother, Mr. Johnson, I denied all those subpoenas.

3           I want you to explain to the Court why you need these

4    subpoenas and what's the purpose of their relevance to the

5    allegations against you in this indictment.

6           DEFT. JOHNSON:  So, it's my understanding that you

7    denied 18 already.

8           THE COURT:  Yes.

9           DEFT. JOHNSON:  18 of the 19?

10          THE COURT:  Yes.

11          MR. QUINLEY:  Excuse me, Your Honor.  We only have a

12   record of seven, and the quashing of six.  We have never seen

13   any additional subpoenas.

14          THE COURT:  There's only seven?

15          LAW CLERK:  No, there's more.

16          (Brief interruption in proceedings).

17          THE COURT:  There was 19.

18          MR. QUINLEY:  We have never been provided with copies

19   of the additional 12.  I don't know if that's because we are

20   not entitled to them or --

21          THE COURT:  They were scanned in.  I mean, they were

22   uploaded to ECF, is that correct, Richard?  Go ahead and talk.

23          LAW CLERK:  The motion was made on, I believe, August

24   24, ECF Document 13.

25          MR. QUINLEY:  Yes, we saw the motion, but we have

1   never received the subpoenas.

2          LAW CLERK:  You have never received copies of those?

3          MR. QUINLEY:  No.

4          LAW CLERK:  We have paper copies up here.

5          MR. QUINLEY:  Thank you.

6          THE COURT:  Do you want a minute to look those over,

7   Mr. Quinley?

8          MR. QUINLEY:  Yes, please, Your Honor.  And, for the

9   record, I don't know if these are in a particular order.

10         LAW CLERK:  Those are the order in which we received

11  them.  It's just the direct print-off as we received them.

12         MR. QUINLEY:  I think some of them are from the first

13  seven.

14         LAW CLERK:  There may be some overlap.  I believe

15  William True overlaps and a few others, but there are some new

16  ones, as well.

17         MR. QUINLEY:  All right.  Thank you.

18         Thank you, Your Honor.  A number of these are new

19  subpoenas, and we would -- if the Court wishes to review each

20  of them with Mr. Johnson, we would be ready to --

21         THE COURT:  These are ones I have already -- Are

22  these ones I already ruled on?

23         LAW CLERK:  There's two batches.  The first batch

24  you've already ruled on, and the second batch which Mr.

25  Quinley now has you have not ruled on.

```
 1              THE COURT:  So, it's the second batch that I have not
 2    -- The first batch I have ruled upon?
 3              LAW CLERK:  Yes.
 4              THE COURT:  And you understand you have the rulings
 5    on the first batch, Mr. Quinley?
 6              MR. QUINLEY:  That's correct.  They were provided
 7    directly by the Clerk of Court, directly, Kara.
 8              THE COURT:  The only one I didn't quash was the one
 9    to Mr. Johnson's mother.
10              MR. QUINLEY:  We didn't object to the subpoena to his
11    mother or the things requested that his mother produce under
12    the 17(c) subpoena in advance of trial, but we raised
13    objections to the other six and the Court ruled.  But, on
14    these 12, Your Honor, I think they could be addressed with
15    Mr. Johnson in the context of this hearing, if it pleases the
16    Court to do it in that fashion.
17              THE COURT:  Right; okay.  Mr. Johnson, do you wish to
18    address the second batch of subpoenas that you have requested?
19              DEFT. JOHNSON:  Well, I put in another request for
20    the issuance, when I went over each one, but I think -- Are we
21    going to go over the first six again?
22              THE COURT:  Who's the first one to?
23              DEFT. JOHNSON:  Well, I have got in my pleading it's
24    Elaine Duke, which is -- as the officer for the Department of
25    Homeland Security, and I believe that she was pertinent to
```

1    this case, because they provided someone at the World Court

2    proceedings to represent the Department of Homeland Security.

3            THE COURT:  Are you talking about the first batch?

4            DEFT. JOHNSON:  Yeah, I guess.

5            THE COURT:  Okay.  Let me --

6            DEFT. JOHNSON:  I'm going off the seven-page request

7    for subpoenas that I supplied.

8            THE COURT:  Okay.  All right.  I think I've got it

9    now, Mr. Johnson.

10           DEFT. JOHNSON:  Okay.

11           THE COURT:  Elaine Duke.

12           DEFT. JOHNSON:  Right.  And I am using her name

13   because I think she's the current Director of the Department

14   of Homeland Security.  And the Department of Homeland

15   Security, to my knowledge, provided somebody at the World

16   Court proceedings, and the World Court proceedings were

17   absolutely pertinent to this particular indictment.

18           THE COURT:  Why?

19           DEFT. JOHNSON:  Because the presumption is that

20   there's no such judgment and proceedings were proved that

21   there was a judgment, or at least that there were proceedings,

22   and so that's absolutely core to the particular accusation.

23           THE COURT:  Do we want to address this one at a time,

24   Mr. Quinley?

25           MR. QUINLEY:  Yes, if I may.

1          THE COURT:  Yes.

2          MR. QUINLEY:  I think there's something fundamental

3    to what the Government believes should be the basis for the

4    Court's ruling.  Mr. Johnson has filed a number of -- I'll

5    call them *processes*.

6          THE COURT:  Call them what?

7          MR. QUINLEY:  He has created instruments by which he

8    seeks admissions of fact, and on these documents that he's

9    created he purports that they have gone to a large number of

10   named individuals and also to John Does.

11         Now, the more recent processes have been to a very

12   large number of the employees of the Bureau of Prisons, but

13   earlier he's had a process to this Elaine Duke with the

14   Department of Homeland Security.  And in these, I call them

15   written processes that he creates, he says that if not

16   responded to, certain facts are admitted.  And he lists out

17   the facts.

18         Now, these facts are the bases for his claim.  And

19   this is a procedure that he's used in previous efforts

20   directed to the Court in the Southern District of

21   California -- or the Central District of California, where he

22   creates a document that looks like a legal document, and he

23   sends it out and, of course, these are not responded to, and

24   he alleges in the document if not responded to within the

25   latest, or within three days, then everything in it is

1   admitted.

2          THE COURT:  Kind of like an admission of facts?

3          MR. QUINLEY:  Admission of facts, that's it.  He

4   cites to a rule in the Rules of Civil Procedure.

5          Now, he has in this district -- And he refers

6   specifically to the two court numbers.  There are two

7   that the Court could take judicial notice of that were handled

8   one by Judge Rosenstengel and one by Judge Reagan.  So, they

9   were opened civil matters.  And in one of those two

10  proceedings that were dismissed in East St. Louis, he refers

11  to this judgment of the World Court, and he says that it's in

12  Appendix A, but the only thing in Appendix A is a cause

13  number, a cause number that he has written onto his Request

14  for Admissions to all the Bureau of Prisons officials.

15         Just like in the Court in California where he says

16  his damage was $7,200,000, now in this instrument that

17  underlies this current proceeding he says that his damage is

18  15 billion, plus 2 billion each year that the CMUs remain in

19  operation in Terre Haute and in Marion.

20         So, he's up to 21 million.

21         THE COURT:  Billion.

22         MR. QUINLEY:  Excuse me.  21 billion.  However, he

23  has discharged one billion of the $21 billion debt so he could

24  find 1099Cs on all these various Bureau of Prisons officials,

25  because these are all admitted facts.  And, in fact, in

1    addition to this initial instrument that he created, he has a

2    subsequent instrument where again directed, I believe, to

3    Elaine Duke, that if not responded to, it's admitted that

4    there's this World Court proceeding, that there's this

5    judgment, and Ruth Donoghue of the World Court, a Justice of

6    the World Court entered it, the various dates, that there was

7    an appeal, that there was a Government representative of the

8    United States representing the United States in the World

9    Court.  And, Your Honor, I think you can take judicial notice

10   of the fact that the United States doesn't recognize, let

11   alone the fact that the International Court of Justice is an

12   organ created by the United Nations Charter, it sits in the

13   Hague in the Netherlands.  It is an instrument created to

14   settle disputes between states.  Now, this can refer to

15   treaties between states, and I think this is how Mr. Johnson

16   has tried to, you know, basically say that they had his case

17   and decided his case, because he cites to a treaty, a treaty

18   that the Library of Congress cannot locate or produce.  The

19   Library of Congress, in fact, did respond through an

20   intermediary to Mr. Johnson's inquiry, but the United States

21   Supreme Court in 2008 in *Medellin v. Texas* -- and this was a

22   treaty between the United States and Colombia, or a foreign

23   state, you know, about counselor rights and about a person has

24   to be advised of their counselor rights, and there was an

25   attempt to enforce that treaty obligation of the United States

1    in the International Court of Justice in the Hague, and the

2    Supreme Court pointed out that since 2005, the President of

3    the United States has withdrawn United States accession to the

4    jurisdiction of the United Nations Court of Justice.

5         So, even though it's impossible that -- Well, one,

6    there's never been any proceeding there.  There are just these

7    instruments where Mr. Johnson believes he has created

8    admissions of what are, I think the Court will recognize, some

9    pretty -- I forget what the exact word in the English language

10   is -- fantastical allegations that Mr. Johnson cloaks with

11   legal language and with this demand of process and rights, and

12   I think, Your Honor, in good faith the United States can

13   attack the position and will take the position with regard to

14   a number of these subpoenas that they are not being requested

15   of the Court in good faith and that the Court would have the

16   authority in its discretion to quash them as we go through

17   them one by one, particularly with regard to Elaine Duke.

18        And I don't know Mrs. Duke.  I know that the current

19   Secretary of the Department of Homeland Security is Kirstjen

20   Nielsen, but I think the -- I think given the whole history of

21   Mr. Johnson's conduct in creating what he then used as a debt

22   obligation of the warden and the intelligence officer to file

23   involuntary bankruptcy petitions, which is the reason why we

24   are here now on a criminal proceeding, I think the Court would

25   have it within its discretion rather than entertaining that

1   Mr. Johnson is doing this in good faith, that with regard to

2   some of the particular subpoenas -- and I don't mean to

3   blanket all of them, but with regard to some of them that they

4   are not in good faith.

5          Many of the others we have provided the discovery

6   that has been requested, but we would have to go through that

7   one by one, because we haven't reviewed these 12.  So, I

8   apologize to not being able to advise the Court better.  And I

9   think if we do take them one by one -- But, starting with the

10  first one to Elaine Duke, Secretary of Homeland Security, the

11  Government would oppose that.  We believe it's not offered in

12  good faith, because there's no good faith reason for anyone to

13  believe that there are any records at the Department of

14  Homeland Security having anything to do with Mr. Johnson's

15  self-created allegations.

16         THE COURT:  Do you want to respond, Mr. Johnson?

17         DEFT. JOHNSON:  Sure.  That's quite a yarn, I can

18  tell you that, but completely factually inaccurate.

19         First off, the processes that he talks about are

20  governed by international treaty.  They are not just some

21  inmate whipping stuff up in his cell.  What he's

22  mischaracterizing is really a bunch of facts that are

23  irrelevant to this particular situation.

24         He's mixing Rule 36 admissions and civil procedures

25  that had nothing to do with this particular transaction.  And

1    I'm sure you guys are familiar with Rule 36 admissions.  This

2    process, the administrative procedures, the international --

3    governed by treaty international procedures, function -- can

4    function like Rule 36 admissions.  They are not governed by

5    Rule 36, and in this particular situation they had a chance to

6    answer and they chose not to, and so it did work like a

7    default admission.  But, it wasn't governed by Rule 36, it was

8    governed by the international treaty.  And in that

9    international treaty, the International Court of Justice or

10   World Court has original jurisdiction.

11        Elaine C. Duke, I think, is a director, not the

12   Secretary of the Department of Homeland Security.  To my

13   knowledge there was a proceeding in the courts governed by the

14   treaty and not by rules, Federal Rules of Civil Procedure,

15   Rule 36.  In that particular proceeding the United States

16   apparently felt that they were obligated to be present and

17   sent, I believe, a gentlemen by the name of Andrew Feirstein

18   to the hearing to represent the Department of Homeland

19   Security, and he filed a Notice of Abatement and an injunction

20   to enjoin the enforcement of the judgment until such time as

21   the abatement hearing was heard.

22        I have given very specific facts in the bankruptcy

23   proceeding that are very detailed about those hearings and the

24   events that happened.  They are not fanciful, they can be

25   verified through discovery, and we can get rid of this silly

1    stuff, because it's not -- this is not my fanciful

2    imagination.  And though you are trying -- the Government

3    wants to force that square peg through a round hole, there are

4    events outside of myself by competent people.  I mean, he's

5    saying that Judge Donoghue doesn't even exist.

6              MR. QUINLEY:  I made no such allegations.  She does

7    exist.

8              DEFT. JOHNSON:  You said she's an invention in

9    your --

10             MR. QUINLEY:  The proceeding is an invention.

11             DEFT. JOHNSON:  So, and the proceeding is not an

12   invention and I will have witnesses to speak to that.  But,

13   certainly the -- it could be found out very quickly with Ms.

14   Duke if she sent Andrew Feirstein or any other person to that

15   hearing that a proceeding happened, and so it's very pertinent

16   to and speaks directly to the accusation that there are no

17   such proceedings.

18             MR. QUINLEY:  Your Honor, if I may add just one small

19   thing.

20             THE COURT:  Hold on.  Don't interrupt him.

21             MR. QUINLEY:  I didn't mean to interrupt.

22             THE COURT:  Don't interrupt.  Go ahead, finish.

23             DEFT. JOHNSON:  So, you know, if there is a real

24   proceeding then this accusation is B.S., if I can put it that

25   way.  So, you know, certainly -- And he's gone to the Grand

1    Jury already on this particular premise, and so it's very

2    direct to the accusation itself that if there's a proceeding,

3    then, whether it's governed by the treaty, whether the

4    obligations are governed by the citation he gave -- I don't

5    believe they are -- but those are completely different

6    situations as to guilt and innocence.

7            THE COURT:  Mr. Quinley?

8            MR. QUINLEY:  Your Honor, I don't know whether

9    Mr. Johnson received the response or not, but he, through

10   intermediaries, just like he had filed a subpoena for the

11   Library of Congress, he had been asking intermediaries to get

12   the Library of Congress to produce a copy of the treaty that

13   he refers to, and one of his intermediaries was successful.

14   The Reverend Rudy Johnson was successful, and the Library of

15   Congress responded.  And they did a detailed search not just

16   in the Library of Congress, but they cited to all the sources

17   where treaties in force are listed going back to all the years

18   referred to by Mr. Johnson, including 1972, and they very

19   politely and very thoroughly responded that they could locate

20   no such treaty.

21           Now, I don't know whether Mr. Johnson has actually

22   received that response.  It was posted in a YouTube video by

23   his intermediary, his friend, who had done this inquiry for

24   him, but I don't know if Mr. Johnson has been able to see that

25   or has received the response from the Library of Congress.

1    That was the only thing I was going to interject, is that even

2    the treaty itself is an invention, it doesn't exist.

3           THE COURT:  Mr. Johnson, did you receive the

4    information back from the Library of Congress?

5           DEFT. JOHNSON:  I have not.  I don't know if this

6    Court is familiar with the type of prison that I am in.  It's

7    not a normal prison.  I'm in a special unit.

8           THE COURT:  Control Management Unit.

9           DEFT. JOHNSON:  Yeah, we will call it the terrorist

10   unit.  But, very limited communication.  They have complete

11   access to conceal, steal legal work.  There's -- It's -- I'll

12   call it a censorship unit.  And under those particular

13   situations it's very difficult for me to obtain the

14   information that I need.  And if you want to say due

15   diligence, I say it's impossible from the location that I am

16   at without outside help.

17          The treaty that I am asking for from the Library of

18   Congress is to the best of my recollection.  But, based on

19   that information and my recollection, a friend of mine or

20   intermediary was able to obtain a copy of that judgment from

21   Senator Cory Booker.  I mean, not judgment, but treaty from

22   Senator Cory Booker.  It was mailed in and Ms. Hill refused to

23   deliver it.  So, some treaty exists, obviously, that was

24   relevant to the facts that I provided that Senator Corey

25   Booker mailed in and was not delivered.

1          So, these are details that can come out in trial, of

2    course, but we are not dealing just with imagination.  It's

3    fanciful on his part, but there is a treaty that regulated the

4    administrative procedures.  They were outlined in that.

5          You guys are familiar with Title V which regulates,

6    you know, our administrative procedures, which is a copy of

7    the international one, so the law is relevant.  That's why I

8    subpoenaed the Library of Congress.  The law that I relied on,

9    the law that governed the procedures that Elaine Duke sent

10   somebody to.  And, so, fanciful or imaginary is an accusation,

11   it's not a fact.  And I've presented -- In bankruptcy

12   proceedings I presented all these facts, and so they are

13   certainly relevant to a fraudulent claim out of bankruptcy.

14   And what happened in the bankruptcy is they didn't provide --

15   allow me to have the discovery that I am seeking here, for

16   whatever reason.  But, you want to take it to a case of guilt

17   or innocence and fraudulent claims, well then I certainly need

18   this kind of information to defend against the accusation of

19   fraud.

20         You know, if there's a proceeding that happened in

21   front of Judge Joan E. Donoghue on January 14th of 2016, where

22   an abatement was presented by the Department of Homeland

23   Security with an injunction and a hearing set on February 19th

24   and then recalled on February 11th, because of the bad faith

25   of the Government, which seems to be continuing, and then a

1    final judgment was entered.  Then they filed an appeal which

2    was affirmed on 9/28/2016.  So, where are these facts coming

3    from?  Are they just delusions of myself or are they something

4    that can be verified by evidence?

5            And I am saying I can't do due diligence from my

6    location, but I could do it with the power of the subpoenas.

7    And these facts would come in and this whole case would

8    implode, because it's not -- it speaks directly to my intent,

9    which is part of the elements of this offense, okay?  You have

10   the fraudulent claims of the documents filed, all right, and

11   science, sir, is an element.

12           THE COURT:  Let me stop you there.

13           Mr. Quinley, explain to the Court, because, again,

14   this is now coming to the Court on Final Pretrial, trial is

15   scheduled, the allegations and the scheme to defraud contained

16   in the indictment.

17           MR. QUINLEY:  Yes, Your Honor.  Basically the

18   material falsehood is the claim that there's $20 billion

19   indebtedness on the person of William True, the Warden for the

20   prison.  So, that's two of the counts, is that that's the

21   falsehood, is that there's a $20 billion judgment against

22   them, and, of course, in the bankruptcy proceeding the Warden

23   testified that there's no such judgment, and he did bring to

24   the attention of the FBI that following the filing of this

25   involuntary bankruptcy against him he's received mailings from

1   businesses that help people in bankruptcy.  So, of course,

2   he's concerned about the impact of this upon his credit

3   history.  And, the exact same thing with Kathy Hill, the

4   intelligence officer.

5          So, the Defendant here creates a document in which he

6   says that if all these facts are admitted he's entitled --

7   it's actually by his calculation $21 billion.  He has

8   voluntarily discharged one billion.  So, he files involuntary

9   bankruptcy saying the warden owes him 20 billion, because it

10  was joint and several with all the people in the Bureau of

11  Prisons named and even persons unnamed, but John Does.  And,

12  in fact, Warden True is one of those John Does, because he's

13  not even named in this instrument created by the Defendant.

14  We have a copy of it unsigned, unexecuted, not filed anywhere

15  that is the origin of this claim that somehow it's turned into

16  a legally enforceable judgment through some process that never

17  occurs at all, again, except in the imagination of

18  Mr. Johnson.

19         So, the allegation -- And, frankly, the Government's

20  position is, one, the Warden and Ms. Hill deny any such

21  obligation or any such judgment against them and, frankly,

22  Your Honor, on its face the claim that Bureau of Prisons

23  officials owe Mr. Johnson $20 billion because he objects to

24  the processes in the CMU is absurd.

25         DEFT. JOHNSON:  You bet.

```
 1              MR. QUINLEY:  Yes, it's absurd.  And he may think
 2   that he has a legal defense that he believes his own absurdity
 3   and, therefore, can't be convicted of any crime, but I think
 4   if it's put to a jury, a jury might determine otherwise.
 5              THE COURT:  Okay.  Mr. Johnson?
 6              DEFT. JOHNSON:  Okay, Your Honor.  If the record is
 7   clear, because this is not -- there's plenty of proceedings
 8   leading up to this particular case.  There was a habeas corpus
 9   filed in regards to that judgment where he may have obtained a
10   copy --
11              THE COURT:  Which judgment are you talking about?
12              DEFT. JOHNSON:  The judgment that I believe was
13   obtained from the International Court of Justice, okay?
14              THE COURT:  Who was that judgment in favor of?
15              DEFT. JOHNSON:  It was in favor of Executor Kurt
16   Johnson.
17              THE COURT:  Pardon?
18              DEFT. JOHNSON:  It was in favor of Executor Kurt
19   Johnson.
20              THE COURT:  Okay.  Do you have a copy of that
21   judgment?
22              DEFT. JOHNSON:  No, and I would like to get a copy of
23   it, because it does exist.  I am being precluded from getting
24   a copy of it by the Government's enforcement and activities
25   even through Hill and True.  So, but I believe it's obtainable
```

1    by subpoena.  In the records that are going to absolutely be a

2    part of this case, the actions that were taken against True

3    and Hill were not even done until after the judgment

4    supposedly, you know, existed.  So, the idea that the judgment

5    was enforceable by my own imagination is just his fanciful

6    thinking, and that kind of fancy concerns me, quite frankly.

7    But, the dates that were provided was very specific:  There

8    was a hearing on January 14, 2016, in front of Judge Joan E.

9    Donoghue.  That's very specific.  That's not delusional.

10            THE COURT:  Where is he a Judge from?

11            DEFT. JOHNSON:  She's a Judge from the International

12   Court of Justice.

13            THE COURT:  Okay.

14            DEFT. JOHNSON:  And she's a New York citizen, she is

15   -- I sent a bio to you.  She's quite prolific in her

16   international law background.  She was a counselor to

17   Secretary of State Clinton and also to President Obama.  She's

18   worked for the Government for 20 years specializing in

19   international law.  I'm sure she's quite competent in her

20   affairs.  But, you know, there's 15 judges on that particular

21   court.  I am naming the specific Judge, I'm naming a specific

22   day, I am naming the specific instrument, I am providing a

23   case number.  If this is all my imagination, it's really

24   bizarre and, quite frankly, I'm sure you are confident

25   enough --

1          THE COURT:  What date was this judgment entered?

2          DEFT. JOHNSON:  1/14/16.

3          THE COURT:  Were you incarcerated at that time?

4          DEFT. JOHNSON:  Yes.

5          THE COURT:  Were you representing in the World Court

6     at that time?

7          DEFT. JOHNSON:  There were attorneys involved.  I had

8     mediators that I am not allowed to talk to and I am cut off

9     from my entire family.  I can't communicate with anybody

10    pretty much in the outside world that's relevant to my life

11    because of the facility.

12         THE COURT:  Does your mother have a copy of this

13    judgment?

14         DEFT. JOHNSON:  Does my mother?

15         THE COURT:  Yeah.

16         DEFT. JOHNSON:  No, she was -- I was trying to get it

17    to her, but they cut me off and I can't even talk to my

18    mother.  I can't write her, she can't write me.  There's no

19    communication with my family.  I can't even do any due

20    diligence.  But, these are not -- These are not fanciful

21    facts.  Where am I getting the names Andrew Feirstein?  Where

22    am I getting the names of Judge Donoghue?  I have got the

23    dates of 1/14, 2/11, 2/19, 9/28.  These are all events that

24    are verifiable factually.  And if they are factual, then I'm

25    not delusional.  And you should be confident enough right now

1   to figure out I'm not delusional.  I'm competent in the

2   language and I'm quite aware of my surroundings and what's

3   being talked about.

4         So, it's a great idea, but these things speak

5   directly.  That's why I was really concerned about, quite

6   frankly, your denial, because there's a lot more to this case

7   than just, you know, vain imaginations and accusations of that

8   on both sides.  There's a lot of facts that are very specific.

9   And if they are false, they are false; if they are true, they

10  are true.

11        And the whole purpose, I thought, of discovery was to

12  get to the facts so that at trial it could go forward with

13  truth.  And, you know, if that's the case, then these speak

14  directly.  Certainly if the Department of Homeland Security

15  sent somebody there to represent and they have an e-mail,

16  even, if they have a document, if they have the documents they

17  provided, you know, if they have a copy of the notice of

18  abatement or, excuse me, the Motion for Abatement, which would

19  have been appropriate at that particular time, and their

20  injunction, then what are we talking about?  My vain

21  imaginations are gone.

22        MR. QUINLEY:  Your Honor, if I may read into the

23  record a document of Mr. Johnson's that he filed with a Court

24  in this district, in the proceeding where he attached as

25  Exhibit A the judgment, this is what he filed with Exhibit A

1    where he does have the cause number; cause number that is

2    handwritten on the copy of the instrument that he created

3    which he says is a default or -- or by these processes is now

4    an enforceable default.

5           "Petitioner supplies this notice of obstruction in

6    place of the intended Exhibit A, which was to be a copy of the

7    World Court judgment."  And it's a very long number, so I

8    won't read the number into the record.  But, he is consistent

9    with it.

10          "Respondent, along with all his coconspirators, have

11   used their office in illegal operation of the CTU -- CMU unit

12   to prevent Petitioner from obtaining a copy of this judgment.

13   The intended benefit of having it filed with this petition for

14   easy viewing of the Court and all intended parties has now

15   spent many times over with this 18-month delay caused by their

16   destruction; therefore, any and all relevant parties and the

17   Court are free to obtain a copy from the World Court in New

18   York or the Netherlands as a public record."

19          And, Your Honor, on that representation, if the

20   people who assist this Court cannot obtain this public record,

21   then I think the Court will have all the information it

22   needs -- and I don't think it needs any, really, but to

23   evaluate whether or not Mr. Johnson is proceeding in good

24   faith.

25          THE COURT:  Does this judgment that Mr. Johnson says

```
 1    exists exist?

 2          MR. QUINLEY:  No, it does not.  There is no process,

 3    there is no proceeding.

 4          THE COURT:  Has the Government inquired as to the

 5    World Court as to whether this judgment exists?

 6          MR. QUINLEY:  There's nowhere to inquire from.  Every

 7    detail that Mr. Johnson cites from memory are details that he

 8    has created in written instruments, which he has then styled

 9    as admissions of fact.  So, the very process he recited for

10    the Court by rote with all the dates, and he was accurate in

11    every one of them, are from his separate instruments from the

12    original creation of this where he now recites eight facts

13    that he requires Elaine Duke to admit if she does not answer

14    to the eight facts, the fact of World Court, the fact of Judge

15    Donoghue, the fact of the hearing.

16          And, of course, Your Honor, I think the Court can

17    take judicial notice about this claim that the Government

18    asked for abatement and an injunction of this instrument that

19    somehow is filed through some unknown process with the Court

20    that because of the bad faith of the Government Judge Donoghue

21    recalls the hearing, doesn't hold the hearing and makes his

22    instrument a final judgment, and then that's approved on

23    appeal.

24          One, I don't know what the appeal process is, either,

25    from the 15-Judge International Court of Justice sitting in
```

1    the Hague, and, as I say, from the Supreme Court of the United

2    States there's no jurisdiction of that court and there are no

3    private remedies for citizens of any country anywhere in the

4    world.   And I'm sorry Mr. Johnson never got the response from

5    the Library of Congress that the treaty he cites to does not

6    exist, and we will provide him with what the response was to

7    the Reverend Randy -- Rudy Davis that Rudy Davis posted on

8    YouTube on behalf of the Defendant.

9            THE COURT:  Why don't you provide that response to

10   him.

11           Go ahead, Mr. Johnson.

12           DEFT. JOHNSON:  We are getting -- Again, I would like

13   to keep things separate.  The admissions that I sent to Elaine

14   Duke that he keeps referencing, okay, were Rule 36 admissions

15   in a civil procedure, okay?  That's completely different than

16   the processes he keeps talking about in the International

17   Court, okay?  The chances of me obtaining this judgment in

18   this particular --

19           THE COURT:  What was the judgment for?

20           DEFT. JOHNSON:  The judgment was -- Actually, why

21   don't I just take a minute to get you up to the procedures

22   that he calls processes.

23           THE COURT:  Answer my question first.  What was the

24   judgment for?

25           DEFT. JOHNSON:  The judgment was for -- It was a

```
 1   administrative default judgment obtained at the end of
 2   administrative procedures, okay, and the procedures are
 3   governed by the treaty where you start out with an
 4   international demand, then if it's not answered you put a
 5   Notice of Fault, if that's not answered then you can go to a
 6   notice of -- you go to a Notice of Dishonor -- excuse me,
 7   dishonor second, and Notice of Fault, and then the fourth
 8   process would be a judgment.  The judgment -- All four of
 9   those documents, it's true, are created by the person
10   that's -- In this particular case I created all four of those
11   documents.  But, the procedures are very precise.  They have
12   to go to an international administrative hearing officer.  To
13   my knowledge that was a gentleman named Jonathan Helmsford.
14   And Jonathan Helmsford accepted and looked at the treaty for
15   compliance with the documents, and then he presented them to
16   the World Court, in this particular case Joan Donoghue.  And
17   Joan Donoghue, based on the compliance with the treaty and the
18   motions put forward by the Department of Homeland Security,
19   put out a nine-question questionnaire to the Government and
20   all the respondents that are listed, and she received such
21   dishonor from the nine-question questionnaire that she
22   created -- I didn't create, it wasn't a figment of my
23   imagination -- and that is what the dishonor was that caused
24   her to retract her hearing dates and make the judgment final
25   eight days before the hearing.
```

```
 1              THE COURT:  Okay.

 2              DEFT. JOHNSON:  And these facts, again, are -- You

 3    know, if the Government can't seem to find the judgment, you

 4    are asking a lot of me if I can't do it through subpoena to do

 5    it through due diligence.  That's just not going to be

 6    possible.

 7              THE COURT:  Okay.

 8              DEFT. JOHNSON:  And I have had quite a bit of

 9    difficulties doing anything with this particular case.

10              The processes that he's talking about in California,

11    I have done private administrative processes most of my life,

12    okay?  That's very different than the one that I am talking

13    about here.  Those are governed under Title V, okay?  This is

14    governed under international treaty where the Court has its

15    own original jurisdiction in regards guaranteed by that

16    treaty.  So, the law itself as to the Library of Congress

17    would be completely irrelevant, obviously.

18              THE COURT:  What about the -- There's subpoenas of

19    International Court of Justice, Michael Puckett.

20              DEFT. JOHNSON:  Right.

21              THE COURT:  Sheriff Rich Stevenson, FBI Agent

22    Jeschke.

23              DEFT. JOHNSON:  The International Court of Justice,

24    obviously Judge Donoghue could speak to this situation very

25    quickly.  If there are documents created, I mean, she created
```

1    the nine-question questionnaire that I am claiming that she

2    did, then that's certainly enough right there to show that

3    there was processes and that she felt she had jurisdiction

4    over the particular subject matter.  And these things are

5    really absolutely central to this entire claim.

6           So, you know, that would be crucial.

7           Michael Puckett, I was informed, actually has a copy

8    of the judgment.  Whether these guys have it or don't have it,

9    whether that's a true fact or not, I can't be certain until I

10   subpoena.

11          THE COURT:  Who is Michael Puckett?

12          DEFT. JOHNSON:  Michael Puckett is a Disciplinary

13   Hearing Officer for the Central Region in the Federal Bureau

14   of Prisons.

15          THE COURT:  How do you know he has a copy of the

16   judgment?

17          DEFT. JOHNSON:  There was a hearing in late June

18   where he came in and did a disciplinary hearing with Stephen

19   Sherak.  And Stephen Sherak was another inmate that had helped

20   me through his family to get some of these things done on the

21   outside.  And Mr. Puckett claimed to have as part of his

22   evidence in support of the disciplinary hearing a copy of the

23   judgment that he received from what sounded like a David

24   Schleger (ph) from the Department of Homeland Security, and

25   that Mr. Schleger had told him, "I know how to get around that

1    judgment." And I heard that -- I was standing outside the

2    office, I heard it, but it was also reported to me by Stephen

3    Sherak.

4           So, I don't know if he's got the unexecuted copy or

5    he has an executed copy. I don't know.

6           THE COURT: Let me stop you there. Do you know

7    anything about this Michael Puckett, Mr. Quinley?

8           MR. QUINLEY: We know all about Stephen Sherak who

9    had seized amongst his property when he was being released a

10   list of 30 Bureau of Prisons officials that this Defendant

11   wished to have involuntary bankruptcies filed on. There was

12   also a letter to his father in which he expressed that once

13   these were filed that all hell would break loose and he

14   expressed the belief that Washington wouldn't want to deal

15   with him and he would be released. "If all goes well, I could

16   be out by February, God knows."

17          And, Warden True, maybe, wasn't the warden by that

18   time, because he wasn't amongst the 30; Kathy Hill was. And,

19   Your Honor, there are no records from the Bureau of Prisons of

20   any such instrument except, again -- And, again, this is

21   because of correspondence where the Defendant, before he was a

22   Defendant in this matter, where he sent it either to his wife

23   of promise, Deborah, or to his mother or to his father, so we

24   have copies of this instrument that he created, handwritten on

25   the top is this case number, unsigned, unexecuted, and, as far

```
1    as anyone can tell, not filed anywhere by anyone.
2           And you asked the Defendant what the basis was for
3    the $20 billion or $21 billion.  The basis is the oppressive
4    condition of being confined in the CMU.  So, it's a global
5    joint and several judgment against all the Bureau of Prisons.
6    It increases every year by 2 billion as long as the Terre
7    Haute CMU and the Marion CMU remain in operation.  So, that's
8    what the basis is for the 20 billion or the 21 billion,
9    reduced by one.
10          But I think the letter that was taken from Mr. Sherak
11   addressed to the Defendant's father illustrates that he knows
12   exactly what he was doing.  He's a very clever individual, and
13   his hope is that he becomes so difficult to manage --
14          THE COURT:  Where is Stephen Sherak now?
15          MR. QUINLEY:  He'll get out.  He's out, he's at
16   liberty.  He was released.
17          THE COURT:  Go ahead.
18          DEFT. JOHNSON:  Okay.  Well, you know, it's funny to
19   me that they are this familiar with Stephen Sherak, and that's
20   another person that's, you know, necessary to subpoena,
21   because his efforts to assist me, obviously you can see, are
22   central to this case.  They plan to introduce evidence
23   themselves about documents seized from his person.  And he's
24   central and yet there was no 302s for him by the FBI.  This is
25   the kind of obstruction that I am up against.  You know, call
```

1    the Court.  If Joan Donoghue says I'm full of crap, I'm full

2    of crap, simple as that.  But, don't call Stephen Sherak or

3    Faith Sherak or any of your discovery, because you don't want

4    to know any of the facts.  You are really happy parading out

5    this propaganda that this is all my delusion, and, you know, I

6    know what a delusion is, but a delusion is not shared with

7    lots of other people.  You can look it up in psychology.

8    Delusions are not shared and they don't have all these outside

9    facts and they don't stay constant over the years.  It's

10   been -- Just a habeas alone took me 18 months to get filed.

11   And the reason it wasn't with a certified copy of the

12   judgment, which Mr. Sherak was going to provide for me when he

13   got out, is because they threatened him and put him back in

14   jail.  And these are facts that are going to come out in the

15   case.

16          But, you know, you can't continue to block and block

17   and block and block and say it doesn't exist, and when I try

18   to get it, which is relative to the defense --

19          THE COURT:  So, you want Mr. Sherak to testify on

20   your behalf?

21          DEFT. JOHNSON:  He's definitely going to testify.

22          THE COURT:  Do you know where he is?

23          MR. QUINLEY:  I believe in New York.

24          AGENT BIGHAM:  New Jersey.

25          MR. QUINLEY:  New Jersey.  By the way, Your Honor,

1    he's not cooperating.  Correct?

2         AGENT BIGHAM:  We have not approached him, but he's

3    -- he's never been able to find the judgment.  He is

4    currently -- He defrauded his mother out of some money and

5    from his correspondence was no longer cooperating with the

6    Defendant.  And so, you know, we have not reached out to him.

7    In reading all of his correspondence, he's never been able to

8    provide the judgment or the order that he's needing.  No one

9    in his family has.  None of his outside people, his father,

10   mother, the Sherak, can provide his judgment.  That's what

11   he's wanting from them.

12        DEFT. JOHNSON:  That's a good point he brings up

13   here, because he hasn't reached out to Mr. Sherak, and Sherak

14   probably doesn't want to reach out to them because he's been

15   threatened and bullied and very concerned about assisting me

16   at the expense of going back to prison just because of the

17   particular judgment.

18        And to add some facts, in order to try to alleviate

19   some of that threat, I was informed by Mr. Sherak that the

20   judgment was modified on February 8, 2018 to redact the name

21   of him and him and his family from the judgment and from all

22   the court proceedings of the International Court.  That's how

23   scared he is of the threat of the Government.

24        THE COURT:  You have confused me now.  I thought you

25   got the judgment.  Sherak didn't get the judgment.

1              DEFT. JOHNSON:  I understand, and I'm sorry for the

2    confusion.  I'm just giving you facts.

3              The handling of the transactions are not done by me

4    in prison.  It's not possible, okay?  Mr. Sherak was a

5    mediator in helping me with some of his contacts and people to

6    take these procedures to the International Court.

7              This is information that they already possess, they

8    know about Mr. Sherak.  They know about his position on the

9    threats, they know about why he didn't file --

10             THE COURT:  So, you want him to come testify on your

11   behalf?

12             DEFT. JOHNSON:  Sure.

13             THE COURT:  What do you expect him to testify about?

14             DEFT. JOHNSON:  I expect him to testify, one, that

15   there is a judgment; two, that he's been threatened to prevent

16   -- threatened in such a way that he did not feel comfortable

17   providing the judgment or getting the judgment to me.

18             And just to give you a little historical fact, I

19   wrote a habeas in this particular district -- I wrote a habeas

20   procedure based on the judgment, okay?  The judgment was to be

21   filed as an exhibit, Exhibit A, in regards to that, and that

22   was in front of Mr. Herndon, okay?  That was not filed by me,

23   okay?  That was Mr. Sherak, when he got out was going to file

24   that on my behalf and attach the judgment which he had in his

25   possession at the time, okay?  That was my understanding.

1  Then it was filed without the judgment.  And what I would call

2  an abstract of judgment was provided, but not a certified one

3  from the Court, something that I believe Mr. Sherak produced

4  himself.

5          So, you have him being able to speak directly to why

6  wasn't the judgment filed directly as an exhibit to my desire,

7  and he will respond he was threatened, he will respond to, you

8  know, all the reasons why he had to get the judgment reissued

9  with redactions.  His sister was involved, his mother was

10  involved, there were lawyers involved, and there was expenses

11  that, you know, were provided, and so and so on.  So, it's

12  certainly not my delusion.

13          THE COURT:  Okay.  What about some of these other

14  people you want to -- You have this Sheriff Rich Stevenson,

15  FBI Agent Jeschke.

16          DEFT. JOHNSON:  Yes.

17          THE COURT:  Elliot Weisner and California Secretary

18  of State, Florida Motor Vehicle, New Jersey Vital records.

19          DEFT. JOHNSON:  Let me start with Mr. Stevens and

20  Jeschke.  The prosecution, I believe, made these moot, because

21  they provided me these documents.  My concern about that

22  provision of documents, though, is that what Agent Jeschke

23  provided me, I'm assuming he provided me through, did not have

24  a copy of the judgment, and both Faith and Stephen Sherak will

25  testify they mailed a copy of the certified judgment to FBI

1    Agent Steven Jeschke.

2           So, I am concerned there.  Somebody is lying.  If

3    Agent Jeschke actually did receive the judgment, I didn't

4    receive it in discovery, and so I think that part of the

5    subpoena being quashed was to avoid any conflicts with this

6    Court for contempt by not providing it if Mr. -- Agent Jeschke

7    actually has a copy of the judgment.  Mr. Sherak and Faith

8    Sherak will testify that a certified copy of the judgment was

9    provided to Ms. Hill.

10          THE COURT:  Who is Faith Sherak?

11          DEFT. JOHNSON:  Stephen's mother.

12          THE COURT:  Okay.

13          DEFT. JOHNSON:  Will testify that they provided a

14   certified copy of the judgment, which I have never seen,

15   okay -- I'm making clear I have never seen -- that they

16   provided one to Kathy Hill and they provided one to Agent --

17   FBI Agent Jeschke.  Are they lying to me?  Well, they can come

18   in here and lie to the Court.  But, to my knowledge that's the

19   fact why I asked for those things.

20          THE COURT:  Okay.

21          DEFT. JOHNSON:  Mr. Jeschke provided the files.  And

22   just to give you a little background, Stephen Sherak was being

23   released in November of 2017.  He had some of my documents and

24   was going to assist me, which is what the prosecutor here is

25   referencing about doing bankruptcies and filing my habeas and

```
 1    these types of things.  Ms. Hill confiscated all of that and

 2    they kept Mr. Sherak in jail for another seven months, and he

 3    was released in July of 2017, okay?  So, he's completely

 4    entrenched into these particular issues about the bankruptcy,

 5    he's central to the defense.  And the other documents, or the

 6    other thing I was provided from Rich Stevenson was all the

 7    recorded phone calls while he was in county jail, and 12 of

 8    those were to Stephen Sherak, and on those recordings he will

 9    either -- he will have to address the things he said, because

10    some of the things he said I am telling you about the threats

11    and the judgment, how they were issued, so on.

12            THE COURT:  Let's get beyond Stephen and Faith

13    Sherak.

14            DEFT. JOHNSON:  I'm just letting you know that that

15    was for Richard Stevenson.

16            THE COURT:  Richard Stevenson.

17            DEFT. JOHNSON:  So, I received all those phone calls.

18            THE COURT:  If Stephen Sherak appears to testify, he

19    can testify to all that stuff.

20            DEFT. JOHNSON:  I understand.

21            THE COURT:  So, we don't need Rich Stevenson.

22            DEFT. JOHNSON:  No, I received those.  I'm letting

23    you know they were made moot.

24            THE COURT:  All right.

25            DEFT. JOHNSON:  Mr. Weisner was an attorney, to my
```

1   knowledge, that did the due diligence on the procedures.

2           THE COURT:  Who was he?  Who hired him?

3           DEFT. JOHNSON:  Jackie Sherak, or Jacqueline Sherak,

4   which is Faith's daughter and Stephen's sister.

5           THE COURT:  Okay.

6           DEFT. JOHNSON:  Okay.  And he did the due diligence,

7   and based on information I had he has some of the documents,

8   including those that were signed by Andrew Feirstein, though

9   he may not have a copy of the judgment itself.

10          THE COURT:  Okay.

11          DEFT. JOHNSON:  So, he would be relevant as to, one,

12  the treaty; he would be relevant as to the processes, the

13  administrative hearing officers, attorneys that represented

14  the executor at the proceedings, that the proceedings actually

15  took place, that he has some documents that prove that the

16  proceedings actually took place, and these are far --

17          THE COURT:  Who's the executor?

18          DEFT. JOHNSON:  Kurt Johnson.

19          THE COURT:  Who?

20          DEFT. JOHNSON:  Kurt Johnson; Executor Kurt Johnson.

21          THE COURT:  You?

22          DEFT. JOHNSON:  Yeah.

23          THE COURT:  Okay.  You are the executor?

24          DEFT. JOHNSON:  Yes.

25          THE COURT:  Okay.

1          DEFT. JOHNSON:  So, he could be really relevant as to

2   a defense against the delusional claim.  As far as California

3   Secretary of State and all these -- I would have used all of

4   that information to speak towards the status of the accused,

5   but you said that ship has already sailed and so I would still

6   like to obtain those, because I'm going to -- you know, I'm

7   objecting to the presumption, and that would be evidence

8   related to that presumption.  But, that's up to you.

9          Then Deutsche Bank made an offer of just about 75 to

10  80 percent for this particular judgment that doesn't exist.

11  They opened up an escrow, deposited $700,070,000.  This is all

12  through Jackie Sherak, who is a banker.  They deposited

13  $700,070,000.  They were getting ready to completely fund and

14  purchase this particular judgment.

15         THE COURT:  How do you know that?

16         DEFT. JOHNSON:  I got this information through

17  Stephen Sherak and --

18         THE COURT:  So, Stephen Sherak will be able to

19  testify to that?

20         DEFT. JOHNSON:  Yes.  And they were going to pay the

21  rest.  But, Deutsche Bank got in a little financial trouble a

22  few years back and they had to withdraw.  So, getting any of

23  those escrow documents would obviously prove the due diligence

24  of a bank will not drop $700,070,000 to an account by a bogus

25  paper made by an inmate in a secret unit.  So, that's one of

1    the reasons that I think they are completely relevant.  The

2    bank is available in New York and, therefore, is, you know,

3    within the jurisdiction of this court.

4            The escrow officer, I believe, was a gentleman named

5    Heiko Lotz.  And so I have given as much detail in these

6    subpoenas I can to make it very specific for these people to

7    provide the information that I need to prove that a judgment

8    exists.  Obviously, you know, the deduction -- even if the

9    judgment doesn't exist, but the deduction would be that if a

10   bank offers, you know, $14 billion for a judgment that it's

11   not fake.  So --

12           THE COURT:  Who's Angela Clemmons?

13           DEFT. JOHNSON:  Angela Clemmons is a lady that dealt

14   with Stephen Sherak once he got out, and I believe there's

15   some communications that she had directly with him and, you

16   know, I'll probably need --

17           THE COURT:  Wouldn't that be hearsay?  If Stephen

18   Sherak testifies, why do you need her?

19           DEFT. JOHNSON:  Basically the reason being is because

20   it will be -- it will provide some timelines and some

21   different communications that I'll need to properly understand

22   his testimony or be able to communicate.  Because I wasn't

23   out.  I'm in what they call incognito.  I had no communication

24   with Mr. Sherak, very limited once he got out.  And, so, you

25   know, Angela Clemmons had some information that I think would

1    be pertinent and relevant to me dealing with Mr. Sherak.

2         THE COURT:  Would Mr. Sherak be able to testify as to

3    that same information?

4         DEFT. JOHNSON:  No, I don't think so.

5         THE COURT:  Hold it a second.  If A talks to B and A

6    tells B something that B testifies, B can testify as to the

7    timeline, as to everything, you know, so I don't understand

8    why you need --

9         DEFT. JOHNSON:  Okay.  Let me see if I can address

10   it.

11        THE COURT:  It seems to me most of hers would just be

12   hearsay.

13        DEFT. JOHNSON:  I'm not trying to get her to testify

14   as to what she knows, okay?  I'm just trying to get some

15   documents from her.

16        THE COURT:  What documents does she have that Mr.

17   Sherak doesn't have?

18        DEFT. JOHNSON:  Well, she might -- I don't know if

19   Mr. Sherak has all the communication he had with Angela

20   Clemmons, okay, and it's going to be important for me to --

21   because, you know, I'm really playing in the dark here, okay?

22        THE COURT:  I understand that.

23        DEFT. JOHNSON:  So, I need as much light as I can

24   shine on the facts so I can properly question Mr. Sherak.  You

25   know, I don't know who's telling the truth, who's lying to me

1    at this point, and it's just relevant, I think, to have the

2    evidence to address, like I say, timelines, communications.

3    There might be impeachment evidence, you know, of my own

4    witness, I don't know, because I don't know who's lying to me

5    yet.  I have good reason to believe who's lying to me and

6    who's not, but, you know, we are going to have to get to the

7    bottom of it.

8            THE COURT:  Postmaster General.

9            DEFT. JOHNSON:  The Postmaster General is irrelevant

10   to the particular type of situation that I am in.  I tried to

11   sue the Postmaster General not through this -- not through

12   these processes, but in the actual civil suit that was brought

13   before Judge Rosenstengel, and under that particular situation

14   I couldn't even get the litigation to the Court.  I'm so

15   bogged down with censorship at this particular unit that I

16   didn't even have access to the Courts.  And, so, I have

17   information related to that with documents that have never

18   been able to go out in the mail.  I sent an actual copy of the

19   complaint.  You can't start a civil proceeding without a

20   complaint.  So, the complaint never made it out of the unit.

21   I tried to get an amended complaint out of the unit and they

22   wouldn't mail it.  So, I couldn't even -- I fully paid for the

23   litigation, was never able to litigate it, and these are the

24   type of practices and patterns that I suffer under with Hill

25   and True, which will speak towards the obstruction that I am

1    up against, will speak towards their pattern and practice.  It

2    will be impeachable for the credibility of his witnesses.  And

3    these are the type of things that -- these particular

4    relationships between the Postmaster General.  Because the way

5    the mail is handled in this particular unit is impossible for

6    it to be lawful.

7              THE COURT:  Okay.  And I assume that, Mr. Quinley,

8    both True and Hill will be testifying?

9              MR. QUINLEY:  Yes, they have already testified under

10   oath in the bankruptcy proceeding.

11             THE COURT:  Okay.

12             MR. QUINLEY:  So, we are making arrangements to have

13   copies.  Mr. Johnson was present, well, by telephone and

14   cross-examined them.  But, we are trying to arrange to have

15   copies of those recorded testimonies provided to Mr. Johnson.

16             THE COURT:  So, they will be here?

17             MR. QUINLEY:  Sure.

18             THE COURT:  Okay.  Anybody else?

19             DEFT. JOHNSON:  No.  I mean, there were a couple of

20   other subpoenas I wanted to produce, but I chose not to do

21   them yet, because there's still some information that I am

22   seeking.

23             THE COURT:  Well, this trial is set for, you know,

24   ten days.  So, if we are going to issue subpoenas, you know --

25   Of course, we will consider and I'm going to hear the

1    arguments of Mr. Quinley in a minute, but we may have to put

2    this trial off.

3          DEFT. JOHNSON:  I understand.  You know, if I don't

4    have a fair shot at discovery, you know, this is --

5          THE COURT:  Well, I assume the Government has turned

6    over discovery to you, have you not, Mr. Quinley?

7          MR. QUINLEY:  That's correct, Your Honor.  It's

8    extensive.

9          DEFT. JOHNSON:  It's not all that extensive.  But,

10   you know, these particular subpoenas are really essential for

11   laying a foundation of the defense.  And the defense is not

12   complicated, you know.  Their accusations are really simple:

13   I'm a delusional fraud, okay?  Well, there's a lot of facts

14   out there where I'm not the delusional fraud and, you know,

15   just an example, I was trying to bring up in the habeas

16   proceeding it took me 13 months -- I mean, 18 months from the

17   time I created that document to get it filed.  That's how much

18   obstruction that was involved just in the habeas.  And I

19   didn't even prepare the habeas until the judgment was entered.

20   So, I am making my procedures and governing my lifestyle and

21   facts based on the judgment.  So, the judgment is critical and

22   central to the entire thing.  And whether the judgment exists

23   or not is not really going to be the final question.

24          THE COURT:  Well, what is the final question?

25          DEFT. JOHNSON:  The final question is going to be if

1    the judgment doesn't exist, did I have good reason to believe

2    it exists and was I led to believe it exists under the

3    circumstances that I was in and, therefore, I don't have the

4    mens rea.  So, those are the two defenses, and they are

5    specific enough to be addressed, but I have got to get the

6    facts.  You know, if you just keep me in this box, okay, and

7    railroad me through processes without being able to get these

8    particular facts -- And I would think the Government has

9    better access to getting them than I do.  But, if they are not

10   going to get them, I need to get them.

11        MR. QUINLEY:  Your Honor, I think the Defendant just

12   hit the nail on the head.  The whole exercise that he's

13   undertaking is to try to defeat proof of his mens rea.

14        Now, Your Honor, another Court was confronted,

15   different circumstances, it was his habeas petition, but after

16   dismissing his habeas petition Judge Herndon had a Motion for

17   Reconsideration, which basically, just like the habeas with

18   Exhibit A, the World Court judgment that's not there,

19   Mr. Johnson persisted.  And Judge Herndon wrote in his denial

20   of the Motion for Reconsideration, "The Court also notes that

21   Petitioner's claim that the illegality of his confinement was

22   litigated by the parties is absurd."

23        And, that's the bottom line here.  No matter how many

24   details, no matter how many claims of *I have sent this person*

25   *to get it and that person to get it*, it's all a cloud.  And

1    the underlying allegations and the details of those

2    allegations are absurd and, frankly, Your Honor, I think a

3    Court of this district or any district in the United States is

4    entitled basically upon its knowledge of the legal system to

5    conclude that these claims are absurd.

6         And Mr. Johnson is not going to be barred in any way

7    from trying to convince a jury that he's a true believer in

8    the creations of his own imagination and to try to show all

9    these connections, and in the end I think the Government will

10   be able to persuade the jury that he's a liar.  He's not

11   delusional.  He has a purpose and his purpose is to be so

12   difficult that he will get out of the CMU and maybe even out

13   of prison.  He's not going to succeed in that effort and he

14   may be delusional in thinking that that's an achievable goal,

15   but all of his actions are consistent with that goal.  None of

16   his actions are consistent in any believable fashion in

17   creating a $20 billion debt on the part of Bureau of Prisons

18   officials, nor a $1 billion source of income by his voluntary

19   discharge of $1 billion of that debt and filing 1099s on, was

20   it, 30 or -- at least a dozen Bureau of Prisons through an

21   intermediary.

22        This is a campaign of harassment, Your Honor.

23        THE COURT:  Well, apart from that, what's your

24   response to, you know, these other people and entities that he

25   wants to subpoena?

1            MR. QUINLEY:  Your Honor, I think any trial subpoena

2    that the Defendant requests should be issued so that these

3    people can appear in court and testify.  I think that the --

4            THE COURT:  There has to be a basis for issuing those

5    subpoenas.

6            MR. QUINLEY:  Well, 17(c) subpoenas is for the

7    production of documents in advance of trial.  He has the right

8    to subpoena witnesses for his defense, and the Government's

9    not going to raise any objection to that.  And if those people

10   can be served and if they appear in court -- And, you know,

11   now there will be a question of the relevancy of their

12   testimony.  But, the Government is not seeking to bar

13   Mr. Johnson from subpoenaing witnesses.  This is the 17(c)

14   process which provides by Court order and by permission of the

15   Court with the early production of documents.  And that's why

16   we didn't oppose the subpoena to Nell Leffel.  He says that

17   she doesn't have the documents, but in his subpoena he asks

18   for them from Nell Leffel.

19           THE COURT:  From who?

20           MR. QUINLEY:  His mother.

21           THE COURT:  Yeah, his mother.  All right.

22           MR. QUINLEY:  But, at any rate, he can subpoena all

23   of these witnesses, and if they can be served and if they can

24   appear, then the Court can then consider whether or not they

25   would be permitted to testify based upon the Rules of Evidence

1    and relevancy.  And, frankly, Your Honor, as he plainly

2    pointed out to the Court, it all goes to his mens rea and his

3    defense that even if it's not real, he believes that all of

4    this is real and, therefore, he's not guilty of fraud.  So, we

5    will litigate that.

6         But, I'm just saying that the Court doesn't need to

7    engage Mr. Johnson in what is absurd and is a fantasy in

8    reality, and that's why I think that, you know, you can go to

9    YouTube and listen to Judge Donoghue lecture at a school in

10   Virginia and at other forums.  She's a very distinguished

11   member, first female member of the International Court of

12   Justice.  I don't think the Court needs to harass her, either,

13   but she's subject to subpoena, I suppose, like anyone else.

14        DEFT. JOHNSON:  One of the things, Your Honor, is

15   that you know, the Government seems to think if they can just

16   say absurd enough, enough, enough in different places that

17   it's a reality.  It's not even close.  And bringing up Judge

18   Donoghue, documents would be a lot more responsible handling

19   of this particular person than trying to depose her or bring

20   her in because of her responsibilities and the very person

21   that she is to drag her out into a criminal case.  I am trying

22   to be diligent in using, you know, court resources in the most

23   advantageous fashion.  I think it would be really

24   irresponsible if she has documents that would prove and speak

25   to the issue to not go for the documents and then just demand

1    that she come here for appearance.

2           THE COURT:  Who's this?

3           DEFT. JOHNSON:  That's Judge Donoghue.  I think --

4           THE COURT:  She's not on your list, though.

5           DEFT. JOHNSON:  She's on my list under the

6    International Court of Justice as far as subpoenas go.

7           THE COURT:  Okay.

8           DEFT. JOHNSON:  And, like I said, I think it would be

9    a lot more responsible just to attempt documents that can

10   speak to the absurdity that seems to be trumpeted all over the

11   place.  And, you know, that particular order that he

12   references is not final anyway in Judge Herndon's particular

13   situation.  Mr. Herndon was definitely trying to address a

14   habeas, but everybody's presuming -- Judge Herndon, the

15   prosecution, Judge Rosenstengel, and even the Judge in the

16   bankruptcy, everybody wants to presume I'm an idiot and that I

17   am lying.  That's fine, but there's facts out there that can

18   speak directly to it and, you know, now the fun is over.

19          You guys brought a criminal case.  You have already

20   gone and lied to the Grand Jury as far as I'm concerned.  So,

21   this is getting serious now, and I think, you know, it's time

22   to get to the facts and get the facts on the table, because

23   absurd, delusional, fanciful, those are all nice words to

24   throw around, but there are facts out there that speak to the

25   reality of the situation and they need to be addressed, I

1    think, in the best and most advantageous fashion of getting

2    the documents before trial and then from there, in all

3    fairness, where access to these proceedings --

4            THE COURT:  Well, procedurally the documents don't

5    exist, though.

6            DEFT. JOHNSON:  That's the assumption.  How can you

7    prove that?  You guys are walking around trying to prove the

8    negative.  I say they exist and I'm trying to prove the

9    positive.  Like I say, if you want to make the accusation they

10   don't exist then call up --

11           THE COURT:  I'm not saying they don't exist.  I'm

12   saying the Government has a duty to disclose discovery to

13   you --

14           DEFT. JOHNSON:  Yeah, right.

15           THE COURT:  -- and I'm assuming -- I don't know

16   whether you have inquired as to whether these documents exist

17   and he's claiming they exist or not.  But, if you have them,

18   you have to disclose them.

19           DEFT. JOHNSON:  Well, obviously they haven't done

20   that.

21           MR. QUINLEY:  We have nothing, Your Honor.

22           THE COURT:  Okay.

23           DEFT. JOHNSON:  They haven't done that and I don't

24   think they have even done due diligence to pursue it, because

25   anybody who's looked at my e-mails, my communications and my

```
1    -- and the disciplinary hearing events and the activities

2    that's been going on in the CMU knows that Stephen Sherak is

3    central to this particular thing, and they haven't tried to

4    reach him.

5            THE COURT:  Okay.  We are going to --

6            DEFT. JOHNSON:  Those are -- I'm just saying --

7            THE COURT:  I'm prepared to tell you right now that

8    we are going to -- I'm going to authorize the issuance of

9    subpoenas to Faith and Stephen Sherak.

10           DEFT. JOHNSON:  Okay.

11           THE COURT:  I assume we know where they are.

12           Now, this International Court -- Who's the

13   International Court Judge you want subpoenaed?

14           DEFT. JOHNSON:  Judge Joan E. Donoghue.

15           THE COURT:  Joan Donoghue?

16           DEFT. JOHNSON:  Yes.  And you should have a bio

17   available for you.

18           MR. QUINLEY:  It's actually Ruth.  Oh, it is Joan,

19   I'm sorry.  Excuse me.

20           THE COURT:  So, if we subpoena her and tell her to

21   bring any and all documents, that would solve your problem,

22   right?

23           DEFT. JOHNSON:  Absolutely.  I do want to just -- You

24   know, I'm trying to be considerate of Judge Donoghue.

25           THE COURT:  Well, I'm trying to be considerate of
```

1    your defense.

2            DEFT. JOHNSON:  I agree.  And the documents would

3    resolve the issues if they exist, correct.

4            THE COURT:  It would be easier to subpoena her and

5    tell her to bring all relevant documents.

6            DEFT. JOHNSON:  Okay.

7            THE COURT:  If they exist she will bring them.  If

8    they don't, she will come and say they don't exist.  So, let's

9    just get her here.

10           DEFT. JOHNSON:  Okay, that's fine.

11           THE COURT:  Let's just get her here.

12           DEFT. JOHNSON:  Okay.  I'm fine with that.  I'm

13   just --

14           THE COURT:  Now, you understand there may be issues

15   -- subpoenas that are issued that there will be Motions to

16   Quash those subpoenas, and we will to have hearings on those,

17   and then in a Motion to Quash she may or may not say that,

18   "Hey, I don't know anything about this."  But, you know, I

19   will issue her a subpoena.

20           DEFT. JOHNSON:  Okay.

21           THE COURT:  And with a subpoena duces tecum, I mean,

22   she has to bring documents related to this judgment that you

23   have, say you have.

24           DEFT. JOHNSON:  Okay, thank you.

25           THE COURT:  Now, do we really need Sheriff Rich

1    Stevenson and the FBI agent?

2          DEFT. JOHNSON:  Sir, that was just for -- that was

3    just for documents.  I don't need Mr. Stevenson to testify for

4    anything.  And Jeschke is probably going to be on their

5    witness list, so --

6          THE COURT:  How long is this trial going to take,

7    Mr. Quinley, from the Government's standpoint?

8          MR. QUINLEY:  Really, it would be hard to imagine how

9    it would go longer than two days, but we won't be in control

10   of cross-examination, of course.

11         THE COURT:  Right.

12         MR. QUINLEY:  But, frankly, it really could be

13   presented in one afternoon.  I anticipate there may be issues

14   raised that could extend it into two days.  And we are ready

15   to proceed, Your Honor.

16         THE COURT:  What happens if -- It's going to be hard

17   to get people here by the 20th.

18         DEFT. JOHNSON:  I understand.

19         THE COURT:  I don't know how fast we can issue these

20   subpoenas.  I know, Mr. Quinley, you have another assignment

21   you have to go to at some point in time in the fall.

22         MR. QUINLEY:  Yes, Your Honor, but the Government

23   believes that it can be tried a week from Monday.  I believe

24   an attempt could be made, hopefully successful, to serve in

25   person each one of these individuals.  They would then be

1   flown at Government expense to the trial.  If there's a

2   failure to obtain service or, as the Court pointed out, if the

3   person subpoenaed themselves attempts to quash the subpoena,

4   then that would be a bridge we would have to cross.

5            THE COURT:  Right.

6            MR. QUINLEY:  But, otherwise we could get personal

7   service on the individuals with documents, of course, subpoena

8   duces tecum that the Court authorizes.  And, like I say, a

9   trial subpoena to testify, I think it's almost the Defendant's

10  right to summon people to court for his defense.  We would get

11  them served and have them here on Monday, the 24th of

12  September.

13           THE COURT:  Okay.  From what I am hearing,

14  Mr. Johnson, I don't know the relevance of Elaine Duke being

15  subpoenaed here.

16           DEFT. JOHNSON:  Okay.  Again, I will go over it real

17  quickly.  The relevance is that I don't need her as a witness,

18  okay?  I just want to confirm that she sent somebody up to the

19  proceedings.  I'm just trying to violate the proceedings.  The

20  proceedings are probably going to be first spoken of by

21  Stephen Sherak.  I would love to get Jackie Sherak, but I

22  don't know how to obtain her at the present time without

23  somebody helping me on due diligence to see if she would be

24  available, because she set up the escrow accounts, she set up

25  the hearing in the World Court, she was the one that worked

1    directly with Elliot Weisner.

2            THE COURT:  Well, wouldn't Stephen Sherak have that

3    kind of information?

4            DEFT. JOHNSON:  He would have a lot of that

5    information, but Jackie did most of this while he was

6    incarcerated.

7            THE COURT:  Who's Jackie?

8            DEFT. JOHNSON:  Jackie is his sister, Faith's

9    daughter.

10           THE COURT:  She's not on your list.

11           DEFT. JOHNSON:  I know she's not.  She's one of the

12   ones I would have added, but I don't have any contact

13   information for her.  All I have is her work.  She's at Abu

14   Dhabi Commercial Bank in United Emirates.  So, that's the only

15   place I can --

16           THE COURT:  Well, if we can't find her, we can't find

17   her.

18           DEFT. JOHNSON:  Yeah, I understand.  If somebody

19   could speak with Faith or Stephen Sherak --

20           THE COURT:  We are going to subpoena Faith and

21   Stephen Sherak.

22           DEFT. JOHNSON:  I understand.  But, if somebody could

23   contact them for information about Jackie, maybe Jackie could

24   be reached and Jackie could become a witness, because Jackie

25   could speak to things that Faith and Stephen could not speak

1    to.  This is part of the due diligence problem I am having

2    from my facility.  I don't have the ability to contact anybody

3    that could even speak with Stephen or Faith Sherak.

4            THE COURT:  I don't see any need that Elaine Duke

5    needs to be subpoenaed.  I think any evidence that she may

6    have could be obtained through other witnesses.

7            The Library of Congress, I don't know what you are

8    seeking there.

9            DEFT. JOHNSON:  Kathy Hill --

10           THE COURT:  If you are seeking a copy of the

11   judgment, you are saying Stephen Sherak has a copy.

12           DEFT. JOHNSON:  I'm seeking a copy of the treaty that

13   the judgment was issued on.  Kathy Hill supposedly has a copy

14   of it.

15           THE COURT:  Hold on a second.  You are giving him --

16   Didn't he have somebody that looked into that and said it

17   doesn't exist?

18           MR. QUINLEY:  Right, the Library of Congress wrote

19   back and in a very detailed recitation said everything they

20   did to try to locate the treaty as identified by Mr. Johnson

21   and that taking all the steps that they took they can locate

22   no such treaty.

23           THE COURT:  Have you given that information to

24   Mr. Johnson?

25           MR. QUINLEY:  We will have a copy it and we will

1    provide it.  Apparently we can only provide things at Marion

2    prison through a particular official there, otherwise we would

3    hand it to him today directly.

4              THE COURT:  Can he take a look at it today and then

5    give it back to you and submit it to him --

6              MR. QUINLEY:  Yeah, Brian, could you go print that

7    off?

8              THE COURT:  Yeah, before he goes back.

9              MR. QUINLEY:  My e-mail, okay?

10             THE COURT:  So, I don't see any need -- There's been

11   an inquiry by this Reverend, I guess.

12             AGENT BIGHAM:  Rudy Davis.

13             MR. QUINLEY:  Rudy Davis.  Reverend Rudy Davis on

14   behalf of Mr. Johnson forwarded his request to the Library of

15   Congress, and the Library of Congress responded.

16             THE COURT:  Okay.  So with the International Court we

17   are going to subpoena this Joan Donoghue.

18             This Michael Puckett.  Again, what was his --

19             DEFT. JOHNSON:  He claimed to have a copy of the

20   judgment.  I don't know if the copy that he had was the copy

21   mailed out.

22             THE COURT:  If you know where he is we will subpoena

23   him.

24             DEFT. JOHNSON:  He's just at the regional office.

25             THE COURT:  Okay.  Faith and Stephen Sherak will be

```
 1   subpoenaed.  Elliot Weisner, who was an attorney employed by
 2   Jackie Sherak --
 3            DEFT. JOHNSON:  Correct.
 4            THE COURT:  Okay.  What's his relevance?
 5            DEFT. JOHNSON:  He did the due diligence on the
 6   administrative procedures and the treaty.  He has some
 7   documents related to the proceedings in front of the World
 8   Court.  He would know names and dates and information related
 9   to the proceedings.
10            THE COURT:  Would he have a copy of the judgment?
11            DEFT. JOHNSON:  He won't have a copy of the judgment,
12   that I'm aware of.  He might.  He would know that the judgment
13   exists.  He would know -- He would have documents related to
14   the --
15            THE COURT:  Where is he located?
16            DEFT. JOHNSON:  He's in New Jersey, I believe.
17            THE COURT:  Where?
18            DEFT. JOHNSON:  New Jersey.
19            THE COURT:  New Jersey.  Okay.  Let's try to subpoena
20   him.
21            I don't see any need for the Secretary of State,
22   Florida Motor, New Jersey, or the Deutsche Bank, Angela
23   Clemmons.
24            DEFT. JOHNSON:  Deutsche Bank, you don't believe?
25            THE COURT:  No, you just can't -- you say the -- You
```

1    are talking about you believe that the Deutsche Bank set aside

2    so many billions of dollars in an escrow account for you,

3    right?

4           DEFT. JOHNSON:  $700,070,000 was deposited in an

5    escrow account to purchase this particular judgment in

6    question.

7           THE COURT:  Do you know who?

8           DEFT. JOHNSON:  Heiko Lotz.

9           THE COURT:  Who?

10          DEFT. JOHNSON:  Heiko Lotz was the employee.

11          THE COURT:  Where is that person?

12          DEFT. JOHNSON:  I don't know.

13          THE COURT:  This is you -- You have --

14          DEFT. JOHNSON:  I know you keep trying to put the due

15   diligence on me.  I'm trapped in a box with no phone calls,

16   nothing.

17          THE COURT:  I can't help that.

18          DEFT. JOHNSON:  I know, but I believe the bank should

19   be requested for documents, because it's hard to obviously get

20   a bank to come to the hearing.

21          THE COURT:  Who else would know that?  How do you

22   know that?  From one of your other witnesses?

23          DEFT. JOHNSON:  Stephen and Jackie would know that.

24          THE COURT:  Okay.  They can testify to that, then,

25   all right?  But I don't see any need to subpoena the Deutsche

1    Bank.

2           Angela Clemmons, again, had direct contact with

3    Stephen Sherak.  He could testify as to timeline.

4           DEFT. JOHNSON:  That's fine.

5           THE COURT:  I'm not going to subpoena her.

6           Postmaster General?

7           DEFT. JOHNSON:  Not relevant for trial, Your Honor.

8    The documents would have been relevant, but --

9           THE COURT:  Right; not relevant.  And, of course,

10   William True and Kathy.  So, if we can get those people here

11   by the 24th, get them subpoenaed, we will have a trial.

12          DEFT. JOHNSON:  Ms. Hill is supposed to have a copy

13   of the treaty in question --

14          THE COURT:  Okay.

15          DEFT. JOHNSON: -- from Senator Cory Booker.

16          THE COURT:  Okay.  If she has it she will bring it.

17          DEFT. JOHNSON:  Okay.

18          MR. QUINLEY:  Your Honor, it may help the efficiency

19   of the proceeding if we are all in agreement as to, even

20   though unexecuted, unfiled, whether or not this is -- with the

21   number handwritten on the top of it, whether or not that is,

22   in fact, the -- I say *the instrument* -- according to

23   Mr. Johnson ratified and made to have force of law by the

24   International Courts of Justice.

25          DEFT. JOHNSON:  Correct.

```
1              THE COURT:  So, it's the nine pages.
2              DEFT. JOHNSON:  Nine pages.
3              MR. QUINLEY:  It's the nine-page document.  Do you
4    have any signed copy of it?
5              DEFT. JOHNSON:  With my signature?
6              MR. QUINLEY:  With your signature.
7              DEFT. JOHNSON:  I may.
8              MR. QUINLEY:  And, Your Honor, in the interest of
9    reciprocal discovery, I would ask that the Defendant produce
10   the one that he signed.
11             DEFT. JOHNSON:  If I don't, I would be glad to
12   execute one for you.
13             THE COURT:  What?
14             DEFT. JOHNSON:  I said if I don't have one signed I
15   would be glad to execute one for you.
16             MR. QUINLEY:  All the ones that have been sent all
17   over are unsigned.
18             THE COURT:  Unsigned?
19             MR. QUINLEY:  Yeah, and he just offered to sign it
20   now.
21             THE COURT:  Okay.
22             MR. QUINLEY:  So, yeah.  But I was asking if there's
23   a historical --
24             THE COURT:  Yeah, is there a historical signed
25   document?
```

1          DEFT. JOHNSON:  I will check my records, because my

2    records have been trashed many times.  If I have it I will be

3    glad to bring it, you know.

4          THE COURT:  Okay.

5          DEFT. JOHNSON:  No problem.

6          THE COURT:  Okay.  Anything else?

7          MR. QUINLEY:  Now, the marshals will be serving the

8    subpoenas?

9          THE COURT:  Yes.

10          MR. QUINLEY:  If they can keep the parties apprised

11   of their progress.

12          THE COURT:  We will need to get addresses and all

13   that stuff.

14          DEFT. JOHNSON:  Mr. Sherak is in custody at least as

15   a supervised release.  I don't know if a separate habeas needs

16   to be created for him, but --

17          MR. QUINLEY:  So, not in custody, but under

18   supervision?

19          DEFT. JOHNSON:  Yes.

20          MR. QUINLEY:  Okay.  So that will make it even

21   easier.

22          THE COURT:  Yeah, that will make it easier.

23          DEFT. JOHNSON:  In Philadelphia.  I'm sure you guys

24   will find him.

25          MR. QUINLEY:  I won't be looking for him, but the

1    marshals will.

2           THE COURT:  Okay.  Anything else?  We will start on

3    the 24th.

4           MR. QUINLEY:  Your Honor, when would you like jury

5    instructions to be submitted?  By Friday?

6           THE COURT:  Yes.

7           MR. QUINLEY:  All right.  We will submit those

8    directly to the Court and we will make arrangements to deliver

9    a set to Mr. Johnson.

10          THE COURT:  Okay.

11          DEFT. JOHNSON:  Am I going to be getting the informal

12   discovery request?

13          MR. QUINLEY:  There are a couple of other things that

14   may or may not be pending before the Court, Your Honor.

15   Mr. Johnson filed a request for mental evaluation.

16          THE COURT:  Oh, yes; yeah.  The Court is going to

17   deny that.  You know, just from this -- You want to argue

18   Mr. Quinley's mental state?

19          DEFT. JOHNSON:  Well, look, if you want to dismiss

20   it, you dismissed it.  My position is this is -- this absurd,

21   fanciful, lack of reality is a concern, but, you know, what

22   are we going to do.

23          THE COURT:  Court's going to deny that.

24          MR. QUINLEY:  In addition, Mr. Johnson referred to

25   informal discovery.  He's conferred directly by letter with

1   Counsel.  I have not responded, but some of the communication

2   was a definition for money, a definition for sovereign

3   citizen, a definition -- There were a number of requests for

4   me to define terms.  I'm not responding to it.  If Mr. Johnson

5   wants to make a motion to the Court, I would respond to the

6   Court.

7           There may be other things like that out there.  I

8   think that's what he labeled informal discovery.  But, as far

9   as the actual discovery, we have provided everything relevant

10  to the matter in the possession of the Government and,

11  frankly, anything that Mr. Johnson identified as relevant that

12  we did not originally have; for instance, the file -- the case

13  file of FBI Agent Steven Jeschke on the Sherak matter where

14  documents of Mr. Johnson's were seized from Mr. Sherak upon

15  his release from prison.  And Mr. Sherak did not cooperate at

16  that time.  No, we haven't gone back to Mr. Sherak, but Mr.

17  Sherak was not cooperative with Agent Jeschke.  But, at any

18  rate, all the documents from that have been provided.

19          In addition, Your Honor, the Defendant by his

20  communications has had a number of YouTubes posted by Reverend

21  Rudy Davis and some others, and correspondence of his read --

22  We are attempting -- Actually, now we have the CDs of those

23  YouTubes that we have located and we are going to be

24  delivering those to the prison, as well.  In one of those

25  YouTubes was the response of the Library of Congress.

1              THE COURT:  Okay.

2              MR. QUINLEY:  So, we will also get a copy of that

3     right now, and before -- with permission of security personnel

4     let Mr. Johnson read it here before he leaves.

5              THE COURT:  Before they take him back.

6              MR. QUINLEY:  So, unless Mr. Johnson -- Yeah, he had

7     the additional matter of informal discovery.  I may have

8     forgotten or overlooked something, so --

9              DEFT. JOHNSON:  I'll make it simple.  I asked for

10    court records for the habeas proceeding, the bankruptcy

11    proceedings, and those were not part of the bill of

12    particulars.  They were just informal request for court

13    records.

14             MR. QUINLEY:  You know, those were proceedings that

15    Mr. Johnson initiated that were -- that are now closed, and I

16    assume Mr. Johnson has all of the own records in his own

17    proceeding.  If not, we can print out -- I printed out the

18    memorandum, the two memorandum and orders, and I printed out a

19    docket if he wanted to be more specific as to more particular

20    things, but I imagine they are thin files.  He's also asked

21    that they be certified copies.  The bankruptcy records --

22    Again, his own proceeding, I'm assuming he has the records.

23    We are not going to require certification for foundation.

24             DEFT. JOHNSON:  That's fine.

25             MR. QUINLEY:  We are just going to provide -- You

```
 1  know, like I say, I think in this case he already has it.  As
 2  a courtesy, if it's necessary, we can print it out.
 3          DEFT. JOHNSON:  That's an assumption again.  I asked
 4  for it, because I don't have complete records in regards to
 5  those proceedings.  Documents get stolen from me all the time
 6  at this facility.  I was put in the SHU as part of retaliation
 7  for the bankruptcy filings.  I had no access to copy machines.
 8          THE COURT:  We will get those documents.  We will
 9  print them out for you.
10          DEFT. JOHNSON:  Okay.
11          MR. QUINLEY:  We can print out the two proceedings.
12  And the bankruptcy proceedings, each of the two files which
13  are nearly identical, are very --
14          DEFT. JOHNSON:  I asked for one.
15          MR. QUINLEY:  You only need one?
16          DEFT. JOHNSON:  The second one would be redundant.
17          MR. QUINLEY:  It is redundant.  Okay.  So, we will
18  copy Mr. True's.
19          DEFT. JOHNSON:  All right.
20          MR. QUINLEY:  Okay.  We will do that, Your Honor.
21          THE COURT:  Okay.  That will be all.
22          THE CLERK:  All rise.
23          Court's adjourned.
24
25
```

1                          *   *   *   *   *   *   *

2

3       I certify that the foregoing is a correct transcript from the
        record of proceedings in the above-entitled matter.

4

5       /S/ Stephanie K. Rennegarbe              09/24/2018
        Certified Shorthand Reporter

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25