1                    IN THE UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF ILLINOIS
2

3   UNITED STATES OF AMERICA,          )
                                       )
4              Plaintiff,              )
                                       )
5   v.                                 )   No. 18-cr-40043-JPG-1
                                       )   Benton, Illinois
6   KURT F. JOHNSON                    )
                                       )
7              Defendant.              )

8

9
                        TRANSCRIPT OF PROCEEDINGS
10                     **SENTENCING PROCEEDINGS**

11              BEFORE THE HONORABLE J. PHIL GILBERT
                   UNITED STATES DISTRICT JUDGE
12
                        SEPTEMBER 5, 2019
13
    APPEARANCES:
14
    FOR THE PLAINTIFF:      William E. Coonan, Esq.
15                          Assistant United States Attorney
                            #9 Executive Drive
16                          Fairview Heights, IL  62208
                            618-628-3700
17                          Liam.Coonan@usdoj.gov

18  FOR THE DEFENDANT:      Robert L. Elovitz, Esq.
                            Law Offices of Robert L. Elovitz
19                          521 St. Louis Street
                            Edwardsville, IL  62025
20                          618-692-4800
                            elovitzlaw@gmail.com
21

22              Stephanie Rennegarbe, RDR, CRR, CBC
                        IL CSR #084-003232
23                       301 West Main Street
                          Benton, IL  62812
24                          618-439-7735
                Stephanie_Rennegarbe@ilsd.uscourts.gov
25

1                          I N D E X

2

   **WITNESSES CALLED ON BEHALF OF THE DEFENDANT:**

3
                                                     PAGE
4

5    RICHARD WARREN
        Direct Examination by Mr. Elovitz          26
6
     STEPHEN SHERAK
        Direct Examination by Mr. Elovitz          31
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings began in open court at 9:07 a.m.)

2                  ***************************

3          THE CLERK:  *United States of America v. Kurt F.*

4  *Johnson*, case #18-40043.  This matter comes before the Court

5  on a sentencing.  Are the parties ready?

6          MR. COONAN:  Yes, ma'am.  Liam Coonan on behalf of

7  the United States.  Good morning, Your Honor.

8          THE COURT:  Good morning.

9          MR. ELOVITZ:  Good morning, Your Honor.  Rob Elovitz

10  on behalf of the defense, and we are ready to proceed.

11          THE COURT:  Let the record show that the Defendant,

12  Kurt Johnson, is present in court with counsel, Mr. Elovitz.

13  Mr. Coonan is present on behalf of the Government.

14          This matter comes before this Court for sentencing.

15          Mr. Johnson, will you please stand?  A written

16  Presentence Investigation Report, which has been revised --

17  And the latest one is dated May 20 of this year, is that

18  correct, Caleb?

19          PROBATION OFFICER:  Yes.

20          THE COURT:  -- May 20th of this year, has been

21  prepared to assist me in sentencing you.  Have you received a

22  copy of that report?

23          DEFT. JOHNSON:  Yes.

24          THE COURT:  Have you had an opportunity to read it?

25          DEFT. JOHNSON:  Yes.

1          THE COURT:  You filed some objections to the report,

2    and then when the Court appointed Mr. Elovitz to represent you

3    he filed some amended objections on August 16th of this year

4    incorporating your *pro se* objections, as well as additional

5    objections to the Presentence Investigation Report, and then

6    there was an addendum to the report dated August 30 of this

7    year.  Have you had a chance to read and review that document?

8          DEFT. JOHNSON:  Yes.

9          THE COURT:  Other than the objections made by you and

10   your attorney, are there any other errors, corrections,

11   alterations, or additions to the report which you wish to make

12   to it?

13         DEFT. JOHNSON:  Not that I'm aware of.

14         THE COURT:  Mr. Elovitz, other than the objections

15   that you have filed, are there any other objections to the

16   report that would affect the advisory guideline range?

17         MR. ELOVITZ:  No objections that would affect the

18   advisory guideline range.

19         THE COURT:  Okay.  You may be seated.

20         MR. ELOVITZ:  Thank you.

21         THE COURT:  Mr. Coonan, does the Government have any

22   objections to the report that would affect the advisory

23   guideline range?

24         MR. COONAN:  No, thank you, Your Honor.

25         THE COURT:  All right.  Mr. Elovitz, let's go through

1    the objections.  Objections 1 through --

2            PROBATION OFFICER:  13.

3            THE COURT:  -- yeah, 1 through 13 were filed by Mr.

4    Johnson, and then objections beyond that, 14, 15, 16, and 17,

5    were filed by you, is that correct?

6            MR. ELOVITZ:  That's correct, Judge.

7            THE COURT:  And the objections -- The main

8    objections, as I look at it, that affect the guideline range

9    are the objections to intended loss and the four-level

10   enhancement for leadership role.

11           MR. ELOVITZ:  That's correct, Your Honor.

12           THE COURT:  Then you also have, I guess, an argument

13   for some kind of variance based upon Mr. Johnson saving a

14   man's life in Terre Haute, is that correct?

15           MR. ELOVITZ:  Those are all correct, Your Honor.

16           THE COURT:  Okay.  So, that's what we need to -- So,

17   let's go through these Objections 1 through 13 first, and then

18   we will get to the intended loss.

19           Objection #1.  The Defendant objects to the

20   California identification number on page two of the PSR.  And

21   the response was that that was corrected.

22           So, is there -- So that, Mr. Elovitz, was corrected?

23           MR. ELOVITZ:  That's correct, Your Honor.

24           THE COURT:  Okay.  So, the Court will adopt the

25   response, because it was corrected.

 1              Objection #2.  Again, both pieces of information were

 2    from a prior PSR, had to do with the Florida driver's license,

 3    and in that report the Defendant has the alias name *Kurt J.*

 4    *Johnson*; therefore, no changes -- the Probation Officer

 5    recommended no changes to make regarding page two of the PSR.

 6              Any argument regarding that?

 7              MR. ELOVITZ:  There's no argument concerning that.

 8              THE COURT:  The Court is going to adopt the response

 9    from Probation.

10              Objection #3, Defendant objects to paragraph 6 which

11    uses the term *sovereign citizen*, as the Defendant asserts he

12    makes no mention of what that term means -- as this makes no

13    mention of what the term means and no sense on its face since

14    it's an oxymoron.  Without definition, according to Defendant,

15    it is impossible to understand what is being said.

16              And the response:  According to the records received

17    from the Bureau of Prisons, Mr. Johnson is identified as a

18    sovereign citizen, quote/unquote, and no change is recommended

19    by Probation.

20              The Court is going to overrule that objection and

21    adopt the Probation Officer's position, because these are

22    records from the Bureau of Prisons.

23              Objection #4.  Defendant objects to paragraph 11

24    which mentions Deborah Hood Welsh.  According to the Defendant

25    no such person is known and no relationship exists.

```
 1              In discussions with the case agent in the response,

 2   the middle name Hood may have been incorrect and, therefore,

 3   that was changed to Deborah Welsh, and that was changed in the

 4   presentence report.  Any objection to that?

 5              MR. ELOVITZ:  No, Your Honor.

 6              THE COURT:  Okay.  The Court adopts the Probation

 7   Officer's position.

 8              Objection #5, according to Defendant, paragraph 13

 9   ignores testimony at trial by the Defendant's mother that

10   Deborah is his wife.

11              Now, I guess, Mr. Elovitz, you can answer this

12   question.  I will be happy to make the change from girlfriend

13   to wife.  Is it girlfriend or wife?

14              DEFT. JOHNSON:  It's my wife.

15              MR. ELOVITZ:  He insists it's his wife, Your Honor.

16              THE COURT:  It's his wife?

17              MR. ELOVITZ:  He does insist.

18              THE COURT:  Okay.  I will have Probation make that

19   change, okay?

20              MR. ELOVITZ:  Thank you, Your Honor.

21              THE COURT:  Again, it has no effect on the guideline

22   range, but it's for clarity purposes.

23              MR. ELOVITZ:  It is, Judge.  Thank you.

24              THE COURT:  Objection #6.  The Defendant asserts

25   paragraph 15 mentions threats of lien, but lists no incidents.
```

1    None were ever factually alleged or proven at trial, according

2    to Mr. Johnson.

3              In response, according to an investigator familiar

4    with this case, exhibits provided in trial exposed the fact

5    that Defendant threatened to file liens against the Clerk of

6    Court and Judges.  This information will remain in paragraph

7    15.

8              The Court's going to overrule the objection and adopt

9    the Probation Officer's finding.  Again, this does not affect

10   the advisory guideline range.

11             Objection #7.  The Defendant objects to paragraph 22,

12   stating money is handled like, quote, ghost dope, unquote.

13   According to the Defendant it was just an imaginary figure

14   according to the Government's case-in-chief.

15             In response, according to paragraph 7 of the PSR, the

16   Defendant filed two involuntary petitions against an

17   individual (U.S. Bankruptcy Court Official Form 105) against

18   both W.T. and K.H., claiming he is owed $21 billion from a

19   judgment awarded by the World Court in Netherlands.  The

20   Defendant was found guilty of this offense on September 26,

21   and no change would be made to paragraph 7.

22             The Court is going to adopt the Probation Officer's

23   position and overrule that objection.

24             Objection #8.  The Defendant objects to paragraph 23,

25   which he asserts appears to be double counting since this

1    element is included as an element of the offense.

2           Again, the response:  2B1.1 of the guidelines is used

3    in all fraud cases.  The offense level is increased by two

4    levels if the offense involved a misrepresentation or other

5    fraudulent action during the course of the bankruptcy

6    proceeding.

7           And, Probation did not recommend any change to

8    paragraph 23 and, again, upon review, the Court is going to

9    overrule that objection and adopt the Probation Officer's

10   position.

11          Objection #9.  The Defendant objects to paragraph 43

12   which seems to factor in the State offense which was more than

13   20 years ago.  According to Defendant, the appropriate history

14   is believed to be III criminal history.

15          Criminal history and response are not assessed based

16   on date of conduct.  Points are assessed based upon the date

17   the sentence was imposed or release date from incarceration

18   for certain cases.  Mr. Johnson was assessed three criminal

19   history points in paragraph 42 because he was convicted of

20   this offense and received 300 months incarceration.  This

21   falls within 15 years of the Defendant's commencement of the

22   instant offense and under the guidelines.  The Defendant

23   committed the instant offense while serving a term of

24   incarceration imposed on March 18, 2008, in the Northern

25   District of California; therefore, two points were added.  The

1    Probation Officer believes the Court properly calculated

2    Defendant's criminal history as III.

3           The Court's reviewed the criminal history and agrees

4    with the Probation Officer's position and will overrule the

5    Defendant's objection as to the criminal history.

6           Objection #10.  Defendant objects to paragraph 55

7    which he states is not supported by any history.  It is

8    believed it was added just to pad the Government statistics to

9    obtain program funds.  This has to do with whether he --

10   Paragraph 55 has to do with drug use.

11          The information provided in paragraph 55, in our

12   current PSR, was obtained from a prior sentence report which

13   was adopted by the Northern District of California and was not

14   appealed; therefore, no change was recommended in paragraph

15   55.

16          The Court's reviewed Mr. Johnson's objection,

17   reviewed the PSR.  Again, this does not affect the guideline

18   range, but this is information from a previous presentence

19   report in the Northern District of California, which was not

20   appealed, and the Court's going to adopt the response and

21   overrule the Defendant's objection to paragraph 55.

22          Now, it doesn't mean when we get to terms of

23   supervised release whether or not drug treatment will or will

24   not be ordered here.  And the Court may delay that or may

25   postpone ordering any drug treatment until Mr. -- and review

1  that again when Mr. Johnson gets out of prison.

2  Objection #11.  Defendant objects to paragraph 79,

3  80, 93 and 94, which states all are irrelevant as they grow

4  out of falsity of paragraph 55.

5  Again, for the same reason, the Court is going to

6  overrule that objection.  Objection #10 was information that

7  was obtained in a prior presentence report, so the Court's

8  going to overrule that objection and adopt the Probation

9  Officer's position.

10  Objection #12.  Mr. Johnson objects to paragraph 99

11  which fails to mention the intervention that occurred November

12  10, 2018, at the Terre Haute CMU facility where the attempted

13  murder of Richard Warren was -- stabbing by Anthony Hammerick,

14  who had already murdered David Neil, was stopped, and a life

15  was saved.  The Defendant states Warden Bell would verify this

16  information.

17  Following the disclosure of the initial PSR, Mr.

18  Johnson was awarded monetary special award recommendation due

19  to his intervention in the assault, so this information was

20  added to paragraph 42.

21  The Court will adopt the addition to the paragraph 42

22  by the Probation which indicates that event.

23  Now we get to Objection #13, which repeats and

24  realleges 1 through 12, and the Court's already made those

25  rulings and will adopt the Probation Officer's position with

1    respects to objection 13, which were the new objection by Mr.

2    Elovitz which basically reiterated the Objections 1 through

3    12.

4            So, now we get to the objections that affect the

5    advisory guideline range.

6            Objection #14.  Mr. Johnson objects to paragraph 22

7    of the PSR as to the increase in the offense level for

8    intended loss.  According to the Defendant, the Court must

9    consider the economic reality principle and determine whether

10   he had devised an ambitious scheme that was doomed to failure

11   from the inception and which caused little or no actual loss.

12   Mr. Johnson asserts it would be unfair to sentence him based

13   on the intended, but impossible, loss of determination from

14   2B1.1 table because intended loss bears no relation to

15   economic reality.  The PSR sets forth the intended loss of $21

16   billion, which is completely illusory as it was obvious

17   neither this amount, nor any smaller portion of this amount

18   could ever be collected by Mr. Johnson.  The Defendant also

19   asserts the PSR does not disclose any economic loss to any

20   victim.  According to Mr. Johnson, the intended loss is a

21   gross overstatement of the Defendant's relevant criminal

22   conduct and a downward departure is not only warranted, but

23   mandated.

24           Does that pretty much set forth your position, Mr.

25   Elovitz?

1          MR. ELOVITZ:  It does, Your Honor, and that position

2     was set forth in greater detail in the Defendant's sentencing

3     memorandum, filed Document 99.

4          THE COURT:  Which the Court has reviewed and read.

5          MR. ELOVITZ:  Thank you.

6          THE COURT:  Anything you wish to add to your

7     memorandum?

8          MR. ELOVITZ:  I think the memorandum sets it forth as

9     clearly as I can, Judge.

10          THE COURT:  Okay.  All right.  Mr. Coonan?

11          MR. COONAN:  Nothing else to add to our sentencing

12     memorandum and our response to Defendant's sentencing

13     memorandum.

14          THE COURT:  Well, why should I use $21 billion if it

15     was impossible?

16          MR. COONAN:  Because the guidelines, as I read it,

17     indicate that we can do that.

18          For example, Your Honor, and I do believe that there

19     was a change from the old guidelines where this was in like

20     Section 2F to what is now in 2B1.1.  But, the intended loss

21     which can be used means that pecuniary harm that the Defendant

22     purposefully sought to inflict, and includes intended

23     pecuniary harm that would have been impossible or unlikely to

24     occur.  And the examples, are as in a Government's sting

25     operation or insurance fraud which the claim exceeded the

1    insured value.  That's in Sentencing Guideline 2B1.1

2    Application Note 3(A)(ii), and that would apply.

3          Now, the Court can, of course, consider a downward

4    departure and the United States does ask the Court to consider

5    that downward departure, but just to rule on our side that

6    it's outweighed by aggravating factors.  But, the -- what

7    allows that is in Application Note 21(C), downward departure

8    consideration.  There may be cases in which the offense level

9    determined under this guideline substantially overstates the

10   seriousness of the offense.  In such cases a downward

11   departure may be warranted, and then they give an example in

12   securities fraud.

13         So, United States takes the position, Your Honor, by

14   reading what's in the sentencing guidelines, that that is --

15   and I cite a few cases where -- similar cases where they use

16   that guideline amount, that high amount we will call it for

17   argument purposes right now, but then they have the Court

18   consider a downward departure.

19         So, again, Your Honor, the United States submits that

20   it's the correct number, but the Court is allowed to do a

21   downward departure.

22         THE COURT:  Okay.  Mr. Elovitz, what's the

23   Defendant's position on what loss should be applied here?

24         Well, let me ask you this:  Does it make a difference

25   on it who the Defendant is or who the victim is?

1           Let's say the victim wasn't the warden, but was Jeff

2   Bezos, who's worth $110 billion?  Does it make a difference

3   who the victim is?

4           MR. ELOVITZ:  Well, is the answer to the question the

5   same?  Could the Defendant under any possible theory, no

6   matter how many convolutions we have to go through,

7   permutations we have to apply could have gotten a penny if it

8   was Jeff Bezos?  No.  The same answer is if it was the warden,

9   because the basis under the claim under which the fraud is

10  alleged to have occurred, this judgment from a treaty with a

11  World Court, and there's no such governing body of justice

12  known as the World Court and there's no such treaty.  So, you

13  couldn't --

14          THE COURT:  But, in Mr. Johnson's mind there was.

15          MR. ELOVITZ:  Well, in his mind -- And I don't doubt

16  that, Judge.  Part of the sentencing hearing today will go to

17  who helped him foster this belief in his mind, falsely or

18  otherwise.  But, as a practical matter what he believes and

19  what reality is are two very divergent separate things in this

20  case.

21          And I wanted to bring this up, I deferred it and

22  didn't mention it in my first argument, but in this case we

23  would have to presuppose that the bankruptcy judges could

24  somehow be hoodwinked by this scheme, that somehow a cursory

25  reading of the filings in this case would somehow escape their

1   attention and it would proceed any farther than an involuntary

2   dismissal, which is exactly what occurred in this case.

3          So, I would posit to the Court if he had named Jeff

4   Bezos as the debtor that he was seeking involuntary bankruptcy

5   against and the cursory reading was this imaginary treaty that

6   didn't exist and a court that didn't exist, the same result

7   would occur, which would be the immediate involuntary

8   dismissal.

9          The basis upon which the alleged fraud was sought to

10  be perpetrated is so based in nonfact, as a layperson reading

11  it can easily see, there's no such court, there's no such

12  treaty, there could be no such judgment, without that judgment

13  there can't be the involuntary bankruptcy.  So, truly it

14  doesn't matter.  It was one of those -- such a far-fetched

15  scheme that he will take it to his grave possibly that there

16  is such a treaty, I'm sure, and I have tried to convince him

17  otherwise, Judge, and I think there's some hope that he's

18  seeing that whatever belief he had was not corrected, it was

19  fostered and advanced and furthered by Sherak and possibly

20  others to where it got to this point.  But, no, I don't think

21  the victim matters, because it's so preposterous that any

22  bankruptcy judge reading the petition would go, "Oh, heck no."

23          THE COURT:  Okay.  The Court in reading the

24  guidelines, the -- under 2B1.1, and note 3(A)(ii), *Intended*

25  *Loss* under the guidelines means, one, pecuniary harm that the

1    Defendant purposely sought to inflict.

2            I don't think there's any question that Mr. Johnson

3    purposely sought to inflict the pecuniary harm here.

4            And, two includes intended pecuniary harm that would

5    have been impossible or unlikely to occur, as in the

6    Government's sting operation or an insurance fraud in which

7    the claim exceeded the insured value.

8            And then when you get to *Pecuniary Harm*, it means

9    harm that is monetary or that otherwise is readily measurable

10   in money.  Accordingly, pecuniary harm does not include

11   emotional distress, harm to reputation, or other non-economic

12   harm.  The pecuniary harm here was the $21 billion.

13           Probation's response was according to 2B1.1, the

14   comment that I just read.  Subject to exclusions in

15   Subdivision (D), loss is the greater of actual loss or

16   intended loss.  Intended loss means pecuniary harm that the

17   Defendant purposefully sought to inflict, and includes

18   intended pecuniary harm that would have been impossible or

19   unlikely to occur, and for that reason Probation recommended

20   no change to paragraph 22.  And, for the same reason the Court

21   is going to overrule the objection, realizing the arguments

22   and acknowledging the arguments of Defendant, but I think

23   clearly under the guidelines -- And it may be a matter for the

24   Court to consider in determining the sentence, but the Court

25   feels that paragraph 22 is accurate and the Court will

```
 1   overrule and adopt the Probation Officer's position on
 2   paragraph 22 as the intended loss.
 3          Now we get to Objection #15.  It states that Stephen
 4   Sherak was not under the direction -- This has to do with the
 5   four-level increase under the aggravating role.
 6          Mr. Elovitz, anything you wish to add other than what
 7   you have filed in your sentencing memorandum?
 8          MR. ELOVITZ:  I think the sentencing memorandum
 9   speaks fairly clearly to it, Judge.  You also presided over
10   the trial and heard evidence concerning each individual's
11   alleged involvement in the case and I think the Court is in a
12   position to make that ruling based on the facts it's heard.
13          THE COURT:  Mr. Coonan?
14          MR. COONAN:  Yes, Your Honor, the United States
15   supports the position of the Probation Office and, again,
16   there was no evidence of this that came out in trial as far
17   as --
18          THE COURT:  Well, the Court heard the trial and he
19   heard the testimony of the Defendant's mother, who testified
20   for the Government in that case, and she was an unwitting
21   participant in the situation, in the fraud, and, of course,
22   Stephen Sherak, and the wife, Deborah Welsh, and then Monya
23   Ballah and father, Fred Johnson, Byron Gasher, and others
24   helped facilitate the scheme.
25          The Court, having heard the testimony at trial, feels
```

1    the four-level enhancement for aggravating role -- that the

2    Defendant was an organizer or a leader of a criminal activity

3    that involved five or more participants and was extensive, and

4    the Court's going to apply the four-level increase for

5    aggravating role in the offense and will adopt the Probation

6    Officer's position as to -- on Objection #15.

7         On Objection #16, the Defendant objects to paragraphs

8    27 and 30 of the PSR for the same reasons presented in the

9    original and amended objections.  For reasons set forth in

10   Objection #13 and response to previous objections, the

11   Defendant's *pro se* filings, no changes will be made to

12   paragraphs 27 and 30, and the Court hereby adopts the

13   Presentence Investigation Report with regard to those

14   paragraphs.

15        And on Objection #17, the Defendant objects to

16   paragraph 63 of the PSR for the same reasons presented in the

17   amended objections filed and the objections that Mr. Johnson

18   filed *pro se*, and the Court for the reasons in response to

19   objection 13 and the response from previous objections, the

20   Court's going to be adopting the Probation Officer's position

21   and adopt the Presentence Investigation Report as to Objection

22   #17.

23        Okay.  It will, therefore, be the findings of this

24   Court that based on the bankruptcy fraud, the Count Group I

25   found in USSG 2B1.1(a)(2) provides for the base level offense

1   of 6.   The Court is going to apply the 30-level enhancement,

2   because the loss exceeded 550 billion -- or million, as 20

3   billion, but for a level under 2B1.1(b)(1)(p), the intended

4   loss as this Court originally found or recently found to be

5   over 20 -- to be $20 billion, so there's a 30-level increase.

6        Because the offense involve a misrepresentation or

7   other fraudulent actions during the course of a bankruptcy

8   proceeding, under paragraph 23 a two-level enhancement will be

9   applied.

10        Under paragraph 24, because the victim was a

11   Government officer or employee and the offense of conviction

12   was motivated by the status -- by such status, a three-level

13   increase under the guidelines under 3A1.2(a), and then

14   adjustment for role in the offense, paragraph 25, as the

15   Defendant was an organizer or a leader of a criminal activity

16   of five or more participants, being Nell Leffel, Stephen

17   Sherak, Deborah Welsh, Monya Ballah, B-A-L-L-A-H, Byron

18   Gasher, and others, including his father, Mr. Johnson;

19   therefore, the four-level increase, for a total offense level

20   of 45; no acceptance responsibility.   But, a total offense

21   level of more than 43 is to be treated as an offense level 43,

22   and, therefore, it will be an offense level of 43, criminal

23   history category of III, being five criminal history points;

24   custody range on Counts 1 through 4 of up to five years; a

25   guideline provision can run consecutively up to 240 months;

1    supervised release range on Counts 1 through 4 of one to three

2    years; and a fine range of 50,000 to $250,000; and, a special

3    assessment of $100 per count, for a total of $400.

4            Based upon the rulings of this Court, any objections

5    to those guideline range findings?

6            MR. COONAN:  No, Your Honor.

7            MR. ELOVITZ:  Subject to the objections, no, Your

8    Honor.

9            THE COURT:  Subject to the objections; okay.

10           Recommendation from the Government?

11           MR. COONAN:  Thank you, Your Honor.

12           THE COURT:  First of all, we have a victim here.  Are

13   there any victims that wish to testify?

14           MR. COONAN:  No, Your Honor.  We have -- The warden

15   submitted -- or victim submitted a letter which is attached to

16   our response to Defense's sentencing memorandum.  I can get a

17   copy for Your Honor.

18           THE COURT:  Was that -- Well, it was part of your

19   sentencing memorandum, wasn't it?

20           MR. COONAN:  Our response to the sentencing

21   memorandum.

22           THE COURT:  Why don't you get that?

23           MR. COONAN:  I will, Your Honor.  Thank you.

24           THE COURT:  I think I am -- Oh, yeah, I have it here.

25   I think I have it here.  Yeah, I do have it.

1           MR. COONAN:  Okay.  Thank you, Your Honor.

2           THE COURT:  Yeah, I have it here.  That was dated

3    September 4th.

4           MR. COONAN:  Yes, Your Honor.

5           THE COURT:  Yeah, the Court has that.

6           MR. COONAN:  Your Honor, the United States recommends

7    the low end of the guidelines, which would be 20 years of

8    imprisonment, to be served consecutive to his current federal

9    term of imprisonment.  20 years would come about by stacking

10   the four counts consecutively.

11          And, I'm just going to hit it, because it was a topic

12   that came up as far as a downward departure.  The United

13   States again requests that the Court do, in fact, consider a

14   downward departure but that it does not give a downward

15   departure because of aggravating circumstances.

16          Those circumstances would be as follows, Your Honor:

17   The Defendant had a *mens rea*.  That's what he intended to do,

18   whether it was unlikely or not.  And, as far as unlikely or

19   impossible, the Bankruptcy Court had to have a hearing on it,

20   so it wasn't something that they just got rid of and closed it

21   right away.  So, they had -- You know, the two victims had to

22   appear and so there was something going on with this, Your

23   Honor.

24          The second thing is that it's not about the money,

25   Your Honor, necessarily.  It's the other motive that's causing

1  emotional harm to other folks, these folks being federal

2  employees.  It's not the, you know, rich guy on a Caribbean

3  island.  These are folks that are entrusted and in charge of

4  supervising federal inmates, and this is a way to intimidate

5  those who are -- have that, you know, atlas-like

6  responsibility, and it's not the first time that the Defendant

7  has done this.  He did that back in California against Judges,

8  AUSAs, and BOP personnel.  So, that's an aggravating factor

9  and it's -- we need these responsible people not to be

10 intimidated or harmed by the federal inmates and otherwise

11 control is lost, there's -- it can be done, you know, as soon

12 as one inmate finds out, "Oh, I can do this, I can intimidate

13 a federal employee, the warden, whoever, staff member, and,

14 you know, I get to do things my way, I am now in charge," so

15 to speak.

16        So, you know, the victims had to worry about their

17 credit reports, they were getting -- because it was in the

18 bankruptcy court there's businesses that tracked this that

19 have limited access to ECF, so the victims were getting

20 letters from folks, you know, telling them how they can avoid

21 bankruptcy, how to deal with it and such, and that's horrible.

22        And then more particular, you know, kind of a third

23 point, but I kind of already addressed it, Your Honor, is,

24 yes, that motive, but also it's targeting these individuals.

25 It's not somebody saying, "Oh, I hate the BOP."  This is

1    somebody actually doing something to particular people, and

2    then there was a list he had of 28 other BOP staff members

3    that he was or was going to target, as well.

4            The other thing is -- And I am referring to the PSR,

5    Your Honor.  It's on page eight, paragraph 40.  What that is,

6    Your Honor, is it's a previous conviction that got zero

7    points, but it's for selling unqualified securities back when

8    the gentleman, the Defendant, was age 28, so it's outside the

9    normal range, and he got five years and eight months of

10   imprisonment.  Again, Your Honor, page eight, paragraph 40.

11   So, that wasn't put into the calculus of the guidelines and,

12   but, you know, Your Honor, the United States submits that this

13   is the same kind of thing that he's doing; it's falsehood.

14   Like for there he obtained a false driver's license in the

15   name of Kay Clayton Knight which he used to perpetrate this

16   particular ponzi scheme.  So, he can't just help himself, Your

17   Honor.  The last bit I was summarizing, the second last

18   paragraph on page nine, Your Honor.

19           And then, of course, what is counted for is that

20   Northern District of California conviction where he's -- he

21   was -- he was being detained and he and another guy filed

22   fraudulent tax forms and other documents charging debt against

23   what I mentioned earlier, Your Honor; Judges, Assistant U.S.

24   Attorneys, and Bureau of Prisons staff.  He's doing this while

25   he's detained.  There's -- He's unstoppable, and the United

1  States respectfully submits that 20 years of imprisonment to

2  be served consecutively at least keeps him away, because I'm

3  sure, well, he would do much more damage if he was out of the

4  prison.  But, right now, don't get me wrong, he's got that

5  motive to go after the folks that are in charge.

6          So, for those reasons, Your Honor -- And, if Your

7  Honor has any questions of me I would accept them.  But, a

8  minimal fine, if any fine, and the maximum supervised release

9  the United States would request, and certainly the $400 in

10 special assessments, Your Honor.

11          THE COURT:  Okay.

12          MR. COONAN:  Thank you, Your Honor.

13          THE COURT:  Thank you.  Mr. Elovitz, any evidence by

14 way of mitigation and your recommendation?

15          MR. ELOVITZ:  Yes, Your Honor.  I had previously

16 issued a request for a writ for a Richard Warren and I would

17 like to call him to testify at this time.

18          THE COURT:  Okay.  Is he downstairs, I assume?

19          Have them bring Richard Warren up.

20          (Brief interruption in proceedings)

21          THE COURT:  Mr. Warren, come on up here and please be

22 sworn.

23          (Defense witness, Richard Warren, sworn).

24          THE CLERK:  Please be seated.  Please state your full

25 name and spell your last name for the record, and speak

1    clearly into the microphone.

2             MR. WARREN:  Richard Warren, W-A-R-R-E-N.

3             THE COURT:  You may proceed.

4             MR. ELOVITZ:  Thank you, Your Honor.

5

6                         DIRECT EXAMINATION

7    BY MR. ELOVITZ:

8    Q.  Mr. Warren, where is your current residence?

9    A.  I'm at the CMU in Marion.

10   Q.  Okay.  And before you were at Marion were you in the CMU

11   in FCI-Terre Haute?

12   A.  Yes, sir.

13   Q.  And while you were there did you have an occasion to

14   become acquainted with the Defendant in this case?

15   A.  Who's the Defendant?

16   Q.  The Defendant is Kurt Johnson seated at the table over

17   there.

18   A.  I didn't have my glasses on.  Yes, I -- yes.

19   Q.  Are you familiar with Kurt Johnson?

20   A.  Yes, sir.

21   Q.  Okay.  While you were in the CMU in Terre Haute were you

22   the victim of a violent attack?

23   A.  I was.

24   Q.  Do you remember when that occurred?

25   A.  November 10th, last year, at exactly 6:40 p.m.

```
 1    Q.  And can you describe that attack to the Judge?
 2    A.  Yes, sir.  Mr. Johnson and Mr. Landers, myself, and Mr.
 3    Neil, who was killed the same night by the same man that
 4    attacked me and tried to kill me, were all watching a DVD.
 5    I'm a Christian minister, ordained minister, and we hold
 6    Christian services from 6 p.m. until 8 p.m. every evening in
 7    the chapel.  We were watching a Christian DVD.  I believe it
 8    was Jeremiah.  And the second part of that we couldn't watch
 9    because we had to surrender the chapel at 8:00 to a group of
10    Muslim fellas that had it from there until 9:15.  Mr. Johnson
11    and Mr. Neil got up at exactly 6:32, and I know because I'm
12    the one that runs that, and we didn't have enough time to
13    watch the second part.  They got up and left.  Mr. Landers and
14    I stayed there, and we have to set the table up, get the
15    chairs put away and the TV and DVD and all that kind of stuff.
16    And, at exactly 6:37, Mr. Landers, who was in cell 19 -- I was
17    in cell 20, David Neil was in cell 21.  We entered our cell,
18    and right away, of course, having sat there, we needed to use
19    the restroom.  We are supposed to block our window when we do
20    that, so we just put a towel up there.
21         As soon as I had taken my towel down to dry my hands,
22    one person by the name of Anthony Hammerick was standing at my
23    door.  Anthony Hammerick used to come in and speak with me,
24    and in my cell right across from my bunk I have a chair and he
25    would sit there, and we would sit there and talk about four or
```

1    five minutes.  I thought that's what was going to happen, so I

2    turned toward my bunk to go to my bunk and sat down.  He

3    grabbed me from behind.  He had a seven-inch ice pick with a

4    list of names, mine being at the top of that list, and a rag.

5    He stabbed me here (indicating) and it hit my bone and pushed

6    the ice pick up in his hand.  I elbowed him and knocked him up

7    against my locker that stood beside the door and I turned to

8    face him.  He then held that up, pulled it down, flipped it

9    over and started stabbing me.  He stabbed me -- Of course, I

10   warded it off -- the blows off with my left hand, and he

11   stabbed me five times across my hand and nine times across my

12   abdomen.

13        Having said that, when I -- he was stabbing at me and

14   I am trying to fight him off with my hands, I yelled out and I

15   kicked him and knocked him up against the sink, which was

16   beside the door.  He then came at me again and he stabbed me a

17   number more times, one of them pretty serious in my stomach,

18   and I yelled again.  At that very moment, Mr. Johnson was

19   walking by, down the hallway, and he stepped in between me and

20   Mr. Hammerick.  And Mr. Hammerick, when I hit him and knocked

21   him back, when I had yelled, he dropped both the note, the

22   rag, and the weapon on the ground.  Mr. Johnson stood between

23   me and him.  He then -- Mr. Johnson told him he doesn't know

24   what's going on, but enough is enough.  He reached down,

25   picked up his thing and left.  Mr. Johnson then also turned

1   around and left.  The only glimpse I had of a note knowing

2   that my name was at the top of that note.  And, by the way, we

3   were attacked because we were Christians, and he made that

4   very clear.  I had no idea until later on that night I got to

5   the hospital, Union Hospital, that David Neil had even been

6   killed by the same person with a single stab wound to the

7   heart, and then afterwards he tried to cut his head off,

8   literally sliced his neck around.

9   Q.  And, so, Mr. Warren, I want to -- this attack on Mr. Neil,

10  would it had to have occurred just seconds before the attack

11  on you?

12  A.  Yes.

13  Q.  Because you all entered your cells at the same time; is

14  that your testimony?

15  A.  No.

16  Q.  Okay.

17  A.  Mr. Neil and Mr. Johnson had left a few minutes -- Mr.

18  Landers and I have to stay --

19  Q.  Oh, I see.

20  A.  -- and put the room back in order for the next group.  So,

21  they left at exactly 6:32 p.m., because I'm looking right at

22  my watch.  We entered our cells at 6:37, this happened at

23  6:40.

24  Q.  So, do you think Mr. Neil was already dead at that point?

25  A.  Yes, sir, but I didn't know that until I got to the

1    hospital.

2    Q.  And do you believe that were it not for the actions of

3    Mr. Johnson that Mr. Hammerick would have retrieved his weapon

4    and finished his attack upon you?

5    A.  I believe he would have tried to do that, yes, because

6    that was his intent.

7    Q.  Just one more question.  Prior to today have you ever held

8    the title of hearing officer in any function at all, any

9    capacity in any employment?

10   A.  Me?

11   Q.  Yes.

12   A.  No.

13   Q.  Okay.

14           MR. ELOVITZ:  I don't have anything further, Judge.

15           THE COURT:  Cross-examination?

16           MR. COONAN:  No, thank you.

17           THE COURT:  You may step down, you are excused.

18   Thank you.

19           Next witness?

20           MR. ELOVITZ:  Stephen Sherak I would call as a

21   witness.

22           THE COURT:  Okay.  Stephen Sherak.

23           Please approach the witness chair.

24           Please raise your right hand to be sworn.

25           (Defendant witness, Stephen Sherak, sworn).

```
 1                THE CLERK:  Please be seated.

 2                MR. SHERAK:  Thank you.

 3                THE CLERK:  Please state your full name and spell

 4    your last name for the record, and speak clearly into the

 5    microphone.

 6    A.  Stephen Isaac Sherak; S-H-E-R-A, as in apple, K, as in

 7    kangaroo.

 8                THE COURT:  You may proceed.

 9                MR. ELOVITZ:  Thank you.

10

11                          DIRECT EXAMINATION

12    BY MR. ELOVITZ:

13    Q.  Mr. Sherak, where are you currently residing?

14    A.  Marion United States Penitentiary.

15    Q.  And why are you there?

16    A.  I'm here on a violation and new charge.

17    Q.  A violation of what?

18    A.  Supervised release.

19    Q.  And what were you on supervised release for?

20    A.  Bank fraud and counterfeit checks.

21                THE COURT:  Can you kind of speak closely into the

22    microphone?

23    A.  I apologize.  Bank fraud and counterfeit checks.

24    Q.  Was it a violation of your supervised release that you are

25    back on?
```

1  A.  I'm back on a new charge and the violations.

2  Q.  What's the violations based on?

3  A.  There's multiple Grade Cs and Grade Bs, from being out of

4  district, being in contact with other inmates, and getting a

5  new charge.

6  Q.  Is one of the other inmates you have been alleged to have

7  contact with Kurt Johnson?

8  A.  That is correct.

9  Q.  And do you see Kurt Johnson in court today?

10  A.  I do.

11  Q.  Where is he?

12  A.  Standing right behind you in a white T-shirt.

13  Q.  Is he seated or standing?

14  A.  Seated.

15  Q.  Were you ever incarcerated in the same unit as

16  Mr. Johnson?

17  A.  Yes, I was.

18  Q.  And when would that have been?

19  A.  If I'm not mistaken the dates were between the end of

20  2015, maybe, to 2017.

21  Q.  And where would that have been?

22  A.  That was at the United States Penitentiary in Marion.

23  Q.  What unit were you in together?

24  A.  I-Unit, Communications Management Unit.

25  Q.  Okay.  What is your mother's name?

1   A.   Faith Sherak.

2   Q.   Okay.  And do you have any siblings; brothers or sisters?

3   A.   I have a brother and sister.

4   Q.   What's your brother's name?

5   A.   Alexander Sherak.

6   Q.   And, your sister?

7   A.   Jacqueline Sherak.

8   Q.   And, to the best of your knowledge has your sister ever

9   been employed by the Abu Dhabi Commercial Bank?

10  A.   She was with Syria National Bank and then the ADCB for

11  about nine years.

12  Q.   Okay.  I filed a sentencing memorandum and attached an

13  Exhibit 1 to that.  Let me show you this that I have attached.

14  A.   Okay.

15  Q.   Do you recognize that Exhibit 1?

16  A.   I do.

17  Q.   What is that?

18  A.   That is an offer for a judgment and a monetary judgment

19  for Mr. Johnson.

20  Q.   Okay.  Could you tell us about this?  This isn't the first

21  time you have seen this, correct?

22  A.   I mean, it's been a few years.  It's first time I have

23  seen it since maybe 2017.

24  Q.   Okay.  And, at the time did you have an iCloud account

25  S.Sherak@iCloud.com?

1    A.  Yes, I still have that.

2    Q.  You still have that; okay.  And was this Exhibit 1

3    e-mailed to your iCloud account?

4    A.  It was e-mailed to the iPhone account.  It's not an iPhone

5    account, it's an Apple account.  But, it was e-mailed to it.

6    I probably opened it up on my iPhone, that is correct.

7    Q.  And do you know who e-mailed this to you?

8    A.  That was e-mailed to -- No, I know -- I mean, I know who

9    e-mailed it to me, my sister.  But I e-mailed that directly

10   from my phone to Sarasotanell, which is, I believe, Kurt

11   Johnson's mother.

12   Q.  Okay.  And in this is your sister forwarding a

13   communication that says that the Abu Dhabi Commercial Bank is

14   going to offer $281 million for Mr. Johnson's judgment?

15   A.  I don't believe it says from my sister.  I believe it's

16   from someone else.  I believe it says from Abdul Shahaf Sayeed

17   and Alain Marquees, but I believe it does say to contact my

18   sister.

19   Q.  And this would have come to you via your sister, correct?

20   A.  I mean, it came from a different person.  It didn't come

21   from my sister.  It shows who it came from at the top.

22   Q.  Okay.  And did you forward this to Kurt Johnson?

23   A.  I didn't forward it to Kurt Johnson.  I forwarded it to

24   his mother.

25   Q.  Now, had you discussed an alleged $21 billion judgment

```
 1    that Kurt Johnson received with him?

 2    A.   Have I discussed it with who?

 3    Q.   With Kurt Johnson.

 4    A.   Oh, multiple times.

 5    Q.   Multiple times.  And did you at some point tell

 6    Mr. Johnson that an attorney by the name of Elliot Wiesner or

 7    Wiesner had secured documents in the case?

 8    A.   Elliot Wiesner helped me get in touch with my sister and

 9    helped me provide information regarding a treaty, that's

10    correct.

11    Q.   What treaty are we talking about?

12    A.   To this day I was sitting down in the bullpen trying to

13    remember it.  It's a corporation resolution contract treaty,

14    and I can't remember the original name.  It wasn't the

15    original name, which was the administrative prior remedy

16    process treaty, but it was a different name, and to this day I

17    cannot remember it.  Maybe if you have some refresher I would

18    be able to.

19    Q.   Well, and so did you then confirm to Mr. Johnson the --

20    that this treaty did, in fact, exist that he was talking

21    about?

22    A.   Over two years ago, maybe three and a half years ago.

23    Q.   Okay.  And did you tell him you would assist him in

24    obtaining a judgment in this -- against -- or using this

25    treaty?
```

1   A.   No.

2   Q.   Did you tell him you would help get him copies of a

3   judgment that he believed he had obtained?

4   A.   I told Mr. Johnson from the beginning he was having -- he

5   didn't have any people, excuse me, to contact on the street in

6   order to find this.  We had called the Library of Congress.  I

7   helped Mr. Johnson procure the information about the treaty.

8   Everything was done through other sources.  But, at the time

9   prior to me leaving there was a talk between Mr. Johnson and I

10  about receiving a formal copy, as well as a certified copy of

11  the judgments to him upon release.

12  Q.   Okay.  And did you have any communications with this

13  Elliot Wiesner about this treaty and about this judgment?

14  A.   I mean, I have spoken with him multiple times.

15  Q.   About this judgment?

16  A.   About Mr. Johnson.  Not about the specific judgment, no;

17  that's incorrect.

18  Q.   Okay.  What did you speak to Mr. Wiesner about

19  Mr. Johnson?  What was that conversation or conversations

20  concerning?

21  A.   Well, Mr. Johnson had written Mr. Wiesner, and Mr. Wiesner

22  was a little baffled, because his e-mails -- or actually his

23  letters and his e-mails seemed a little, as Mr. Wiesner said,

24  loopy, and he thought he was a little crazy.

25          Stop laughing, Kurt.

1            Excuse me.  And, at the time he said, "Stephen, I

2    feel very uncomfortable talking with this person."  And I

3    said, "All right.  We will deal with a different attorney, if

4    that's the case."

5    Q.  Let me show you something that's been marked as Exhibit 2

6    in my sentencing memorandum.  Take a look at this Exhibit 2,

7    Mr. Sherak, and see if you recognize that document.

8    A.  Can I hold the paper?

9    Q.  That's going to be up to the Court.  I usually with

10   prisoners don't let them out of my hands.

11   A.  I just need to take my glasses off.  I can barely see it.

12           THE COURT:  He can hold it.

13   Q.  That'll be fine.

14   A.  Reading from the top, correct?

15   Q.  No, I am just asking if you recognize the e-mail.

16   A.  I mean, it's an e-mail.  I recognize it as an e-mail.

17   Q.  Will you read it and see if you recognize the contents?

18   A.  That makes more sense, thank you.

19           It is over three years old, but, I mean, it's

20   probably something that went through my -- looks as something

21   I've done.  I don't remember it word for word, but it sounds

22   familiar.  There were many e-mails sent.

23   Q.  Okay.  And does this e-mail concern something from --

24   allegedly from Elliot Wiesner about a judgment?

25   A.  It concerns an e-mail that I wrote to Elliot.

1    Q.   Okay.  And does it mention World Court Main Offices?

2    A.   Give me a second.

3             Yes, in the e-mail that I received, correct.

4    Q.   And in this e-mail is it allegedly from Elliot Wiesner

5    saying there are certified copies with seals of a judgment in

6    this case?

7    A.   I mean, I don't know if it -- It says, "Forwarded info,"

8    so I can't be guaranteed, but it says "Elliot" on the bottom,

9    so I'm assuming that it is.

10   Q.   But, your testimony has been that Elliot Wiesner wouldn't

11   have had anything to do with this, is that correct?

12   A.   My testimony is I didn't deal with Elliot as far as

13   everything.  We discussed nothing as far as -- other than the

14   procurement of the World Court judgment and as well as helping

15   me attain information, but nothing that financially settled.

16   He refused to cooperate after receiving the letters from

17   Mr. Johnson.

18   Q.   Did you cause Mr. Johnson to have money sent to your

19   mother to obtain copies -- certified copies of this alleged

20   judgment?

21   A.   There was, I believe, $374 sent, that is correct.

22   Q.   And why that amount?

23   A.   I believe that's how much it was with shipping and

24   everything else.

25   Q.   And how did you determine what the shipping would be and

1   what the fees would be?

2   A.   Three years ago it came from whatever the amount was.  I

3   wasn't a hundred percent sure.

4   Q.   And where were you going to obtain the copies of this

5   judgment from?

6   A.   We were going to send it over to Hague and ask them for

7   copies of the judgment.

8   Q.   And how did you know a judgment existed?

9   A.   Like I just told you, we were -- we had information as far

10  as the person, the hearing officer that signed it.  I had

11  information through a family member that had everything taken

12  care of, as well as we had information stating that everything

13  was signed and done.

14  Q.   So, you presented all of this information that you had

15  accumulated on this alleged judgment to Mr. Johnson, correct?

16  A.   I mean, between that and discussions, yeah, but there was

17  nothing presented, there was no physical evidence.

18  Q.   I understand there was nothing physical, but you told

19  Mr. Johnson repeatedly that the judgment existed, is that

20  correct?

21  A.   That is correct.

22  Q.   You told Mr. Johnson if he gave your mother $374 she would

23  obtain certified copies of this judgment, is that correct?

24  A.   No, that's incorrect.

25  Q.   Okay.  I'm sorry, I misunderstood your testimony.  What

1   was the money for?

2   A.  Mr. Johnson said he would like a copy of the certified

3   judgment.  I said, "Here's what you do to get it."  He said,

4   "Well, do you have someone that could do it for you?"  I said,

5   "I will ask my mom to do it."  And, that's basically it.  I

6   never offered, I never did anything.  All I did was, "I'll

7   ask."

8   Q.  But in your conversations -- your repeated conversations

9   with Mr. Johnson, you repeatedly informed him both of the

10  existence of this judgment and its validity, is that correct?

11  A.  I never said *validity*; I said *existence*.

12  Q.  So, what did you do yourself or have anyone else do to

13  confirm the existence of this judgment?

14  A.  We read a treaty and looked at the paperwork.

15  Q.  Who's *we*?

16  A.  Mr. Johnson and I.

17  Q.  Okay.  And, so to confirm the existence of the judgment

18  what did you do other than tell Mr. Johnson?

19  A.  We didn't have the ability to confirm it.  We did

20  everything with just a hope and a prayer.

21          MR. ELOVITZ:  I don't have anything further, Judge.

22          THE COURT:  Any cross-examination?

23          MR. COONAN:  No, thank you, Your Honor.

24          THE COURT:  Okay.  You may step down.  Thank you.

25          Any other witnesses?

```
 1              MR. ELOVITZ:  Judge, no other witnesses today.

 2              THE COURT:  Okay.  Your recommendation?

 3              MR. ELOVITZ:  Judge, I would like to start off with a

 4    brief reference -- and you hate to do it as you get older --

 5    but to life expectancies.  I checked the Social Security

 6    actuarial tables this morning.  And, so, for a white male, age

 7    56, you can count on just under an additional 25 years of life

 8    expectancy.  That would put Mr. Johnson right around age 81.

 9    He was sentenced, I believe, at age 43, to a 25-year sentence.

10    That would put him at age 68.  Given the Government's

11    recommendation, the Court would -- it would have the Court

12    impose a sentence to where release of the Defendant would

13    occur seven years after his life expectancy.  He would be

14    there until he was age 88.

15              Now, we are talking --

16              THE COURT:  According to the presentence report his

17    projected outdate under his Northern District of California

18    case is December of 2027, which is eight years from now.

19              PROBATION OFFICER:  That changed, though, Judge.

20              MR. ELOVITZ:  That may take into consideration the

21    good time, but he's not entitled to any.

22              PROBATION OFFICER:  He now has, with good conduct,

23    11/6 of '28.  I just talked with the case manager yesterday.

24              MR. ELOVITZ:  Additionally, Judge, the *Martin* case

25    and other cases indicate that when considering life
```

1  expectancies in sentences we shouldn't be discounting by the

2  good time when accumulating the sentences in the aggregate,

3  because of the potential.

4       So, the 25-year sentence at age 43 and a 20-year

5  sentence now puts him well past the 80-year life expectancy

6  that he has as he sits there today.  He's not a violent

7  offender.  To say that this scheme was half-baked is an

8  understatement by meters, by miles, by tens of miles.  As I

9  stated earlier, he couldn't have collected a penny.  So, the

10 only alternative theory for conducting this would have been to

11 harass the warden and the intelligence analyst.  Is a 20-year

12 sentence appropriate for that conduct when the Defendant, I

13 think the Court -- I would hope the Court would agree, could

14 never collect a penny on a judgment that didn't exist, that it

15 couldn't have gone any farther than it did, which was a

16 dismissal; that it was so outrageous, so far-fetched, so

17 ridiculous that nobody was going to give a penny for it under

18 any circumstances.

19       And, so, then you have nonpecuniary loss and how

20 traumatic was the event.  Does it justify a 20-year sentence?

21 Is the Defendant such a recidivist that a 20-year sentence is

22 necessary to protect the public?  And, if so, to protect the

23 public from what?  Further frauds that aren't capable of

24 defrauding anyone of a penny?  Further conduct of the

25 Defendant that causes minimal harassment for a period of 44

1    days where I think the worst that can be said was they got

2    some unsolicited mailing from bankruptcy attorneys or other

3    bankruptcy agencies to their work address?

4           Yes, I'm not saying this was a good thing for him to

5    do, I'm not saying it was a legal thing for him to do.  What

6    I'm saying is it's not a 20-year prison sentence for him to

7    have done, it's not a life sentence thing for him to have

8    done.  I understand there needs to be deterrence for others

9    similarly situated in prison that might have a half-brain,

10   half-cocked idea to claim that the warden owes them $21

11   billion under a treaty that didn't exist with a judgment that

12   never occurred.  I suppose a 20-year sentence might deter

13   these people, but, to be quite frank, it might not.  And

14   should we be handing out these type of life sentences for this

15   type of conduct?  I understand the Defendant has a criminal

16   history, that he has spent a substantial period of time in

17   prison, that his time in prison hasn't been entirely

18   productive, that this offense occurred while he was in prison,

19   but some of the Government's points, Your Honor, specifically

20   that he targeted the warden and the intelligence analyst, that

21   he must be punished for that, are already taken into

22   consideration in the guidelines and in the presentence report.

23   He's getting three levels added because of whom he targeted,

24   Your Honor.  He's getting that as punishment.  The Government

25   makes a lot about the fact he's incarcerated and he has got to

1    be punished additionally because of that, but he is.  The

2    sentence has to run consecutive to the sentence he's serving

3    in prison.  That's the punishment that's contemplated

4    additionally for committing crimes when you are in prison,

5    that your new sentence runs consecutive, that you target the

6    warden.  That's the three levels, that's already taken into

7    consideration.  So, when you look at everything, you have the

8    wholly illusory amount.  He could have said $5 trillion, he

9    could have said $1; it simply wouldn't matter.  He couldn't

10   have gotten anything.  The only thing he could have got, which

11   is what the Government does concede and what the presentence

12   report does declare, is nonpecuniary gains to him in the form

13   of perhaps harassment of a minor nature to both the warden and

14   the intelligence analyst and, therefore, Your Honor, I think

15   getting back to the fact that he's not such a recidivist, that

16   there's no hope for him and no redeeming qualities, I think

17   the Court clearly heard that he prevented a second fatality, a

18   second murder from occurring in the CMU in Terre Haute,

19   Indiana and that he saved the gentleman's life.  This isn't

20   somebody that was going to stand there and calmly look and

21   watch this unfold and watch this happen.  He stood up and did

22   the right thing.  Is there a reward for that?  I'm not so sure

23   I'm asking for a reward as I am trying to point out to the

24   Court he's not without redeeming value, that he is not a lost

25   cause, that he isn't somebody that -- if you take the

1   Government's position, Judge, he isn't somebody that must be

2   warehoused for the rest of his natural life.  I think we

3   should reserve that for people that actually caused great

4   physical harm to others, that caused great pecuniary loss,

5   there's like Bernie Madoff should never go free.  There was a

6   scheme that could get to a billion dollars; this one could

7   not.  There is big difference, and the difference in degrees

8   is the difference in a man's life here, Your Honor, and I ask

9   the Court to seriously consider that when determining a

10  sentence to be imposed.

11          THE COURT:  Okay.  Mr. Johnson, will you approach the

12  podium with your attorney here?

13          Anything you wish to say or offer in mitigation

14  before this Court imposes sentence?

15          DEFT. JOHNSON:  Yeah, I think I would, but I would

16  ask the Court to indulge me for a couple seconds or couple

17  minutes, because I'm not really doing the blame game -- that's

18  what it's going to sound like, but I'm just going to use it

19  for some facts in relationship to the point that I would like

20  to make.

21          THE COURT:  Okay.

22          DEFT. JOHNSON:  When this thing started the

23  Government says that I am doing it for harassment.  That's not

24  really the case.  There's a statement that I am doing it for

25  the money.  That's not really the case.  I am doing it based

1 on a belief that a judgment exists and that the -- that I was

2 asserting a legal entitlement for debt collection, and that

3 was the only purpose for it.  Whether those facts are true or

4 not is now determined.

5    But, my frustration with the Court is that I don't

6 believe that I was entitled to a fair trial, that the Defense

7 was not able to present its case.  My subpoenas were not

8 properly handled, they were never executed, witnesses weren't

9 able to be presented.  And as far as the place that I am

10 housed, if I had known that the judgment doesn't exist this

11 would never have occurred.  But, at the CMU I am obstructed

12 constantly, can't even do regular basic communications.  It's

13 a unit that doesn't operate with any regulations, it doesn't

14 operate with any enumerated powers within the constitution,

15 and all these things are kind of like the perfect storm that

16 created this incident.  And, like I said, if -- but with all

17 that wickedness, and even if I got a Judas kiss from my friend

18 here, Stephen Sherak, with all that terrible stuff that

19 happened -- and I regret it all -- I can't possibly -- I can't

20 really say that I regret this situation, because with all what

21 I consider wickedness, God enters into those things to work

22 his good for those who are called according to his purpose.

23 And I don't really have an extraordinary life, but I find it

24 really precious to save a man's life.  And if the trial

25 wouldn't have gone too fast and improperly, if all the other

1    things wouldn't have happened, I wouldn't have been

2    transferred, I wouldn't have been there for that moment.  And,

3    you know, I feel like I could have been stabbed to death at

4    that time.  And the Bible says that it's -- you know, no

5    greater love does a man have except to lay down his life for a

6    friend.  I feel like I could have lost my life right there,

7    and even if I lost my life I would have been happy to save Mr.

8    Warren's life.  And, so, I think that good came out of it.

9    And whether you want to take the rest of my life or some

10   portion thereof, I left my life in that cell on that day, and

11   I'm good with that.  I don't have any regrets.  Do I wish I

12   didn't file the thing?  I guess if I would have known what I

13   know -- what appears to be known today I would never file

14   that.  My purpose was to -- I spelled my purpose out very

15   clearly in the petition itself.

16        THE COURT:  Let me ask you this:  What did you think

17   the judgment was for?  Why do you think you were entitled to a

18   judgment from the World Court?  What did you do to deserve a

19   judgment from the World Court?

20        DEFT. JOHNSON:  Well, sir, the way that the

21   administrative procedure works is that you have to present

22   administrative demand, you have to present notice of default

23   and a notice of -- I mean, a notice -- There's three

24   particular procedures followed by the treaty, and then it has

25   to be presented to a hearing officer, and in this particular

1   case Mr. Sherak told me that that was a Jonathan Helmsford in

2   the Netherlands, and the hearing officer's duty is to look

3   through treaty compliance, and if treaty compliance goes

4   forward then it's presented to the Court for validation.

5           THE COURT:  So, you thought you were entitled to a

6   judgment because of the treaty?

7           DEFT. JOHNSON:  Yes, and because that -- I was

8   following a -- I was following a treaty procedure and I was

9   not pulling a rabbit out of my ass, if you want to --

10           THE COURT:  What did you do to --

11           DEFT. JOHNSON:  I presented the administrative demand

12   to the Central Office.

13           MR. ELOVITZ:  I think the Court's asking what wrong

14   did you think entitled you to relief under the treaty?

15           THE COURT:  Yeah.

16           DEFT. JOHNSON:  Okay.  The claims that I made are

17   also spelled out in the evidence.  But the claim is -- I wrote

18   about seven or eight pages in the administrative demand that

19   spelled out my claims.

20           THE COURT:  And what were those claims?

21           DEFT. JOHNSON:  They were based on that the CMU is

22   not a regulated unit, it's not properly authorized.  In fact,

23   what it comes down to and how the figure arrived --

24           THE COURT:  So, it had to do with your incarceration?

25           DEFT. JOHNSON:  Right.

 1              THE COURT:  Okay.

 2              DEFT. JOHNSON:  And the way that I arrived at that

 3     number, if you want to know, is the requested relief and the

 4     administrative demand was for $1 billion for every year of

 5     operation for the two CMU units.  And they didn't have exact

 6     starting dates, identical starting dates, so when the judgment

 7     was granted, under my understanding it was $15 billion and

 8     then it went up to a billion --

 9              THE COURT:  Right, I understand that.

10              DEFT. JOHNSON:  Right, and so that's all spelled out

11     in that document.

12              THE COURT:  Okay.  Anything else you wish to say?

13              DEFT. JOHNSON:  No.  And I would just say to

14     everybody here that life is precious and saving a life is

15     precious, it was fun, I'm glad that I got to do it, and I

16     think that, you know, as Donald Trump did with saving --

17     choosing to save 150 lives and not trading 150 Iranians for a

18     piece of machinery, I think we would all do better if we all

19     started to pay attention, and so I think that life is

20     precious.

21              THE COURT:  Okay.  So, Mr. Johnson, you are before

22     this Court for sentencing on two counts of bankruptcy fraud

23     and two counts of false declaration in bankruptcy.  You are

24     responsible for causing two false involuntary bankruptcies

25     against BOP Warden W.T. and Intelligence Research Specialist

1    K.H.  You committed the scheme while serving a 300-month term

2    of imprisonment in the Bureau of Prisons.

3         Come back up here.

4         MR. ELOVITZ:  I'm sorry.  Come up here.

5         THE COURT:  You received enhancements for intended

6    loss, being 20 billion, fraudulent actions during the

7    bankruptcy proceedings, the victim being a Government employee

8    and role adjustment for being a leader.  You have five

9    criminal history points, you had a jury trial and were

10   convicted.  And, there are some aggravating factors that have

11   not been accounted for by the guidelines.  The highest

12   specific offense characteristic pertaining to intended loss is

13   Level 30, as the loss exceeded -- for the loss to exceed 550

14   million, your intended loss was, as the Court found earlier,

15   20 billion.  You sought personal identifiers of at least 28

16   additional intended victims, but were unsuccessful.  You also

17   threatened to file liens against the Clerk of Court and

18   Judges.  And, following the trial in this case, paragraph 12

19   of the presentence report, you successfully smuggled two

20   letters out of prison.  The letters were posted on YouTube and

21   made direct threats against Marion BOP, the staff, and the

22   warden of the prison.  You have prior convictions for

23   developing a scheme to defraud other victims out of millions

24   of dollars.

25         In mitigation, factors presented have not been

1   accounted for in the guidelines.  Reportedly you have three

2   children to support.  Also, the Court acknowledges the fact

3   that you did save a life.

4        When I look at the 3553(a) factors, the nature and

5   circumstances of the offense and the history and

6   characteristics of you as a Defendant, Mr. Johnson, you -- I

7   think you identify yourself as a genius.  You are very

8   intelligent; very intelligent.  But, yet you have entered into

9   a life of trying to con people out of money and you have a

10  history of doing that.  You have an addiction, maybe not to

11  drugs, but you have an addiction to try to con people, and the

12  Court has no reason to believe that your future actions will

13  not conform to what your past actions have been.  This is a

14  serious offense.  You have not been deterred from previous

15  sentences, you committed this offense while you were

16  incarcerated.  The Court needs to protect the public from

17  further crime from you and, as I said, I'm not sure you know

18  anything other than to try to develop schemes to defraud

19  people.

20        As far as the actuarial tables on how long you are

21  going to live, that's not for me to decide.  As you stand

22  there you seem to be a very healthy individual.  You could

23  easily live to be in your 90s.  I don't determine how long

24  people live.  That's above my pay grade to determine that.

25  And, I do hope you live a long time and I do hope you get out

1   of prison, but I hope when you get out of prison that you have

2   the mental state that you're going to abide by the rules and

3   laws of society.

4          The Court, having considered all the information in

5   the presentence report, including guideline computations and

6   factors set forth in 18 U.S.C. 3553(a), pursuant to the

7   Sentencing Reform Act of 1984, it would be the judgment of

8   this Court that Defendant Kurt F. Johnson is hereby committed

9   to the custody of the Bureau of Prisons to be imprisoned for a

10   term of 216 months, which consists of 60 months on each of

11   Counts 1 and 2, and 48 months on Counts 3 and 4 to be served

12   consecutively with each other and consecutively with your

13   current sentence in docket #05-cr-0611-002 (WHA).

14          The Court is considering the arguments of your

15   counsel and recognizing the Court can vary downward or vary

16   from the maximum here.  The Court did come off nine levels of

17   the offense level and sentenced you to 216 months based upon a

18   nine-level reduction from 43 to 34, within that guideline

19   range.

20          It is ordered you shall pay the United States a

21   special assessment of $400, and the special assessment is

22   payable through the Clerk of the U.S. District Court.  It is

23   further ordered you shall pay the United States a total fine

24   of $400 consisting of a $100 fine on each count, and the fine

25   is due immediately.

1              You shall notify the United States Attorney for this

2    district within 30 days of any change of name, residence, or

3    mailing address until paid in full.  Having assessed your

4    ability to pay, payment of the total criminal monetary

5    penalties shall be paid in equal monthly installments of $20

6    or ten percent of your net monthly income, whichever is

7    greater, and you shall pay any financial penalties imposed by

8    this judgment that remains unpaid at the commencement of the

9    term of supervised release.

10             Upon release from imprisonment you shall be placed on

11   supervised release for a term of three years on each count to

12   run concurrently.  And that will run concurrently with -- What

13   was your term of supervised release in your Northern

14   California case, do you recall?

15             DEFT. JOHNSON:  Five years.

16             THE COURT:  Five years.  Well, my three years will

17   run concurrent with that.

18             Within 72 hours of release from the custody of the

19   Bureau of Prisons you shall report in person to the Probation

20   Office in the district to which you are released.  While on

21   supervision you shall be subject to and be required to comply

22   with conditions of supervision as ordered by this Court.

23             I need to advise you you have a right to appeal this

24   sentence -- your conviction and sentence.  That appeal must be

25   filed within 14 days after entry of judgment.  If you cannot

1    afford the services of an attorney to handle your appeal, one

2    will be appointed for you.  If you so request, the Clerk of

3    Court will notice an appeal for you at this time.

4            Do you wish to have the Clerk enter a Notice of

5    Appeal for you?

6            DEFT. JOHNSON:  I have documents prepared.

7            THE COURT:  You have documents prepared.  Okay.  So,

8    are you going to have your attorney do that or are you going

9    to do that?

10           DEFT. JOHNSON:  They are already -- I am just putting

11   them in.

12           THE COURT:  Pardon?

13           DEFT. JOHNSON:  I am putting them in.

14           THE COURT:  Okay; all right.  So, you have 14 days to

15   do that.  Do you understand that?

16           DEFT. JOHNSON:  I will give them to you right now.

17           THE COURT:  Okay.  Well, I'll tell you, give them to

18   the Clerk.

19           DEFT. JOHNSON:  Okay.

20           THE COURT:  Okay; all right.  Anything else,

21   Mr. Elovitz?

22           MR. ELOVITZ:  I don't think so, Judge.  Thank you.

23           THE COURT:  Oh, about the supervised release.

24           MR. ELOVITZ:  Oh, the reading of them.  Can I have a

25   moment with Mr. Johnson, Your Honor?

```
1               THE COURT:  Sure.

2               MR. ELOVITZ:  Thanks.

3               THE COURT:  I am going to do this:  On the supervised

4   release what's the provision on drug testing?

5               PROBATION OFFICER:  You mean as far as the special

6   condition?

7               THE COURT:  The special condition.

8               The Court's going to defer that special condition

9   until you are released from prison, Mr. Johnson.

10              PROBATION OFFICER:  He's got mental health --

11              THE COURT:  I want the mental health in there.

12              PROBATION OFFICER:  He's also got the special

13  condition when he gets released on TSR he's going to have to

14  participate.

15              THE COURT:  He's going to have to participate in drug

16  -- Okay.  I want to defer that until you are released,

17  because, again, there's nothing in the presentence report that

18  indicates -- in this current one.  There was in the Northern

19  California one, but I think we have had some direction out of

20  Chicago that we may want to defer that if there's no evidence

21  for drug abuse.

22              MR. ELOVITZ:  Understood, Your Honor.

23              DEFT. JOHNSON:  Arthritis drugs by then, anyway.

24              MR. ELOVITZ:  He's on arthritis drugs.  That's the

25  hardest drugs he's on.
```

```
 1            DEFT. JOHNSON:  No, I'm not on that.

 2            THE COURT:  Okay.  So, other than that condition, are

 3    there any objections to any of the conditions of supervised

 4    release?

 5            MR. ELOVITZ:  There are not, Judge.  And the

 6    Defendant and I have both executed a written waiver of the

 7    reading.

 8            THE COURT:  Is this your signature on the written

 9    waiver, Mr. Johnson?

10            DEFT. JOHNSON:  Yes, it is.

11            THE COURT:  Okay.  The Court accepts the waiver and,

12    with the exception of one condition, the other conditions will

13    be adopted by this Court and will be part of the judgment in

14    this case, which, of course will be part of the appeal.

15            Anything further, Mr. Coonan?

16            MR. COONAN:  No, thank you, Your Honor.

17            THE COURT:  Okay.  That will be all.

18            THE CLERK:  Judge, do you want me to take the Notice

19    of Appeal?

20            THE COURT:  Yes, hu-huh; yeah.

21            THE CLERK:  Thank you.

22            All rise.  Court's adjourned.

23

24

25
```

1                         *   *   *   *   *   *   *

2

3

     I certify that the foregoing is a correct transcript from the
4    record of proceedings in the above-entitled matter.

5

6    /S/ Stephanie K. Rennegarbe                    09/30/2019
     Certified Shorthand Reporter
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25