1                IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF ILLINOIS
2

3   UNITED STATES OF AMERICA,        )
                                     )
4              Plaintiff,            )
                                     )
5   v.                               )   No. 18-cr-40043-JPG-1
                                     )   Benton, Illinois
6   KURT F. JOHNSON                   )
                                     )
7              Defendant.            )

8
                    TRANSCRIPT OF JURY TRIAL PROCEEDINGS
9                         (TRIAL DAY 1 OF 3)

10              BEFORE THE HONORABLE J. PHIL GILBERT
                    UNITED STATES DISTRICT JUDGE
11
                        SEPTEMBER 24, 2018
12

13   APPEARANCES:

     FOR THE PLAINTIFF:    Michael J. Quinley, Esq.
14                         Assistant United States Attorney
                           #9 Executive Drive
15                         Fairview Heights, IL  62208
                           618-628-3700
16                         Michael.J.Quinley@usdoj.gov

17   FOR THE DEFENDANT:    Kurt F. Johnson - Pro Se
                           13177-081
18                         Terre Haute FCI
                           Federal Correctional Institution
19                         P.O. Box 33
                           Terre Haute, IN  47808
20
                    Stephanie Rennegarbe, RDR, CRR, CBC
21                         IL CSR #084-003232
                           301 West Main Street
22                         Benton, IL  62812
                           618-439-7735
23              Stephanie_Rennegarbe@ilsd.uscourts.gov

24
        *Proceedings recorded by mechanical stenography; transcript*
25            *produced by computer-aided transcription*

1                              <u>I N D E X</u>

2

**WITNESSES CALLED TO TESTIFY:**

3
                                      <u>DX</u>    <u>CX</u>    <u>RDX</u>
4
   ADAM HANNA                         76   130
5  WILLIAM P. TRUE                    153

6

7                            <u>E X H I B I T S</u>

8

   <u>EXB #</u>        <u>DESCRIPTION</u>                        <u>ID'D</u>   <u>ADMT'D</u>
9
   Plf's 1      Petition against William True     117    118
10 Plf's 2      Petition against Kathy Hill       117    118
   Plf's 3      Binder regarding William True     102    103
11 Plf's 4      Duplicate of Exhibit 3            103    103
   Plf's 5      Binder of 17-cv-1385              77     78
12 Plf's 6A     Binder of 18-cv-783              127    129
   Plf's 6B     Binder of 18-cv-784              127    129
13 Plf's 7      Binder of 17-cv-1010              83
   Plf's 8      Binder of 15-525                 129    130
14 Plf's 9      ICJ FAQ site                     109    110
   Plf's 9A     ICJ Current Members website      109    110
15 Plf's 10     ICJ Decisions through 2017       109    110
   Plf's 11     Library of Congress Letter       114    116
16 Plf's 12     2017 Treaties in Force           115    116
   Plf's 13     2001 Treaties in Force           115    116
17 Plf's 14     Howard Buick Letter              158    159
   Plf's 15     Debt Education Letter            158    159
18 Plf's 33     Court Security Act Notice 2017   163    163
   Plf's 42A    Cancellation of Debt (True)      164    165
19

20

21

22

23

24

25

1           (Proceedings began in open court at 8:46 a.m.; jury

2    not present)

3                   ************************

4           THE CLERK:  *United States of America v. Kurt F.*

5    *Johnson,* case #18-40043.  We are here on a jury trial.  Are

6    the parties ready?

7           MR. QUINLEY:  Good morning, Your Honor.  Yes, the

8    United States is ready to proceed, appearing this morning by

9    Assistant United States Attorney, Michael Quinley.

10          MR. JOHNSON:  I don't know how ready I am.  It's been

11   kind of tough the way things have been going before the trial,

12   but I'm here.

13          THE COURT:  Let the record show that the Defendant

14   Kurt F. Johnson is present *Pro Se*.  Mr. Quinley is present on

15   behalf of the Government.  This matter comes before this Court

16   on a jury trial today.

17          There are several pending motions, and then some

18   other filings that -- one by you, Mr. Quinley, regarding

19   judicial notice, and then, Mr. Johnson, you had some filings,

20   I think, on Friday afternoon.

21          There is a Motion to Compel regarding Defendant seeks

22   to compel James Massey, a former employee of the CMU, who left

23   in the middle of 2016.  And I think you indicated to us that

24   he was probably down in Paducah area working for the Sheriff's

25   office.

```
 1          MR. JOHNSON:  Best of my recollection, he lives in
 2   Paducah, and he should be a County Sheriff.  I don't know if
 3   it's in Paducah county or --
 4          THE COURT:  Well, we tried to -- I had my staff try
 5   to locate him and we can't find him.  He doesn't work for the
 6   Sheriff's Department, doesn't work for any law enforcement
 7   down there, and so we just can't find him to serve him.
 8          MR. JOHNSON:  You are not able to locate him through
 9   the BOP records or the Social Security and all of those
10   things?
11          THE COURT:  You know, Mr. Johnson, you were given an
12   opportunity to have an attorney, which you denied, which you
13   refused to have an attorney.  We can't -- You know, it's your
14   obligation to give us locations where we can find these
15   people.  And you indicated that he was in Paducah, McCracken
16   County, and we looked there and we can't find him.
17          MR. JOHNSON:  I don't know that he's a Sheriff in
18   McCracken County.  I just know that he told me he lived in
19   Paducah.
20          THE COURT:  He may not now.  I don't know.  He may
21   have moved.  He cannot be found.
22          MR. JOHNSON:  Then can you provide a private
23   investigator for these purposes?
24          THE COURT:  It's kind of late in the day for that.
25   You had an opportunity.  I offered you to have an attorney
```

1    appointed that would have been able to do all this stuff for

2    you.  It's not up for the Court to prepare your case for you.

3            MR. JOHNSON:  I can appreciate that.  But, at the

4    same time, the Court should be cognizant of, you know, fair

5    play.  When this thing started, it started out with burning up

6    my clock right away, you know.  First I stayed in the county

7    jail for 13 days, didn't receive any discovery until the 14th

8    day.  Then the prosecution sat on my Bill of Particulars for

9    quite some time, and then I found out on 9/14 that he had no

10   intentions of answering them.  These were all stall moves and

11   tactics that burned up the clock and, you know, I don't have a

12   problem going to trial as fast as possible, but I would like

13   at least an opportunity to have a fair one, and so I wasn't

14   given even the opportunities to know when to -- what kind of

15   indictment I was dealing with.  Those questions are paramount

16   and certainly need to be answered first before a defense can

17   be prepared, and if I was given, I think, a proper leeway and

18   proper time, maybe I could have taken the opportunity to ask

19   for a private investigator and ferreted out some of these

20   issues.  Like I said, I don't just think the tactics have been

21   fair in regards to burning up my clock and not giving me the

22   opportunity to put on a fair defense.  And to turn around and

23   use it against me at the end here seems, you know, a bit of a

24   bully-type move.

25            THE COURT:  Mr. Quinley?

1           MR. QUINLEY:  Your Honor, perhaps it would be helpful

2    if the Court would take up the pending motions, particularly

3    the Motion for Bill of Particulars, because I think this is

4    relevant to Mr. Johnson's perception that somehow the -- well,

5    his allegation that somehow the process is unfair.

6           So, I would like to respond to his written Motion for

7    Bill of Particulars filed on Friday.

8           THE COURT:  We will take the Bill of Particulars up.

9           MR. QUINLEY:  Your Honor, in federal practice, which

10   Mr. Johnson may not be fully familiar with, but as the Court

11   pointed out an attorney would be more likely familiar with,

12   Bill of Particulars filed by counsel in federal cases are

13   routinely denied, because the indictment and examining the

14   four corners of the indictment is more than sufficient to

15   inform the Defendant of the particulars of the charge against

16   him.  And I would suggest that's the case with this

17   indictment.  Now, in his written motion, other than the word

18   *resources*, he doesn't direct the Court to what he's asking

19   should be particularized, but I can let the Court know that

20   one of the things that he requested in his letter is, "What

21   does W.T. mean?"  William True.  "What does K.H. mean?"  Kathy

22   Hill.

23           And I submit, Your Honor, there's no real

24   misunderstanding on the Defendant's part that the people he

25   filed involuntary petitions against were William True, W.T.,

1    in the indictment, and K.H., Kathy Hill, in the indictment.

2         As far as resources, there was simply an allegation

3    that an involuntary bankruptcy filed with the Court would take

4    time and resources, and *resources*, I think, is a commonly

5    understood word, time and whatever else is associated, and I

6    don't think it requires further definition.

7         If the Court considers it surplusage it could be

8    struck, but I don't think the indictment -- And it's a very

9    brief indictment, but also full in terms of covering the

10   essential allegations of both the scheme to defraud and then

11   the elements or the statutory language of each of the two

12   statutes used for each of the two victims.

13        And it would not be an unusual ruling for this Court.

14   I would ask the Court to deny the Motion for Bill of

15   Particulars as unnecessary and not warranted at all.

16        THE COURT:  Mr. Johnson?

17        MR. JOHNSON:  I don't have the paperwork in front of

18   me, but I also would like to bring up one of the questions

19   related to that, because there was an issue that I could have

20   raised in the Motion to Dismiss the Indictment as a statutory

21   construction issue in regards to the word -- Excuse me.  The

22   statute itself seems to use the word *permission*, and the

23   indictment does track the statute.  But it says, "As permitted

24   in 17 46," and to me *permitted* doesn't -- or at least can be

25   construed as not being prohibited.  And so, you know, the way

1    that the statute reads -- it might be able to be read a couple

2    of different ways, but there appears to be a little bit of

3    confusion in the statute to me as if there's any prohibitive

4    act.  And under the rule of lenity I would believe that if

5    it's prohibited in one way and permitted in another way, that

6    under the rule of lenity I would be entitled to permit it.

7            And, so, these are the types of questions I asked in

8    the Bill of Particulars, because they were leading to legal

9    arguments that I would want to raise.  And when they weren't

10   answered it just left me in a stall and I couldn't do anything

11   to move forward.  And I did the best I could with the short

12   amount of time and put forth documents.  They can go and see

13   how much -- you know, how diligent I was in all of my efforts.

14   I'm not here slacking, waiting for things to just drop in my

15   lap.  I'm trying to move the case, but I have been prohibited

16   in moving it the way it needs to be moved and I believe

17   prohibited in moving it in a fair and orderly fashion.

18           And, the rush to trial, like I say, there's still

19   plenty of time left on the speedy trial clock.  But, it seems

20   like the rush of the trial was that -- with the purpose of

21   giving me as many disadvantages as possible.  I still have the

22   truth on my side, and that's fine.  And, you know, just

23   because I don't have a lawyer doesn't mean you have to

24   disadvantage me at every opportunity.

25           THE COURT:  How come you waited until three days

1    before the trial to file your Motion for Bill of Particulars

2    when the order regarding pretrial discovery and motion

3    practice -- and Bill of Particulars is a pretrial motion --

4    states that, "If a party desires to file any other motion,

5    including a Motion to Dismiss the Indictment or a Motion to

6    Suppress, which also would include the Motion for Bill of

7    Particulars, the motion shall be filed within 21 days of the

8    arraignment"?

9              MR. JOHNSON:  If the Court would look at the

10   record --

11             THE COURT:  How come you waited?  And that time

12   period has long passed.

13             MR. JOHNSON:  I understand.  But, if the Court will

14   note I put the Court on notice through a Notice of

15   Noncompliance that the way the time was being dispensed

16   towards me there was no way for me to comply with that order,

17   and I did that before the time elapsed.  And, like I said, it

18   was --

19             THE COURT:  But, there was no extension -- The Court

20   never entered an order extending that time frame.

21             MR. JOHNSON:  That may be the case.

22             THE COURT:  Well, not *may be the case*; that is the

23   case.

24             MR. JOHNSON:  So, I was handcuffed again,

25   figuratively, in the sense that without the Bill of

1    Particulars addressed informally -- and I tried to do it

2    informally, which I believe is also encouraged by the

3    procedures -- tried to handle these things informally, when

4    they were handled informally with silence, and I don't find

5    out until 9/14 that they had no intentions of answering them,

6    I don't know how I could have done any better or been able to

7    comply with your orders in the time frame.  And if the time

8    frame is fixed there has to be equitable considerations for

9    situations where the trial tactics of the prosecution

10   prohibits me from performing.  I have done the very best I can

11   to perform in a fair and equitable fashion, and so far all I

12   have had is an arraignment, one pretrial conference.  I don't

13   get any information from the Prosecution and then we are in

14   trial.  And, under those circumstances I think I performed

15   diligently and attentively towards the situation and tried to

16   move the case.

17          THE COURT:  Mr. Johnson, by choice you are

18   representing yourself, so you are your own attorney, which

19   means you, as your attorney, you are held to the same

20   standards.  And the Court's trying to be as flexible as

21   possible as if you had legal counsel, outside legal counsel

22   that could be following the rules.  But, when an order says

23   that certain motions should be filed within 21 days, they need

24   to be filed within 21 days of the arraignment unless the Court

25   extends that.  And there's been no -- You didn't file a motion

1    to extend the time for discovery.  And, you know, you make

2    choices in life, and the Court, having considered the Motion

3    for Bill of Particulars -- and Mr. Quinley is correct in that

4    generally these motions, Bill of Particulars in criminal cases

5    are routinely not granted.

6          The Court has reviewed the indictment.  It seems

7    pretty clear and straightforward, so the Court's going to deny

8    your Motion for Bill of Particulars as being, number one,

9    untimely and, number two, unnecessary.

10         Okay.  So, that takes care of the Motion for Bill of

11   Particulars.

12         With respect to the motion for this Mr. Massey,

13   who -- Again, we can't find him.  And the Court had made an

14   effort based on your representation at the last hearing as to

15   where he was potentially located, and so the request to issue

16   a subpoena for James Massey, when you have not provided us

17   with an address for him, provided us with an area -- We looked

18   into it.  In your motion you say, "Mr. Massey lives in

19   Paducah, Kentucky and has become a local County Deputy

20   Sheriff."  We contacted the Sheriff's Office down there and no

21   such person has ever worked for them.  We have done all we can

22   do to try to locate Mr. Massey.

23         MR. JOHNSON:  Your Honor, the Prosecution doesn't

24   have an address for him from the work files?  It seems a

25   little silly to go down this road.  I mean, he's an employee

```
 1   -- an ex-employee.
 2           THE COURT:  This is your case and it's your
 3   obligation to provide --
 4           MR. JOHNSON:  And I appreciate your point of view,
 5   but I have no access to the phone.  I'm in one of your secret
 6   prisons where I am blockaded from all communication.  I can't
 7   even ask my family to look up anything.  What exactly do
 8   you --
 9           THE COURT:  And you had the -- And the Court offered
10   you legal counsel to assist you in that, and you refused that.
11           MR. JOHNSON:  Well, there's a lot that comes along
12   with legal counsel besides the benefits of the telephone.
13           THE COURT:  Again, you made that choice.  The Court
14   will not issue a subpoena for a person we cannot locate.
15           MR. JOHNSON:  I would like to put in an objection for
16   the record.
17           THE COURT:  The Court will note your objection.
18           MR. JOHNSON:  I would like to add to the objection
19   that I don't think that not having an attorney should be
20   barred from all these proceedings --
21           THE COURT:  It's not a bar.
22           MR. JOHNSON:  -- for having -- a bar for all these
23   disadvantages that are being applied.  You know, I don't even
24   get sticky notes, I don't get file folders, I don't get any
25   way to even prepare.  It seems silly to me that just because I
```

1  don't have an attorney I have got to suffer and I have got to

2  be disadvantaged.  That's my objection.

3        THE COURT:  You have a right to represent yourself.

4  You are not being penalized for not having an attorney, but

5  the point I am trying to make, Mr. Johnson, is that -- And the

6  Court knows you are incarcerated, but you make choices.  And

7  whether you are incarcerated or not, you have to provide the

8  Court with proper addresses to subpoena people.  And the fact

9  that you are in the CMU, I know handicaps you, but it is what

10  it is.  And --

11        MR. JOHNSON:  I think it's kind of unique in this

12  situation, Your Honor -- Excuse me if I am interrupting, but I

13  think it's unique in this situation where my very captors are

14  the so-called victims.  I think if the Court is not cautious,

15  it certainly appears that you are giving them every advantage

16  over me and, you know, when they can supply the address, they

17  know that he worked for them, they have his Social Security

18  number, they could easily provide it to the Prosecution, the

19  Prosecution could easily find it.  And here I am being said,

20  "Oh, you can sit in a box and we will block you from every

21  opportunity to defend yourself," and it's unfair.  I just --

22  "Oh, and, by the way, you didn't get an attorney, so you

23  deserve it."

24        THE COURT:  That's not the point.  I'm just saying,

25  anyway, that your objection is noted.

 1          MR. JOHNSON:  Thank you.

 2          THE COURT:  All right.

 3          MR. QUINLEY:  Your Honor, if I may, just so that it's

 4  in the record if it's being reviewed at some point in time, in

 5  the Notice of Noncompliance, the Defendant alleged that he got

 6  access to materials that would permit him to review legal

 7  matters and the discovery on August 2nd of 2018, and that

 8  access to the disk reader he obtained on August 5th of 2018.

 9  And he was informing the Court by this notice that that was

10  his first opportunity and, of course, we know that the time

11  between August 5th and today there was no request for relief,

12  there was no motion with the Notice of Noncompliance.  And,

13  what Mr. Johnson actually did in the document was confirm that

14  he had received the discovery and that he had been delayed in

15  some number of days in being able to look at it.

16          So, I just thought that that should be in the record,

17  Your Honor, --

18          THE COURT:  All right.

19          MR. QUINLEY:  -- that Mr. Johnson himself in a

20  written document filed with the Court reported that at least

21  as of August 5th of 2018, he could begin to review the

22  materials provided in discovery.

23          THE COURT:  Okay.  I also have an emergency request

24  for subpoenas; Francis Schaeffer August Cox.

25          Mr. Johnson?

```
 1              MR. JOHNSON:  Yes.

 2              THE COURT:  And then we have a Ruby Davis, Tracy

 3    Knutson, Jacqueline Sherak, which I think we discussed at the

 4    last hearing --

 5              MR. JOHNSON:  That's right, we did discuss it.

 6              THE COURT:  -- who, again, is somewhere over --

 7    outside the United States.

 8              MR. JOHNSON:  Jacqueline Sherak is -- And you will

 9    see in my motion, if it should come out in testimony, that

10    she's in the states and available and I can get her address.

11    I just want the Court to be on notice that I would like to

12    obtain her immediately.  I don't have -- You know, she may not

13    be in the states, but her mother could obviously testify that

14    she's available in the States, her brother could testify that

15    she's available in the States, that she's willing -- These are

16    types of situations -- This is a preemptive move, if you want

17    to put it that way, that if she becomes available during the

18    trial I need to obtain her right away.

19              THE COURT:  If she becomes available we will take a

20    look at that at that time.

21              MR. JOHNSON:  Okay.

22              THE COURT:  And, Adam Hanna is going to be here

23    anyway.

24              MR. QUINLEY:  He's the first witness, Your Honor.

25    And, Your Honor, I might say at an appropriate time the
```

1    Court -- may urge the Court, to the extent that there's a

2    request for subpoena issue or even a subpoena that has been

3    issued, the Government may make at the appropriate time a

4    Motion to Quash simply because the witness would not offer

5    anything relevant to the Defendant's case.

6            THE COURT:  Well, we will cross that bridge when we

7    get to it.

8            MR. QUINLEY:  That's correct, Your Honor.  And I

9    think more development would be helpful in making that

10   determination.

11           THE COURT:  Okay.  Tracy Knutson.  She works for BOP.

12           MR. QUINLEY:  She's Katherine Siereveld's supervisor.

13   She's also an attorney for the Bureau of Prisons.  And I

14   believe Ms. Siereveld plans to be here today, but I don't have

15   any idea why Tracy Knutson -- And, in fact, I would urge --

16   Well, at an appropriate time I would oppose any request to

17   subpoena Ms. Knutson as having nothing to offer on behalf of

18   the Defendant.

19           THE COURT:  Now, why -- What does Tracy Knutson have

20   to offer in your defense?

21           MR. JOHNSON:  Okay.  My defense will be based

22   theoretically on the type of unit that I am in, instructions,

23   confiscations of documents, the types of policies that are

24   enforced at this unit to obstruct justice, access to the

25   courts.  I believe that Ms. Knutson can speak to those policy

1    situations, she can address the confiscations of documents,

2    she's involved in the -- what we call shake-downs as inmates.

3         THE COURT:  What does that have to do with the

4    indictment against you?

5         MR. JOHNSON:  What it has to do is that the

6    indictment -- My defense is that I'm in a particular type of

7    unit that prevents me from obtaining copies of judgment,

8    prevents me from communicating in any fashion to present the

9    judgments.  They deny me access to the courts, and this is all

10   part of the so-called victims' approach to preventing me from

11   defending myself, prosecuting my rights, and it's part of

12   their pattern and practice to, quite frankly, commit

13   bankruptcy fraud and then turn around and use the power of

14   Government against me to make the same accusation.

15        THE COURT:  Let me ask you this:  You say her

16   supervisor is going to be here?

17        MR. QUINLEY:  Actually, she's the supervisor, as I

18   understand, Tracy Knutson.  But the attorney who's assigned to

19   this unit at Marion prison will be present not as a witness.

20        And, Your Honor, if I may, please, briefly, other

21   than evidence of Mr. Johnson's motive for as alleged filing

22   false involuntary bankruptcy petitions, it wouldn't be

23   relevant to any issues in the case.  It certainly wouldn't be

24   a defense that *I can file false involuntary bankruptcy*

25   *petitions because I have been treated so badly.*

1           Now, I think he tries to make it more relevant in

2    that he's trying to say that he can't prove that his

3    involuntary bankruptcy petitions are not false.  And that's

4    true, he can't prove that they are not false, because they are

5    false.  And I think very early in the trial that's going to be

6    determined really beyond any doubt.

7           And, as Mr. Johnson informed the Court last Friday,

8    he's then going to shift to *but I believe it and that's all*

9    *that matters*.  And I think the Court will have to address that

10   and the jury will have to address that and I will have to

11   address that.  But, the notion that he gets to try his

12   conditions of confinement as a defense is actually not

13   relevant to the crimes charged.  He actually would be just

14   describing how he has a very strong motivation to punish his

15   captors, in particular the warden and Ms. Hill.

16          THE COURT:  Anything further, Mr. Johnson, on that

17   issue?

18          MR. JOHNSON:  Yeah, that's kind of a pasturization

19   recharacterization of what I'm saying.

20          First off, the filing of the bankruptcies is a matter

21   of dispute.  Whether it's a factual and legal right or if it

22   wasn't, that hasn't been determined yet.  Of course, it is my

23   belief that I had every right to file that.

24          But, the conditions of confinement are relevant to a

25   defense not because I'm trying to harass, which is what they

1    put in their brief in bankruptcy.  That motivation is an

2    accusation.  That's not at all what the defense will put

3    forward.  The defense is that I have a legal right to present

4    -- I mean, to prosecute and the judgments that I have

5    obtained.

6           THE COURT:  Let me ask you this:  How do your

7    conditions of confinement prevent you from filing involuntary

8    bankruptcy petition?  Obviously it doesn't, because you did.

9           MR. JOHNSON:  No, there is plenty of facts that it

10   was almost impossible.  First off, this is not an isolated

11   instance of January 8th when these petitions were filed.  It's

12   been a three-year process of writing the demand, having the

13   demands confiscated out of the mails, having legal mail

14   confiscated, having documents taken out of my cell so that I

15   can't have access to the courts, and this is not an overnight

16   thing.

17          THE COURT:  But this is not a conditions of

18   confinement case, --

19          MR. JOHNSON:  I know it's not a conditions of

20   confinement.

21          THE COURT:  -- so I don't see how it's relevant.

22          MR. JOHNSON:  Okay.  Let me see if I can address that

23   for you.

24          It's relevant, Your Honor, because the conditions of

25   the confinement have a lot to do with how this bankruptcy was

1    filed, how it was delayed, why it was necessary to go this way

2    and why I had to use my mother, why I can't just have straight

3    access to the Court.  I can't even print off -- I printed off

4    the blank forms.  I can't even come directly to this court.  I

5    can't file the bankruptcy proceedings.  If I had the right, I

6    couldn't do it from there because they would confiscate them

7    and say it's criminal.  The way that they operate this

8    facility, the patterns and practices that they use to make

9    legal determinations prevent me from access to the court, and

10   there's a long history within these court documents in this

11   local court of me not being able to have access to this court.

12   And it's tragic that the Government has to go to this great

13   length of creating a criminal charge to even give me access to

14   the court.

15        You know, the only way that I can -- And it's

16   unfortunate for me, the only way that I can even address my

17   right to file these bankruptcies is I have got to be subjected

18   to criminal prosecution.  And the way that these units

19   operate, it's all part and parcel, I believe, of a conspiracy

20   to create the opportunities for guys like me never to get out

21   of this unit, never to be heard, never have access to the

22   courts in any reasonable and meaningful fashion to redress

23   grievances and prevent any evidence from getting out or

24   getting in that would make it available to prosecute a right.

25        THE COURT:  Okay.

1           MR. QUINLEY:  Your Honor, in the Government's

2    presentation of the case much of this is actually going to be

3    covered.  And, Your Honor, the Court, of course, is unaware,

4    because we haven't begun the trial yet, but the first instance

5    that the Government will be addressing at the relevant point

6    in the presentation of evidence where Mr. Johnson attempted to

7    file involuntary bankruptcies was November 25th of 2016, and

8    it's part of a common scheme or plan which met with success on

9    January 8 of 2018.  And, in fact, within days of that success

10   Mr. Johnson attempted to have sent from the prison to the

11   relevant courts; 45 courts, 40 additional involuntary

12   bankruptcy petitions.  And because it's all part of a common

13   scheme or plan and relevant to motive, intent to defraud, all

14   the elements to which it is relevant, you know, a lot of this

15   context is actually going to be in the Government's

16   case-in-chief.  In fact, Your Honor, the Court is going to

17   offer each one of the records of the Southern District of

18   Illinois of proceedings that Mr. Johnson has initiated,

19   beginning in 2015 in Judge Rosenstengel's court, continuing in

20   2017 in Judge Herndon's court, which contains a necessary

21   cross-reference to the bankruptcies in Judge Grandy's court;

22   the appeal from the dismissal of those bankruptcies again now

23   with Judge Rosenstengel; and, of course, as the Court may

24   recall, for a very brief time this Court had to sort out the

25   beginning of a civil case at the end of 2017 that actually was

1   the bankruptcy and then was transferred.

2           So, Your Honor, I just hope that the Court doesn't

3   get the impression that the Government's approach is going to

4   be narrow.  And much of what Mr. Johnson speaks of will

5   necessarily be fully developed in the evidence.

6           I'm just saying that when we get to the Defense case

7   the Court may have more information as to whether or not

8   there's any need for witnesses who are not available to the

9   Court or to Mr. Johnson to prove matters essential to

10  Mr. Johnson's defense.

11          THE COURT:  All right.  At this time I'm going to

12  reserve ruling on Tracy Knutson, okay?

13          MR. JOHNSON:  Okay.  Can I just add something to

14  that?

15          First off, he didn't mention the *habeas*.  I don't

16  know if that's going to be in the list of procedures.  Okay.

17  So, that's fine.

18          And then the other thing he mentioned was this is an

19  ongoing continuous scheme of which the success was on January

20  8.  And from the Defense point of view, the opposite is

21  actually true; that the very fact that it took all the way to

22  January 8 and it was delayed for two years is the ongoing and

23  continuous success of this type of censorship unit, and so I

24  think it becomes relevant for the Defense to raise all the

25  issues of the Government's success in obstructing their own

1    bankruptcies.

2              THE COURT:  Okay.  What about Ruby Davis?

3              MR. JOHNSON:  I believe Rudy Davis is relevant --

4              THE COURT:  *Rudy* Davis.

5              MR. JOHNSON:  Rudy Davis is relevant, one, because

6    he's one of my current blocked contacts.  He's a civilian as

7    opposed to an inmate.

8              THE COURT:  Where is he?

9              MR. JOHNSON:  He's in Texas, Forney, Texas, which is

10   near Dallas.

11             THE COURT:  Do you have an address for him?

12             MR. JOHNSON:  I don't have a specific address.  I

13   have a P.O. Box.  But, I have a phone number -- or an e-mail

14   address, I believe.

15             THE COURT:  What's the relevance of his testimony?

16             MR. JOHNSON:  He can testify to his experience with

17   this unit as a civilian, the type of information and the

18   censorship and blockades and how he's been blocked, his

19   personal dealings with William True, type of character.

20             THE COURT:  How is that relevant to the indictment?

21             MR. JOHNSON:  And he's going to be brought in, I

22   believe, by the Government as due diligence for the treaty

23   that I was trying to find, and it would speak towards how the

24   Government doesn't do its due diligence when it has the

25   opportunity, puts me in a blockade, then blocks me from the

1  contacts that can help me, and then it's all part of the

2  continuing theme of the defense for how this unit operates.

3  And, as a civilian I think he can have much more credibility

4  than me as an inmate in this particular set of facts.

5       THE COURT:  Mr. Quinley, any response to that?  Do

6  you know who this person is?

7       MR. QUINLEY:  Sure.  The Defendant has been able to

8  correspond with him.  While he was in the county jail he

9  actually was able to speak to him directly and, in fact, had a

10 video teleconference with him in each of these things at least

11 that he has done this with, Pastor Rudy Davis has posted them

12 on YouTube so the various people who follow him can hear and,

13 in fact, where it's a written communication Mr. Davis actually

14 reads Mr. Johnson's words on the YouTube so that people can

15 hear it.

16      He also posted on YouTube Mr. Johnson's request to

17 the Library of Congress, which he actually got to the Library

18 of Congress, and then he posted the response from the Library

19 of Congress on YouTube and where the Library of Congress

20 posted there is no treaty that Mr. Johnson references in spite

21 of their diligent search, and they described the search.

22      So, would Mr. Davis has anything -- any firsthand

23 knowledge that he could report?  Absolutely not.  And

24 certainly I would object to the notion that he's some sort of

25 character witness for the victim, Warden William True.

1          So, at any rate, I would oppose the Defendant's

2     request to have Mr. Rudy Davis subpoenaed for the trial.

3          THE COURT:  The Court is going to deny the issuance

4     of a subpoena to Rudy Davis and note the Defendant's objection

5     to that.

6          Now, Francis Schaeffer August Cox.  Who is that

7     person and why is that person relevant to this trial?

8          MR. JOHNSON:  Well, Mr. Cox used to be at the Marion

9     facility.  He's currently at the Terre Haute facility.  Mr.

10    Cox can speak to the types of conditions and would prevent me

11    from having to testify, if that's the case, because he could

12    be an excellent witness for types of conditions that I'm

13    subject to, he's had very similar experiences of having

14    documents confiscated, obstructions of court filings, denied

15    access to the courts and to the press.  He was intimately

16    involved with Stephen Sherak, so he could speak specifically

17    to communications inside the facility with Stephen Sherak.  He

18    could speak directly to conversations related to how the

19    bankruptcies were going to be filed, what the intentions of

20    filing the bankruptcies were about.  He could speak to

21    information provided by Stephen Sherak at the time.  He also

22    has World Court judgments of his own that are separate and

23    distinct from mine so he's similarly-situated as to myself.

24    He was basically threatened in the facility and that's why he

25    was transferred.

1          So, he's very -- very precise or very -- He's an

2   articulate young man and he's quite capable of addressing all

3   the particular issues about this unit, the World Court, his

4   reliance on what Steve had to say, his own experience of

5   getting judgments granted by the World Court on December 16th.

6   I have, according to my knowledge, presented six judgments to

7   the Court and received five; one was rejected.  He had two

8   presented to the Court which were granted and there was

9   another gentleman named Viktor Bout, and he had one.  So, he's

10  right on point to all the facts of this particular case.

11          THE COURT:  Mr. Quinley?

12          MR. QUINLEY:  Your Honor, I think the Defendant, Mr.

13  Johnson, has very ably described for the Court that he would

14  like for his own relevant -- perhaps relevant testimony about

15  facts relevant to him.  He wants to substitute Mr. Cox as a

16  parallel to Mr. Johnson's dealings or Mr. Johnson's testimony

17  and, of course, that's not permissible.  You can't have a

18  stand-in because you yourself don't want to testify and don't

19  want to be cross-examined.  And Mr. Johnson has very plainly

20  advised the Court he does not intend to testify as a matter of

21  strategy, but he wants Mr. Cox because his experiences were

22  similar to Mr. Johnson's.

23          And the additional thing he said, Your Honor, is that

24  Mr. Cox also had these conversations with Mr. Sherak that

25  perhaps Mr. Johnson had.

1            First, Mr. Sherak is going to be made available to

2    testify from the prison he's in in New York, and he can

3    testify directly if it's relevant as to what he told the

4    Defendant.

5            Mr. Cox's testimony about Mr. Sherak --

6            THE COURT:  Would be hearsay.

7            MR. QUINLEY:  -- is hearsay.  So, clearly this is a

8    witness that, frankly, even if he was brought over here the

9    Government would object to him ever taking the witness stand,

10   and so I object to him being subpoenaed.

11           MR. JOHNSON:  Well, he can also speak directly to the

12   credibility of what was said and confirm that that -- You

13   know, because the question is is Mr. Sherak telling the truth,

14   right?  So, you know, the credibility of what was said at that

15   particular time versus what was said at another time, I think

16   it could be an important part of the case since Mr. Sherak is

17   probably going to be central to the Defense to have possible

18   witness for impeachment or credibility as to Sherak's

19   testimony.

20           THE COURT:  Okay.  The Court's going to deny the

21   issuance of subpoena to Mr. Cox, finding that his case --

22   Mr. Quinley is right.  Whatever happened in his case is not

23   relevant to what happened in your case, Mr. Johnson.

24           Mr. Sherak is going to be testifying.  Mr. Cox cannot

25   testify as to the credibility of Mr. Sherak, because the

1    credibility is an issue for the jury to decide.

2              MR. JOHNSON:  May I add one thing?

3              THE COURT:  And the Court will note your objection to

4    the denial of issuance of subpoena to Mr. Cox.

5              MR. JOHNSON:  May I just add one thing?

6              THE COURT:  Pardon?

7              MR. JOHNSON:  May I just add one thing?

8              THE COURT:  Sure.

9              MR. JOHNSON:  Also, you know --

10             THE COURT:  And, again, this is not a conditions of

11   confinement case.  Go ahead.

12             MR. JOHNSON:  Mr. Cox also had direct conversations

13   with me, so he could speak directly to my motive, and I think

14   in that way he would be very pertinent, because I have had

15   conversations directly with Mr. Cox about why --

16             THE COURT:  Well, that would be hearsay.  He can't

17   testify as to conversations he -- That would be hearsay.

18             MR. JOHNSON:  Okay.

19             THE COURT:  I mean, you can testify if you choose,

20   but you don't have to testify.  But if you want to take the

21   stand you can testify as to what you said, but you can't have

22   somebody else testify as to what you said, because that's

23   hearsay.

24             MR. QUINLEY:  And, Your Honor, I hate to interrupt,

25   but I think this perhaps -- because Mr. Johnson is appearing

1    without counsel, perhaps this is something that the Court

2    might wish to address with Mr. Johnson just so that he

3    understands the rules under which we are proceeding; that as

4    he's acting as his own attorney -- And it's in a Third Circuit

5    pattern instruction that we submitted to the Court.  But,

6    under the rules of the Court if Mr. Johnson is acting as an

7    attorney then the very same rules apply to him as to an

8    attorney, and the Court is going to be instructing the jury

9    that what an attorney says in opening statement, closing

10   argument is --

11           THE COURT:  Is not evidence.

12           MR. QUINLEY:  Simply the questions asked is not

13   evidence.  And I think Mr. Johnson needs to be aware of that

14   so he can make an informed decision as to whether or not to

15   testify.  Of course, he can't be forced to testify, but he may

16   think as a matter of strategy that he will testify plenty

17   without being sworn and taking the witness stand, and I think

18   it would be useful that the Court is assured that he

19   understands that that's not the system that we work under.

20           THE COURT:  Do you understand that, Mr. Johnson?

21           MR. JOHNSON:  Actually, Your Honor, I'm quite aware

22   of that situation.

23           THE COURT:  Okay.  All right.  Then we have three

24   filings -- Well, we have the United States' Notice of Intent

25   to Request Judicial Notice.  Mr. Quinley?

1          MR. QUINLEY:  Yes, Your Honor.  We just wanted the

2    Court not to be surprised and Mr. Johnson not to be surprised

3    and, of course, we provided the web links so that if the Court

4    wished by itself or through its staff that it could examine

5    it.  But, we intend to put on Mr. Hanna who has actually, and

6    at least with regard to the International Court of Justice,

7    did this in connection with his representation of William True

8    and Kathy Hill historically that we will be presenting

9    admissible evidence under the rules from which it can be

10   accurately and readily determined that there is no judgment of

11   the International Court of Justice.

12          In addition, we will be presenting again admissible

13   evidence that there is no such treaty as Mr. Johnson has

14   referenced in this creation of his.  And we are going to ask

15   that with the evidence available to the Court that the Court

16   actually, under the Rule 201, make the judicial notice finding

17   that that's a fact.  And, of course, for a criminal case the

18   jury is not required to accept that, but that the Court's

19   judicial notice is evidence in the case.

20          And I think it's sensible in this particular case,

21   because, for instance, the publication treaties in force is

22   594 pages.  And, so, I think rather than putting that kind of

23   burden on jurors to wade through a publication of public

24   authority, I think the rule makes plain that the Court can

25   simply find by judicial notice that certain things are facts;

1   that there is no such World Court judgment and that there is

2   no such treaty under either of its two names that Mr. Johnson

3   refers to.  Now, again, I think the proper time -- and, of

4   course, the rule says that this can be done at any time --

5   would be when Mr. Hanna identifies these sources and we move

6   for their admission.

7           THE COURT:  All right.  Okay.

8           And then we have a Notice of Expert Witness.

9           Again, this is Judge Joan Donoghue, Mr. Johnson.

10          MR. JOHNSON:  Yes.

11          THE COURT:  You said she's a Judge in the

12   International Court, --

13          MR. JOHNSON:  Justice.

14          THE COURT:  -- is that correct?  World Court?

15          MR. JOHNSON:  Correct.

16          THE COURT:  The Marshals tried -- You know, the only

17   address that we had for her was the United Nations.  We cannot

18   serve subpoenas at the United Nations, because, guess what,

19   it's on foreign soil and U.S. Marshals have no jurisdiction to

20   enter foreign soil to serve a subpoena.  And, other than that,

21   we have no idea where this Judge Joan Donoghue is.

22          MR. JOHNSON:  It's funny to me, Your Honor, that with

23   all the resources of the Government that you can't find

24   somebody that is a public figure that already -- that worked

25   for the Government for over 20 years when her testimony is

1   actually central.  You want to turn around and put in evidence

2   that no judgment exists, but you don't want to find out from

3   the Judge where the one judgment exists.  This is the kind of

4   stuff that to me it's a railroad approach towards my

5   conviction when I can't even get the witnesses that -- and

6   then you put me in a box and you say, "Well, you can't talk to

7   anybody, you can't have anybody try to help you find," and

8   then, "Oh, you didn't get a lawyer, so too bad."  This is

9   really a very unfair advantage.

10          THE COURT:  Well, all I know is I issued a subpoena

11   and it couldn't be served.

12          MR. QUINLEY:  Your Honor, may I suggest additional

13   grounds for denying any further effort in this regard?  There

14   is absolutely no good-faith indication whatsoever and, in

15   fact, much to the contrary that this Judge of the

16   International Court of Justice has any relevant evidence to

17   provide.

18          Mr. Johnson has produced nothing to suggest that she

19   has any relevant evidence, as opposed to the actual records of

20   the International Court of Justice, the actual processes of

21   the International Court of Justice, the actual reality of

22   these treaties that he cites that do not exist.

23          So, Your Honor, I think the Court admirably went to

24   some effort to try to accommodate Mr. Johnson, but if the

25   Court was able to speak with Judge Donoghue she would tell him

1   nothing different than what the Court will already have in

2   front of it, and I think Mr. Johnson has to show some good

3   faith basis that she would provide relevant information.  What

4   he provides the Court is his assertion about a process of

5   which there is no evidence other than his assertions.

6       THE COURT:  All right.  Next we have the formal

7   objection to false designation, the man being the Defendant.

8       Mr. Johnson?  You know, this is not in the form of a

9   motion.

10      MR. JOHNSON:  No, it's just an objection in the

11  record and I put it in informally so that, you know, you are

12  going to continue to refer to me as *pro se*, you are going to

13  continue to refer to me as *Defendant*, I'm not going to sit

14  here and object every 15 seconds.

15      THE COURT:  The Court will note a continuing

16  objection for the record.  Okay.

17      MR. JOHNSON:  Correct.  Can I just add one thing

18  about the Judge Donoghue situation?

19      THE COURT:  Sure.

20      MR. JOHNSON:  The Prosecution has already provided me

21  discovery where there's recorded phone calls of Sherak telling

22  me that the judgment exists, telling me that Judge Donoghue

23  signed it, that there was escrow accounts.  These facts are

24  going to come out in trial, of course.  But, you know, this is

25  not just my invention, my imagination.  And though I may not

1    have the exact name of the treaty correct, I would like to

2    look at those -- I would like to have access to those 534

3    pages so that I could at least look and see if I can identify

4    the 30 days that I am looking for and it might be under a

5    different name.  So, you know, these are the opportunities I

6    have to bring forth evidence, and I'm not -- and I'm being

7    denied these opportunities.

8            I would love nothing better than to have direct

9    access to Joan Donoghue to say yea or nay on the situation.  I

10   would love nothing better than to have the treaty to say this

11   is the one I relied on.  But, the treaty that was mailed in

12   based on what I told Mr. Sherak to identify the treaty was

13   able to be identified, it was sent in by Senator Cory Booker's

14   office, according to Mr. Sherak.  So, the treaty made it into

15   the facility, but never made it into the hands of Mr. Sherak

16   or myself, and so I was denied the opportunity to have the

17   treaty right now that I could say, "Oh, this is the treaty I

18   relied on," and I was denied that by the very circumstances of

19   confinement.  So, to continue to block me from all the

20   particular evidence and then to turn around and say I have no

21   evidence to justify, it's just kind of a circle jerk, it's

22   kind of a continuous self-authenticating scenario and, you

23   know, I think at the very minimum I should have access to the

24   584 on a discovery disk so I can see if I can produce the --

25            THE COURT:  Your objection is noted.

1          MR. JOHNSON:  Okay.

2          THE COURT:  Then we have this Notice of Dishonor, and

3    the Court will be striking that, as well as striking the

4    Formal Objection to False Designation, but the Court will note

5    that that's filed for the record, okay?

6          Anything else before we go down to jury selection?

7          Now, jury selection will be -- I will be asking all

8    the questions.  The procedure is we are going to be picking in

9    panels of four and there will be one alternate.  I will do all

10   the questioning, and then after the jurors -- after all the

11   questioning is done, the jurors take a recess and we will go

12   over the jury selection.  Like I say, we pick in panels of

13   four.

14         I allow back-striking within the panel, Mr. Johnson.

15   But, once the panel is -- Back-striking is if you accept a

16   juror that you tender to Mr. Quinley and then you change your

17   mind and you want to strike that juror later on.  It only has

18   to be done in the panel, before the panel is accepted.

19         And then once we get the jury selected we will take a

20   recess, and then when the jury comes back they will be sworn

21   in, I will give some preliminary instructions to the jury

22   regarding procedure, and then we will have opening statements.

23         Everything is going to be done from the table.  All

24   the questioning will be done from the table.  If there's

25   evidence, documents to be handed to witnesses, my law clerk

1    will be there to be the runner.  This is going to be in the

2    big courtroom downstairs, Mr. Johnson.

3            So, is there any questions on jury selection?

4            MR. JOHNSON:  I have some questions in regards to

5    jury instructions.

6            THE COURT:  Okay.  Let me stop.  You have ten

7    peremptory challenges and the Government has six.  So, that

8    means you can strike a prospective juror for any

9    nondiscriminatory reason.

10           MR. JOHNSON:  Okay.  Thank you.

11           I guess Friday we had to have our jury instructions

12   in.  I did the best I could.  I put them in the mail on

13   Friday.  I don't know if the Court received them.

14           THE COURT:  We will probably get them today, then.

15           MR. JOHNSON:  Well, not with this particular unit.

16   But, you know, Mr. Burgess told me that he was faxing -- you

17   know, that he was scanning these copies to you, to the Court,

18   and to the Prosecution.  I don't know if that happened.  I

19   wanted to bring that to your attention.

20           MR. QUINLEY:  I received them from Mr. Johnson.

21           THE COURT:  You did?

22           MR. QUINLEY:  Yeah, so I can provide it to you.

23           THE COURT:  Give them to my law clerk.

24           MR. QUINLEY:  I think one of the reasons Mr. Johnson

25   is raising this now is there's at least one that might be

```
 1    pertinent for the Court's preliminary instructions.  One is to

 2    your address.

 3              MR. JOHNSON:  Yes.

 4              THE COURT:  Okay.

 5              MR. JOHNSON:  And I wasn't really provided the

 6    pattern instructions.  I looked in the law library and they

 7    weren't available anywhere.  I would have probably liked to

 8    take a little more time to work on the jury instructions, but,

 9    again, I think just the --

10              THE COURT:  Have you tendered to Mr. Johnson your

11    instructions, Mr. Quinley?

12              MR. QUINLEY:  Yes, but I don't know if he's received

13    them.

14              MR. JOHNSON:  I have not.

15              THE COURT:  We will make sure you get them today.

16              MR. JOHNSON:  I don't know if there's a certain

17    pattern, like you said, that you mentioned in your order, but

18    I never -- I didn't have access to those and I thought it

19    would have been nice to have more time to prepare jury

20    instructions, and I will just note an objection, continuing

21    objection to the way that this trial --

22              THE COURT:  This trial is going to take two or three

23    days, possibly, so you will have time to look them over.

24              MR. QUINLEY:  And hopefully during the lunch hour if,

25    you know, you would like to review them then.
```

```
 1              MR. JOHNSON:  Okay.  Will I be in chains the whole
 2   time during trial?
 3              THE COURT:  Downstairs he will be bolted to the
 4   floor?
 5              MARSHAL ROBERTSON:  Yes, Your Honor.
 6              THE COURT:  Other than that you won't be in any
 7   chains.
 8              MR. JOHNSON:  Okay.
 9              THE COURT:  Okay?
10              MR. JOHNSON:  Okay.
11              MR. QUINLEY:  That's why we are both remaining at
12   counsel table for all questions.
13              MR. JOHNSON:  I figured that's why I was.
14              MR. QUINLEY:  But your hands should be free, right?
15              THE COURT:  Your hands will be free.
16              Okay.  Anything else before we proceed downstairs?
17              MR. QUINLEY:  Oh, Your Honor, we are currently -- I
18   don't know whether it was directly or through Mr. Burgess, but
19   Mr. Johnson wanted items from the electronic discovery printed
20   off for his use.  I don't think he needs them during jury
21   selection, but we are in the process of trying to print at our
22   printers across the street the things that Mr. Johnson
23   requested.
24              THE COURT:  Okay.
25              MR. JOHNSON:  I'm still catching up on discovery.  I
```

```
 1    haven't been able to truly get through all the disks, though I

 2    am being diligent in using the discovery computer, which you

 3    guys can validate.  But, there will probably be more printed

 4    documents.  I still would like some basic supplies, like some

 5    file folders and maybe a highlighter or sticky notes or some

 6    way for me to try to organize for a trial.  I don't know that

 7    not having a lawyer should be another disadvantage.

 8              THE COURT:  We will get you sticky notes, get you a

 9    highlighter.

10              MR. JOHNSON:  I asked for these things more than a

11    week ago and was told I wasn't going to get them.

12              MR. QUINLEY:  Well, they are not prevented in the

13    CMU, but in the courtroom --

14              THE COURT:  In the courtroom you will get them.

15              THE CLERK:  Judge, we have these we could give him.

16              THE COURT:  Okay.  Go ahead and give it to him.  We

17    have a highlighter.  We will get him a highlighter and a pad.

18              There you go.  There's a pad right there.

19              MR. JOHNSON:  Okay.

20              THE COURT:  What kind of pencil do they use?  Jim, do

21    they have a special kind of pencil?

22              MARSHAL ROBERTSON:  I will look and see if we have

23    one.  We usually have them.

24              THE COURT:  As soon as the jury is -- We will get you

25    downstairs before they bring the jury in.
```

1          MR. QUINLEY:  Again, just on logistics, we have 50

2     marked exhibits that may or may not be admitted, but we have

3     four copies of each one of the exhibits.  So, and I guess this

4     is more for the Clerk since he's going to be the runner, so

5     that there would be a copy that would be the original, but

6     then a copy for Mr. Johnson, a courtesy copy for the Court if

7     the Court wishes to have them, --

8          THE COURT:  Yeah.

9          MR. QUINLEY:  -- and then we will retain one.

10         Now, there are a number of exhibits, 3 through 8,

11    that are actually the Court's file for particular proceedings.

12    Now, we haven't made -- Well, we have made three binders, so

13    we have the bankruptcy proceeding for Mr. True.

14         I think as the Defendant acknowledged at least to the

15    Government at the Final Pretrial last week, we have not done a

16    binder for Kathy Hill because they are the same documents.

17    So, instead of two very large binders --

18         THE COURT:  Just one.

19         MR. QUINLEY:  -- there's just one.  But, we have a

20    placeholder for Ms. Hill as Exhibit 4.  But then we also have

21    the few documents that were the preliminary civil opened in

22    error, case prior to transfer, so that's available and then we

23    have the -- as you refer to it.

24         Oh, then we have the two appeals from the bankruptcy

25    that appeared before Judge Rosenstengel, so that would be 5

1    and 6.

2            And then No. 7, Mr. Johnson wanted to make sure the

3    *habeas* was here, so we have the full record of the *habeas*

4    proceeding in the binder.  And then the final one is the

5    proceeding before Judge Rosenstengel back in 2015, a much

6    smaller one.  And, in fact, there is a necessary

7    cross-reference from the bankruptcy where Mr. Johnson

8    identified a particular document in the *habeas* proceeding in

9    necessary support of his bankruptcy filing, or allegation of

10   the bankruptcy, Document 3, and so we have got copies of that

11   and have that loaded and, of course, the petition.

12           But otherwise, the contents of the binders, other

13   than the fact that you have the entire binder, courtesy copy

14   for the Court, copy for Mr. Johnson, we haven't individually

15   loaded these into Trial Director or scanned them.

16           The other exhibits we have loaded into Trial Director

17   so we will be able to, if it's admitted, call it up and

18   display it.  And I know the Court would have the ability to

19   have Mr. Johnson view it -- Well, he should be able to view a

20   paper copy.

21           THE COURT:  Right.

22           MR. QUINLEY:  But, at any rate, before it's admitted

23   we can look at it, right?  There's a way the jury wouldn't see

24   it before it's admitted?

25           THE CLERK:  Correct.

```
 1              MR. QUINLEY:  So, logistically that's our
 2   organization.  And we intend, Your Honor, for Mr. Johnson, to
 3   start with Adam Hanna, to go to Warden True, and then,
 4   depending upon time, put on Nell Leffel.  Kathy Hill would be
 5   the logical next witness, but Ms. Leffel may have to return to
 6   Florida, so it depends on timing.  And then after that, Gary
 7   Burgess.  And we may have one or two final witnesses.
 8              But, that's basically the order of presentation.
 9              THE COURT:  Okay.  All right.
10              MR. JOHNSON:  I would like to know a little bit about
11   the Defense witnesses.  Who have you obtained?
12              THE COURT:  Okay.  Sherak?
13              THE CLERK:  By video.
14              THE COURT:  By video when?
15              THE CLERK:  Today at 2:00, but --
16              THE COURT:  Today at 2:00.  We will take them out of
17   order.  We have a video set up for him.
18              MR. QUINLEY:  I don't think anybody will be able to
19   understand his testimony until at least near the Defense case.
20              THE COURT:  Why don't we try to move it to tomorrow,
21   then?
22              THE CLERK:  What time?  10:00?
23              THE COURT:  Yeah, we will move that to tomorrow.
24              MR. JOHNSON:  Any other witnesses?
25              MR. QUINLEY:  We will take a Defense witness before
```

```
 1    the Government has completed its case?

 2              MR. JOHNSON:  I would rather not, anyway.

 3              THE COURT:  Okay.  Well, let's try to make it

 4    tomorrow afternoon.

 5              THE CLERK:  Okay.

 6              MR. QUINLEY:  Thank you, Your Honor.

 7              And Mr. Clinton Bigham is going to be seated at

 8    counsel table.  And I don't know how the Court feels about two

 9    representatives of the FBI or how Mr. Johnson feels about it.

10    I mean, it's possible that Agent Wechter would be called, but

11    not likely.

12              THE COURT:  I don't know.

13              MR. QUINLEY:  I don't know if Mr. Johnson wants him

14    excluded or not.

15              THE COURT:  Do you want him excluded?

16              MR. JOHNSON:  I'm not going to object to it.

17              THE COURT:  Okay.

18              MR. JOHNSON:  What other witnesses were obtained?

19              THE COURT:  Those were the only ones that we were

20    able to locate.

21              MR. QUINLEY:  What's the situation with the

22    attorney --

23              THE COURT:  Oh, your mother.

24              MR. QUINLEY:  We have subpoenaed her.  She's going to

25    be here to testify for the Government; or as the Government's
```

1    witness, I should say.  We subpoenaed her, are putting her on.

2    So, I would ask that Mr. Johnson also ask whatever is relevant

3    in the Defense case just so that she can travel.

4              THE COURT:  Right.

5              MR. QUINLEY:  The last thing.  Has there been any

6    communication with this Wiesner, the attorney?

7              THE COURT:  We have not, no.

8              MR. JOHNSON:  Okay.  So, the only witness that the

9    Defense was able to obtain was Stephen Sherak?

10             THE COURT:  And your mother.

11             MR. JOHNSON:  What about his mother, Faith Sherak?

12             THE COURT:  Haven't been able to locate her.

13             MR. JOHNSON:  Okay.  And then there was five -- There

14   was five granted.  Elliot Wiesner, Donoghue you have

15   addressed.

16             Do you recall what the fifth one is?

17             THE CLERK:  There was two Sheraks.

18             MR. JOHNSON:  Two Sheraks, Elliot Wiesner, Donoghue.

19             LAW CLERK:  Michael Puckett.

20             THE COURT:  Pardon?

21             MR. JOHNSON:  Michael Puckett.

22             THE COURT:  Yeah.

23             THE CLERK:  Judge, as far as the witness that's

24   appearing by video tomorrow, how is he going to have the

25   exhibits?  He would have to have them in person, and I don't

 1   have an idea of what exhibits he will need, because he won't

 2   be able to see what's showing on ELMO.

 3          THE COURT: Well, we will just have to describe the

 4   exhibits to him.  I don't know.  We will figure that out.

 5          THE CLERK:  I mean, it's the Defense's witness.

 6          MR. JOHNSON:  I have a couple of other questions

 7   concerning that.

 8          So, Mr. Puckett is coming or not coming?

 9          THE COURT:  No, we don't have any -- We were not able

10   to serve him.

11          MR. JOHNSON:  Okay.

12          MR. QUINLEY:  Your Honor, again, I don't know --

13   Look, he's a current employee of the Bureau of Prisons in the

14   regional office in Kansas City, Kansas, yes.  However, he was

15   the disciplinary hearing officer on this first instance of

16   November 25, 2016, that I mentioned to the Court where

17   Mr. Johnson was attempting to get involuntary bankruptcy

18   petitions sent out on 30 Bureau of Prisons employees, which

19   the Government is going to be presenting evidence on.  But,

20   Your Honor, unless the Defendant can show -- if the Defendant

21   can show the Court to the Court's satisfaction that the

22   hearing officer who reviewed the discipline that he received

23   for that incident is relevant to his defense, you know, at an

24   appropriate time I would be asking the Court and I think the

25   Court will be more fully informed later to make a ruling.  And

```
 1    if the Court rules that Mr. Johnson should be permitted to put

 2    him on, we will make arrangements to get him here.

 3              THE COURT:  Okay.  All right.

 4              MR. QUINLEY:  Is that fair?

 5              THE COURT:  We will do it that way.

 6              MR. JOHNSON:  With Mr. Sherak incarcerated, I guess,

 7    you know, the questions of documents from him providing -- I

 8    guess he provided none and, you know, I need to know about

 9    that.  Again, that's a good question, how do I show him

10    documents.  I'm sure I could probably have 30 or 40 exhibits

11    or documents to try to bring in through Mr. Sherak at a

12    minimum, and so I would like to know how to do that.

13              And, secondly, if I want to bring up a document --

14    Well, I guess Sherak is going to be my only witness.  That

15    would be how to address it.  I don't know if I'm going to be

16    able to pull up documents from discovery to do

17    cross-examination with the Government witnesses.  I'm not sure

18    how that works or what you have got arranged downstairs.

19              MR. QUINLEY:  Again, the law clerk serving the Court

20    is going to act as a runner.  Any document you have, he can

21    take it up, lay it on the ELMO so it can be displayed for

22    everyone.

23              MR. JOHNSON:  What if it's not paper?  What if I have

24    to pull it up as a disk or something?

25              MR. QUINLEY:  Well, that's why you've identified the
```

1    things you wanted, and they are being printed across the

2    street.

3          MR. JOHNSON:  I understand.  And that's not a

4    complete list.  You know, I am working on the fly and with not

5    enough hours to go through all the disks and print.  I haven't

6    had enough time to organize.

7          MR. QUINLEY:  Every time you give us additional we

8    will have somebody go across the street and print them out.

9          But, Your Honor, I don't think there's going to be

10   any means for the Defendant to access electronic records in

11   court.  The Government is not going to have that means,

12   either.  It would have to be outside of the court.

13         MR. JOHNSON:  Then I don't have to bring the disk

14   with me to court every morning.

15         MR. QUINLEY:  Yes, because there would be no way to

16   access them.

17         MR. JOHNSON:  All right.

18         MR. QUINLEY:  Okay; very good.

19         THE COURT:  Okay.  We will recess until we begin jury

20   selection.

21         THE CLERK:  All rise.

22         (Court in recess)

23         (Following jury selection, proceedings continue in

24   open court.)

25         (Voir Dire/Jury Selection not ordered for

1    transcription).

2             (Following a recess, proceedings continue in open

3    court; jury present.)

4             (Jury panel sworn)

5             THE CLERK:  Please be seated.

6             Again, ladies and gentlemen of the jury, I want to

7    thank you for your participation in this trial.  There's an

8    order in which trials are conducted and I want to go over that

9    with you.

10            Soon you will hear the lawyers' opening statements,

11   and then the evidence will begin.  The Government will have a

12   chance to present their witnesses and other evidence that you

13   may see or hear.  Then the Defendant, who's presumed innocent,

14   will have the chance to present his witness and any other

15   evidence you may see or hear.

16            Again, I want to remind you the Defendant need not

17   testify if he chooses not to so do.

18            After all the evidence is in the lawyers will have

19   the opportunity of making final arguments; the lawyers and

20   Mr. Johnson will have the opportunity to make final arguments.

21            Before the final arguments I will be instructing you

22   on the law.  First I will read the instructions to you, and

23   then you will get them in writing.  You will have those

24   instructions with you in the jury room when you begin your

25   deliberations.  You will also have those exhibits I have

1    allowed into evidence and have decided you should have in the

2    jury room.  After you hear my instructions on the law and the

3    arguments of Mr. Quinley and Mr. Johnson, you will then retire

4    to the jury room, then for the first time you will begin

5    talking about the case; that is, you will begin your

6    deliberations.  Up until that time you will not have discussed

7    anything about this case with anyone, not with friends,

8    family, among yourselves, or anyone else.  You will have kept

9    an open mind, not reaching any opinions or conclusions until

10   you have heard everything there is to hear and that you have

11   been instructed on the law and have begun your deliberations

12   in the privacy of the jury room.

13           I want to explain something that you may hear during

14   the course of the trial.

15           During the trial you may hear Mr. Quinley and

16   Mr. Johnson make objections.  The parties -- The lawyer and

17   Mr. Johnson -- Mr. Quinley and Mr. Johnson have the right to

18   make objections if they believe testimony or other offered

19   evidence is not admissible under our rules.  When I sustain an

20   objection you will hear me say, "Objection sustained," and you

21   must disregard the question and answer if one is given.  Do

22   not infer anything from the question and answer, and you must

23   not speculate on what the witness would have said had I

24   allowed the witness to answer.

25           There will be times that I strike evidence or

1    comments from the record.  When that happens you will hear me

2    say, "The jury is to disregard those words, they are stricken

3    from the record."  You must then completely disregard those

4    records and erase them from your minds just as if they were

5    not spoken.  When I sustain an objection to evidence or strike

6    any evidence you must completely disregard that evidence or

7    those words.

8         When I overrule an objection you will hear me say,

9    "Objection overruled." You may consider the evidence, but you

10   must not give it any more weight or meaning had the objection

11   not been made.

12        You have the ability to take notes, and we will hand

13   the -- Why don't you hand the note pads out now, Robyn?

14        Note-taking is strictly a personal preference.  I

15   have no preference one way or the other.  Some people like to

16   take notes, other people don't.  This is not going to be a

17   long trial, so if you don't take notes and someone else has

18   taken notes, it doesn't mean his or her memory is any better

19   than someone who is not taking notes.  You should rely on your

20   own memory of the evidence.  If your notes conflict with your

21   memory or someone else's notes conflict with your memory, you

22   are free to use your own memory of the evidence.  Just because

23   a juror has taken notes does not mean his or her memory of the

24   evidence has any more weight or impact than the memory of a

25   juror who has not taken notes.  Your notes will not leave the

1     courtroom.  They will be collected by Court Security when you

2     leave for lunch and at the close of the day, and they will be

3     returned to you during each day as this trial proceeds.

4          You are now going to hear the opening statements of

5     Mr. Quinley and Mr. Johnson.  Opening statements are not

6     evidence.  Opening statements are for the purpose of giving

7     the jury a broad brush view of what each party expects the

8     evidence is going to show.

9          Now, logistically I am allowing both Mr. Quinley and

10    Mr. Johnson to present their opening statements to you sitting

11    down.  Generally it's a procedure that they stand up, but at

12    my request they are going to be sitting down.  It's no

13    disrespect to the jury or to the Court.  And then during the

14    course of the examination of witnesses they will still be

15    seated.  When there is documents to be introduced into

16    evidence my law clerk will be assisting the parties and the

17    Clerk in getting those documents to any witness that may be

18    examining those documents.

19         So, we are now going to begin the opening statements

20    of Mr. Quinley.

21         Mr. Quinley, you may proceed.

22         MR. QUINLEY:  Thank you, Your Honor, Mr. Johnson.

23         Ladies and gentlemen of the jury, I would like to

24    call up the indictment in this case.  I think you've heard the

25    Judge say the indictment is the way in which a criminal case

1    begins.  And, of course, it's not evidence itself, but I think

2    it would be useful if all of us can see the indictment and

3    this will make this opening a little faster, too, I think.

4             So, if we can box the --

5             THE COURT:  Tina, can you hit the lights?

6             MR. QUINLEY:  Ms. Brazier has now enlarged the top of

7    the instrument and the first two paragraphs.

8             So, in the first paragraph we just identified

9    Mr. Johnson and where he's located.  And normally that

10   wouldn't be something, but in this particular case it's going

11   to be relevant, and so you will hear evidence and I think you

12   have already heard it even during the voir dire selection.

13            Now, in the second paragraph we identify W.T.  Now,

14   in this instrument it's just initials, but that's because this

15   is a public document.  That's Mr. William True.  He goes by B.

16   True or Bill True, and he's the warden at the Marion

17   Penitentiary and you will be hearing from him.

18            K.H. is Kathy Hill.  And she works on Mr. Johnson's

19   unit, this Communications Management Unit that you will be

20   learning about in the presentation of the evidence and, so,

21   also an employee there at the Marion penitentiary.  And

22   certainly Ms. Hill in her daily duties had interactions with

23   Mr. Kurt F. Johnson and to a lesser extent the warden.

24            Let's go to the next, please.

25            So, the bottom of the first page shows what are

1    fundamental allegation is here, and that's that Mr. Kurt

2    Johnson -- He devised a scheme to defraud both the warden and

3    Ms. Hill, and he did this by using legal process in the

4    Bankruptcy Court.

5            Now, let me just stop for a moment -- And, by the

6    way, this scheme was executed or attempted to be executed on

7    January 8, when Mr. Johnson actually succeeded in getting

8    involuntary bankruptcy petitions to be filed against both the

9    warden and Kathy Hill and, as alleged here, and as I think you

10   can imagine, an involuntary bankruptcy proceeding can be a

11   costly use of time and resources and was in this case.

12           Now, I don't know -- I think one person or two people

13   in the voir dire panel had mentioned they had the experience

14   of entering bankruptcy themselves, and our first witness in

15   the case, Mr. Adam Hanna, he actually was assigned -- he was

16   asked -- they asked for representation, the warden and Mr.

17   Hill, so Adam Hanna of our office, an Assistant United States

18   Attorney, he was assigned because he does bankruptcy work for

19   our office.  He was asked to defend them.  But, even though I

20   think most of us are aware that if you get into a situation

21   where you have debts that you can't -- just can't handle, you

22   just don't have enough assets, and so to get free of that

23   burden you might enter -- or, you know, the circumstances may

24   just require you to go into the Bankruptcy Court.  I think

25   most people are familiar that a person in that situation might

1    put themselves into that process, either Chapter 13 or Chapter

2    7, to reorganize their debts or try to get free of them.

3           What I think most people are not familiar with is

4    that there's a process in bankruptcy law called *involuntary*

5    *bankruptcy*, where a creditor -- and actually the rules are

6    fairly specialized; really takes three creditors most of the

7    time and there's some other technical rules -- but, basically

8    the idea that a creditor forces you into bankruptcy.  They

9    say, "This person has debts to me and to others that far

10   exceeds their assets, and I'm not going to try to collect from

11   them and I want them in bankruptcy and whatever assets they

12   have to be divvied up to me and, if there are other creditors,

13   there's supposed to be equitable sharing," okay?

14          But in this case we are going to show that Mr. Kurt

15   Johnson is using this legal process that's available under the

16   bankruptcy code, he's using it as a weapon to harm his captors

17   or attempt to harm his captors.  And, by the way, that's how

18   he describes them, as his captors, and you will see in the

19   evidence where he reveals his intent to cause harm to them.

20          And, as you can imagine, if you enter bankruptcy

21   voluntarily, that's reflected on your credit report for many,

22   many years and, of course, it's a public proceeding.  Well, it

23   shouldn't be any surprise that if somebody succeeds in filing

24   an involuntary bankruptcy against you, that's public, that

25   gets noticed.  All of a sudden all sorts of companies -- and

1    you will see this in evidence -- that have noted your

2    circumstance of being in Bankruptcy Court are going to be

3    sending solicitations to help debtor education, special deals

4    on vehicles and, of course, at very high interest rates.

5           So, both W.T. and K.H. could have had their consumer

6    credit negatively impacted.  You will learn in the evidence

7    that there was an attempt by Mr. Hanna to very quickly get the

8    Bankruptcy Court to seal the file, to try to eliminate or at

9    least minimize that threat.  But, you will learn in the

10   evidence that it didn't become sealed for almost 24 hours, and

11   you will see from the letters directed at both the warden and

12   particularly Ms. Hill, and continuing to be directed at Ms.

13   Hill, that businesses have noticed that her name is on a

14   filing in Bankruptcy Court through no fault of her own,

15   because you are also going to learn in the evidence that she

16   has no debt to the Defendant, nor does the warden, nor do

17   another 2,000- plus employees of the prisons.  But, more on

18   that in a moment.

19          So, you can see the beginning of the sentence in the

20   indictment, these involuntary bankruptcy petitions contained

21   false, imaginary, far-fetched --

22          And if we can go to the next page and box the rest of

23   that paragraph 5 and 6.

24          So, here's this claim of indebtedness.  Mr. Johnson

25   filed a document in support of the Form 105 that initiates

1    this involuntary petition in which he will allege that they

2    owed him $20 billion -- I mean, it's ridiculous on its face --

3    pursuant to a judgment he claimed to have obtained against

4    them in 2016 from the International Court of Justice.

5          Now, you are going to learn in evidence that, yes,

6    there's an International Court of Justice, it's in The Hague

7    in the Netherlands.  It doesn't hear individual grievances, it

8    doesn't hear grievances from non-Government organizations, it

9    doesn't hear grievances from corporations; it only hears cases

10   from states, from nation of states.  You are also going to

11   hear that it publishes all of its judgments, advisory opinions

12   and orders, and that it's easy to go and see all of those

13   judgments.  And the judgment that Mr. Kurt Johnson claims that

14   he has, of course, is not there, because it doesn't exist.

15         He used his mother, Nell Leffel -- And you will be

16   hearing from her tomorrow.  He used her to actually file the

17   Form 105.  There was some confusion initially.  It got opened

18   up as a civil matter in this court, but then at Mr. Johnson's

19   request it was transferred to the Bankruptcy Court and it was

20   opened, and so he had succeeded.  And, at any rate, his mother

21   can tell you why she helped her son file this.

22         It also contains allegations by the nature of it, and

23   I think Mr. Hanna will be able to address this, that the

24   allegations have to be made under a penalty of perjury and it

25   references this Section 1746 of Title 28.  And I think you

1    will see on almost all of Mr. Johnson's documents, he says --

2    that he creates that he says they're all done under the

3    authority of that statute.  It basically allows an unsworn

4    statement, but made under penalties of perjury to be relied on

5    in various proceeds.  He asserts and continues to assert that

6    he has this judgment and this debt.

7          Now, there's one little quirk here I need to mention

8    to you here in opening statement so you can follow it when we

9    actually get to the evidence.

10         There's an underlying document that Mr. Johnson

11   created.  It's a nine-page document that he says is the basis

12   for this nonexistent judgment.  And in this document it's nine

13   pages long.  He has a number of allegations, a long list of

14   allegations, and he writes in the document that when you

15   receive this -- And, by the way, it's never sent to Warden

16   True, it's never sent to Kathy Hill, but supposedly it's sent

17   to various people in the Bureau of Prisons.  And Mr. True and

18   Ms. Hill, well, they are included in the John Does or Jane

19   Does, because he says, "In addition to all the named

20   Defendants, the United States and all the named people in the

21   Bureau of Prisons," then he also says it's also against 2,000

22   John Does.

23         But, at any rate, it purports that there are all

24   these allegations about his horrible conditions of confinement

25   at Marion Penitentiary in the CMU and a horrible, horrible

place that's violating his rights.  And, after each one it
says, "You have agreed, you have agreed, you have agreed," and
he says in there, "So, if you don't respond within three days,
these are admitted."  So, he maintains that all of his
allegations are admitted.

Now, the other interesting thing is that he specifies
what the remedy is.  And you are probably going to see a
number of these things, I anticipate, and they all have a
remedy.  And he used to have a remedy of millions of dollars,
but for whatever reason his remedy in this particular one, by
the face of it, it shows that he created it in, I believe,
2014.  The remedy he writes in is $15 billion, plus $1 billion
for each CMU for each year that they remain in operation.

And, I am sorry, this is kind of long-winded.  I'm
going to get to why I say there's something you need to hear
about tax laws in a moment, but we'll get there.

So, 15 billion and 1 billion additional, and there
are two CMUs in the United States; one in Terre Haute and one
in Marion.  By the way, there are less than 80 prisoners
currently housed in both CMUs together out of almost 200,000
prisoners in the Bureau of Prisons.  And you are going to
learn about the CMU, why it exists, what they try to do.

All right.  So, 15 billion.  So, you get another 2
billion for 2015, another 2 billion for 2016, another 2
billion for 2017.  And that's when he tried to file the

1    bankruptcy was in 2017.  Well, that equals 21 billion.

2          Right by the appendix where he makes the allegation

3    about 20 billion, he also says that he has discharged 1

4    billion of the 21 billion debt owed to him by all Bureau of

5    Prison officials, including the warden and Ms. Hill.

6          Well, why in the world has Mr. Johnson cancelled 1

7    billion of the debt owed to him?  What you are going to learn

8    in the evidence is that part of the same scheme to harass

9    involved filing a form with the IRS and with the individual

10   debtors and it's a Form 1099-C and it's called *Cancellation of*

11   *Debt*.  And the reason why a creditor who forgives a legitimate

12   loan has to file a Cancellation of Debt Notice is because the

13   IRS considers that income to the debtor.  You don't have to

14   pay that debt, it's been cancelled, but you may have to pay

15   federal income tax on it.

16         So, he was using the involuntary bankruptcy or

17   attempting to as a weapon against his captors.  And in

18   connection with it and on the face of the very thing he files

19   in Bankruptcy Court, he also refers to this other technique

20   that he's using in parallel, and that is these 1099-Cs.  And

21   you will see that he had delivered to the prison -- He had one

22   of his compatriots on the outside mail and deliver to the

23   prison to, I believe, 14 people at the Marion prison,

24   including the warden, including Ms. Hill, the Copy B that goes

25   to the debtor of these 1099-Cs.

1          You are also going to learn that he's been attempting

2     this since at least November 25 of 2016, with 30 -- a list of

3     30 names that he wanted these involuntary petitions filed on

4     were seized at the prison when he tried to sneak the materials

5     out with a friend, Stephen Sherak, who's being released.  It

6     was stopped, it was caught.  And you will see correspondence

7     that he has with people on the outside instructing them what

8     he wants done versus his captors.  And you will see, in fact,

9     amongst the seized documents was a letter to his father in

10    which he explained that all hell would break loose when he got

11    these filed and maybe Washington just wouldn't want him in

12    their prison anymore.  And the last thing he said to the

13    father was perhaps -- or, "If all goes well, I will be out by

14    February."  And I would submit to you that that's the only

15    thing that's delusional, because I think you are going to

16    learn that the rest of this is purposeful, it's a dishonest

17    belief that this Defendant will persist in forever because it

18    serves his purposes.

19         All right.  Well, let's take a look at what the crime

20    is.

21         So, there's no evidence -- In fact, you are going to

22    see evidence that it does not exist.  And the treaties that he

23    claims it is based on do not exist.

24         So, let's go on to the actual charged offense, which

25    would be the next part of this page.  This gets us at least

1    for Count 1 -- And, Count 2 will be the same.  There will be

2    one count for the warden and one count for Ms. Hill.

3          So, what is the charge?  It's the scheme that we

4    described above and with the intent he actually files this

5    involuntary bankruptcy proceeding.  So, that's basically the

6    crime right there.  As I said, the next count is for Ms. Hill.

7          But, let's look at Count 3.

8          So, that's the first, that the filing of the

9    bankruptcy is the attempt to cause harm.  You know, it has the

10   potential of causing a monetary or property loss to the

11   victim.  And I think we all understand how important our

12   credit is, and any adverse credit can certainly be damaging to

13   anyone and certainly these two individuals.

14         Now, there's a separate statute, a separate crime

15   that actually makes the false declaration itself, as long as

16   it's made in connection with that Statute 17 -- well, it's

17   here in this document -- that the fraudulent declaration

18   itself is actually a crime made under the penalty of perjury.

19   The section number is on the next page, if we can just get it

20   up.  And there it is again at the top page.  And, again, Count

21   4 for Ms. Hill.  Yeah, you can see it up there at the top.

22         Okay.  So, really, two crimes with two victims, okay?

23   Counts 1 and 3 for the warden and Counts 2 and 4 for Ms. Hill.

24   And you will have this at the end along with the Court's

25   instructions on the elements of those offenses.

1          So, I mentioned the attempt in November of 2016, and

2    you will hear evidence about that, in fact, from Mrs. Hill,

3    because she actually seized the documents and she will show

4    you the relevant ones and the excerpts from it.

5          At some point you will also learn that they are

6    trying to prevent inmates from using these tax forms and using

7    these bankruptcy forms, Form 105.  They are trying to prevent

8    inmates in the CMU from actually getting proceedings going

9    that would damage Bureau of Prisons employees.  Nobody has a

10   right to file a fraudulent involuntary bankruptcy.  And you

11   are going to learn -- And, to complete that story, he succeeds

12   with these two.  And then within days of succeeding with these

13   two, they seize from him six envelopes going to five courts,

14   and in five of those envelopes are, 40 more involuntary

15   bankruptcy petitions against 40 Bureau of Prisons' employees

16   in addition to the warden and Ms. Hill, and again with the

17   same allegation of the same debt based upon the same

18   instrument.  So, Mr. Johnson is certainly persistent.

19         Now, the other thing you are going to learn in

20   evidence is that Mr. Johnson has access to the courts here in

21   the Southern District of Illinois.  There's the bankruptcy

22   proceeding and then there's things related to the bankruptcy

23   proceeding like the appeal taken.  But, he's had access to the

24   court -- and this will come out in evidence and I think

25   Mr. Johnson will agree -- because in the bankruptcy proceeding

1    he referred to a filing that he made in the habeas proceeding

2    and he asked the Bankruptcy Court to rely upon the instrument

3    that he filed in his habeas proceeding.  But, what you are

4    going to learn is that Mr. Johnson has access to file

5    proceedings and to have them heard and decided in the courts

6    here where he is housed.

7            In fact, in 2015, he had brought another case against

8    the Postmaster General of the United States, and that was

9    heard in this district.  I think from the evidence you will

10   hear that Mr. Johnson does have access to the courts to

11   redress his grievances.  What he cannot have is the ability to

12   file phoney processes for the purpose of harming his captors.

13           THE COURT:  Three minutes.

14           MR. QUINLEY:  Thank you, Your Honor.

15           He can litigate his complaints.  If he had a valid

16   judgment he could seek to enforce it, but not by filing a

17   phoney involuntary bankruptcy merely to damage the warden and

18   an officer on his floor, on his unit.

19           And I think when you've heard all the evidence and

20   the instructions of law from the Court you will be able to

21   assess that Mr. Johnson will try to persuade you that he is a

22   true believer in *We the People* and the Estate of Kurt F.

23   Johnson, and his judgment with the World Court simply has

24   weaponized this dishonest belief that he will persist in

25   forever, because it's what enables him to keep attacking

1    everyone involved with his imprisonment, and a valid complaint

2    could be heard in the appropriate form.  We cannot allow our

3    tax laws or our bankruptcy laws to be used to damage.

4              THE COURT:  Thank you, Mr. Quinley.  Time is up.

5              MR. QUINLEY:  Thank you, Your Honor.

6              THE COURT:  Mr. Johnson.

7              MR. JOHNSON:  Thank you, ladies and gentlemen, for

8    your duty.

9              First off, if I could, with a quick show of hands, do

10   you know who the Judge is in this case?

11             THE COURT:  They are not supposed to raise their

12   hands.

13             MR. JOHNSON:  They are not?

14             THE COURT:  No.

15             MR. JOHNSON:  All right.  Well, nix that.

16             Can I put up a document for them?

17             THE COURT:  Why don't you get it from him and give it

18   to -- Put it on the ELMO.  Show it to Mr. Quinley.

19             Come down further.

20             MR. QUINLEY:  No objection, Your Honor.

21             THE COURT:  The entire document is not on it.

22             LAW CLERK:  He only wants the bottom paragraph.

23             MR. JOHNSON:  First I would like to bring it to your

24   attention that what the Government has presented is not an

25   original thought.  This is what I would call the *Me Too*

1    *Movement.*  This is the paragraph from Judge Nancy

2    Rosenstengel, which is at the end of my appeal process that

3    he's talking about on one of the proceedings that were taking

4    place, and I would just like to read it out loud to you.

5        It says, "Finally, the Court finds this appeal

6    clearly frivolous.  It's hard to imagine a case with

7    allegations more fanciful, delusional, irrational, or wholly

8    incredible than one where a federal inmate claims the warden

9    of his prison and a prison staff member are indebted to him in

10   the amount of 20 billion because a judgment was purportedly

11   entered against them by the World Court and with no proof of

12   any judgment to boot."

13       Basically this is the beginning of the Government's

14   accusation, this is the beginning of the Government's

15   purported theory.  But, the theory is really at the tail end

16   of a much longer process.  What you are hearing about in the

17   World Court judgment is not an isolated incident that we are

18   describing by the last nine pages.  The process has actually

19   developed over a period of time by an international treaty

20   they say doesn't exist.  I say that they prevent me from

21   having the opportunity to actually get a copy of it and to

22   even present it here as evidence.

23       The process is administrative.  There is a judicial

24   review process by which the International Court of Justice

25   would review it.  That process probably wouldn't be on the web

1    page, which they are going to probably offer as evidence.

2    It's a little bit different and I want you guys to understand

3    the difference, that the process that was used is an

4    administrative process.  And, in fact, our Title 5, which is

5    the Administrative Procedures Act, is a copy from the

6    international process that I used.

7            It starts out with an administrative demand and you

8    will see on documents where it starts out with a demand, and

9    this is where the claims are made and you have an opportunity

10   to be heard, you have an opportunity to address the claim.  If

11   you do not address the claim then there is a Notice of Default

12   and opportunity to cure, that these are given different time

13   frames.

14           The one that was mentioned by Mr. Quinley was just

15   the last one, and that's called a Notice of Administrative

16   Judgment.  After the Notice of Fault, I believe on a demand

17   you are given 20 days to 30 days.  On the administrative

18   Notice of Fault you are given ten days to 20 days, depending

19   on the procedure, and then on the Notice of Default you are

20   given three days, and then on the judgment you are actually

21   not given three days.  After the three days judgment is taken

22   out against you.

23           That process goes to an international administrative

24   hearing officer.  In this particular case the administrative

25   hearing officer's name was a gentleman named Jonathan

1    Helmsford out of the Netherlands.  He hears the entire

2    process, he looks at all the documents and he tests them for

3    treaty compliance.  There's a $60 fee for this, and once that

4    is done he can refer it to the World Court or International

5    Court of Justice for judicial review.

6           I have had that process done six times, five of which

7    went to judgment and were confirmed as judgments, one that was

8    rejected.  The one that we are talking about relevant to this

9    case is the largest one of all of those and it happens to be

10   related to the Communications Management Units.  There were

11   2,145 listed Respondents, and the amount of the judgment, he's

12   correct, was 15 billion at the time that it was written and

13   continues to expand.  By that judgment, when it says *it is*

14   *agreed* or *you have agreed*, that means there are no more

15   argument, you have had your opportunity to talk about it and

16   you didn't talk about it.  You had an opportunity to put up

17   evidence and you didn't choose to do it, so basically you had

18   your due process opportunity.

19          What's happening now is the Government wants a second

20   opportunity, a second bite at the apple to create false

21   accusation and to use every advantage they have from my

22   conditions of confinement to try and prevent, as far as I'm

23   concerned, the evidence to be available, regardless of the

24   disadvantages I have suffered and the amount of or lack of

25   information that I have had access to.  And you will hear

1    about these obstructions and the different types of threats

2    and different types of situations and denials and access to

3    court in a general types of situation.

4         My particular prison is not like any other prison.

5    This is considered a terrorist unit, some special unit that is

6    highly regulated.  I would probably consider it a maximum

7    security facility, and they get the opportunity of determining

8    and making legal determinations about what is right, wrong, or

9    indifferent before any documents go out.

10        And, so, he mentions here that nobody has a right to

11   use these processes, court processes with fraud.  But at the

12   same time I would reverse that and say nobody has the right to

13   prevent the legitimate filing of these documents, and yet it

14   took me two years to file these documents and I had a

15   legitimate right for over two years to do so.  I did not

16   exercise that right until I had the right, and I was prevented

17   for, like I say, almost two years to actually get the

18   documents.  I had to go through massive gesticulations to

19   circumvent all the different procedures that prevent me from

20   doing legitimate business.  I can't just print off bankruptcy

21   forms, fill them out and send them out in the mail, because

22   guess who gets to stop them?  Kathy Hill and Mr. True.  They

23   can say, "Oh, well, we are not going to let you file

24   bankruptcy against us whether you have the right or not."  And

25   it's this kind of obstruction, this kind of David and Goliath

1  kind of story, if I can put it that way, that I am up against.

2  And you will see in many of the documents and probably in the

3  testimony that this is a persistent point of view that I have

4  offered, and this document, I think, was up already -- Do you

5  want to put that up?

6          THE COURT:  Show it to Mr. Quinley.

7          MR. QUINLEY:  That's fine.

8          THE COURT:  Okay.

9          MR. JOHNSON:  This appendix which was filed

10  originally with the petition -- And you will hear that there

11  was a lot of mishandling, and all these mishandlings of this

12  particular petition is because I was not able to even address

13  it in a civil manner and had to work with people in limited

14  communications.  My communications are routinely blocked.  I'm

15  currently blocked from almost all my outside contacts.  I have

16  no contact with my family at this time.  This is the type of

17  facility that I am in.  And I'm not sure why I am there, but I

18  believe it's for the opportunity to have them put you in a box

19  within a box, never let you have access to the outside world

20  and never let you defend yourself, never let you get the

21  evidence that you need to defend yourself, and under those

22  conditions and that kind of burden it's difficult, but I

23  managed successfully to accomplish something that is viable,

24  that is legal, and does give me an opportunity to address my

25  captors and, in all reality, I do believe all hell would break

1   loose.

2          The $20 billion might seem ridiculous on its face

3   but, if you had to live under these conditions of a Government

4   that is absolutely shameless about its disregard for the law,

5   has no respect for the processes of law, and uses force and

6   its ability to crush the little guy, if you want to put it

7   that way, I think quite frankly it probably should have been

8   more.  But, that is what it is.

9          But, in this appendix I just wanted to bring out a

10  couple of points that he's bringing up that are in the

11  indictment, is that the violation they believe that I -- or

12  the statute that they believe that I violated was 11 U.S.C.

13  303, as far as having a right.  That creates the right in the

14  bankruptcy.  They say that I don't have that right, and in

15  that particular -- that my statement about a $20 billion

16  judgment is fraudulent, that it doesn't exist, is what they

17  put in their indictment.  Yet, in the World Court I have this

18  number, this case #IWC 011416-A862234-003.  That is not a

19  fabrication or an invention of my own imagination.  That was

20  provided for me in the limited capacity of communications that

21  I had for the people that were handling my affairs on the

22  street.  That was provided to me.  11-303 allows for the

23  filing of a bankruptcy by a creditor if they have the right,

24  and I alleged in here under the Special Circumstances that

25  this debtor was a coconspirator in a continuing criminal

 1    enterprise, which is the basis of the judgment where they used

 2    overt and covert acts under the color of authority to defraud

 3    creditor rights, titles and interests.  These acts have not

 4    ceased by having the claims reduced to judgment.  In fact,

 5    obstruction of this process is almost a certainty.  We are way

 6    past it being *almost*.  It's been nothing but hell on earth in

 7    trying to address this particular right.  And, again, this is

 8    probably going to be entered into evidence and you will have

 9    an opportunity to look at some more details about the

10    conspiracy creditors and so on.

11            But, it's a wonderful thing to be a debtor and to

12    have the power of Government to prevent your creditor from

13    filing against you.  They have had the particular advantage

14    now and you will see that they believe and maintain the

15    advantage in these proceedings to continue to delay their own

16    bankruptcy.  That's a damage to me as a creditor of the

17    judgment I do believe exists; I can't show it to you, I'm not

18    allowed to get it in.  The treaty was mailed in by a Senator

19    Cory Booker.  I can't even get that into the unit.  I can't

20    get access to the law that I relied on, I can't get access to

21    people that helped me, can't get access to anybody to get the

22    information.  And the only reason you are going to see that I

23    have much of a viable defense is I got out of this unit -- in

24    the last six years I have been out of this unit 13 days.  In

25    that 13 days I was able to accomplish about 90 percent of my

1    defense.  That's the kind of situation that I am in where if I

2    were stuck in that box, anything they want to do to me they

3    could.  That's pretty much how it operates.

4           I will do my best to address all these issues as they

5    come up, but I believe that the Government is taking advantage

6    of the situation, because they say it doesn't exist.  They

7    have all the resources based on the information I have

8    provided in multiple court proceedings now.  They have all the

9    information they need to validate the judgment.  They choose

10   not to.  They would rather bring criminal charges.  The fact

11   that it is a weapon against my captors, it might turn out to a

12   weapon, it's totally irrelevant to me.  I was exercising a

13   legal right, and I believe I have every ability to exercise a

14   legal right just like you're exercising a legal right as a

15   jury.  I'm exercising a legal right to go to a jury trial.

16   Bankruptcy is no different than that.  If I have the right, I

17   have the right; if I don't, I don't, they can make the

18   fraudulent charge.  I have brought that to the Court's

19   attention.  I have been very honest and straightforward in all

20   of my proceedings and I have given as many facts as available.

21   And the way this judgment came to pass is that I gave the

22   facts that I did have to my friend, which is Stephen Sherak,

23   who you will hear about.  He was incarcerated with me at the

24   CMU.  Her sister is in banking.  Her name is Jacqueline

25   Sherak, you will hear about her, and she was able to, based on

1    the information that I provided, discover what treaty I relied

2    upon.  Then she was able to get a copy of the treaty and she

3    was able to give it to an attorney to do due diligence to see

4    if it's viable.

5          The attorney, who was a gentleman named Elliot

6    Wiesner -- you will hear about him -- did the due diligence,

7    discovered that these administrative processes are viable and

8    legitimate, and then based on that recommendation they went

9    forward and acted as agents on my behalf, presented them to

10   Jonathan Helmsford, and then he referred it to Judge Joan E.

11   Donoghue from the International Court of Justice on January

12   14, 2016.  And the United States appeared at that hearing.

13   And when the United States appeared they presented a couple of

14   different motions.  One called a *Motion For Abatement* and

15   another one for an injunction.  The abatement is to basically

16   say we can't argue against the judgment, but we can argue

17   against your processes and service and we think certain people

18   might not be qualified for the judgment.

19         She granted that and she also granted the injunction

20   to give them time.  Basically that stalled the enforcement of

21   the judgment during the time between their granting it and the

22   abatement hearing which she set for February 19th -- on

23   February 11, excuse me, once she developed a questionnaire to

24   develop the record for the abatement hearing.  And you will

25   hear about all of this in evidence.  And at that time she

1    received so much bad faith from the Government that she

2    recalled her abatement hearing and the injunction and granted

3    the final judgments on February 11, 2016.

4        I began pursuing the bankruptcy procedures probably a

5    few months after that.  An appeal was filed by the Government

6    and the appeal was affirmed on September 28, 2016.  The

7    Government's had every opportunity to do everything they

8    wanted to to validate it.  They have had somebody represent

9    them from the Department of Homeland Security, which I believe

10   is a gentleman named Andrew Feirstein.  They don't attempt to

11   validate any of that stuff.  They just want to put me on trial

12   and say, "Prove that something exists."  Why would they stop

13   you from proving anything exists?  That's the type of

14   situation that I am under.

15       It's my hope and desire that you pay close attention

16   to the facts, close detail to the facts, that you are able to

17   see truth behind all the trauma.  And there's going to be a

18   lot of lying and deceit here, and truth really matters, you

19   know, and there's --

20       THE COURT:  Three more minutes.

21       MR. JOHNSON:  Okay.  There's a way to test truth;

22   it's noncontradictory, it corresponds to reality, and it's

23   coherent.

24       And I ask that you guys will use these tests of

25   truth, because truth matters especially when you are on the

1    stinging end of a lie.  And the United States is not here, the

2    United States is a figment of our imagination.  The lying can

3    only be done by men.  We all stand in front of God, and that's

4    who answers for the lies.

5         So, I ask that you would be diligent and pay

6    attention to the truth and hopefully decide for the truth in

7    this big old drama and smoke screen of deceit.

8         As far as the harassment, there was never any

9    intention for harassment.  I was executing rights.  There

10   might be consequences of exercising those rights.  I have to

11   address my captors, because that's where the judgment

12   addresses and all hell will break loose and there are

13   consequences that might actually, you know, end in a possible

14   benefit of getting out.  But, I am not trying to extort

15   anybody, I'm not trying to create any frauds, and I believe

16   there will be enough evidence to show that that was never the

17   intention and that it's not delusional and that it's not

18   fanciful.  And though the numbers are big and I know they seem

19   big to you, that's what the Judge granted and that's what we

20   are dealing with.

21        Thank you.

22        THE COURT:  Okay.  Call your first witness, Mr.

23   Quinley.

24        MR. QUINLEY:  Mr. Adam Hanna.

25        THE COURT:  If anybody wants to stand, they can.

```
 1            MR. QUINLEY:  Your Honor, I'm going to have to run

 2   out and run right back in.

 3            THE COURT:  Okay.

 4            (Brief interruption in proceedings).

 5            THE COURT:  Come on in, Mr. Hanna.

 6            THE CLERK:  Please be seated.

 7            Please state your full name and spell your last name

 8   for the record.

 9            MR. HANNA:  My name is Adam Hanna, H-A-N-N-A.

10            THE COURT:  You may proceed.

11            MR. QUINLEY:  Thank you, Your Honor.

12

13                        DIRECT EXAMINATION

14   BY MR. QUINLEY:

15   Q.  Mr. Hanna, can you tell the ladies and gentlemen of the

16   jury how you are employed?

17   A.  Yes, I am an Assistant United States Attorney for the

18   Southern District of Illinois, and I'm assigned to the Civil

19   Division.

20   Q.  In the Civil Division, amongst other duties, do you handle

21   any bankruptcy matters that involve the United States?

22   A.  I do.

23            (Brief interruption in proceedings).

24   A.  Yes, one of my case area responsibilities in the Civil

25   Division is to handle bankruptcy matters in which the United
```

1    States is a party.  Some examples would be tax claims, claims

2    of various federal agencies.

3    Q.  In those cases the United States is the creditor with an

4    interest in the bankruptcy, is that correct?

5    A.  That's correct.  That's the most typical scenario that we

6    have.

7    Q.  All right.  Now, did a bankruptcy matter where the United

8    States was not involved come to your attention sometime early

9    in 2018, this year?

10   A.  The case I believe you are referring to, the case

11   involving Mr. Johnson actually came to my attention in late

12   2017, around the Christmas holiday.

13   Q.  All right.  And at that time had the matter been opened as

14   a civil proceeding here in the Southern District of Illinois?

15   A.  Are you referring to with the Court?

16   Q.  Yes, with the Court.

17          Well, here, why don't I just ask you to take a look

18   at Government Exhibit 5.

19          MR. QUINLEY:  And if I can ask Mr. Self to bring that

20   to you.

21   Q.  (By Mr. Quinley) Are you familiar with *Johnson v. Debtor*

22   17-cv-01385-JPG?

23   A.  Yes, so this is the case that was initially brought to my

24   attention in late December of 2017.

25          MR. QUINLEY:  Your Honor, for the convenience of the

1    record -- And I will ask the witness to confirm this, then.

2    Q.  (By Mr. Quinley) Is this the nine docket entries from the

3    electronic case filing system used by this district?

4    A.  Yes, it appears to be.

5         MR. QUINLEY:  All right.  Your Honor, I would ask

6    with that foundation that this --

7    Q.  (By Mr. Quinley) And would that be the complete record in

8    that matter as reflected in the docket summary?

9    A.  Yes, it appears that these nine docket entries comprise

10   the whole case.

11   Q.  And the docket summary printed out on September 18 of

12   2018?

13   A.  That's correct.

14   Q.  Okay.

15        MR. QUINLEY:  So, Your Honor, I would ask that at

16   least as to foundation, the case of *Johnson v. Debtor* be

17   received in evidence.

18        THE COURT:  Any objection?

19        MR. JOHNSON:  For the whole record to be inserted?

20        THE COURT:  Just this --

21        MR. JOHNSON:  All nine documents?

22        MR. QUINLEY:  Yes.

23        MR. JOHNSON:  I have no objection.

24        THE COURT:  Okay.  They will be admitted.

25   Q.  (By Mr. Quinley) And so because of this filing and the

1    first filing was when --

2           MR. QUINLEY:  Excuse me.  He's going to need that.

3           Leave that back there.

4           Thank you, Mr. Self.

5    Q.  (By Mr. Quinley) So, this record, the first entry in this

6    record I think you said was late in 2017.  When was the first

7    thing filed in this record?

8    A.  According to the docket sheet it was December 22, 2017.

9    Q.  And do you have a memory as to whether anything came to

10   your attention before Christmas, or was it after Christmas?

11   A.  I believe it was December 26th that I got an e-mail from

12   my supervisor, the Civil Chief, assigning me this case for

13   handling.

14   Q.  All right.  In fact, was that upon an order transferring

15   the matter to -- Okay.  Strike that.

16          At any rate, that's when you believe you got notice?

17   A.  Yes.

18   Q.  And then so what steps did you take when you learned of

19   it, when you got the assignment from the Civil Division Chief?

20   A.  So, we would have opened a file within the office, I would

21   have reviewed all the documents that were on the docket at

22   that time to try to bring myself up to speed on the case and

23   what had occurred up until that point.  I would have contacted

24   the attorneys with the Federal Bureau of Prisons and asked

25   them for litigation assistance, because they are typically

1    most familiar with cases involving federal inmates, and I

2    would have begun researching what we needed to do to defend

3    our clients in the case.

4    Q.  Okay.  So, Document No. 1, that would been available for

5    you to review, is that correct?

6    A.  That's correct.

7    Q.  All right.

8            MR. QUINLEY:  So, I'm going to ask Mr. Self if he

9    won't -- you have it there with you -- if Mr. Self won't take

10   Document No. 1 here and display it on the ELMO.

11   Q.  (By Mr. Quinley) And I think we see a file stamp of

12   December 22, we see a signature purportedly, then, of Kurt F.

13   Johnson, is that correct?

14   A.  Yes.

15   Q.  We see a reference on this document to -- Is it Title 28,

16   United States Code Section 1746?

17   A.  Yes.

18   Q.  And is that a provision permits the filing of allegations

19   under penalties of perjury?

20   A.  That's correct.

21   Q.  All right.  In fact, is the recitation at the bottom of

22   it -- And I don't know if we can blow it up, but you have it

23   right there in front of you.  Can you read the recitation on

24   the bottom *I, Kurt Johnson*?

25   A.  It says, "I, Kurt F Johnson, the Petitioner/Creditor,

1    declare and state that the facts presented in this petition

2    and the appendix are true, correct, not misleading based upon

3    firsthand knowledge, and as for those facts based upon belief

4    that are believed true, being of majority in age and competent

5    for testifying, reserving the right of amending for truth,

6    clarity and justice."

7    Q.  All right.  And then the reference to the statute?

8    A.  Yes.

9    Q.  As you later learned, did -- Strike that.

10           So, at this point were you familiar with the

11   allegation that's contained in the first paragraph of the

12   indictment?  Excuse me -- of the document, Document 1 in

13   Exhibit 5?

14   A.  Yes, I would have read this document when the case was

15   first assigned to me on or about December 26, 2017.

16   Q.  And let's see if we can't blow that up for the jury,

17   because I would like you to read that first paragraph for the

18   ladies and gentlemen of the jury, because we are going to be

19   going over this and I think it's useful for the very first

20   filing in report what the first paragraph says.

21   A.  "Petitioner has appended a certified copy of the judgment

22   claim affirmed on appeal and not a possible subject of a bona

23   fide dispute which meets all of the requirements of 11 U.S.C.,

24   Section 303(b), as Exhibit A in his habeas corpus petition,

25   *Kurt F. Johnson v. Todd Sloop*, filed in the Southern District

1    of Illinois, Benton, Illinois.  All relevant parties can

2    review said judgment there or obtain a certified copy from the

3    World Court IWC-011416-A862234-003 in New York for $75.  The

4    current value of the judgment to the Petitioner and direct and

5    immediate liability to this debtor as of January 1, 2017, is

6    $21 billion.  However, petitioner/creditor did cancel $1

7    billion through the 1099-C tax mechanism so that the current

8    unpaid balance is $20 billion.  It is believed by

9    petitioner/creditor that this debt obligation so far exceeds

10   the debtor's assets and income potential that they are

11   effectively bankrupt."

12   Q.  Now, as you began assessing this did you go ahead to the

13   habeas case, *Johnson v. Todd Sloop*, to take a look at this

14   Exhibit A that he references?

15   A.  I did.  And it took me a couple of tries to find it,

16   because he didn't give me a case number, but I did eventually

17   find the other District Court case that he's talking about.

18        MR. QUINLEY:  Mr. Self, leaving Exhibit 5 with the

19   witness, could you please retrieve Exhibit 7 and hand it to

20   the witness?

21   A.  Thank you.

22   Q.  (By Mr. Quinley) And, again, just for housekeeping

23   purposes, is that the entire record of filings with the Court

24   in *Johnson v. Sloop* with the cause number referenced 17-cv-

25   01010-DRH?

1  A.  It appears this is a complete docket sheet printed out

2  through September 17 of this year.

3  Q.  How many entries in that record?

4  A.  22.

5  Q.  All right.  Then are each of the entries contained in the

6  binder with a tab for each doc number entry?

7  A.  Yes, it appears that each document is at a tab that

8  corresponds to the document number.

9       MR. QUINLEY:  Similarly, as Exhibit 5, I would also

10  ask that this be also admitted.

11       THE COURT:  Any objection?

12       MR. JOHNSON:  No objection.

13       THE COURT:  It will be admitted.

14       MR. JOHNSON:  That's the whole record again, correct?

15       THE COURT:  Yes.

16       MR. QUINLEY:  Yes.

17       MR. JOHNSON:  Thank you.

18       MR. QUINLEY:  Now, if we can pull this up, if we can

19  switch from the ELMO to the Trial Directory display.

20  Q.  (By Mr. Quinley) Let's go to the first document filed in

21  that record, which has now been referred to in this filing

22  with the Court in Exhibit 5, if we can go to that very first

23  document and, let's see, one, two -- Well, it's page six.  So,

24  the very first document, is that not the -- It's 7-1.  So,

25  this is the very first document starting a 2241 habeas filed

1    by Mr. Johnson, is that correct?

2    A.  Yes, this is what I located when I found the *Johnson v.*

3    *Sloop* case.

4    Q.  All right.  And there's a number of allegations in the

5    body of it, but what he was referring us to in the document

6    that you immediately reviewed when your supervisor assigned it

7    to you, he referred to Exhibit A.

8         MR. QUINLEY:  And if you can turn to page six, pull

9    up page six, and if we can just box that and make it very easy

10   for everybody to read, including the top there, Document 1.

11        Perfect.

12   Q.  (By Mr. Quinley) Is that Exhibit A?

13   A.  Yes, it appears to be Exhibit A in this case.

14   Q.  And so were you able to locate, looking at Exhibit A, any

15   judgment?

16   A.  I was not able to locate a judgment on file with the

17   International Court of Justice, no.

18   Q.  Well, or even anything filed by Mr. Johnson.

19   A.  I at some point found a document that he purported that

20   was an unexecuted copy of a judgment.

21   Q.  Let's go to that point, then, 7-3.  At some point during

22   your representation -- And I guess we haven't gotten to that

23   yet.  But, in your representation of Warden True and Officer

24   Hill, in the course of that were you referred to this Document

25   No. 3 in the habeas proceeding by Mr. Johnson; I mean, that he

1    referred you to it?

2    A.  Yes, so I finally figured out that this is the document he

3    was referring to in the case that's referred to in Exhibit 5.

4    Q.  In fact, he kind of says that on this cover sheet that,

5    gee, it was supposed to be Exhibit A, right?

6    A.  That's how I understand it.

7    Q.  Okay, fine.

8            MR. QUINLEY:  Well, let's just take it as that.  But,

9    let's begin with the document itself, page 2, please.

10           Okay.  And now I think for readability I think we are

11   going to maybe take half at a time so we can go through the

12   Group 1, top Group 1, leave off Group 2, 3 and 4 in terms of

13   display.

14           Well, we need it from the top.

15           Tell you what, just take the top up to Group 1 and we

16   will get to what Group 1 says in a moment.  From the very top

17   to -- Yeah, there we go.

18   Q.  (By Mr. Quinley) So, anything you can tell us about this

19   once Mr. Johnson directed you to it and you examined it?

20   A.  When I looked at it it did not appear to me to be a

21   conventional judgment as I have come to understand them in the

22   course of my work as an AUSA.

23   Q.  Let's back up for a second.

24           Are you familiar with legal process by which people

25   file lawsuits?

1    A.   I am.

2    Q.   In fact, you have to defend the United States against

3    lawsuits filed by individuals?

4    A.   Yes, all the time.

5    Q.   And are those heard by judges of the United States?

6    A.   In my experience, yes.

7    Q.   Or perhaps judges of the State of Illinois?

8    A.   Yes.

9    Q.   Or in some other state in the United States of America?

10   A.   Yes.

11   Q.   In fact, are prisoners able to bring to the Court a

12   complaint about the conditions of their confinement in the

13   form of a lawsuit that can be heard in the court?

14   A.   Yes.

15   Q.   Do you and your colleagues from time to time -- Are you

16   called upon to defend the United States and employees of the

17   United States in such lawsuits?

18   A.   Yes, frequently.

19   Q.   And, in fact, can you even have those suits even proceeded

20   to where a jury determines the allegations made by the

21   Petitioner, the person bringing the lawsuit?

22   A.   Yes.

23   Q.   And, by the way, does the jury, then, make a

24   recommendation to the Court as to what the appropriate damages

25   would be if they find the United States liable or one of its

1    employees?

2    A.   If an individual employee is sued, yes, the jury would

3    determine the amount of damages for that.

4    Q.   And, in fact, would the Court that presided over the trial

5    also have the ability to determine whether or not an award of

6    damage was reasonable or not reasonable?

7    A.   I have not had that come up, but I believe so.

8    Q.   Okay.  And you know Courts in some cases, perhaps in State

9    Court, to have reduced the amount of awards of damages?

10   A.   Yes.

11   Q.   Okay, fine.  So, you say that this doesn't look like

12   anything that you are familiar with?

13   A.   That's correct.

14   Q.   Okay.  Well, let's just go here -- By the way, are you

15   familiar with the County of Johnson and State of Johnson?

16   A.   I'm sure there's a Johnson County, but not a State of

17   Johnson, no.

18   Q.   You believe -- Although the actual county, Williamson, is

19   listed and the actual State of Illinois is also listed?

20   A.   Yes.

21   Q.   All right, fine.  Now, it says, "This administrative

22   notice is made pursuant to, quote, the International

23   Administrative Private Remedy Process Treaty"?

24   A.   Yes.

25   Q.   By the way, have you found with the Department of State a

1    publication of all treaties that the United States is in, has

2    entered into?

3    A.   Yes.

4    Q.   All right.  And, by reviewing that publication have you

5    been able to determine whether there's any such thing as an

6    International Administrative Private Remedy Process Treaty?

7    A.   There is not.

8    Q.   All right.  And we will turn to those documents in a

9    second.

10            Now, it says here that demand is being made upon the

11   following.  And can you just read the list into the record?

12   A.   "United States of America, Inc., et al., all agencies,

13   departments, offices, officials, officers, employees,

14   contractors and subsidiaries, including every state of most

15   specifically."

16   Q.   Are you familiar with an entity the United States of

17   America, Inc.?

18   A.   No.

19   Q.   Is the United States of America a corporation?

20   A.   No.

21   Q.   All right.  Let's go to the groups now.  And I think we

22   can take Group 1 to the bottom and include his handwriting.

23   Include *the* handwriting, I should say.

24            All right.  So, now we have a list of the people this

25   is against, correct?

1   A.  Yes.

2   Q.  And I guess in Group 1 we have at least at that point in

3   time everybody in charge of all sorts of law enforcement

4   agencies and intelligence agencies?

5   A.  Yes.

6   Q.  Okay.  Now, when we get to Group 2, Martinsburg,

7   Virginia -- actually West Virginia, is there an office of the

8   Bureau of Prisons there that's involved in Case Management

9   Units?

10  A.  There's an office -- I'm familiar with this because I have

11  had a case with them before known as the Counter Terrorism

12  Unit of the Bureau of Prisons that operates there and I

13  recognize some of these names from my work on that case.

14  Q.  Okay.  Now, Group 3, are you familiar with the Regional

15  Office of the Bureau of Prisons located in Kansas City?

16  A.  Yes.

17  Q.  Then we have Group 4, Terre Haute, Indiana, THA.  Is that

18  the destination of that penitentiary?

19  A.  Yes.

20  Q.  All right.  And then we have a whole lot of people

21  employed there.

22          Let's go to the next page.  By the way, when you

23  examined the people listed in this thing that Mr. Johnson

24  directed to you, did you notice whether or not Warden William

25  True or Kathy Hill were listed in at least the first part of

 1    it?

 2    A.  I noticed that -- I remember noticing for sure that Mr.

 3    True was not.  I don't remember if Ms. Hill was on the list or

 4    not.

 5    Q.  So, we can get to the appendices to it in a second.  Now,

 6    for the Marion officials --

 7            MR. QUINLEY:  Let's just box the Marion officials.

 8    That's large enough, I think everybody can see it.

 9    Q.  (By Mr. Quinley) Now, apparently there was a different

10    warden at the time?

11    A.  Yes.

12    Q.  Although former wardens are also listed?

13    A.  Yes.

14    Q.  Assistant wardens?

15    A.  Yes.

16    Q.  And then I see Mr. Gary Burgess.  You are familiar with

17    him, aren't you?

18    A.  Yes.

19    Q.  He works in the CMU currently?

20    A.  Yes.

21    Q.  And apparently for some time, and then a lot of other

22    employees of the Bureau of Prisons at Marion?

23    A.  Yes.

24    Q.  Now, on the Does 1-2000, can you just read that in the

25    record?

1    A.   "Any and all employees who directly or indirectly advance

2    the operation of these illegal CMU units and the criminal

3    enterprise conspiracy overtly or covertly, regardless of their

4    participation, negligence, acquiescence, or silence when they

5    had a duty for speaking and exposing the fraud and crimes."

6    Q.   All right.  And I take it from time to time he starts

7    filling in the 1-2,000 Does with some specific names when he

8    gets them?

9    A.   Yes.

10   Q.   All right.  Let's go on, please.  Let's take the bottom of

11   it.  The bottom of that page is just -- It's just stuff about

12   the size of the paper and -- I mean, it's not very relevant,

13   is it?

14   A.   No.

15   Q.   Let's look so that everybody can see and we are not

16   skipping anything.

17          MR. QUINLEY:  2, which is actually 3.  The paging is

18   going to go from what it says at the top.

19          All right.  Just box that so we can really see it

20   doesn't have anything to do with anything.

21   Q.   (By Mr. Quinley) It just says notices to everyone and

22   demand is made.  Okay.  And then --

23          Oh, this is good.  The first underlying sentence

24   here, what is that?

25   A.   It says, "Silence is acquiescence and your tacit

1    agreement."

2    Q.  Now, you don't work in the CMU, do you?

3    A.  No, I don't.

4    Q.  You're an attorney?

5    A.  Right.

6    Q.  So, you don't have firsthand knowledge of many of the

7    allegations contained in here, right?

8    A.  That's right.

9    Q.  But, in your work as an attorney, except as ordered by a

10   Court or except as required by the legal process of a Court of

11   the United States or of a state, is anybody required to answer

12   what Mr. Johnson writes?

13   A.  No.

14   Q.  And so is Mr. Johnson entitled to claim that silence is

15   acquiescence in your tacit agreement?

16   A.  No.

17   Q.  All right.  Let's go to the next page.

18           Okay.  So, starting with the next paragraph, let's

19   see what he has to say, because he says this is the

20   uncertified judgment.

21   A.  That's right.

22   Q.  All right.  So, a lot of introductory language.  Okay.

23           MR. QUINLEY:  Next paragraph, please.

24   Q.  (By Mr. Quinley) Another introductory paragraph of general

25   allegations, correct?

1    A.  Yes.

2    Q.  Next paragraph, *Notice*.

3         And he says not only that it must be answered, but

4    how it must be answered, right, in the form of an

5    affidavit, --

6    A.  Yeah.

7    Q.  -- a declaration or a deposition?

8    A.  That's what this says.

9    Q.  Okay.  And in the time frame that he provides?

10   A.  Three days is very short.  I have never seen anything like

11   that before in my practice.

12   Q.  By the way, if Warden William True's name doesn't appear

13   anywhere in here, not the primary document nor any of the

14   appendices adding names, even if we accepted for one moment

15   that this actually went out to 245 people, I think Mr. Johnson

16   said -- and I don't know how you send it out to the *Does*, but

17   if Mr. William True's name isn't anywhere in here, how could

18   he possibly respond to it?

19   A.  I don't think that he could have, and that struck me as a

20   very interesting fact about this document as I read it.

21   Q.  All right.  Well, let's go on.

22         So, three days.  Now, what's the other -- Okay.

23   That's the notice.  And what's the other?

24         Oh, and, "If you don't controvert these facts they

25   are deemed stipulated," right?

1    A.   That's what he says.

2    Q.   "Agreed and not subject of future controversy or judicial

3    adjudication."

4    A.   Yeah, that's what it says.

5    Q.   Well, but if anybody does choose to respond within three

6    days, whether they receive this or not, then he reserves the

7    right of judicial review on any controverted fact not in any

8    court of the United States, but in the International Court of

9    Justice or the United States Supreme Court having original

10   jurisdiction over treaties, right?

11   A.   That's how this reads, right.

12   Q.   Okay.  Again, is this consistent with any legal process in

13   the United States that you know of?

14   A.   No, traditionally there would be a court case opened and

15   there would be litigation ongoing before anybody could ask you

16   to stipulate or agree to a particular set of facts.  So, you

17   would expect to see a case filed in a court having

18   jurisdiction over the parties in the subject matter and you

19   would see a Plaintiff going through a legitimate process of

20   presenting documents and the other side would have a period of

21   time to respond to them, but that's not what I see here.

22   Q.   Let's go to the next page, please.

23        All right.  So, let's just take a quick look at the

24   plain statement of facts, if we can, please.  Go ahead and

25   read it into the record, please.

1   A.   "On or about 2004, the Executive Branch of the United

2   States, Inc. initiated a conspiracy through various agencies,

3   departments, and subsidiaries, such as, but not exhaustively

4   listed, the Federal Bureau of Prisons, FBOP, Homeland

5   Security, HS, Federal Bureau of Investigations, FBI, and the

6   Central Intelligence Agency, CIA, for creating a continuing

7   criminal enterprise against the rights of *We the People* in

8   forming the Communicating Management Unit, CMU, at Terre Haute

9   in 2006 and the CMU in Marion in 2008."

10  Q.   All right.  Go to the next paragraph, please.  Go ahead.

11  A.   "These units were shaped by total disregard of this form

12  of Government and its founding documents.  The proposed

13  regulations were flawed in that censorship, obstruction,

14  discrimination, cruel and unusual punishments, fraud in the

15  inception, inducement and operations with illegal funding

16  outside the Congressional delegation, mandate, or

17  appropriations were incorporated, leaving no hopes for

18  converting them into final regulations."

19  Q.   And, please, the next paragraph.

20  A.   "These proposed regulations were submitted with fraudulent

21  deceit for public comment at Federal Register volume" --

22  Q.   And you don't have to read all the cites.

23  A.   Okay.

24  Q.   And then the conclusion after giving the sites, go ahead.

25  A.   "And both times soundly rejected the FBOP has been

1    representing in court that these proposed regulations would

2    quickly become approved and reaping the benefits therefrom, in

3    an example *Rodley v. Lappin*.

4    Q.  All right.  Next paragraph, *These units as an idea*.

5    A.  "These units as an idea cannot legally operate beyond the

6    one-year funding appropriation, a signed executive order, and

7    must move through Congress, which has never occurred.

8    Therefore, Terre Haute been illegal from 2007 and Marion from

9    2008.  As of this writing, Terre Haute has had eight years of

10   illegal operation and Marion seven years."

11   Q.  Then, finally, the beginning of the paragraph on the next

12   page.

13   A.  "Further, the employees who advance, aid and abet these

14   continuing criminal enterprises attempt avoiding detection

15   from the public and their enterprises."

16   Q.  Go to top of the next page, which is six.

17   A.  "By black-op style funding and forged and fraudulent

18   documents like Form 324 and BP-A741 which purport that inmates

19   are transferring and volunteering for this program proposed as

20   CMU, which is opposite of the truth.  It is nothing short of

21   indeterminate administrative detention without any due process

22   of law."

23   Q.  Now, by the way, are these allegations that could be made

24   in a lawsuit against the United States and Marion Penitentiary

25   and perhaps in the name of its warden?

1    A.  Yes, there are a number of avenues that inmates have for

2    challenging the conditions of their confinement while they are

3    inside the Bureau of Prisons.

4    Q.  Okay, next paragraph, *Men are kidnapped*.

5    A.  "Men are kidnapped from other institutions or sent

6    directly from courts if they have displayed any political

7    dissent, political or financial threat as whistle blowers of

8    corruption or in retaliation for showing legal prowess within

9    the courts or administratively.  Communications are

10   intentionally obstructed through discriminatory deprivations

11   of access, excessive monitoring without any Congressional

12   guidance for what information is being sought, what actions

13   are proper enforcement and what sanctions are lawful and

14   appropriate.  Without Congressional guidance the so-called

15   volunteers are the subject of personal predilections and

16   vicious whims of employees with no accountability, no

17   oversight."

18   Q.  And, please finish.

19   A.  "And no due process protections for proper regress for

20   grievances."

21   Q.  Okay.  Next paragraph?

22   A.  "Crimes occur daily under the color of law and courtroom

23   cover for the executive's dirty little secret.  These units

24   are secreted away from any public scrutiny while family are

25   informed by web pages that the so-called volunteers are at the

1    USPs.  These units are hidden within.  Staff enforce blind

2    regulations that can never be scrutinized, confirmed, or

3    redressed and also purporting operating under FBOP

4    regulations, which has never been properly attached upon these

5    units at law."

6    Q.  Next paragraph on that page?

7    A.  "All employees are routinely rotated in and out of these

8    units of operation for avoiding anyone becoming enough

9    informed for becoming a whistle blower.  The practice of

10   misprison felony is encouraged for keeping these units secret.

11   Off-site, secret Nazi-style administration occurs at the

12   Counter Terrorism Unit in Martinsburg, Virginia who report in

13   secret off-record Nazi-style to HS, CIA, FBI, and other

14   executive tentacles of this criminal enterprise.  Every

15   employee has violated their oath of office, their ethics."

16   Q.  And there are a large number of cites, correct?

17   A.  Correct.

18   Q.  And their fiduciary duties?

19   A.  That's correct.

20   Q.  And the next page?

21        Okay.  And, so, concluding *Through advancing* at the

22   top.

23   A.  "Through advancing these criminal enterprises by their

24   labor, negligence, contempt and silence."

25   Q.  Now, I'm not going to ask you to read through the known

1   facts, but if you could just box known facts all the way down

2   to the end of the page, and do you see on this sixth page of

3   the document, seventh page of the exhibit that he has some

4   known facts that are enumerated 1-14, and after each one has

5   said -- has written, "you have agreed"?

6   A.  Yes.

7   Q.  Now, again, these are allegations about the CMU, and you

8   don't work in the CMU, do you?

9   A.  I don't work in the CMU.

10  Q.  All right.  And I'm not going to ask you to address these.

11  We will do that with another witness.

12          Let's go to the next page, and then it continues the

13  list to 13-26; again each allegation being followed by *you*

14  *have agreed*, is that correct?

15  A.  I think it's 15 through 26, but otherwise --

16  Q.  Very good, 15 through 26.  Again, you don't work there so

17  I'm not going to pose Mr. Johnson's allegations to you.

18          All right.  So, now we finally get to his conclusion.

19  And, forgive me, but I'm going to ask you to read the

20  conclusion and we are going to go to *Relief Sought*.  Go ahead.

21  A.  "For all the reasons stated above, these named Defendants/

22  Respondents have been summoned through this administrative

23  demand for answering for their tortuous and criminal

24  advancement of a RICO scream against *We the People* an executor

25  by and through these illegal and unregulated CMU units

1  secretly operated outside the limited grants and delegation of

2  authority of this form of Government, and that the damages are

3  real and personal for Executor Kurt F. Johnson, individually,

4  and as one of *We the People* who have all been defrauded with

5  claims made through inspection of the record and firsthand

6  experience as a victim of the CMU.  These damages are

7  egregious in that they are willful, intentional, seditious,

8  treasoness, and multiplied in that they on -- from a position

9  of trust in violation of duties, promises, and oaths made

10  contrary of the actions taken.  They are a complete overthrow

11  to this form of Government and conspiratorial concert of overt

12  and mostly covert acts for lack of transparency, and that this

13  demand requires your firsthand sworn response without

14  falsehood in violation of 18 U.S.C. Section 1621, 1622, in a

15  timely fashion, and that be warned again that you have a duty

16  for speaking as employees, fiduciaries, and violators.  In

17  failing doing so your silence will be used against you as your

18  acquiescence by tacit procuration and stipulated agreement

19  between the parties.  Your appeal rights are very narrow and

20  this demand should be taken up with the upmost seriousness for

21  avoiding a judgment being taken out against you.

22  Q.  In fact, in the next part of the document he specifies his

23  own remedy, doesn't he?

24  A.  He does.

25  Q.  Let's see what that remedy is, *Relief Sought*.

1   A.   "With each party being liable jointly and severally in

2   their private and public capacities, the amounts due and

3   payable upon the entry of the judgment are:  $1 billion for

4   each year of illegal operation of the CMU units currently at

5   eight years for the Terre Haute facility and seven years for

6   the Marion facility, being a total of 15 years at the time of

7   this writing of $15 billion.  However, any day of operation in

8   a particular calendar year is the same as the full year of

9   operation.  And on January 1, 2015, these units are still in

10  operation.  Another $2 billion will be incorporated as part of

11  this judgment should it be obtained, and will continue

12  accruing at the same rate until these units cease operation.

13  And if additional units are discovered in operation or added

14  at a future date in time, the same annual sanction shall be in

15  operation and effect with Executor retaining the right for

16  making claim on these additional sanctions by and through

17  invoicing the above named when and if appropriate.

18  Q.   So, when we had the allegation in the document on the ELMO

19  right there --

20          MR. QUINLEY:  And if we can just switch back to that.

21          THE CLERK:  Do you need the ELMO?

22          MR. QUINLEY:  Yes, it's still laying right there.

23  So, if we can just switch to the ELMO.  Forgive me for the

24  switching.  We will have to switch one more time, but I do

25  think it's important to pull this in.

1              Mr. Self, can you zoom in again that first paragraph?

2         That's good.

3    Q.   (By Mr. Quinley) So, again, are the calculations set forth

4    in the referenced uncertified judgment -- are those reflected,

5    then, in this first paragraph of the appendix filed in this

6    court that led to the involuntary bankruptcies?

7    A.   I think that's what he alleges there in the first

8    paragraph.   That's my understanding.

9    Q.   So, by 2017, it's gone from $15 billion to $21 billion,

10   but he cancelled one billion of it?

11   A.   Yes.

12   Q.   I know it's skipping ahead, but during the pendency --

13             MR. QUINLEY:  By the way, Mr. Self, I'm going to go

14   ahead and ask you to hand Mr. Hanna Exhibit 3.

15   Q.   (By Mr. Quinley) And is that the record of the bankruptcy

16   proceeding prior to the appeal from the proceeding of the

17   involuntary bankruptcy initiated on transfer from Exhibit 5?

18   Is that the entire record for the proceeding against William

19   True?

20   A.   Yes, this appears to be the complete docket sheet through

21   September 21 of 2018.

22   Q.   And how many documents filed?

23   A.   It shows 100 docket entries, but actually one slot below

24   that, so perhaps 101.

25   Q.   And they are tabbed by each docket entry.  You don't have

1    to go through the whole file.  You are familiar with the file

2    having handled it?

3    A.  Yes, I am.

4         MR. QUINLEY:  And, similarly to the other two, Your

5    Honor, I would ask that the Court accept this as its own

6    records in its entirety.

7         THE COURT:  Any objection?

8         MR. JOHNSON:  No objection.

9         THE COURT:  It will be admitted.

10   Q.  (By Mr. Quinley) And there's also a separate proceeding,

11   we will call it Exhibit 4, for Kathy Hill, is that correct?

12   A.  Yes.

13   Q.  But, we don't have a second binder, and why not?

14   A.  Well, as I recall, the two cases were basically identical

15   in that everything filed in one case was also filed in the

16   other.

17        MR. QUINLEY:  If that's acceptable to the Defendant,

18   Your Honor, then we are not going to introduce a duplicate,

19   really, of three.

20        MR. JOHNSON:  I would like it excluded, also, for

21   it's redundancy, also.  Thank you.

22        MR. QUINLEY:  Okay.  Very good.  That's less

23   burdensome for the Court.

24        All right.  But, at any rate, if that can be accepted

25   into evidence.

1          THE COURT:  That will be accepted.

2    Q.  (By Mr. Quinley) So, it is skipping ahead, but at some

3    point among those 100 or 101 documents, did Mr. Johnson file a

4    motion that the judgment had increased and the debt had

5    increased because we were now in 2018 from 20 billion to 22

6    billion?

7    A.  Yes, at some point he filed a document titled *Increase of*

8    *Judgment Amount*, or something to that effect, claiming that

9    the judgment had gone up because it was another year.

10   Q.  All right.  Again, consistent with what we looked at in

11   this underlying document.

12          MR. QUINLEY:  And, forgive me, if we can then switch

13   back.  After *Remedy* we can go to the next page.

14          THE CLERK:  Are we back on Prosecution?

15          MR. QUINLEY:  We are back on 7-3, and the page would

16   be the next page, whichever -- Is that the next page?

17          Okay.  Great.  We can pull up the first part of it,

18   *Affirmation Before Certified Ruling*.

19   Q.  (By Mr. Quinley) And, again, here, Mr. Johnson

20   incorporates this into his involuntary bankruptcy proceeding,

21   is that right?

22   A.  Yeah, so he referenced this document that was in the

23   separate habeas case and sort of incorporated it by reference

24   as being filed in this different case.

25   Q.  Okay.  Very good.  So, if you can just read, then, the

1    Affirmation.

2    A.  "In support of this notice, the above-stated facts are

3    made with the penalty of perjury according to God's law, the

4    maximums of law created therefrom and the laws of this

5    republic where Executor is now housed, but does not maintain a

6    domicile, and that the facts stated herein are true, correct,

7    not misleading in any manner whatsoever and are based upon

8    firsthand knowledge of the Executor/Employer and from

9    inspection of the record and as for those facts based upon

10   belief they are believed true, reserving all rights for

11   amending for truth, clarity and justice.

12          Done with the penalty of perjury, by and through 28

13   U.S.C. Section 1746.  Done by the light of day this 25th of

14   November 2014."

15   Q.  And, then, finally, with simply a signature or a place for

16   a signature?

17   A.  Yes, it says, "Respectfully submitted without prejudice,

18   sui juris, Executor, Kurt F. Johnson."

19   Q.  Okay.  Let's look at the last thing in the document.  I

20   think we are on the last page, page nine, and the section

21   that's called *Certified Ruling*.  Go ahead.

22   A.  It says, "I, the herein undersigned duly-appointed hearing

23   officer have reviewed the documentation presented by the

24   hereinabove identified injured party and have found the same

25   to be in accordance with the International Administrative

1    Private Remedy Process Treaty in which this matter is

2    presented.  Demand was made upon Respondents by and through

3    USPS certified mail number 7013 2630 0000 0956 0972, received

4    on December 1, 2014 at 7:30 a.m. without response."

5    Q.  If I can just stop you right there.  Was this mailed to

6    anyone?  Do you have any idea?

7    A.  I have no idea.

8    Q.  Was there any way for it to have been mailed to Warden

9    True, who apparently became the warden within the last two

10   years?

11   A.  No, not if he wasn't named in the document.

12   Q.  Okay, let's continue.

13   A.  "Further, injured party caused delivery of Notice of

14   Default and opportunity for curing on January 6, 2015 at 7:40

15   a.m. through certified mailed numbered 7013 2630 0000 0956

16   0286, with no response.  Finally, injured party tendered a

17   Notice of Dishonor and Default upon Respondents by USPS

18   certified mail numbered 7012 1010 0000 6152 8190 received on

19   February 5, 2015, at 11:34 a.m., receiving no response."

20   Q.  And all this time Mr. Kurt Johnson is in the CMU from

21   2014, through the present, at Marion Penitentiary?

22   A.  That's my understanding.

23   Q.  So, any of these alleged correspondence would be there?

24   A.  I would assume so, yes.

25   Q.  Did he present any to you in the course of the bankruptcy

1    -- of the involuntary bankruptcy proceeding?

2    A.  I'm not sure I --

3    Q.  Did he present any of these to you?

4    A.  No.

5    Q.  Okay.  At any rate, that's what the allegation is.

6            And then what does it say?

7    A.  "The above documents were all in compliance with said

8    treaty, and said injured party is entitled to an

9    administrative judgment under such treaty, and it is therefore

10   so ordered.  Judgment is so ordered.  Done this *blank* day of

11   the *blank* month in the year of our Lord, 2015 AD."

12   Q.  And then by duly-appointed hearing officer?

13   A.  Yes.

14   Q.  And apparently by seal, right?

15   A.  Yes.

16   Q.  Of course, there is no seal?

17   A.  Correct.

18   Q.  There is no hearing officer?

19   A.  Correct.

20   Q.  And there is no date by the hearing officer?

21   A.  Correct.

22   Q.  And are you familiar with any process by which a person

23   can create their own document, present it to absolutely no

24   Court and simply have somebody sign off on it creating a debt

25   of now 22 billion, would have been 23 billion, but the

1    creditor, Mr. Johnson, has discharged or cancelled 1 billion?

2    A.  That's not how it works in my experience.

3    Q.  All right.

4            THE COURT:  Mr. Quinley, we are going to take a

5    15-minute recess now.

6            MR. QUINLEY:  Very good.  Thank you, Your Honor.

7            THE CLERK:  All rise for the jury.

8            (Jury out).

9            THE COURT:  From a timing standpoint how much longer

10   do you think it will be with Mr. Hanna?

11           MR. QUINLEY:  I think we can speed up now.  It had to

12   be done once.

13           THE COURT:  I just ask you a simple question.  Half

14   hour, 45 minutes?

15           MR. QUINLEY:  Yeah, don't you think?

16           MR. HANNA:  I think a half hour to 45 minutes.

17           THE COURT:  Yeah, all right.

18           MR. JOHNSON:  How long do we go to every day?

19           THE COURT:  4:30, quarter to 5:00.

20           THE CLERK:  Court's in recess.

21           (Following a recess, proceedings continue in open

22   court; jury in).

23           THE COURT:  Okay.  Mr. Quinley, you may continue.

24           MR. QUINLEY:  Thank you, Your Honor.

25   Q.  (By Mr. Quinley) All right.  So, we went through the

1    cross-referenced judgment.

2         Can we now turn back to what you did to try to make

3    any further inquiry as to what Mr. Johnson was claiming?

4    A.  Yeah, so, I approached this with an open mind.  It struck

5    me as strange that there would be a judgment worth $20 billion

6    out there that we hadn't heard about, but, again, I wanted to

7    do my due diligence and look into this.  So, I began

8    researching what the International Court of Justice or the

9    World Court actually was.  I went to their website, I looked

10   through their listing of judgments and orders and opinions,

11   looked at the roster of judges that are members of the

12   International Court of Justice, and I tried to engage myself

13   what this entity was because I had never heard of it before.

14        So, these were all things that I did pretty early on

15   after having the case assigned to me.

16   Q.  All right.  So, have you printed out these publications of

17   the International Court of Justice at the cited websites in

18   Exhibit 9, Exhibit 9A, and Exhibit 10?

19   A.  Yes.

20   Q.  So, are each of these three exhibits a publication of the

21   International Court of Justice?

22   A.  Yeah, so these are publications made public on the website

23   of the International Court of Justice, and I visited them back

24   in December or early January -- December 2017, or early

25   January of 2018, and then I looked at them again in

1    preparation of this trial.

2           MR. QUINLEY:  Your Honor, I will move for the

3    admission of 9, 9A and 10.

4           THE COURT:  Any objection?

5           MR. JOHNSON:  Was that 9?

6           THE COURT:  9, 9A, and 10.

7           MR. JOHNSON:  All three documents?  No objection.

8           THE COURT:  They will be admitted.

9           MR. QUINLEY:  With no objection, can we pull up 9,

10   please?

11   Q.  (By Mr. Quinley) Is that frequently-asked questions on the

12   International Court of Justice website?

13   A.  Yes.

14          MR. QUINLEY:  And if you can look at the -- what's

15   stated under *Attestations to the Court* and box that.  We will

16   be on display, we will not be laying things down.

17   Q.  (By Mr. Quinley) And you can go ahead and read that into

18   the record.

19   A.  It says, "Only states are eligible to appear before the

20   Court in contentious cases.  At present this basically means

21   the 192 United Nations member states.  The Court has no

22   jurisdiction to deal with applications from individuals,

23   nongovernmental organizations, corporations, or any other

24   private entity.  It cannot provide them with legal counseling

25   or help in their dealings with the authorities of any state

1    whatever."

2    Q.  All right.  And you mentioned that you did just review the

3    current members of the Court.

4         MR. QUINLEY:  That's 9A, if we can just pull that up.

5         And I'll just ask Ms. Brazier to quickly step through

6    each of the pages just so that we can see who sits on the

7    board.

8    A.  Yeah, so this is --

9    Q.  (By Mr. Quinley) And, notice we have a Judge Joan E.

10   Donoghue of the United States.

11   A.  Yeah, so I was interested to see if this Judge existed,

12   and, in fact, she does exist and is a member of the

13   International Court of Justice.

14   Q.  You can finish up.  I believe there are 15, is that right?

15   A.  That sounds right.

16   Q.  All right.  Very good.

17        Now, let's go to Exhibit 10.  Does the International

18   Court of Justice as a publication on its website list all of

19   its judgments, advisory opinions, and orders?

20   A.  Yes, much like other courts, including this court, there's

21   now an electronic record of what the Court is working on, and

22   when there's a written opinion or judgment that comes down,

23   the International Court of Justice includes it on their

24   website, as I said, as do many local courts here in Illinois.

25        MR. QUINLEY:  If we could box the top there before

1    the first order that's listed, so we can all see what's there.

2         Great.

3    Q.  (By Mr. Quinley) So, what's listed on the however many --

4    16 pages of what you printed out, what are the 16 pages?

5    A.  So, this is a search that I reproduced I think last week

6    in preparation for trial that I had previously done when I was

7    assigned this case.

8         So, I searched the International Court of Justice's

9    website to see if there was any judgment out there related to

10   Kurt F. Johnson, and so I searched from 2015 to 2017, because

11   supposedly this judgment was issued in 2016.  So I reviewed

12   every judgment, advisory opinion, and order listed on the

13   website, and did not locate anything mentioning Mr. Johnson.

14   Q.  Okay.  And, in fact, these 16 pages are all of the

15   judgments, advisory opinions, and orders of the International

16   Court of Justice?

17   A.  That is my understanding.

18   Q.  So, actually we could, if we wanted to take the time, we

19   could go through.  But, you say you have already taken the

20   time and there's no Kurt F. Johnson?

21   A.  Correct.  And if you look at every single one of them,

22   none of these cases relate to individual claims between

23   private parties.  These are all governmental-type cases listed

24   on the website.

25         MR. QUINLEY:  All right.  Your Honor, at this time,

1    based upon the self-description of the jurisdiction of court

2    reflected in Exhibit 9, as well as its record of judgments

3    from 2015 through 2017, I would ask this Court to take

4    judicial notice that there is no judgment of the World Court

5    or the International Court of Justice in favor of Kurt F.

6    Johnson.

7         THE COURT:  Okay.  The Court will take judicial

8    notice based on the testimony of Mr. Hanna, as well as the

9    websites that he has accessed and reviewed.

10        Ladies and gentlemen of the jury, taking judicial

11   notice of facts may be considered as a matter of common

12   knowledge.  You may accept these facts as proved, but you are

13   not required to do so.  So, you are not required to accept the

14   judicial notice that I have just taken.

15        MR. JOHNSON:  May I offer an objection?

16        THE COURT:  Yes.

17        MR. JOHNSON:  First off, I accept them into the

18   record, but I would like them under the limited conditions

19   that it's just the web page, it's not -- you know, it's apples

20   and oranges.  You know, I am not talking about having a

21   judgment in the Court, never have been talking about having a

22   judgment in the Court, never have represented about having a

23   judgment in the Court.  So, it proves the Court behaves a

24   certain way, but it has no relevance to the judgment that we

25   have already gone through with Mr. Hanna.

1          THE COURT:  Okay.  Your objection is so noted.

2          MR. JOHNSON:  Thank you.

3    Q.  (By Mr. Quinley) All right.  In addition, did you also do

4    some research with regard to the treaty?  Let me hand you

5    Exhibit No. 11.

6          MR. QUINLEY:  Mr. Self?

7    Q.  (By Mr. Quinley) And I think you have a copy with you.

8    A.  Yes, I do.

9    Q.  All right.  So, at any rate, did it come to your attention

10   that Mr. Johnson, in addition to the Administrative -- the

11   International Administrative Process Remedy Treaty -- Private

12   Process Remedy Treaty, was also relying upon the International

13   Financial Transaction Grievance and Corporate Resolutions

14   Treaty of 1972, Charter #8971A?

15   A.  Yes, I became aware that he was -- yes.

16   Q.  All right.  And looking at Exhibit No. 11, does that, in

17   fact, mention that -- Does that appear to be a communication

18   from Mr. Johnson to a Rudy Davis asking for his assistance in

19   getting the Library of Congress to locate the treaty?

20   A.  It appears to be an e-mail to that effect, but I don't

21   know much else about this document.

22   Q.  All right.  And the response of the Library of Congress,

23   did that provide a number of references by which one could

24   determine what treaties there are with regard to the United

25   States?

1   A.  Yes, it looks like there was a message written back from

2   *Ask a Librarian* as part of the Library of Congress, and it did

3   offer some pointers on how to find treaties in force.

4   Q.  Okay, great.  So, did you follow those citations and

5   obtain the publications of the United States Department of

6   State that lists all treaties in force with the United States?

7   A.  Yes, I found on the State Department's website a

8   publication.

9           MR. QUINLEY:  Mr. Self?

10  Q.  (By Mr. Quinley) And, so, referring to these two exhibits

11  did you examine one from 2017 and one from 2000?

12  A.  Yes, these look like the documents and I believe they are

13  the documents that I reviewed in trying to determine if the

14  treaties was real.

15  Q.  All right.  So, either the Administrative Process referred

16  to at the top of the so-called judgment, and also this one,

17  the International Grievance?

18  A.  Yes.

19  Q.  Okay.  And examining both 2017 and going back to 2000

20  and -- 2000, is either treaty contained in either publication

21  of U.S. Department of State that publishes all the treaties of

22  the United States?

23  A.  I could not find any reference to any of the treaties that

24  Mr. Johnson cited in either of these documents.

25  Q.  Right.  And neither could the Library of Congress, is that

 1  right?

 2  A.  That's what it appears.

 3  Q.  All right.

 4         MR. QUINLEY:  Now, I'm going to move for the

 5  admission of -- I'll move for the admission of the letter from

 6  the Library of Congress, Exhibit 11, but then also move for --

 7  I believe it's 12 and 13.

 8  A.  Yes.

 9         THE COURT:  Any objection?

10         MR. JOHNSON:  No.

11         THE COURT:  It will be admitted.

12         MR. QUINLEY:  And, Your Honor, based upon Mr. Adam

13  Hanna's review of each of those publications, of a public

14  authority of the United States, I would ask this Court to take

15  judicial notice that the two treaties mentioned by Mr. Johnson

16  in support of the process he claims do not exist.

17         THE COURT:  Mr. Johnson?

18         MR. JOHNSON:  You know, I was limited to just the

19  title of the treaties that I provided, not the substantive

20  facts of the treaty existing.  I believe that will come out in

21  the evidence later.

22         THE COURT:  The Court is going to take judicial

23  notice of the fact that these treaties do not exist as a

24  matter of common knowledge based upon the Exhibits 11, 12, 13.

25  Again, I'm instructing the jury you may accept those facts as

1    proved, but you are not required to do so.

2         MR. QUINLEY:  Thank you, Your Honor.

3    Q.  (By Mr. Quinley) Now, Mr. Hanna, at some point did you

4    learn that somehow a form -- By the way, is the method by

5    which an involuntary bankruptcy can be opened in Bankruptcy

6    Court, is that with the filing of a Form 105?

7    A.  That's correct.

8    Q.  And did you learn that somehow these 105 forms were, in

9    fact, either transferred from the civil file or in some way

10   that the Form 105s were actually filed in the Bankruptcy Court

11   and opened as to both William True and Kathy Hill?

12   A.  Yeah, so the way that I recall this happening was that

13   initially this case was opened in the District Court, which is

14   the court before which we all stand right now, as one case and

15   it included these Form 105s for both Bill True and Kathy Hill.

16   It's my understanding that after Mr. Johnson learned of the

17   way that this case was opened he requested that these actually

18   be filed as two separate cases in the Bankruptcy Court, which

19   is a separate -- sort of a separate part of the court for this

20   district, and so that, in fact, happened.  A District Court

21   case was opened, Mr. Johnson then complained that it was done

22   the wrong way, so the District Court ordered that these two

23   Form 105s be filed in the Bankruptcy Court as two separate

24   cases.

25   Q.  Okay.  And is that filing then reflected in Government's

1    Exhibits 1 and 2?

2    A.  Yeah, so Government Exhibit 1 is -- appears to be the

3    initial case filing documents in the Bankruptcy Court

4    regarding Mr. William True.

5    Q.  And, of course, that would be contained in Exhibit 3, the

6    entire file for Mr. True is the first document, correct?

7    A.  Correct, one is part of Exhibit 3, as well.

8    Q.  Okay.  But for Exhibit 2, where we have not reproduced all

9    of, I'll call it, Exhibit 4, would this be the first document

10   for Ms. Hill?

11   A.  Yes, so each of these was the first document filed in the

12   respective cases.

13         MR. QUINLEY:  Your Honor, I will move for admission

14   of 1 and 2 individually into the record.

15         THE COURT:  Any objection?

16         MR. JOHNSON:  No, and I would like to note also that

17   2 would be the first document of 3, also, because it's

18   redundant, just so it helps everybody understand.

19         THE COURT:  Okay.  It will be admitted.

20   Q.  (By Mr. Quinley) All right.  And, of course, at least for

21   Ms. Hill, 2 wasn't the same as Exhibit 1, was it?

22   A.  That's correct.

23   Q.  What's the difference?

24   A.  What I noticed was that Exhibit 1, which regards Mr. -- is

25   in relation to Mr. True, it doesn't have a signature of a

1    petitioning creditor at all; whereas Exhibit 2, which is in

2    relation to Kathy Hill, it bears the signature of -- it says

3    Kurt -- I read it to say, "Kurt F. Johnson by Nell Leffel,

4    POA," which I understand to stand for Power of Attorney.

5    Q.  And, of course, isn't the other difference between the one

6    filed against Mr. True and the one filed against Mrs. Hill is

7    that her name is on the other one?

8    A.  That's the most obvious difference.

9    Q.  Right, and not the warden's?

10   A.  Correct.

11   Q.  So, these were two separate proceedings, is that correct?

12   A.  They were opened as two separate cases and there was a

13   separate filing fee and a separate case number for each one.

14   Q.  All right.  And can you just tell the ladies and gentlemen

15   of the jury what the consequence or the potential consequences

16   are of the filing of an involuntary bankruptcy against these

17   two individuals?

18   A.  So, as I mentioned earlier, many courts now have

19   searchable online systems that list all of the cases that are

20   active and closed in those courts.  And so the filing of a

21   bankruptcy petition is important to, for example, credit

22   agencies, like Equifax, TransUnion and some of these others

23   because they want to note that information in somebody's

24   credit report.  So, I know through my own practice that the

25   credit reporting agency like TransUnion, Equifax, and others

1  are able to search the bankruptcy case filing systems sort of

2  in an automated way and capture information about who has

3  filed for bankruptcy.  So, when somebody's name shows up in

4  the bankruptcy docket as having filed a bankruptcy, it has the

5  potential to impact their credit score and their credit

6  report.

7  Q.  Now, of course, Mr. True and Ms. Hill didn't file for

8  bankruptcy, did they?

9  A.  They did not.

10 Q.  Can you explain what this process is?

11 A.  So, the bankruptcy code actually permits a person's

12 creditors under certain circumstances to file bankruptcy for

13 them, essentially to force a debtor into bankruptcy even if

14 they don't want to be in bankruptcy.  It's extremely rare in

15 my experience for an involuntary bankruptcy case to be filed,

16 but it does exist in the bankruptcy code as an option for

17 creditors.

18 Q.  And could someone who was not a creditor file a false

19 petition forcing at least the opening of a bankruptcy

20 proceeding against an enemy?

21 A.  That is possible, yes.

22 Q.  And, in fact, isn't that what happened here?

23 A.  Yes.

24 Q.  Because there is no debt for Mr. True or Ms. Hill to

25 Mr. Johnson, is there?

1    A.  That's correct.

2    Q.  So, this is nothing other than a harassing filing that

3    could cause harm?

4    A.  In my view that's correct.

5    Q.  So, what did you do to try to mitigate or stop that harm?

6    A.  As soon as I became aware that the District Court was

7    ordering the filing to be transferred into two separate

8    bankruptcy case files, I started watching the Bankruptcy Court

9    docket system.  So, I would go in every little while and type

10   in the names *William True* or *Kathy Hill* to see if there was an

11   active bankruptcy file.  And once it came to my attention that

12   those cases were opened, I believe the same day I filed in

13   each case an emergency motion to seal those files, because it

14   was important to me in representing Mr. True and Ms. Hill that

15   those files be kept from public view so that the credit

16   reporting agencies would not pick them up and cause harm to

17   their credit.  So, I filed those I believe the same day that

18   the cases were opened, and then there was an order entered the

19   following day that granted that motion and sealed the cases

20   from public view.

21   Q.  Now, more businesses than just the credit reporting

22   services are monitoring any opening of a bankruptcy matter,

23   isn't that right?

24   A.  Now I know that to be true, because in the less than 24

25   hours that these two bankruptcy files were opened and

1    available to the public, they were apparently scanned by a

2    business that offers car loan credit to people in bankruptcy,

3    and I know this because Kathy Hill received a credit

4    solicitation for people in bankruptcy within about a week of

5    when these two cases were filed.

6    Q.  All right.

7            MR. QUINLEY:  Just a moment, please, Your Honor.

8    Q.  (By Mr. Quinley) Now, by the way, we are not going to go

9    through all of Exhibit 3, but at some point in the proceedings

10   did -- were there -- did Mr. Johnson, the supposed creditor,

11   did he cause to be filed some UCC statements related to this

12   supposed debt?

13   A.  Yes.  One of the many documents that showed up in the file

14   was something that purported to be a UCC financing statement.

15   And in my experience UCC stands for Uniform Commercial Code.

16   Q.  And is that another way in commercial practice of

17   evidencing a debt so that other creditors are aware that you

18   already have a claim?

19   A.  Yes, a UCC financing statement is a way of perfecting a

20   debt, it's a way of taking collateral for a loan or notifying

21   the public that you have taken collateral for a loan.

22   Q.  So, are there a number of these UCCs contained within

23   Exhibit 3?

24   A.  Yes, I believe at Document #56 is where those show up.

25           MR. QUINLEY:  If we can just publish for the jury

1    Document 56.  We will have to use the ELMO for this, Mr. Self.

2    So, going to the -- All right.  So, we are on Document #56,

3    and this is the one, two -- Well, really, it's the second page

4    of the document number.

5    Q.  (By Mr. Quinley) Does this appear to be the form of a UCC

6    financing statement?

7    A.  This looks similar to the form of a UCC financing

8    statement, but it's not exactly like I have seen before.

9    Q.  All right.  Fair enough.  Is the debtor name listed?  I

10   can't see.

11   A.  Yeah, under number one, debtor's name.

12   Q.  Oh, the United States, Inc., I see, is the debtor.

13        MR. QUINLEY:  Then if we can go to the second page.

14   Here we go.

15   Q.  (By Mr. Quinley) So, there's an explanation, right?

16   A.  Yes.

17   Q.  Okay.  And then in Box 8 it says --

18   A.  It says, "Judgment never appealed.  Other debtors not

19   listed herein."

20   Q.  All right.  And if we turn to, again, the addendum is

21   *United States, Inc., et al.*  What does *et al.* mean?

22   A.  To my understanding it means *and all others*.

23   Q.  Right.  And, so there are a lot of others, aren't there?

24   A.  Yes; many, many others.

25   Q.  So, instead of the nine-page document that we went through

1  virtually in its entirety, was the attachment -- We are now

2  moving on to -- through page five to page six, through 11, a

3  six -- a one of six-page -- one of these process documents.

4         Okay.  So, that's the end of the form.  But, then

5  following the form is -- Again, we have kind of seen this

6  header before -- *Notice of Administrative Judgment as*

7  *Affidavit*.  But, this time there seem to be another set of

8  parties, but it's only a six-page document.  And let's go to

9  the sixth page of the document, the fifth or sixth page,

10  because I think we are going to see that there's another

11  remedy.

12         Yeah, *Relief Sought*.

13         So, this time we are only in the tens of millions of

14  dollars totaling 310 million, rather than the billions that we

15  were talking about before, is that correct?

16  A.  Yes.

17  Q.  Okay.  And then there's a signature page, I think, on the

18  next one, also unexecuted, right, the affirmation and

19  certified ruling we saw before?

20  A.  Correct.

21  Q.  Okay.

22         MR. QUINLEY:  And if we can move that up so everyone

23  can see the space duly-appointed hearing officer.

24  Q.  (By Mr. Quinley) Then, finally, if I can hand pages 12

25  through 14, in addition to that one example of his processes,

```
 1   I think we have already heard it said in this court, although

 2   not yet in evidence, that he did six of these.  We have

 3   Exhibit A.  Now it's 19.5 billion.  That seems to relate to

 4   the subject matter of the bankruptcy, is that correct?

 5   A.  I suppose.  I don't know.

 6   Q.  All right.  Let's go to the next one, Exhibit D.  They are

 7   all listed on there.

 8            MR. QUINLEY:  You just have to keep moving.  Maybe

 9   it's on the next page.  Well, no, here we go.

10   Q.  (By Mr. Quinley) Then we have the $310,000,000, right?

11   A.  Yes.

12   Q.  So, that's the document we just saw.  And then the next

13   page.

14            Oh, you can't read it?  I think it's the back of the

15   page, so that would be the next page.

16            And then we get another claim that he's given some

17   number for 121 million and 450,000.  Do you see that?

18   A.  I do.

19   Q.  And then he's got another one for 44 million.

20   A.  Yes.

21   Q.  And each starting with different dates, right?

22   A.  Correct.

23   Q.  And then finally on debtors for a mere 4,800,000?

24   A.  Yes.

25   Q.  And all of this attached to the UCC filing statement?
```

1    A.  This is all documented for the filing at Document 56.

2    Q.  By the way, Nell Leffel assisted with some of this, didn't

3    she?

4    A.  That's my understanding, yes.

5    Q.  Sure.  But, are these filings anyone other than Mr. Kurt

6    Johnson who brought this involuntary bankruptcy proceeding?

7    A.  I'm sorry?

8    Q.  I mean, are these Mr. Johnson's filings?

9    A.  I proceeded with that understanding as I worked on the

10   cases, yes.

11   Q.  All right.  You actually had a in-person hearing -- Strike

12   that.  You actually had a hearing in front of Judge Grandy

13   where you presented the testimony of Ms. Hill and Mr. True,

14   correct?

15   A.  Our understanding of the supposed debtors in this case,

16   William True and Kathy Hill -- our response was to file a

17   motion to dismiss the involuntary bankruptcy case.  So, in

18   response to the Form 105s, I filed on their behalf a Motion to

19   Dismiss.  The Bankruptcy Court then set that motion for a

20   hearing in East St. Louis, Illinois at the main federal

21   courthouse there, and I attended in person, Mr. True and Ms.

22   Hill attended in person, and Mr. Johnson was attending by

23   phone.

24   Q.  By telephone?

25   A.  Yes.

1    Q.  All right.  But, he could hear the testimony?

2    A.  He apparently could, because he was able to interact with

3    the witnesses and cross-examine them.

4    Q.  He conducted a cross-examine of each?

5    A.  He did.

6    Q.  And did he make certain statements directly to the Court?

7    A.  Yes, in the course of his cross-examination.

8    Q.  Okay.  And did the Court rule on the Motion to Dismiss?

9    A.  Yes, the Court dismissed both cases on the ground that

10   there was, in fact, a bona fide dispute about the debts.

11   Q.  And that was all that was necessary in order to take it

12   out of an involuntary bankruptcy proceeding?

13   A.  Yes, from my point we did not need to disprove these

14   debts.  Under the law all that we needed to do was to show

15   that Mr. True and Ms. Hill disputed them, and that was enough

16   for dismissal.

17   Q.  Okay.  And then did Mr. Johnson take an appeal from each

18   of those two dismissals as reflected in 6A and 6B?

19   A.  Yeah, so when a Bankruptcy Court makes a ruling, the next

20   step for appeal is the District Court.  And Mr. Johnson did,

21   in fact, appeal the dismissal of the two bankruptcy cases to

22   the District Court.

23   Q.  All right.  And did the Judge rule on the appeals?

24   A.  Yes, the Judge actually dismissed the appeals as part of

25   the process of applying the lawsuits without paying the

1    pre-filing fee.

2    Q.  All right.  In fact, the Defendant has in opening

3    statement displayed the last paragraph of the Court's ruling,

4    so if you have it in front of you there, it's Doc. 10, the

5    last paragraph finally on page six of six of Doc. 10.

6         MR. QUINLEY:  Since he displayed it in opening, Your

7    Honor, I would like it to be put in evidence.

8         THE COURT:  Sure.

9    Q.  Okay.

10   A.  Okay.  I'm there.

11   Q.  Go ahead.  *Finally*?

12   A.  "Finally, the Court finds this appeal clearly frivolous.

13   It is hard to imagine a case with allegations more fanciful,

14   delusional, irrational, or wholly incredible than one where a

15   federal inmate claims the warden of his prison and a prison

16   staff member are indebted to him in the amount of $20 billion

17   because a judgment was purportedly entered against them by the

18   World Court and with no proof of any judgment to boot.  This

19   appeal is baseless and, thus, it is dismissed."

20        MR. QUINLEY:  All right.  And, Your Honor, I would

21   like -- the procedure we followed before, I would like the

22   complete record of *Johnson v. True*, 18-CV-783-NJR, and *Johnson*

23   *v. Hill*, 18-CV-784-NJR, marked 6A and 6B respectfully be

24   admitted into evidence.

25        THE COURT:  Any objection?

1          MR. JOHNSON:  I would just say that the cases were

2    consolidated and I think 783 is probably sufficient, since 784

3    would probably be redundant.

4          MR. QUINLEY:  But there would be no harm.

5          THE COURT:  No harm in admitting both of them, so

6    they will be admitted.

7    Q.  (By Mr. Quinley) Then did you actually search to see

8    whether Mr. Johnson had filed any prisoner lawsuit against the

9    conditions of confinement?

10   A.  Yes, so at some point -- I don't remember exactly when,

11   but I did search his name through the District Court's

12   electronic filing system to see what his litigation history

13   was like.

14   Q.  Okay.

15         MR. QUINLEY:  And, I'm going to ask Mr. Bigham if he

16   will just retrieve these documents so I can put them back in

17   the binder before I lose the place.

18         THE COURT:  Okay.

19   Q.  (By Mr. Quinley) And so did you find -- We have gone

20   through 3, 4, 5, 6A, 6B and, of course, 7.

21         So, did you find one additional matter?  And I

22   think -- Is the binder in front of you?  No, it's not.  No. 8.

23   A.  Yes, so *Johnson v. Postmaster General* is a case that I

24   found, and I scanned through it, but it was not directly

25   relevant to what I was working on at the time.

1    Q.   Okay.  And was that case also dismissed?

2    A.   It was.

3    Q.   And after only six documents in the entire record, is that

4    correct?

5    A.   I see seven docket entries.

6    Q.   Seven docket entries.  All right.

7    A.   Yes.

8         MR. QUINLEY:  So, Your Honor, again just for

9    completeness of the record of Mr. Johnson's litigative history

10   in this district, I would move for the admission of Government

11   Exhibit 8.

12        THE COURT:  Any objection?

13        MR. JOHNSON:  I have no objection.

14        THE COURT:  It will be admitted.

15   Q.   (By Mr. Quinley) All right.  Well, I think Mr. Hanna, let

16   me just check with my colleagues here one moment, but I think

17   we are finished.

18        (Brief interruption in proceedings).

19        MR. QUINLEY:  Your Honor, I will conclude, then, my

20   Direct Examination of this witness.

21        THE COURT:  Mr. Johnson?

22

23                        CROSS EXAMINATION

24   BY MR. JOHNSON:

25   Q.   Okay.  Mr. Hanna, you are obviously an attorney, correct?

1    A.   Correct.

2    Q.   How long have you been an attorney?

3    A.   Approximately eight years.

4    Q.   And do you consider yourself a specialist in any

5    particular type of law or general practice?

6    A.   I consider myself more of a generalist.

7    Q.   And how much training have you had in international law?

8    A.   Very little.

9    Q.   Okay.  So, when you were hired to defend the clients, you

10   mentioned that you contacted BOP staff attorneys, or something

11   like that.

12   A.   I didn't say I was hired by them, but I did contact BOP

13   staff attorneys after I started work on the case.

14   Q.   Okay.  What was the purpose of that consultation?

15   A.   In general when we are asked to represent federal

16   employees in litigation filed against them individually, we

17   rely on the employing agency to obtain sort of permission for

18   us to work on the case from the Civil Division of the

19   Department of Justice in Washington, D.C., so I would have

20   contacted the lawyers at the BOP for assistance in that

21   process.

22   Q.   Was an application made to you by somebody first before

23   that happened or --

24   A.   No application would have been made to me.  It would have

25   been made to the Civil Division staff.

1    Q.   Okay.  So, to your boss?

2    A.   No.  When I say Civil Division in this context, I'm

3    talking about the Civil Division of the U.S. Department of

4    Justice, which is in Washington, D.C.

5    Q.   So, would it be Hill and True that made an application for

6    you to represent them?

7    A.   Yes, through the BOP attorneys.

8    Q.   Okay.  You spoke a lot about this particular document of

9    the nine-page judgment, administrative judgment that you went

10   over, and I think you read completely in the record that it's

11   unconventional and nothing that you are familiar with.

12   A.   That's correct.  I don't think I read the entire thing,

13   but I did read most of it.

14   Q.   Okay.  Being unfamiliar with it, is that just because you

15   have never seen it in a court process?

16   A.   When I said I was unfamiliar with it, what I was referring

17   to is the appearances of the document, the format of it.  It

18   looks completely unlike anything that I have encountered as a

19   judgment in my law practice.

20   Q.   How familiar are you with administrative procedures?

21   A.   I'm familiar with administrative procedures in the context

22   of the Administrative Procedures Act, part of the United

23   States Code.

24   Q.   Okay.  Does the Code limit any particular type of form or

25   format for administrative procedures?

1   A.  I'm not sure I understand.

2   Q.  Does Title 5 of the Administrative Procedures Act that you

3   are familiar with, does that limit the type of form or format

4   for administrative procedures in any way that you know of?

5   A.  Typically the form or format of a document is governed by

6   the Rules of Civil Procedure and not the substantive law.

7   Q.  The Rules of Civil Procedure are related to court only,

8   aren't they?

9   A.  The Rules of Civil Procedure are applied in court, yes.

10  Q.  How would they apply in administrative procedure?

11  A.  I'm not sure what you mean.

12          MR. QUINLEY:  I'm going to object unless the

13  Defendant can show a foundation for any administrative

14  process.

15          THE COURT:  I will overrule.  I will give the

16  Defendant a little latitude here.  You may proceed.

17          MR. JOHNSON:  Okay.  I would also like to bring to

18  the attention of the Court that it says *Administrative*

19  *Judgment* on there, on the document itself.

20  Q.  (By Mr. Johnson) So, administrative procedures to your

21  understanding and your training at law are different than

22  court procedures?

23  A.  No, not if you are referring to the Administrative

24  Procedures Act.

25  Q.  In your answer, then, are you addressing that the

1   Administrative Procedures Act provides for judicial review?

2   A.  That's correct.

3   Q.  Absent a judicial review, would administrative procedures

4   under that act have to be judicially reviewed at all?

5   A.  There would not be a judgment as part of an administrative

6   procedure in my experience.

7   Q.  Okay.  How about if there was a settlement?  Would that

8   happen in administrative procedure?

9   A.  I'm not sure I understand your question.

10  Q.  Are there ways to settle procedures administratively that

11  don't have to go to court?

12  A.  I'm not sure that I would consider a settlement an

13  administrative procedure.

14  Q.  Okay.  Are you familiar with the BOP's administrative

15  procedure?

16  A.  I am somewhat familiar with the BOP's administrative

17  remedy program.

18  Q.  Okay.  Would you consider that an administrative remedy?

19  A.  Yes.

20  Q.  On an agency level could there be a settlement or

21  determinations that are not reviewed by the Court?

22  A.  I don't understand your question.

23  Q.  Well, in your familiarity with the BOP's administrative

24  procedure, are there opportunities or do settlements occur and

25  administrative determinations get made without judicial review

1   in the -- in those administrative procedures?

2   A.  So, in the Bureau of Prisons Administrative Remedy

3   Program, inmates have the ability to bring virtually any

4   concern about their confinement to institution officials, and

5   institution officials can agree to make some change to the

6   conditions of confinement or they can reject the

7   administrative remedy request or they can respond with an

8   explanation.  But, that process does not ever end in the

9   imposition of a money judgment.

10  Q.  Okay.  But, it does end many times without Court review?

11  A.  Frequently the inmate and the institution are able to work

12  out the dispute, or more often the inmate just gives up and

13  moves on with his or her life.

14  Q.  I know the experience.

15          So, let me ask you this:  You work for the Department

16  of Justice, is that correct?

17  A.  Yes.

18  Q.  Does your own department provide for you an administrative

19  remedy?

20          THE COURT:  Mr. Johnson, I don't know where you are

21  going with this.  I told you earlier I was going to give you a

22  little bit of leeway, but this is not a conditions of

23  confinement case.  So, limit it to the questions that

24  Mr. Quinley raised in his direct testimony.

25          MR. JOHNSON:  I believe that's what I am doing, Your

1    Honor, in that he --

2          THE COURT:  Well, then get to it, then.

3    Q.  (By Mr. Johnson) All right.  Now, the administrative

4    procedures available outside of court, would they have to look

5    like forms that you are familiar with in your court training?

6    A.  I don't know how to answer that question.

7    Q.  Okay.  You mentioned the Federal Rules of Civil Procedure.

8    A.  Yes.

9    Q.  Does the Federal Rules of Civil Procedure govern

10   administrative procedures outside of court?

11   A.  No, the Federal Rules of Civil Procedure would govern

12   court proceedings and not proceedings that are not in court.

13   Q.  So, when you say that you recognized -- that the

14   particular format used was not recognized by you, is that

15   under the context of what you are used to seeing with the

16   Federal Rules of Civil Procedure?

17   A.  It's both that and the fact that these administrative

18   proceedings don't provide for money judgments in the form that

19   you proposed.

20   Q.  Okay.  So, it's my understanding, then -- Let me get what

21   your understanding is.

22          Your understanding is because there's a monetary

23   judgment it's not a valid administrative procedure?  Is that

24   your conclusion?

25   A.  That was a big clue to me that it was not a legitimate

1    judgment.

2    Q.   Okay.  I asked for whether you thought it was a valid

3    administrative procedure.

4    A.   I thought it was not a valid administrative or court

5    procedure.

6    Q.   Okay.  Again, I just want to limit it to administrative

7    procedures.  You didn't think it was a valid administrative

8    procedure?

9    A.   I knew it was not a valid administrative procedure,

10   because the treaty that was cited in it doesn't exist.

11   Q.   Okay.  And at that time that you made that determination

12   you had done the legal research or the due diligence, you call

13   it, for the treaty -- I think they are called *Treaties in*

14   *Force* is where you got that determination?

15   A.   Yes, that was one of the sources I consulted.

16   Q.   Okay.  Now, as part of your due diligence in that area was

17   it only the name or name recognition of the treaty that you

18   used to try to find any facts -- or validate any facts that

19   were presented to you?

20   A.   Sure, I relied on the name of the treaty that you cited in

21   trying to determine if that treaty existed.

22   Q.   Did you happen to do in your due diligence any

23   cross-referencing to the other facts that were provided, like

24   that it was passed in 1972, and that it was amended by Bill

25   Clinton in 1998?  Did you do any reference -- any

1  cross-reference in your due diligence for the treaties in that

2  way?

3  A.  I don't remember if I searched for treaties that were

4  amended in 1972, or amended by Bill Clinton.  I relied on the

5  piles of treaties that you provided in your document that you

6  filed.

7  Q.  I understand.  You said you had an open mind when you were

8  doing your due diligence.  Did you branch out any more than

9  just the titles that were provided in any other due diligence?

10  A.  I consulted the State Department's website and looked at

11  their list of treaties that were in force.  And when I found

12  that none of the treaties that you cited were in force either

13  in 2000 or 2017, I concluded that they didn't exist and that

14  it was a false document.

15  Q.  Okay.  Are you familiar in your legal training with the

16  Principal-Agent doctrines?

17  A.  I am familiar with the concept of principal and agent,

18  although it's not an area that I practice in right now.

19  Q.  When somebody serves on the principal, does that affect

20  the agent?

21  A.  It depends on the context that you are talking about.

22  Q.  Okay.  We were going -- You were going over the pages and

23  I believe under certified ruling you went through and actually

24  wrote that where it talked about -- I think you listed,

25  actually read the certified mailing numbers.  If that was

1    served on the principal, would it affect all the agents?

2    A.  No.

3    Q.  No.  Can you explain why it would not?

4    A.  Sure.  One of the areas that I practice in frequently is

5    prisoner litigation where prisoners file lawsuits against

6    folks who work in the Bureau of Prisons for various reasons,

7    and the rule in those cases is that it's a lawsuit against the

8    prison official individually, and so they have to be named and

9    they have to be served with the complaint and the summons.  It

10   is not enough to send it to the United States of America and

11   claim that that gives notice to the individual Defendant.  It

12   just doesn't work that way.

13   Q.  Now, when you say it doesn't work that way, you are

14   referring to what you are familiar with, which is judicial

15   procedures?

16   A.  That's correct.

17   Q.  You know the difference between an apple and a banana,

18   correct?

19   A.  Yes.

20   Q.  They don't look alike at all?

21   A.  That's correct.

22   Q.  Okay.  So, do you see in your actions that you keep

23   referring to judicial processes when only administrative

24   processes were claimed?  Do you see the difference between

25   them?

1  A.  Well, administrative processes don't give inmates rights

2  to sue and bring prison officials into court.

3  Q.  Again, you continue to go to judicial processes, and I'm

4  saying do you understand that there's a difference between a

5  judicial process and an administrative process, the rights

6  might be completely different?  Are you aware that rights

7  could be different under administrative process than a

8  judicial?

9  A.  Sure, that's possible.

10  Q.  Okay.  So, you are really not certain that the rights

11  don't exist administratively; you are just certain that they

12  don't exist judicially?

13  A.  I'm certain that they don't exist administrative or

14  judicially.

15  Q.  And what makes you certain that it doesn't existed

16  administratively?

17  A.  Because this is an area of law that I practice in and have

18  practiced in for a number of years, and prisoner lawsuits

19  against BOP officials don't proceed administratively.

20  Q.  When you use the term *lawsuit* is that not judicial?

21  A.  Let me be clear.  It doesn't include any claims brought by

22  prison inmates against prison officials, whether lawsuits or

23  administrative claims or otherwise.  Those things simply don't

24  result in money judgments against prison officials.

25  Q.  Okay.  And when you make that statement, you make that

1   based on your experience just in the federal judicial system?

2   A.   Federal and state judicial systems.

3   Q.   Okay.   You're not familiar with the International Court of

4   Justice and what jurisdictions they might operate under?

5   A.   Actually, I became familiar with the International Court

6   and the jurisdiction that they have in the course of working

7   on this case.   It became clear to me that the International

8   Court of Justice does not hear claims by individuals against

9   other individuals.

10   Q.   And that became clear to you by the web page?

11   A.   By the official records and documents of the International

12   Court of Justice available online.

13   Q.   In your due diligence did you ever consider calling Judge

14   Donoghue and asking her if a judgment exists?

15   A.   No.

16   Q.   Do you think that would have been prudent?

17   A.   No.

18   Q.   The Defendant of Homeland Security.   You are familiar with

19   them?

20   A.   I'm aware of the department.   I don't work too often with

21   them, but I know it exists.

22   Q.   Are they part of the Department of Justice that you work

23   for?

24   A.   No.

25   Q.   Are they a completely separate agency?

1    A.   They are a separate department, yes.

2    Q.   And they are not under the same umbrella of the Department

3    of Justice?

4    A.   They both fall under the Executive Branch of the United

5    States Government, but they are not headed by the same

6    department level secretary or Attorney General.

7    Q.   Would it have been easy within your due diligence to

8    validate whether a Department of Homeland Security staff

9    attorney represented the United States or anybody at the World

10   Court?

11   A.   I don't know.  You know, these are large Government

12   agencies, so it's not as simple as just picking up the phone

13   and talking to somebody.  But, I assured myself through the

14   other research that I did that there was no such hearing and

15   that it was not necessary for me to start calling numbers in

16   the Department of Homeland Security.

17   Q.   So, in your due diligence the web page was sufficient to

18   not check out the other facts?

19   A.   The listing of judgments, opinions, orders was sufficient

20   for me; that's correct.

21   Q.   Okay.  Now, concerning the Library of Congress, did you do

22   any due diligence on that yourself or is that borrowed from

23   somebody else?

24   A.   I believe that I did search the Library of Congress, but I

25   can't remember specifically what I did.

1    Q.   Okay.  So, what was presented to you as an e-mail from

2    Rudy Davis is the end of the due diligence in regards to the

3    treaty search?

4    A.   No, I searched the Department of State, and the Department

5    of State is the department in the United States Government

6    that is responsible for treaties.

7    Q.   Okay.  Now, Ms. Hill you claim as one of your clients,

8    correct?

9    A.   Yes.

10   Q.   Part of the facts that were presented in this bankruptcy

11   was that Ms. Hill had received a copy of the treaty from

12   Senator Cory Booker's office.  Did you validate that fact?

13   A.   This is the first time I heard of that.

14   Q.   Ms. Hill never told you that?

15   A.   This is the first time I have heard Cory Booker's name

16   mentioned in this case.

17   Q.   Okay.  As far as the UCC documents, are you aware by the

18   filings that you represented that they are not filed anywhere?

19   A.   That's incorrect.  They are filed with the Clerk of the

20   United States District Court for the Southern District of

21   Illinois.

22   Q.   As an exhibit.  But, as a UCC document they are not filed

23   anywhere?

24   A.   I don't know that they were filed with any UCC filing

25   office in any state, no.

1    Q.  Okay.  All right.  You mentioned that they were used for

2    perfecting a claim.

3            If there was a valid claim would there be any problem

4    with filing a UCC statement?

5    A.  I'm not sure I understand your question if there was a

6    claim.  What do you mean?

7    Q.  If a creditor had a valid claim would there be any cause

8    of concern for filing a financing statement.

9    A.  If a creditor had a valid claim and the borrower granted a

10   security interest in personal property, it would be

11   conventional for the creditor to file a UCC financing

12   statement.

13   Q.  What if the creditor had a judgment?

14   A.  Then that would be out of the ordinary to use the UCC

15   filing form.

16   Q.  Okay.  You mentioned in the documents that you have

17   already gone over that there wasn't a signature on one of

18   them, is that correct?

19   A.  Are you referring to the Form 105s?

20   Q.  Yes.

21   A.  That's correct.

22   Q.  Was that addressed in the bankruptcy proceedings by

23   myself?

24   A.  There are so many documents in the file I honestly don't

25   remember at this moment.

1    Q.  I haven't been able to go through all of the documents

2    myself, but can you recall that there was a document filed

3    under Rule 11 to add the signature?

4    A.  I don't remember at this moment.  I would have to look

5    back through the document, sir.

6    Q.  All right.

7            MR. QUINLEY:  Your Honor, the Government will accept

8    the Defense representation that there is such.

9            THE COURT:  Okay.

10   Q.  Okay.  You also mentioned that involuntary bankruptcies

11   are governed by 11 U.S.C. 303(B), is that correct?

12   A.  That is correct, yes.

13   Q.  Under those procedures I believe we -- it was brought up

14   in the first exhibit, which was the appendix, where it was

15   read on the record that the Petitioner has appended a

16   certified copy and that the subject of a bona fide dispute

17   which meets all requirements of 11-303, and you said that the

18   case was dismissed for lack of proving that condition.

19   A.  Correct.  The Court dismissed the involuntary bankruptcies

20   because it found that there was a bona fide dispute about

21   liability on the claims.

22   Q.  Is it possible that your clients would prevent that

23   judgment from being produced and then tell the Court that it

24   doesn't exist?

25   A.  No.

1  Q.  Did they represent in court that they had no knowledge of

2  a judgment?

3  A.  Yes.

4  Q.  Did they represent that they didn't owe the money?

5  A.  Yes.

6  Q.  Did they represent that they had no debtor/creditor

7  relationship to me?

8  A.  Yes.

9  Q.  When the United States comes into an action, okay, was

10  there an objection that I put in concerning you entering the

11  case.

12  A.  Yeah, I do remember you filed a motion that objected to

13  the Government representing -- or objected to the United

14  States Attorney's Office representing Mr. True and Ms. Hill.

15  Q.  As part of that objection I believe that's Document #9 in

16  Exhibit 3.

17         Was there also a request in that objection to seal

18  the case?

19  A.  I believe that you requested that the Court seal the case

20  for 90 days, but you also objected to debtor's -- the alleged

21  debtor's motion to seal the case.

22  Q.  That's correct.  In that particular motion did I claim

23  that there's just a debtor/creditor relationship and not an

24  inmate/captor relationship that was just as important?

25  A.  I'm not sure what you mean.  Can you --

1    Q.  Let me just read this statement, then.

2          "The relationship of creditor/debtor not

3    inmate/captor is before this Court."

4    A.  I see that in the document, yes.

5    Q.  "And I would very much like to keep -- I would like it" --

6    excuse me.  "I would like it very much if this Court would

7    keep these useless arguments of surplusage from cluttering the

8    docket."

9    A.  I see that in there, yes.

10   Q.  Okay.  "The Motion to Seal should be stricken as it's

11   filed by a non-interested party in bad faith."  Was that my

12   claim against you being present in the hearing?

13   A.  I believe so, yes.

14   Q.  Is it obvious from this particular document that I didn't

15   have any problem with it being sealed, I just had a problem

16   with your filing the seal?

17   A.  No, that was not clear to me.  I mean, what you were

18   asking for was quite different from what True and Hill were

19   asking for.

20   Q.  Is that only because it was temporary in nature?

21   A.  In part, yeah.  Your request was for a temporary seal and

22   we requested that it be sealed indefinitely.

23   Q.  Okay.  Are you familiar with the Federal Rules of Civil

24   Procedure 36?

25   A.  Yes.

1    Q.  And is that what they call judicial admissions or --

2    A.  That rule pertains to Requests for Admissions.

3    Q.  Right, did we -- In part of the proceedings did I submit

4    Requests for Admissions?

5    A.  What I remember for sure is that you submitted Requests

6    for Admissions to somebody who was not a party in the lawsuit,

7    and so the Court ordered that those were not valid.  That's

8    what's coming to mind first.

9    Q.  Okay.  Did I also present them to Mr. Hill and Ms. True --

10   I mean, Ms. Hill and Mr. True?

11   A.  I believe there were some sent at one point, but the

12   details are not coming to me at the moment.

13   Q.  According to those rules, if you don't respond and you are

14   silent can the statement become a stipulation of agreement?

15   A.  No.

16   Q.  Are you familiar with the rules where after 30 days of

17   nonresponse that they become default admissions?

18   A.  So, under Rule 36 if a party does not respond to the

19   request, does not object to them, then they can be deemed

20   admitted for the purposes of that case only, that is correct.

21   Q.  Okay.  Isn't that very familiar with remaining silent and

22   can be used against you?

23   A.  I'm not sure what you mean by that.

24   Q.  Well, you testified that there's no way for silence to be

25   turned into an admission, and we went through this -- you went

1    through the thing where it is agreed -- you have agreed, you

2    have agreed -- We didn't go through those in detail, but it

3    was brought up that the known facts in the judgment,

4    administrative judgment was accomplished through tacit

5    procuration is I believe how you guys went over it, and you

6    said that's impossible, and yet it's available in Rule 36.

7    A.   The difference between what you are describing and what

8    Rule 36 requires is that under Rule 36 there has to be an

9    actual pending lawsuit before a Court in a proceeding that is

10   in discovery, which the parties can send to one another

11   Requests for Admissions.

12   Q.   Again, that's part of your familiarity in your judicial

13   process?

14   A.   Rule 36 is, that's correct.

15   Q.   But, you're also familiar with the constitution, is that

16   correct?

17   A.   I am familiar with the constitution.

18   Q.   You understand from the constitution that the Government

19   gains no rights that the people didn't already have?

20   A.   I'm sorry, I would have to see a copy of the constitution

21   to recall everything that's in it.

22   Q.   Okay.  Just as a general concept you don't understand

23   that?

24   A.   Could you repeat the question?

25   Q.   The question is do you understand that as a general

1    concept of the constitution that the Government receives no

2    rights that the people didn't already have?

3    A.  I'm not sure how to answer that question without seeing

4    what you are talking about.

5    Q.  Okay.  Where do you think the United States gets its

6    rights?

7    A.  I don't know how to answer that question, sir.  I mean,

8    the constitution is the foundational document of our system of

9    Government.

10   Q.  And are you talking about a republic form of Government at

11   this time?

12   A.  Sure.

13          THE COURT:  What are you getting at, Mr. Johnson?  I

14   don't understand your question, either.

15          MR. JOHNSON:  Okay.  What I'm getting at is that he

16   keeps referring back to judicial process, and a judicial

17   process is a right given and executed by the Government.  The

18   right to handle our own affairs was with the people before it

19   was ever given to the Government.  And if the Government can

20   exercise that right by -- create a right through Federal Rules

21   of Civil Procedure Rule 36 where admissions are taken, then

22   certainly the people had that right before the Government got

23   it.  So, I'm saying administratively this could be done.

24          THE COURT:  Okay.  You made your point.

25          MR. JOHNSON:  Okay.  Thank you.

1   Q.  (By Mr. Johnson) You also mentioned that you had done some

2   work with CTU before?

3   A.  I have had one other case, I believe, involving the CTU.

4   Q.  What is CTU?

5   A.  My understanding is it's the Counter Terrorism Unit, part

6   of the Bureau of Prisons, and it's a unit that is responsible

7   for, in part, reviewing communications of inmates who are

8   housed in the Communications Management Units at USP-Terre

9   Haute and USP-Marion.

10  Q.  Is it a separate agency?  Does it have separate budget?

11  Do you know anything about it?

12  A.  I'm not familiar with the budget of the CTU.  To my

13  understanding it's part of the Federal Bureau of Prisons.

14  Q.  Did you represent them or did you just study them or

15  something?

16  A.  The issue just came up in a different case that I handled.

17  Q.  Okay.  So, it would be fair to say you don't know who they

18  are or how they came into being or anything like that?

19  A.  I'm not an expert on the origins of the CTU.

20  Q.  Okay.  I believe that's probably going to be it for me

21  right now.

22          THE COURT:  Okay.  Any Redirect Examination?

23          MR. QUINLEY:  No, Your Honor.  If this witness can be

24  excused.

25          THE COURT:  Okay.

1           MR. QUINLEY:  I was going to try to get on the

2    warden.

3           THE COURT:  Well, we can start with him.  We will go

4    for another 15 minutes.

5           You may step down, you are excused.

6           MR. JOHNSON:  Excuse me, Your Honor.

7           THE COURT:  Yes.

8           MR. JOHNSON:  If there's only 15 minutes left, I

9    imagine there's quite a few issues for us to go over about

10   tomorrow's business and how to handle some things for tonight

11   in regards to discovery that would probably use up that 15

12   minutes.

13          THE COURT:  Well, the jury is going to be here for 15

14   minutes.  We will stay a little longer, okay?

15          Let's get Mr. True.  Let's get him started.  We may

16   not finish, but we will start with him.

17          If anybody wants to stand and stretch, go ahead and

18   stand and stretch.

19          (Brief interruption in proceedings).

20          THE COURT:  Please approach.  Please raise your right

21   hand to be sworn.

22          (Defendant, William True, sworn).

23          THE CLERK:  Please be seated.  Please state your full

24   name and spell your last name for the record.

25          MR. TRUE:  William Page True, III; T-R-U-E.

```
 1              THE COURT:  You may proceed.
 2              MR. QUINLEY:  Thank you, Mr. Self.
 3
 4                     DIRECT EXAMINATION
 5   BY MR. QUINLEY:
 6   Q.  And, Mr. True, could you again state your name for the
 7   ladies and gentlemen of the jury, and also how you're employed
 8   and where you're employed?
 9   A.  My name is William Page True, III, and I go by Bill and
10   I'm a warden at the United States Penitentiary, Marion,
11   Illinois.
12   Q.  How long have you been at that penitentiary?
13   A.  Going on two years.  November 2016 I got there.
14   Q.  November of 2016.  And I guess you had a career before you
15   were stationed at the Marion penitentiary with the Bureau of
16   Prisons?
17   A.  Yes, sir.
18   Q.  Can you just briefly review that.
19   A.  I started in the Bureau of Prisons in 1995 as an intern at
20   USP Marion, Illinois.  I went to FCI Schuykill, Pennsylvania,
21   Federal Correctional Institution in Pennsylvania in 1996.  Two
22   years later, in 1998, I was transferred to USP Lewisburg,
23   Pennsylvania, United States Penitentiary in Lewisburg,
24   Pennsylvania.  I was there for approximately ten years.  And,
25   in 2008, I went to the Federal Correctional Complex in Butler,
```

1    North Carolina as a unit manager.  I spent approximately two

2    years there.  And, then in 2010, I was the Executive Assistant

3    at the Federal Correctional Institution in Cumberland,

4    Maryland, again another two years; and then I was promoted to

5    Associate Warden at the Federal Correctional Institution in

6    Milan, Michigan; and then two years later I was transferred to

7    the Administrative Maximum Institution at Florence, Colorado

8    as an Associate Warden; and approximately March of 2016, I was

9    promoted to Warden at FCI Duluth, Minnesota; and arrived at

10   USP Marion in November of 2016.

11   Q.  Okay.  Now, in the two years you have been at Marion,

12   prior to on or about January 8 of 2018, had you had any

13   particular dealings with Mr. Kurt F. Johnson?  And do you

14   recognize Mr. Johnson?

15   A.  I do.

16   Q.  So, did you have any direct dealings with Mr. Johnson

17   during the two years prior to the filing of the involuntary

18   bankruptcy?

19   A.  No, just in my capacity as warden doing rounds if he would

20   ever talk to me or in any capacity as an inmate.

21   Q.  And did you personally get involved in any disciplinary

22   actions against Mr. Johnson taken within the penitentiary?

23   A.  No.

24   Q.  All right.  And, Mr. Self has handed to you Government

25   Exhibit 1.  Do you recognize that?  It's been previously

1   admitted into evidence.

2   A.  Yes.

3   Q.  And how did that come to your attention?

4   A.  Just when he filed a bankruptcy lien on me, I was privy to

5   this information.

6   Q.  Okay.  Now, had you been trying to get representation in

7   connection with that from United States Attorney's Office?

8   A.  Yes, sir.

9   Q.  Okay.  And were you doing that through counsel for the

10  Bureau of Prisons?

11  A.  Yes, I was.

12  Q.  Okay.  And do you know whether or not counsel was

13  appointed to represent you or assigned to represent you out of

14  the United States Attorney's Office?

15  A.  Yes, I was.

16  Q.  And who was that?

17  A.  Mr. Hanna.

18  Q.  All right.  Now, when you became aware -- Strike that.

19      Did you have a concern -- Even before Exhibit 1 was

20  filed against you in the Bankruptcy Court, did you have a

21  concern of any inmate using a Form 105 to initiate an

22  involuntary bankruptcy proceeding?

23  A.  Prior to this?

24  Q.  Yes, before this.

25  A.  Yes.

1    Q.   Why?

2    A.   Through my career in the Bureau of Prisons, specifically

3    around 2011, memorandums came out specifically detailing what

4    inmates are trying to do.

5    Q.   What is that?

6    A.   File false liens against covered persons, meaning law

7    enforcement officials and their families.

8    Q.   And, in addition to liens?  So, a lien is a publicly-

9    recorded document against property, is that right?

10   A.   Right, that's correct.

11   Q.   That is supposedly based upon a creditor interest in the

12   property?

13   A.   That's correct.

14   Q.   And it could be as a result of a judgment?

15   A.   That is correct.

16   Q.   All right.  And you say that there was a concern about

17   false liens being used as a way to harm law enforcement

18   officials?

19   A.   That is correct.

20   Q.   Now, anything about UCC filings?

21   A.   Yes.

22   Q.   Also?

23   A.   Yes.

24   Q.   Well, what about involuntary bankruptcies?  At some point

25   did that come to your attention, for instance, when you were

1    still at -- what do you call it -- ADX?

2    A.   Uh-huh, ADX.

3    Q.   In Florence, Colorado?

4    A.   In Florence, Colorado.

5    Q.   Is that also called supermax?

6    A.   That is a supermax.

7    Q.   What did you learn there, if anything -- And forgive me if

8    I'm forgetting the sequence here about involuntary bankruptcy.

9    A.   We would have weekly intelligence meetings at the ADX, and

10   specifically we have a number of sovereign citizens there and

11   they were trying to file liens on staff members and other

12   members in the society, and we would go over this document

13   every single week and see if we would allow the correspondence

14   to go out or not go out and determine whether an incident

15   report needs to be written.

16   Q.   Okay.  All right.  But at least during your time at Marion

17   you didn't get directly involved in any of that with

18   Mr. Johnson?

19   A.   That is correct.

20   Q.   That would have been handled by other people?

21   A.   My intelligence staff.

22   Q.   All right.  Very good.  Now, did you have a concern about

23   what the potential consequence was to you personally of the

24   public filing of an involuntary bankruptcy in a court for the

25   Southern District of Illinois?

1    A.   Absolutely.

2    Q.   What was that concern?

3    A.   My greatest concern was my credit rating and my job

4    status.

5    Q.   Okay.  In fact, in your position are you required to go

6    through a very careful and thorough security background check

7    every five years?

8    A.   Every five years we have a background check.

9    Q.   And, in fact, in that background check is any legal

10   proceeding that you have been involved in part of the subject

11   of that background check?

12   A.   That is correct.

13   Q.   All right.  Let's go back to the private side, though.

14   You said you had a concern about your own credit --

15   A.   That's correct.

16   Q.   -- and potential effect on that.  Do you know whether this

17   filing actually came to the attention of any commercial

18   organizations?

19   A.   Yes, it did.

20   Q.   How do you know that?

21   A.   I got the mailings through -- sent to the institution.

22   Q.   Do you have copies of two mailings that you received at

23   the institution following this bankruptcy -- excuse me, this

24   involuntary bankruptcy filing?

25   A.   Yes, I do.

```
 1   Q.  And they are numbered Exhibits 14 and 15, I believe?
 2   A.  That's correct.
 3           MR. QUINLEY:  Your Honor, I will move for the
 4   admission of 14 and 15.
 5           THE COURT:  Any objection?
 6           MR. JOHNSON:  I have haven't seen them, Your Honor.
 7           THE COURT:  Show them to Mr. Johnson.
 8           MR. QUINLEY:  Here's 14.  Let me get 15.  Here it is.
 9           THE COURT:  Any objection?
10           MR. JOHNSON:  No objection.
11           THE COURT:  They will be admitted.
12           MR. QUINLEY:  And, Your Honor, if each could be
13   published.  And, start with 14, please, the second page.
14           We have it here.  It's on there.
15   Q.  (By Mr. Quinley) So, the envelope is an envelope from
16   Howard Buick, is that right, --
17   A.  That is correct.
18   Q.  -- with important information enclosed, addressed to you?
19   A.  Yes.
20   Q.  By the way, the postmark -- is there a postmark that's
21   readable?  January 9, 2018, is that right?
22   A.  That is correct.
23   Q.  So, the day after the filing this is postmarked to you.
24   Okay.  And what did this group --
25           THE CLERK:  Mr. Quinley, it's not showing yet.
```

1          THE COURT:  We don't have it on the ELMO yet.  We

2  don't have it up.

3          THE CLERK:  Do you need it docked?

4          MR. QUINLEY:  Well, we don't if you can pull it up on

5  Trial Director.

6          THE CLERK:  It's not coming up.

7          THE COURT:  Put it on the ELMO.

8          MR. QUINLEY:  Then let's just lay it on the ELMO.

9  That works, too.

10 Q.  (By Mr. Quinley) While we are trying to bring that up,

11 let's go ahead and address the second one, Exhibit 15.  Is

12 that from the Debt Education and Certification Foundation?

13 A.  That is correct.

14 Q.  Also postmarked January 9, 2018?

15 A.  Yes.

16 Q.  All right.  We will take a look at the contents of that,

17 as well, but first we will get --

18         THE COURT:  Well, it looks like technology has failed

19 us.

20         MR. QUINLEY:  Something is coming up.

21 Q.  (By Mr. Quinley) Here.  You know, you have got it right in

22 front of you, Warden.  What did Howard Buick want you to know?

23 What have you been selected for and why?

24 A.  Due to my recent credit situation I was given an

25 opportunity for zero percent financing -- or zero down on a

1    new vehicle for as low as 9.9 percent credit.

2    Q.  That's not exactly low, is it?

3    A.  No, it's not.

4    Q.  All right.  They figured you were in bankruptcy, so what a

5    deal.

6            And, the other one, this is -- if you go to the

7    second page of it, is it entitled *Important Bankruptcy Course*

8    *Information*?

9    A.  Yes, it is.

10   Q.  In fact, does it reference your bankruptcy case by number?

11           MR. QUINLEY:  I have got it right here, Mr. Self.

12           THE COURT:  It's up there.

13           MR. QUINLEY:  It's already up there.  Well, if

14   everyone can read it.

15   Q.  (By Mr. Quinley) So, are they offering you debtor

16   counseling?

17   A.  Yes, they are.

18   Q.  All right.  Is any of this good for you in terms of your

19   personal credit?

20   A.  No, it is not.

21   Q.  And, in fact, if you went to get a car loan, let's say at

22   Howard Buick and GMC, they think that you have been in

23   bankruptcy.

24   A.  That is correct.

25   Q.  And they are actually right.  Someone put you in

1   bankruptcy open to the public for a little less than 24 hours?

2   A.  Yes, they did.

3   Q.  So, really -- Oh, did it come to your attention that

4   Mr. Johnson -- and only if it did, Warden, that Mr. Johnson

5   actually tried to start this against Ms. Hill and 29 other

6   Bureau of Prisons' employees on or about November 25th of

7   2016?

8   A.  That is correct.

9   Q.  You did learn of that incident?

10  A.  I did.

11  Q.  Okay.  So, even though you didn't have any direct contact

12  with Mr. Johnson with regard to discipline on that occasion,

13  you were aware of the incident?

14  A.  I was.

15  Q.  Okay.  And over the course of a year did you, in fact,

16  instruct Gary Burgess and did you offer a memo on the Court

17  Security Act, did you instruct him to actually counsel all of

18  the inmates in the CMU about using legal process to harass

19  Bureau of Prisons officials?

20  A.  I did.

21  Q.  And, so, we have got an exhibit for that.  We can discuss

22  it with Mr. Burgess.

23         But, do you know whether or not Mr. Burgess actually

24  had that meeting with Inmate Johnson and the others?

25  A.  Yes, he did.

1  Q.  And did that specifically include reference to involuntary

2  bankruptcy petitions?

3  A.  Yes.

4  Q.  Okay.  And, 33.  And, handing you Exhibit No. 33, is this

5  the memo that you signed off on?

6  A.  Yes, it is.

7  Q.  Okay.

8          MR. QUINLEY:  I would move for its admission.

9          THE COURT:  Any objection?

10         MR. JOHNSON:  Again, I haven't seen it.

11         MR. QUINLEY:  I'm sorry.  Where is 33?  Where did it

12  go.  33.

13         THE COURT:  Get it from the witness and show it to

14  Mr. Johnson.  And, I want to break soon, Mr. Quinley.

15         MR. QUINLEY:  Yeah, but Mr. Clinton has pointed out

16  something to me as being essential.

17         THE COURT:  Any objection?

18         MR. JOHNSON:  No objection.

19         THE COURT:  It will be admitted.

20  Q.  (By Mr. Quinley) Okay.  So, and did it come to your

21  attention that some envelopes -- I think around January 18 of

22  2018 -- six envelopes were seized with 40 more involuntary

23  bankruptcy petitions that Inmate Johnson was trying to send

24  out?

25  A.  That's correct.

1    Q.  Okay.  And then, finally, did Mr. Burgess come to you and

2    show you Exhibit 42A that was delivered to the United States

3    Penitentiary at Marion in an envelope?

4    A.  Yes.

5    Q.  And what did Mr. Burgess come and show you that was

6    addressed to you specifically that had been contained in a

7    larger envelope that had been delivered to the prison?

8    A.  1099-C form.

9    Q.  What's that?

10   A.  I didn't know what it was at the very beginning, but after

11   doing a little bit of research it looks like I have been

12   forgiven my debt from Inmate Johnson.

13   Q.  All right.  And, is it your understanding that that was

14   supposed to be forgiving a billion dollars?

15   A.  Yes.  20 billion, I think.

16   Q.  Oh, that's for Kathy Hill --

17        MR. QUINLEY:  So, here, this one, if you would put it

18   up here, please.

19   Q.  (By Mr. Quinley) Do you understand that if the IRS accepts

20   the filing of a 1099-C, do you understand the consequences of

21   that to you as a taxpayer?

22   A.  I believe it would hurt my credit rating and my tax

23   refund.

24   Q.  Okay.  All right.  Very good.

25        MR. QUINLEY:  And, Your Honor, I would move for the

1    admission of 42A.

2            THE COURT:  Any objection?

3            MR. JOHNSON:  No objection.

4            THE COURT:  It will be admitted.

5            MR. QUINLEY:  That's all.

6            THE COURT:  That's all for today or this witness?

7            MR. QUINLEY:  That's all for this witness.

8            THE COURT:  Okay.  We will stand in recess until 8:30

9    tomorrow morning.

10           THE CLERK:  All rise for the jury.

11           (Jury out).

12           THE COURT:  You may step down.  Be back here tomorrow

13   at 8:30.  Okay, Mr. Johnson?

14           MR. JOHNSON:  Would this be a good time to ask a

15   couple BOP questions with Mr. True here?

16           THE COURT:  You can ask him tomorrow.

17           MR. JOHNSON:  It's not related to the trial.  It's

18   about documents going back and manila folders.

19           THE COURT:  Go ahead and ask him.

20           MR. JOHNSON:  I know you don't want me to have these

21   binders, but I would like to take back the documents for the

22   night.  These folders -- I could use a few more folders to be

23   organized and just have a couple of envelopes.  Are those a

24   problem to bring back?

25           MR. TRUE:  Not the binders or anything like that.

1          MR. JOHNSON:  No binders, just paper and manila

2    folders and mostly documents -- all documents; no pens, no

3    nothing like that.

4          MS. SIEREVELD:  Some of the documents are --

5          MR. QUINLEY:  They are all his copies.

6          MS. SIEREVELD:  Okay; all right.

7          MR. QUINLEY:  It's all the court documents and then

8    just a few outside of the court documents.  They are all court

9    records except for -- Frankly, they are virtually all court

10   records.

11         MS. SIEREVELD:  Sometimes, Your Honor, if they are

12   court documents, if there's security information on there or

13   things that have personal information, like some of these

14   filed documents from the bankruptcy filings, even though the

15   inmates have access to them they are not allowed to keep them

16   in their possession, in their cell, so the unit will maintain

17   control of these documents and allow the inmates to review

18   them when they are in the discovery area only.

19         THE COURT:  But these are documents that have been

20   admitted into evidence today, is that correct?

21         MR. QUINLEY:  That's correct.

22         THE COURT:  So, you can have those documents, the

23   paper.  No binders.

24         MR. QUINLEY:  I think what the attorney was just

25   describing is he has them under supervision; that either Mr.

1  Burgess or another employee has to be present when he's in a

2  designated area and when he's done working with them.  Then --

3          THE COURT:  They take them back.

4          MS. SIEREVELD:  He can't make copies or anything of

5  that nature.

6          MR. JOHNSON:  Again, the situation is that there's a

7  discovery room, a computer, okay, for accessing the disk, but

8  basically I am hoping to and my desire was to keep these and

9  do some of my due diligence tonight to go through documents

10 that I'm going to try to address tomorrow, and that's the

11 whole purpose of them.  If I can't have them in my house or

12 the cell, then it --

13         THE COURT:  Well, I'm not going to interfere with the

14 procedures of BOP.

15         MR. JOHNSON:  I understand.  And I am making it

16 understood that these were all filed in the Court, I haven't

17 -- I really don't even have time to share it with any other

18 inmates or anything.  You are going to get me back around

19 7:00.  I'm going to have about an hour to do some discovery on

20 the computer and then lockdown and that's it.  I would like to

21 do homework tonight.  That's the whole purpose of it.

22         THE COURT:  Okay.  Just follow whatever the rules

23 they have.

24         MS. SIEREVELD:  Right, Your Honor, and it would be

25 particularly like the 1099s, bankruptcy forms that were

```
 1    entered into evidence today.

 2            MR. QUINLEY:  Treaties in force you wouldn't have any

 3    problems with, right?  Those two large things without a

 4    binder?

 5            MS. SIEREVELD:  What are they?

 6            MR. QUINLEY:  Treaties in force.

 7            MS. SIEREVELD:  I think we are probably fine with

 8    that.

 9            MR. QUINLEY:  You can have those two.  They are

10    yours.

11            THE COURT:  All right.  Anything else, Mr. Quinley?

12            MR. QUINLEY:  No, Your Honor.

13            THE COURT:  Mr. Johnson?

14            MR. JOHNSON:  I guess that would be it.

15            THE COURT:  Okay.

16            MR. JOHNSON:  I am trying to think about tomorrow.

17            MR. QUINLEY:  We'll finish the Warden, we'll put the

18    Defendant's mother, Nell Leffel, and then we will put on Kathy

19    Hill.

20            THE COURT:  Any way we can get anybody in here by

21    about 8:15, 15 minutes before?

22            MR. QUINLEY:  Absolutely.

23            THE COURT:  So, if there's any preliminary stuff

24    before the jury comes in.  I want to keep on the schedule.

25            MR. JOHNSON:  Excuse me.  When will be my first
```

1    opportunity to talk to Sherak?  I guess it will have to be

2    over video conference.

3            THE COURT:  It will be over video conference.  We

4    will get the jury out and we will try to arrange that.  Okay?

5            MR. JOHNSON:  Do you know when that would be?

6    Because it comes into my strategy and my questioning and

7    everything in the whole trial.

8            THE COURT:  2:00 tomorrow afternoon we will hook it

9    up for you, okay?

10           MR. JOHNSON:  Okay.  Thank you, sir.

11           THE COURT:  Okay.

12           THE CLERK:  All rise.

13

14

15

16                      *   *   *   *   *   *   *

17

     I certify that the foregoing is a correct transcript from the
18   record of proceedings in the above-entitled matter.

19

20   /S/ Stephanie K. Rennegarbe                 10/18/2019
     Certified Shorthand Reporter
21

22

23

24

25