```
 1              IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF ILLINOIS
 2

 3   UNITED STATES OF AMERICA,        )
                                      )
 4             Plaintiff,             )
                                      )
 5   v.                               )  No. 18-cr-40043-JPG-1
                                      )  Benton, Illinois
 6   KURT F. JOHNSON,                 )
                                      )
 7             Defendant.             )

 8

 9              TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                          (DAY 3 OF 3)
10
                BEFORE THE HONORABLE J. PHIL GILBERT
11                 UNITED STATES DISTRICT JUDGE

12                      SEPTEMBER 26, 2018

13   APPEARANCES:

14   FOR THE PLAINTIFF:    Michael J. Quinley, Esq.
                           Assistant United States Attorney
15                         #9 Executive Drive
                           Fairview Heights, IL  62208
16                         618-628-3700
                           Michael.J.Quinley@usdoj.gov
17
     FOR THE DEFENDANT:    Kurt F. Johnson - Pro Se
18                         13177-081
                           Terre Haute FCI
19                         Federal Correctional Institution
                           P.O. Box 33
20                         TerreHaute, IN  47808

21              Stephanie Rennegarbe, RDR, CRR, CBC
                        IL CSR #084-003232
22                     301 West Main Street
                         Benton, IL  62812
23                        618-439-7735
                Stephanie_Rennegarbe@ilsd.uscourts.gov
24
         Proceedings recorded by mechanical stenography; transcript
25            produced by computer-aided transcription
```

```
1                          I N D E X

2
     WITNESSES CALLED TO TESTIFY:
3
                              DX     CX    RDX
4
     KURT F. JOHNSON          443    503   525
5

6

7

8                        E X H I B I T S

9
     EXB #        DESCRIPTION                  ID'D     ADMT'D
10
     Deft's 5     Waiver of Claim              445      445
11   Deft's 6     Letter to Hon. Joan Donoghue 463      464
     Deft's 7     Memo from Simmons to True    477
12   Deft's 12    Mail to Postmaster General   488      488
     Deft's 13    Mail to USDC                 489
13   Deft's 14    USDOJ Returned Correspondence 490     490
     Deft's 15    E-mail to Myrian Primera     497
14   Deft's 16    E-mail to Myrian Primera     497
     Deft's 17    E-mail to Faith Sherak       497
15   Deft's 18    E-mail to Myrian Primera     497
     Deft's 19    E-mail to Faith Sherak       499
16
     Plf's 59     Postmaster General           513      513
17   Plf's 60     Involuntary Bankruptcy       513      513
     Plf's 61     Newspaper Article            513      513
18   Plf's 62     Indictment of Sherak         522      522
     Plf's 63     Document on Sherak           522      522
19   Plf's 64     SIS Advisory                 518      519
     Plf's 65     Johnson California Lawsuit   515      515
20   Plf's 66     Statement of Defendant       519      519

21

22

23

24

25
```

1          (Proceedings began in open court at 8:17 a.m.; jury

2    not present).

3                 *********************************

4          THE COURT:  Let the record show that we are on the

5    third day of the jury trial, *United States of America v. Kurt*

6    *Johnson*, 18-cr-40043, outside the presence of the jury.  This

7    is a continuation of the jury instruction conference that was

8    started yesterday evening.

9          First, we redrafted Defendant's 1, Mr. Johnson,

10   regarding the prison clothes, and the proposed instruction

11   that we worked on is *The Defendant wore prison clothes*

12   *throughout this trial.  You cannot infer that the Defendant is*

13   *guilty in this case just because of the prior conviction that*

14   *led to his current wardrobe.  A prior conviction is not*

15   *evidence of the commission of a crime in this case.*

16         Is that satisfactory with you?

17         MR. JOHNSON:  Very acceptable.

18         THE COURT:  Acceptable to the Government?

19         MR. QUINLEY:  Yes, Your Honor.

20         THE COURT:  Okay.  That will be given.

21         All right.  Then I guess the other ones depend upon

22   whether or not you are going to testify in your defense,

23   Mr. Johnson.  Have you thought about it over the evening and

24   are you going to testify in your defense?

25         MR. JOHNSON:  I will testify.

```
1              THE COURT:  Pardon?

2              MR. JOHNSON:  I will testify.

3              THE COURT:  You will testify.  Okay.

4              All right.  Well, we will -- Is there any other -- Of

5    course, if you testify then we will -- Let's go through those

6    instructions.

7              Courts instruction #8 will need to be -- We will use

8    the -- because that does not have *the Defendant*.  We will need

9    to modify that.  I think you have, Mr. Quinley.

10             MR. QUINLEY:  I think we already have -- might be --

11   Is it 10A or -- Let's see.  It's 10A, Government's.

12             Yes, it says *including that of the Defendant*.

13             THE COURT:  10A.  We will do 10A.

14             MR. QUINLEY:  Thank you.

15             THE COURT:  Government's 9A will be withdrawn.

16             MR. QUINLEY:  That's right, 9; Exhibit 9.

17             THE COURT:  I mean, Exhibit 9.

18             Then we will give Government's 14, since the

19   Defendant is going to be testifying, and you will be

20   questioning about his --

21             MR. QUINLEY:  Well, that's a question, Your Honor.

22   Mr. Johnson's conviction was in 2004.

23             THE COURT:  Okay.  That's beyond the --

24             MR. QUINLEY:  So, it's more than ten years.

25             THE COURT:  Okay; all right.  So, you are withdrawing
```

1  Government's 14?

2          MR. JOHNSON:  The conviction goes back to 2005, if

3  that makes a difference.

4          MR. QUINLEY:  2005 is beyond ten years, so I cannot

5  use it to cross-examine you.

6          MR. JOHNSON:  I understand that.  I'm going to bring

7  it up on Direct anyway.

8          THE COURT:  You are going to bring it up on Direct?

9          MR. JOHNSON:  Probably.

10          MR. QUINLEY:  Okay.

11          THE COURT:  Okay.  Then we will keep it in.

12          MR. QUINLEY:  Okay.

13          THE COURT:  We don't know about recorded

14  conversations yet.

15          MR. JOHNSON:  I would like to discuss that a little

16  bit with you.  My recording situation is there's 17 15-minute

17  phone calls between me and Stephen Sherak.  Of that there's

18  about an average of four minutes on each particular call as an

19  average, excerpts that I believe are relevant to this

20  situation.

21          MR. QUINLEY:  And, Your Honor, I'm going to object to

22  those as hearsay.  They are out-of-court statements that are

23  going to be offered for the truth of the matter asserted, and

24  they are statements of the Defendant and another person.  And

25  even though Mr. Johnson can testify here in court under oath,

1    I don't believe that there's an exception to the hearsay rule

2    for his recorded conversations outside of court if offered by

3    him.

4            THE COURT:  Mr. Johnson?

5            MR. JOHNSON:  I believe that they are probative

6    towards motive, state of mind, certainly relevant to belief

7    about the judgment.  They would be relevant to discussions of

8    the evidence that would be presented, they would speak why

9    they would be relevant.  I think it's very probative.  I was

10   involved in the conversation.  It's direct to me, it's

11   recorded, so the parties are known.  So, for all those reasons

12   I believe that it's beneficial to the trial.

13           THE COURT:  Well, you can testify as to what you told

14   Sherak, but what he said on any recorded conversation is

15   hearsay, and I'm not aware of any exception to the hearsay

16   rule that would allow such statements to be of him outside of

17   Court.  And you had an opportunity -- You had an opportunity

18   -- You called him and then you decided not to use him, so you

19   had an opportunity to cross-examine him, to examine him.  So,

20   you can't get through the back door what you decided not to

21   get through the front door.  So, such recordings are not --

22   The Court is going to grant the Government's objection to the

23   use of recordings on the basis they are a violation of the

24   hearsay rule.

25           MR. QUINLEY:  Your Honor, I want the Government's

objection to be clear in that the Government by its objection is not seeking to prevent the Defendant from testifying what he believes and why he believes it. He can explain.

THE COURT: He can explain that. He can explain that.

Okay. So, we will not be using Court's #9, since there will be no recordings.

Any other issues on jury instructions?

MR. JOHNSON: None that I'm aware of.

THE COURT: Have you looked at the verdict forms?

LAW CLERK: I gave him a copy already.

MR. QUINLEY: Okay. Thank you.

THE COURT: Any objections to the verdict forms?

MR. JOHNSON: No.

THE COURT: Okay. All right.

Okay. We will start at -- I have a 8:30 hearing. It'll probably only last 15 minutes, so we might get started at quarter to 9:00, if the jury is here.

MR. QUINLEY: I think the jury was told 9:00, but there was a juror that walked in with me.

THE COURT: Okay. We will stand in recess until we begin the last phase of this trial; I mean, the defense of this trial.

MR. QUINLEY: Yes.

THE CLERK: All rise.

1          (Following a recess, proceedings continue in open

2     court.)

3          THE CLERK:  *United States of America v. Kurt F.*

4     *Johnson,* case #18-40043.  We are here on a jury trial.  Are

5     the parties ready?

6          MR. QUINLEY:  Ready to proceed.  Assistant United

7     States Attorney Michael Quinley.  Good morning, Your Honor.

8          THE COURT:  Good morning.  Let the record show that

9     the Defendant, Mr. Johnson, is present *pro se*, and we are

10    waiting for all the jurors to arrive.  And, it's my

11    understanding, Mr. Johnson, that you have, after consulting

12    with yourself last night, --

13         MR. JOHNSON:  Self.

14         THE COURT:  -- that you are going to testify.

15         MR. JOHNSON:  Yes.

16         THE COURT:  You understand you have a right not to

17    testify, that the burden of proof is on the Government to

18    prove you guilty beyond a reasonable doubt and you do not have

19    to prove your innocence?  You understand that?

20         MR. JOHNSON:  I do.

21         THE COURT:  That if you testify you are subjecting

22    yourself not only in your Direct Examination of yourself, but

23    also the Cross-Examination of Government counsel?  You

24    understand that?

25         MR. JOHNSON:  I do.

1          THE COURT:  Okay.  And knowing all of that, you wish

2     to waive your right against self-incrimination and give

3     testimony in this case, is that correct?

4          MR. JOHNSON:  Yes.

5          THE COURT:  Okay.  Now, I want to caution you,

6     Mr. Johnson, that this is -- I know there's been some -- This

7     is not a conditions of confinement case.  So, when you testify

8     I'm going to allow you to testify in the narrative.  Instead

9     of asking yourself questions, you can testify in the

10    narrative.  But, stick as much as possible as you can to the

11    issues involved in this case, which is the bankruptcy --

12    involuntary bankruptcy petitions, okay?

13         MR. JOHNSON:  Yes.

14         THE COURT:  All right.

15         Anything else before the -- Mr. Quinley?

16         MR. QUINLEY:  No, Your Honor.

17         THE COURT:  Okay.

18         Why don't you go ahead and bring Mr. Johnson up here

19    and you can bring your papers up there, Mr. Johnson, unless

20    you want to testify from there.

21         MR. JOHNSON:  Honestly, I think it's best, because

22    the papers are voluminous.

23         THE COURT:  Okay; all right.  Just make sure you

24    speak directly into the mic, okay?  And I will explain to the

25    jury that you have chosen to testify from there because of the

1  papers that you have.

2          (Following a recess, proceedings continue in open

3  court; jury not present.)

4          THE COURT:  We have just been informed that Juror #2,

5  ███████ McConnell had a family emergency and will not be able

6  to participate in the rest of this trial.

7          Any objection to seating Mr. Metcalf as the alternate

8  into the original 12 jurors?

9          MR. QUINLEY:  No, Your Honor.

10         MR. JOHNSON:  No objection.

11         THE COURT:  Okay.  All right.  With that said, bring

12 the jury in.

13         THE CLERK:  All rise for the jury.

14         (Jury in).

15         THE COURT:  Good morning, ladies and gentlemen of the

16 jury.

17         Juror #2 had a family situation arise last night and

18 will not be able to join us for the remainder of this trial.

19 So, Mr. Metcalf, you will now become the 12th juror in this

20 case and will be part of the deliberations on the verdict.

21         JUROR #12:  Okay.

22         THE COURT:  We are in the Defense case-in-chief.

23 Mr. Johnson let the Court know he wishes to testify on his own

24 behalf.  He has requested to testify from the table there

25 because of papers that he has to review during his testimony,

as opposed to this witness stand.  But, the testimony that he gives from where he is seated is evidence in this case.

So, Mr. Johnson, will you please stand to be sworn?

(Defendant, Kurt F. Johnson, sworn).

THE CLERK:  Please state your full name and spell your last name for the record.

MR. JOHNSON:  Kurt Johnson.  K-U-R-T, J-O-H-N-S-O-N.

THE COURT:  Okay.  You may proceed.

MR. JOHNSON:  Thank you, ladies and gentlemen, for your service.

The Government has put on quite a case, and I would like to testify in narrative form in order to prevent question-answer, Johnson-Johnson, so hopefully that's easier.

The first question that probably comes up is why would I file bankruptcy proceedings.

My understanding for that is that under the law, which has been brought up by the indictment itself, and also by the Government's witness, Mr. Hanna, is that under 11 U.S.C. 303(b), which is for involuntary bankruptcy filings, a person could be qualified to file a bankruptcy based on being a creditor or a debtor that is bankrupt.  That bankrupt definition is you can't afford to pay your debts, and the qualifications for the creditor is that there's no bona fide dispute.  It's very unusual for one creditor to have that right.  There has to be special circumstances.

1          If you will look back at the -- I won't say that, but

2     the appendix that I filed in the bankruptcy, I tried to spell

3     that out very clearly that I was a qualified bona fide

4     creditor and the special circumstances were pled.  So, that

5     was my way of notifying the Court that the bankruptcy filing

6     was legitimate.

7          You have heard from the creditors that -- I mean,

8     excuse me, the debtors, which is Mr. William True and Kathy

9     Hill, that they dispute that debt, and it has been litigated

10    in Court, to which I lost.

11         The reason I filed all my court filings -- and all of

12    them are in the record as evidence -- is that it started out

13    not just with the bankruptcy filing.  There's a long history

14    that led up to this moment.  I would like to give you a little

15    bit of the history so that it's not viewed in a box as it

16    were.

17         First off, there's 2,145 judgment debtors.  That

18    would be found on the judgment itself, and we have talked

19    about it, or it's been talked about or testified to about 2000

20    Does and roughly 2,145 listed debtors.  There are a lot more

21    people involved than Mrs. Hill and Mr. True.  And I would just

22    like to offer this one piece of evidence for right now.  It's

23    a contract I entered into with another debtor that is not a

24    Doe.

25         MR. QUINLEY:  Your Honor, it should be marked as an

```
 1  exhibit.
 2            THE COURT:  Marked as an exhibit?
 3            MR. JOHNSON:  Please.  I believe it's No. 4 now.
 4            LAW CLERK:  It's 5.
 5            THE COURT:  5.  Any objection to its admission,
 6  Mr. Quinley?
 7            MR. QUINLEY:  No, Your Honor.
 8            THE COURT:  Okay.  It will be admitted.
 9            MR. JOHNSON:  Excuse me, Staci.  Could you pull up,
10  also, the actual judgment that we have been going over?  I
11  think it's in 7-C.
12            MR. QUINLEY:  Yeah, Ms. Brazier.
13            MR. JOHNSON:  I'm sorry, Ms. Brazier.
14            MR. QUINLEY:  Oh, first, we have to take them one at
15  a time.
16            THE COURT:  Yeah.
17            MR. JOHNSON:  I understand.  I'm just trying to get
18  it ready for the next --
19            MR. QUINLEY:  Very good.  Thank you.
20            MR. JOHNSON:  I don't know the exact citation right
21  away.  We have been on it a few times.
22            MR. QUINLEY:  7-3.
23            MR. JOHNSON:  Okay.  This contract I entered into on
24  March 15, 2016, that is my signature, and I would just like to
25  read it to you.  It says, "I, Executor Kurt F. Johnson,
```

judgment creditor of the judgment obtained through the World

Court on February 11, 2016, known as the CMU judgment against

judgment debtor Mr. J. Massey, James Massey, of Group 5."

That means he's not a Doe, he's one of the listed

debtors.

"Having come to a settlement agreement between the

parties does hereby, this notice, waive the judgment claim.

This waiver is unconditional as to the amount currently due at

this signing, reserving the right to reassert the continuing

operation portion of the claim against Judgment Debtor Massey

for breach of the NDA," which is the nondisclosure agreement

just below it.

Not everybody would have been put into bankruptcy,

and I have been maintaining from the very beginning that I

have this right based on that judgment of February 11.  The

judgment was pursued by --

Excuse me.  Her name is, again?

MR. QUINLEY:  Brazier.

MR. JOHNSON:  Excuse me, Ms. Brazier.  We can take

this down now and put up the complaint, or the judgment.

THE CLERK:  So, you need the prosecution table?

MR. QUINLEY:  Yes.

MR. JOHNSON:  And you said that's 7-3.  7-3.  Put up

the first page, which would be page two, I believe.

Excuse me, page three.

1          THE COURT:  Are we having trouble getting it up?

2          THE CLERK:  It said it's rebooting.  I got out of it

3     and went right back in.

4          MR. JOHNSON:  While that's coming in, I will continue

5     to testify.

6          My experience inside the CMU is very different than

7     that of Mrs. Hill and Mr. True and Burgess.  I do believe it

8     is a secret unit.  I do have the experience of being censored

9     and having my documents confiscated, having access to the

10    courts obstructed, having any way to conduct any normal

11    business to be completely thwarted.  That may be the

12    intentions of the unit.  I think the intentions of the unit

13    are not exactly lawful.  That's my opinion.

14         I have reason to continue to resist that particular

15    approach towards me.  It's been very difficult through the

16    courts with lawsuits not being able to get to the court.  One

17    of the court records that you will have available to you is

18    15-CV-00525, where I wasn't even able to get the complaint to

19    the Court.  And it's been argued plenty that I have access to

20    the courts, and by these filings it seems that that's true,

21    but it's -- there's plenty of more instances where I don't get

22    an opportunity to get into the courts.

23         While we fold this up, three pages in, I believe.  On

24    Group 5, the third line to the -- third line from the bottom

25    of that group, right in the middle is J. Massey, and I just

wanted to point that out that that is one of the judgment
debtors of this particular judgment.

I want to go to the last page of that, which would be
10 of 18.

There is the final page of the judgment, and you will
notice there's another Notice of Demand that's been offered
into evidence.  It's 14 pages long, and it had to do with the
Postmaster General.

Ms. Hill testified to that about the $2.9 billion
judgment and 30 million, and I think they joked that that was
kind of a relief.  That one there was a Notice of Demand,
which was different than the judgment, and I will explain it
to you shortly.  And that one does not have -- on the back
page does not have this tech section called *Certified Ruling*,
and this only occurs after all of the services have been met.
This is part of the procedures necessary for a judgment to be
obtained through the World Court, and I'll get to explaining
that this judgment is very different than the types of
judgments that have been referenced on the web page and
discussed by the prosecution.

The Certified Ruling -- And the purpose of it is this
is not an attestation by myself.  This is an attestation by
what they call duly-appointed hearing officer.

According to the treaty, which people say they have
not been able to find -- And I have done my best to obtain it,

1    unsuccessfully.  But, according to the treaty which I have

2    read personally more than -- more than a decade ago -- and I

3    don't recall the name specifically -- I identified it in the

4    beginning of the judgment as a Private International

5    Administrative Remedy, and that is the best I could describe

6    it as for its substantive purpose.  And obviously it was

7    sufficient enough for the Court to enter ruling.

8            But here in the certified ruling the documents that

9    would be presented to the hearing officer would be the Notice

10   of Demand, the Notice of Administrative Fault, and the Notice

11   of Administrative Default, and then, of course, this judgment

12   itself.  And those four are presented, and when the hearing

13   officer -- And this is his duty, and there's a fixed fee

14   according to the treaty for $60 for this service.

15           The hearing officer is duly-appointed by the World

16   Court, has nothing to do with me.  I can't determine who's a

17   hearing officer and who's not a hearing officer.  I can't

18   obtain a judgment on my own.  This is not something that I can

19   just come up with and self-authenticate.  It has to be done

20   through a hearing officer.  And then when the hearing officer

21   reads these things and then looks at the evidence that's been

22   supplied, which would be notices probably of proof of mailing,

23   that these certified numbers they were actually mailed and

24   delivered, this would all be presented to the duly-appointed

25   hearing officer.  At that point it gets authorized by the

1    hearing officer.  This particular judgement, the hearing

2    officer was identified as a Jonathan, J-O-N-A-T-O-N (ph),

3    Helmsford.  I brought up those types of questions during

4    cross-examination.

5            So, this Jonathan Helmsford was a duly-appointed

6    hearing officer that apparently resides in the Netherlands,

7    wouldn't be able to obtain him for this trial.

8            The next page, if we can go to that, under

9    *Clarifications*, this is an appendix that -- where Does, as

10   they have been identified, have been systematically added to

11   this judgment.  It's been added in a -- This is my first

12   opportunity to have the document filed in a public record, and

13   this was what I call a habeas proceeding.  And it was offered

14   as a non-executed version of the judgment in that proceeding,

15   and so these appendices, which I believe goes up to 5 or 6 --

16   6, were all added as Does were identified.

17           You will notice in the clarification of this

18   particular one, the second sentence, it says, "It is further

19   noted that James Massey and the Executor have reached a

20   settlement and that a waiver of claim has been executed," and

21   so that was giving another notice even at this time that Mr.

22   Massey was excluded as a debtor.  I bring that up, because I

23   believe it shows -- I'm going to strike that.

24           I don't want to get my closing arguments mixed up

25   with my testimony.  I apologize.

THE COURT:  Yeah, don't make argument.  Just give

facts.

         MR. JOHNSON:  Sure.

         How did that judgment end up in this particular

record is a good question, in that my habeas was intended to

be filed by Stephen Sherak.  You have heard about his

documents, my documents being seized from his property when he

was being released.  Some of those documents were related to

getting this habeas filed.

         My agreement with Mr. Sherak at the time was that he

was going to help me once he got out of the unit.  Help

outside of the unit is absolutely necessary to get anything

accomplished.  You're trapped in a box, inside a box, and you

can't do anything.  So, yes, I did place documents into his

property in hopes to circumvent the restrictions that were --

that I was under.

         It wasn't successful.  Ms. Hill captured those

documents.  But, my agreement with him was that he would file

the habeas petition when he got out, and one of the

requirements of that filing is that in Attachment A he would

attach a certified copy of this judgment from the World Court.

         It was very difficult to communicate with Mr. Sherak

on these issues.  I never saw this filing until actually this

hearing; I mean, until this trial.  I only learned about it

through discussions with my wife and my mother trying to find

1  out when it would be filed, how it would be filed.  I tried to

2  have discussions with Stephen Sherak through e-mails that were

3  circumventing the system through another name.  It was

4  testified to that he had high-jacked or piggybacked on my

5  mother's e-mail, so there was some communications with me and

6  Mr. Sherak using that method, also.

7          So, I learned in that process that a certified copy

8  of the judgment was not filed with my habeas as I had desired.

9  That is what was the motivation to file Document 3, which we

10  were just looking at, which was an unexecuted document or

11  unexecuted copy of the judgment.  And page six of 12 of the

12  same -- 7-3, I believe it is.  Or 7-1, if you could put that

13  up.

14          That would be page six of 12.

15          On this page it has Exhibit A.  It says, "Information

16  concerning and supporting the judgment.  Hearing Judge:  Judge

17  Joan E. Donoghue, International Court of Justice," with her

18  address, phone number, and certified ruling number, and the

19  judgment was under Kurt Johnson.  I didn't produce this

20  document.  I don't know who produced it, but the -- what I

21  intended to be filed was a certified copy of the judgment in

22  this particular location.

23          The Court would have records -- I believe it's in

24  this filing -- that it was mailed by Stephen Sherak, which I

25  believe is 11 of 12 and 12 of 12.

1          And, you can go to 12 of 12, also.

 2          So, the mailing of this -- The mailing of this to the

 3   Court I had no involvement in.  It was my desire for it to be

 4   presented, again because I wanted my habeas to be a public

 5   display where I can point to it even in the bankruptcy

 6   proceedings.  That was my intentions of filing it as quickly

 7   as possible.  The habeas proceeding was offered -- I mean,

 8   filed before the bankruptcy proceedings.  The habeas was not

 9   just a tool to deal with bankruptcy proceedings.  I had a

10   separate claim for wanting to file that, and my claim was

11   based on the judgment itself, being that as part of the

12   judgment, which the known facts which Ms. Hill went through

13   every one of them and the Prosecution went through, "I agree;

14   no, I didn't agree; did you agree to that."

15          That particular page, if you want to pull that up,

16   the known facts, that would be fine.  That's back at the

17   judgment, which is 7-3.

18          They went through those in great detail and gave the

19   impression that they didn't agree.  My impression is

20   different, that this process has been completely -- or has

21   been formalized and completed.  And, you will notice, I

22   mentioned again that the *you have agreed* is only on the

23   judgment; it is not on the other three versions of this

24   particular process.

25          In the Notice of Default it will say that your

silence can be used against you and it would be a stipulated

agreement.  Then after they don't answer that particular

response, then the judgment would say *you have agreed*, as it

does in this particular situation.

     And the very first one says that the "CMUs are not

proper extensions of Congressional law while making

authority."  It's a fancy way to say they are legal.

     It's my belief that the judgment does exist, it's my

belief that this has already been agreed to, attested to as

being conformed by a hearing officer in accordance with the

treaty and that when referred to the World Court, Judge Joan

E. Donoghue, which does exist and has a very extensive

international law experience, where she was even advisor to

Hillary Clinton and President Obama.  So, she's very

distinguished and she is the one who ruled in favor in this

particular ruling.

     The second one says, "The CMUs are not a proper

extension of executive authority."  That means that after the

one-year use of executive authority power, that to continue on

would be an improper extension of that authority.

     And, based on those agreements and what I consider

fully litigated facts settled by a legitimate legal process,

I'm of the position that the CMUs are not legal, that the CMUs

have been illegal for 15 years at the time of this signing,

which is how the $15 billion was originally determined, and it

has now gone up to $23 billion as of 2018.

I still maintain that belief.  And probably the question is why is a certified copy of this judgment not put into the habeas.  I don't have a good answer for that in that my request of Stephen Sherak was that he would provide it.

Stephen Sherak I met in the CMU.  We became friends, as Ms. Hill testified.  I still consider him a good friend.  I was hoping to have him testify yesterday and found out that that would be impossible.

MR. QUINLEY:  Objection, Your Honor.

THE COURT:  Sustained.

MR. JOHNSON:  Okay, sorry.

Mr. Sherak, as a friend --

MR. QUINLEY:  Your Honor, I ask that the testimony of Defendant that it was impossible be stricken from the record and the jury instructed to disregard.

THE COURT:  Jury is to disregard that.

MR. JOHNSON:  I apologize, also.

Mr. Sherak and I as friends in the CMU suffered under the same conditions, but he had particular advantages available to him that I did not.  He had access to an attorney, he had access to Senator Cory Booker.  He was able to make legal phone calls and do certain things and get things done.

In the process of working through Mr. Sherak, I

1    brought it to his attention that I have these treaty processes

2    completed, but I can't get them before a hearing officer.  He,

3    in doing me a favor, went to his sister, whose name was

4    Jacqueline Sherak, and asked her to validate the treaty.  In

5    the process of doing that she discovered and was able to find

6    the treaty and Mr. -- Senator Cory Booker was to mail it in to

7    Stephen Sherak at the CMU facility.  As far as my knowledge to

8    that event, Ms. Hill confiscated it, and the reason that was

9    used is that Mr. Booker received it from the Library of

10   Congress, took that envelope and sealed it inside of his own

11   official envelope and mailed it in and was rejected because it

12   was a remailing-type situation.  Mr. Sherak never received the

13   treaty.

14          The purpose of trying to get that treaty into the

15   unit was to continue to verify the procedures, because I'm

16   going off a very distant memory and a few refreshers here and

17   there, and I wanted to continue to validate all the processes

18   that I used and hopefully put them in the public record

19   wherever that would have been useful.

20          The treaty never coming in made that difficult.  I

21   tried to obtain the treaty.  You have heard about the treaty

22   was -- trying to obtain the treaty for this trial, and still

23   it was difficult and hasn't happened.

24          After filing this habeas, Sherak and I would probably

25   be considered having a falling out.  We have had various

1 discussions about not performing what I asked him to do and

2 particular difficulties, and I don't know all the difficulties

3 and he's not available to testify as to his difficulties.

4         MR. QUINLEY:  Objection as to his unavailability.

5         THE COURT:  Sustained.

6         MR. JOHNSON:  Again, sorry.  So, I don't know all the

7 difficulties, but difficulties were obvious from my position

8 that things were not getting done as I requested.

9         From there I felt like I was a bit on my own, again a

10 man in a box, inside a box, and so I wanted to try to use the

11 power of the Court to obtain the things that I needed to prove

12 my positions.  In doing that, I felt that I needed to file

13 these involuntary bankruptcy petitions in hopes to use the

14 discovery process of the court to obtain a copy of the treaty,

15 to obtain a copy of the judgment, and to finally put to rest

16 all the claims that it doesn't exist, it doesn't exist, it

17 doesn't exist.

18         I was sorely disappointed in that process, and I

19 thought that the Court would give me an opportunity for

20 discovery.  I wasn't interested in bankrupting them and

21 harming them in the fashion that it was presented here.  Yes,

22 there are consequences, but I was just as willing to have the

23 cases sealed, and that was already brought up to the attention

24 of you in evidence.  Those type of statements and all my

25 issues related to my intent and my beliefs and my desire to

use the discovery issues of the Court are fully presented in
this rather large binder which is Document 3, or the binder #3
of the Government's exhibit. In there I fully set out that I
intend and only wanted the Court to provide me the discovery
available, and discovery tools would be subpoena power,
evidentiary hearings, and different types of procedures like
that to allow me to get access to Judge Donoghue. I thought
that I would be able to have access to get this done through
Stephen, and that proved to be a futile situation. So, my
only hope was the power of the Court.

And rather than go through all of these particular
documents, I would rather just maybe highlight a couple of
them and just testify that my -- as best I can that my
statements made in these proceedings under oath are the same
way that I would testify here today. And you're welcome to
consider them for that purpose.

Another thing that comes up, if you could pull up --
It's going to be 13. I can't tell if -- just 13, page one of
one. No, excuse me. I'm still on 3.

Actually, while that's up, I would like to address
just this one. This *Treaties in Force* that was up --

MR. QUINLEY: Yeah, Mr. Self.

MR. JOHNSON: This was brought up as a list of --
This was brought up as a list of active treaties for 2000 and
2017, as part of the testimony that the treaty as I

identified -- and I believe Mr. Hanna spoke to this the

most -- that the treaty was not identified by those names that

I provided.  I looked through all of these and also learned

that the Universal Postal Union Treaty, which I am familiar

with and have been seeking, is also not listed in there, so

I'm not certain that this is a comprehensive list in my

belief.

Again, I want to make -- make clear that the names of

the treaty that I have and have used are the substantive part

and purpose of the treaty, which was to provide an

international remedy for private redress of grievances, and I

believe it was for financial purposes and it was not state to

state as the judicial side of the World Court procedures are.

It's very distinct, it's very narrow.  The Court only issues

judgments in a number of 20 or less of these type of judgments

on an annual basis.  These judgments are administrative, and

they do settle out with a judicial review, but they are

administrative.  This is not a judicial process; very distinct

from what we are practicing here.

The trial in an administrative process is the

documents, Notice of Demand, a Notice of Fault, a Notice of

Default, and then that's your trial.  If you should fail to

perform during that trial and you can equate that to the

experience you have in here, then a verdict or a judgment will

be taken out against you and then that is what goes through

the review process.  But, the trial itself happened.

Now, in this particular judgment and trial proceeding, that was judicially reviewed and accepted by Joan Donoghue.  I will give you the facts as I know them for that procedure.

The judgments were brought -- I'll start with Mr. Helmsford.  Mr. Helmsford, I believe, received the documents around June of -- June or July, around, 2015 -- yeah, probably a little bit later than that, maybe September of 2015 -- yeah, 2015.  And then on January 14th, they were before Judge Donoghue.  On January 14, Judge Donoghue issued a final judgment, but the Government was there defending the case.

Now, two judgments of mine were presented to Judge Donoghue.  They are notified or identified as the big one, the little one, $20 billion -- or $15 billion, and 484, which was actually closer to 486, and that was for 486 million.  That was a completely different procedure, had nothing to do with the CMU, had nothing to do with Ms. Hill and Mr. True.

Both of those went before Judge Donoghue on January 14 of 2016.  You will notice that by the number that was given for the International World Court that the first part, obviously the date, 01/14/16.  What the delineation of the other numbers are, I don't know.  If I had to guess, the A stands for administrative ruling.

But, the two were presented and judgments were

granted on both of them.  There was no opposition to the 484.

         The Department of Homeland Security -- and I have
later learned through an agent named Andrew Feirstein,
represented the Department of Homeland Security at the World
Court and he offered documents that were to be filed, and one
of them was a request for an abatement hearing and the other
one was an injunction to prevent the enforcement of that
judgment.  And this is the judgment that we are talking about;
that that enforcement would be enjoined until such time as the
hearing happened on February 19th, that Judge Donoghue had
scheduled.  From that particular proceeding I do not have a
final judgment.  I have a final judgment on hold, if you
understand the law.

         So, I have a final judgment on hold and I have to a
wait the outcome of the abatement hearing.  I obviously cannot
attend any of these procedures.  I had to be represented by an
attorney.  Mr. Sherak had provided that attorney.  I still
don't even know the name of that attorney, I believe it was
Elliot Wiesner, and that proceeding went forward.

         From the 11th -- or, excuse me, the 14th, when it was
-- and before the 19th, Judge Donoghue had developed a
questionnaire.  And as part of the abatement procedures, which
is basically a motion to say that the judgment is real, but we
don't believe -- we believe there's a defect as to persona-
type jurisdiction, it doesn't belong, it doesn't apply to me,

1  like James Massey could say, "It doesn't apply to me because

2  of the contract that I have shown you," and so he could be

3  abated from that particular judgment.  So, that was the

4  argument that was being made.

5       The Judge, to my knowledge, was given -- or

6  formulated a nine-question questionnaire and presented it to

7  all the Respondents and was going to make her reserve her

8  ruling for the abatement hearing scheduled for February 19th.

9  At that time, on February 11th, I was informed that she had

10 received dishonor or improper, incompleted, or nonresponses to

11 her questionnaire, she felt that there wasn't any serious

12 attempt at the abatement.  She recalled her injunction and

13 cancelled the abatement hearing and made the judgment issued

14 on February 11th to be final.

15      At that point the only thing that's available,

16 according to the treaty and the procedures, is an appeal.

17 There is no Supreme Court in this.  There's an appeal process.

18 The appeal -- According to the treaty you are allowed six

19 months to appeal.  The Department of Homeland Security did

20 appeal sometime in June or -- actually, probably, May, and in

21 that appellate process they go before a three-judge panel,

22 which Judge Donoghue would not be a part of.  You have heard

23 that there are 15 judges, so it would be three of those other

24 15 judges that would hear the appeal.

25      I have a document just to show that I was trying to

be involved with this procedure.  It's a letter that I wrote

         in regards to the appeal to Judge Donoghue.  Excuse me for one

         second.

                   MR. QUINLEY:  Thank you, Mr. Self.

                   MR. JOHNSON:  And that would be my attempt to address

         the Government's appeal filing without an attorney from the

         CMU.  Again, it proved to be somewhat futile, but it shows the

         consistency of my position, and that I wanted to work with the

         World Court as best I could.

                   THE COURT:  Do you want this marked as an exhibit?

                   MR. JOHNSON:  I would.

                   MR. QUINLEY:  I would ask that it be marked as an

         exhibit, and then I ask that I would have a chance to make an

         objection to it.

                   THE COURT:  Okay.  No. 7, is it?

                   LAW CLERK:  6.

                   THE COURT:  Let me take a look at it.

                   MR. QUINLEY:  Yeah, if the Court could examine it,

         please.

                   THE COURT:  Okay.  Mr. Quinley?

                   MR. QUINLEY:  Your Honor, I would object to

         foundation.  Almost everything Mr. Johnson has created over

         time has wound up in filings with the court.

                   THE COURT:  Turn on your mic or speak into it.

                   MR. QUINLEY:  I'm very sorry.  That is relevant to

his claims about this has wound up in various filings with the courts.  There's a whole set of exhibits that he submitted in connection with this supposed -- what he calls a judgment before the World Court that has never -- he's never produced any evidence of other than his own creations.

And, Your Honor, because -- and, if I am wrong, if he's filed this with the court before, then it's just like everything else in his testimony.  But, we don't know from the face of that document when it was created.  We don't know whether it was typed up last night or sometime during these proceedings.

THE COURT:  It's dated June 6, 2016.

MR. QUINLEY:  That's what's typed on there, Your Honor, but I would submit -- Well, that's why I'm raising an objection to foundation is that if it's a recent creation, then I think -- then I would object to its admission in this proceeding.

THE COURT:  Okay.  Well, the Court is going to admit it for whatever weight the jury wants to give to it, if any at all.

MR. JOHNSON:  Okay.  I would like to again point out to your attention it is dated June 6, 2016, the final judgment being in February -- excuse me, 2/11/16.  This would be in the appropriate time period for the appeal.  I guess they took a few months.  This was my only attempt because of my situation

1    and communication with those who were helping me, and I would

2    just like to read the first paragraph to give you the import,

3    and you are welcome again to look at it as you would like.

4    But, "I want to thank you for giving me a forum to be heard.

5    I apologize for my lack of involvement, but assure this Court

6    that it was not from a lack of interest, but caused by the

7    harsh conditions of my confinement.  I am not a lawyer and,

8    therefore, will keep my thoughts brief.  I would like to

9    reference the treaty; however, this was made impossible by my

10   captors who prevented its receipt through the mails as

11   contraband twice sent directly by Senator Cory Booker as a

12   copy he obtained from the Library of Congress.  Under these

13   conditions I am forced to draw upon my memory and my last

14   reading of over a dozen years ago.

15        My goal in providing this to the Court was to just to

16   participate in what I thought was transpiring.  The Government

17   had filed -- I was told about three feet worth of paperwork

18   for their appeal.  And, according to the treaty and my

19   understanding of the treaty, I felt that that was not

20   appropriate, they were relitigating the merits of the case,

21   and that their only option was to address the procedures and

22   to make sure that those were followed."

23        So, that was basically the import of this letter.

24        And when it went before the Appellate, I never got

25   the opportunity to deliver this letter, because in the process

1  of trying to get it out and get it to any -- any way to that

2  Court was futile and, before I could address that, the appeal

3  was affirmed on September 28, 2016.

4          So, the Government had its opportunity to be heard,

5  the Government had its opportunity to appeal, and the judgment

6  was affirmed.

7          Now, I have six judgments presented to this Court

8  over a period of a little over a year and a half.  This is the

9  only judgment where the Government or any party filed an

10  appeal.  All the other judgments were affirmed without an

11  appeal.  They all had their opportunity for six-month appeal,

12  but this was the only one that had additional processes.

13          Of the six judgments that I presented -- And when I

14  say *judgment*, I'm really talking about the whole process.  It

15  has to be a complete process and the judgment is just the

16  final part, but it's presented to the Court.  One of them was

17  rejected, and that's significant in how it was rejected.  And

18  one of the reasons why I believe in the validity of these

19  judgments, when Mr. Stephen Sherak, who's been testified by my

20  mother as to be a con man, and even as my friend you'll see

21  that I am convinced he lies a lot, and so it's one of the

22  reasons why I have independent belief and conviction that the

23  judgments are real and that I am not solely relying on the

24  testimony of somebody that's a liar.

25          I do believe that Mr. Sherak is my friend, I believe

1    that his lying is a personality trait, and I also believe that
2    the friendship is real and that he doesn't intend to lie and
3    that the facts that he tells me about these particular events
4    are truthful.  And I use my own study for truth, which is that
5    they are logically consistent, that they are empirically --
6    that it's empirically -- sorry, I'm missing a word right now
7    -- empirically viable, I guess, in that they're correspondence
8    reality.

9           So, having all those facts, having knowledge of the
10   treaty on my own and who I am working with, even with all of
11   that smoke screen and deception -- and I told you at the
12   beginning that there would be lots of lies -- there are lies
13   in this that I have to deal with and there are a lot of lies.
14   And in all of that I still have my own personal belief of
15   truth that I believe is credible, logically consistent, and
16   one of the biggest indicators for me was that one of my six
17   procedures was rejected by the Court and only five have been
18   granted.  This was a completely different time event.  The
19   four other were presented on December 16, 2016, and that's
20   when one of them was rejected.  Those were all made final on
21   appeal on June 28, 2017.

22          So, I have more than just this particular version to
23   validate my thoughts, the one that's in dispute here.  And the
24   reason that it was rejected has not been -- I have not been
25   informed of that.  But, having written these myself, I can

suspect and know personally why that one would be rejected, because one of the six that I wrote was different in its presentation. Only somebody probably legal in nature would understand the difference, but I knew it. Mr. Sherak would never know the difference.

And, so, I felt it very credible, the information that I received from him, when he told me four judgments have been presented and one was rejected. And, so I said, "Which one was rejected?" I know which one should be rejected. He would have no clue. And he told me that it was the one dealing with my marriage situation. That was the correct one to be improperly presented or not qualifying for the judgment. I knew that, I have never shared that with Mr. Sherak.

And, so, for me the probability of him submitting four, after having already submitted two that weren't rejected, and then knowing which one of those would be the one that could be rejected, I find that impossible and highly improbable. So, that's one of the keys, I would say light in the darkness I have to justify my position.

Another one is that I knew the treaty, I had read the treaty, I was familiar with the procedures. I developed the procedures and did all of this before I ever met Stephen Sherak. So, he didn't know and he wouldn't know, and he knows nothing of abatement. He doesn't know what the purpose of it is, he's not legally proficient. And when he told me that

1  there was an abatement hearing filed and that there was a

2  hearing granted and the facts that I have shared with you,

3  that's something that to me even a liar couldn't get right.

4         And, so, those were independent verifications that

5  helped me in my belief that these judgments are real.  I

6  haven't been able to access Judge Donoghue, though I have

7  desired that very much.  I wanted to independently verify

8  these urgently and have always presented that in all of my

9  documents in the Court that are presented here in evidence.

10         I have consistently sought -- In going back to the

11 beginning here, I have consistently sought the power of the

12 Court to try to obtain these documents, even being hopeful

13 that it would be possible in that particular proceeding, but

14 still the judgment is not here and still the treaty is not

15 made available.  But, that does not mean it exists -- does not

16 exist, and I think honestly that the vacuum of it not being

17 here is probative in and of itself and it's one of the reasons

18 that would actually help convince me that they are real.  That

19 the Government couldn't find it doesn't surprise me under the

20 situation.  And if you call me a conspiracy theorist, I

21 believe that a man in a box, in a box dealing with the type of

22 Government that I am dealing with, that this is not an

23 accident that these things are not even available to me.  Now,

24 this is my third, fourth attempt in court to obtain these

25 documents, and still I haven't been able to do so.

1          I want to go through a Statement of Facts I made in
2     the court.

3          I'm looking for Document -- excuse me -- in 3 again,
4     and I am looking for the Request for Injunction.

5          MR. QUINLEY:  Your Honor, in the interest of time, I
6     believe if we go to -- I think it's 60.  Well, just a moment,
7     Your Honor.  67.

8          Mr. Johnson, if you turn to tab 67, is that what you
9     are referring to, *Ex Parte Preliminary Injunction*, and
10    exhibits following it, 69 through 73, I believe.  72.  Is that
11    helpful?

12         MR. JOHNSON:  That's actually not the one I am
13    looking for.

14         THE COURT:  Well, let's take a 15-minute recess now.

15         MR. JOHNSON:  All right.  I appreciate that.

16         THE CLERK:  All rise for the jury.

17         (Jury out).

18         THE CLERK:  Please be seated.

19         THE COURT:  Did you find it, Mr. Johnson?

20         MR. JOHNSON:  I did.  It's No. 20, and I'm going to
21    start with 12 of 33.

22         THE COURT:  That will be coming up on the ELMO?

23         MR. QUINLEY:  On the ELMO.  And, Your Honor, is this
24    a good time for a restroom?

25         THE COURT:  Yes.  But how much longer do you want to

1   be on Direct Examination?  You are starting to repeat yourself

2   a bit.

3          MR. JOHNSON:  I will try to stop repeating, but I

4   have quite a bit more, Your Honor.

5          THE COURT:  Can you give me a time frame, do you

6   think?

7          MR. JOHNSON:  I'm going to say an hour.

8          THE COURT:  Okay.  When we come back, an hour.

9          MR. JOHNSON:  I will do my very best, yeah.

10         THE COURT:  Okay.

11         MR. JOHNSON:  Do I have to take it out of here to put

12  on the ELMO?

13         THE COURT:  Yes, give it to Mr. Self.

14         THE CLERK:  All rise.  Court's in recess.

15         (Following a recess, proceedings continue in open

16  court; jury not present.)

17         THE CLERK:  Please be seated.

18         THE COURT:  Yes, Mr. Johnson.

19         MR. JOHNSON:  Your Honor, there's an area of

20  testimony that I would like to get into, and I wanted to run

21  it by the Court to see if it's even plausible or viable for

22  me.

23         But, I am of the opinion that I haven't really had a

24  fair trial, okay, and I think the opinion is probative toward

25  the type of theory that I am offering and then I would offer

1  just in limited capacity relative to the evidence that's been

2  presented, and I am not trying to offer this as a fact, I am

3  just trying to offer it as my state of mind, my theory of the

4  case, and I would --

5        THE COURT:  Well, you can do that in closing

6  argument, --

7        MR. JOHNSON:  No, I understand.

8        THE COURT:  -- but not as you are giving testimony as

9  to facts, evidence.

10        MR. JOHNSON:  Right.

11        THE COURT:  You are not supposed to -- You know, you

12  can do that in closing argument and say, "I haven't had a fair

13  trial."

14        MR. JOHNSON:  But can I bring the fact up that I

15  would like to bring up?

16        THE COURT:  What fact is that?

17        MR. JOHNSON:  The fact that Ms. Hill testified that

18  they are not -- you know, we are not allowed to have access to

19  all their identifiers, and the document I presented, which was

20  the contract of James Massey, all right, he wasn't allowed --

21  he couldn't be found because I didn't have the identifiers.

22  That's the kind of thing where I think, you know, the silence

23  or the void of my defense is, in my opinion, a situation where

24  I didn't have full opportunity to defend myself.

25        So, that's just the fact of the issue.  I wanted to

1    bring it up outside the jury, so --

2           THE COURT:  Okay.  You can refer to it briefly, but I

3    don't want you to go into -- because then you are making

4    argument.

5           MR. JOHNSON:  I'm trying to stay from it.  I'm just

6    trying to work with you any way it works.

7           MR. QUINLEY:  I have no problem with him testifying

8    that he doesn't have access to the identifiers for the Bureau

9    of Prisons employees.

10          THE COURT:  Okay.  All right.

11          MR. JOHNSON:  All right.

12          THE COURT:  And you are going to try to wrap it up in

13   about an hour?

14          MR. JOHNSON:  Yes.

15          THE COURT:  All right.  Bring the jury in.

16          THE CLERK:  All rise for the jury.

17          (Jury in).

18          THE COURT:  Mr. Johnson, you may continue.

19          This exhibit has been admitted?

20          MR. QUINLEY:  That's correct, Your Honor.  It's a

21   portion of Exhibit 3, so 3-20.

22          LAW CLERK:  Can you read that?

23          MR. JOHNSON:  Yeah, I can.

24          MR. QUINLEY:  We are going particularly to page 12 of

25   it?

1          MR. JOHNSON:  For the moment we are going to 12.

2          MR. QUINLEY:  Thank you.

3          MR. JOHNSON:  I just want to read that the sentence

4    right before the highlighted version, where it says, "I'll

5    start with just Mr. Sherak doing 67 months on a 60-month

6    sentence, an act of using their public office for the private

7    benefit of delaying or preventing their own private and

8    personal bankruptcies."

9          I believe what I am suffering under is exactly that;

10   that all of these people are using their public office to

11   delay their own bankruptcies and to prevent me from

12   prosecuting a legitimate claim of a real judgment.

13         If we can just go down to the bottom of this page

14   real quick, I'm not going to continue to reiterate the facts,

15   but this is a place where the evolution of claim of right --

16         And then we can go to the next page, please, where I

17   say the remedy for the crimes committed against him is

18   regularly in the secret prison avoided, availed himself of a

19   powerful little known international treaty.  This

20   international financial grievance treaty, which was again

21   presented, was drafted by the United States and was later

22   amended by President Clinton.  These are facts that I have

23   about it:  The dates I know to be true.  The exact name -- I

24   am not absolutely certain that that's the exact name of the

25   treaty.  But, this is a place in evidence where I consistently

reiterated the facts that I just testified to and, you know, this would be consistent with my testimony here today as a consistent pattern that I have been trying to present to the courts from the very beginning.

We can go to the second-to-last page where the next highlight is.

MR. QUINLEY:  Page number?

MR. JOHNSON:  17.

MR. QUINLEY:  Thank you.

MR. JOHNSON:  Again, I presented to the court that legal materials given to Johnson must be first screened by Kathy Hill.  I believe there's been plenty of testimony to that.  This is where I bring up the six legal envelopes were screened by her and confiscated.  Those have already been presented into evidence.

We can go to the next one.

I mentioned that I had fasted, and when I was placed in the SHU, Mr. True testified to that same situation.  But, I fasted over 1,400 days in my life and completed five 40-day fasts, dozens from 21 -- 121 or less.  A religious fast is distinct from a hunger strike practiced by inmates on occasion.  That distinction is important to me because they have totally disregarded part of, to me, the types of conditions that are punitive in this particular thing to not only deny you access to the courts, but deny you simple

liberties of religious freedom.

        The next highlight is "Johnson began his fast when placed in the SHU on 1/3."  I believe I was placed in the SHU for retaliation the very day one hour after I tried to contact the Court to have it correctly filed.  When I put a letter into the mail, an hour later I was in the SHU.

        And that's an important fact to bring up why did I have to even address the Court this way.  In my attempts to circumvent all the different obstructions, I had to try to get my mother to file these documents for me, and that's very difficult.  My mother, as lovely as she is, is not as competent in legal affairs as myself, and the forms were misfiled and an entire case was improperly created in which this Judge was actually the one who addressed it.

        So, at that time I had to try to address it once the facts were finally available to me, which was impeded even more by being in the SHU.  I didn't have access to any kind of e-mails, any kind of phone, as limited as I had.  Shortly thereafter I was denied access to all my contacts at that time, except for one Rudy Davis, a reverend who was later blocked.

        So, at that time, though, I still had e-mail and phone access.  When I was placed in the SHU, the e-mail and the phone access automatically ceases, and before I got out of the SHU I was blocked from all of my contacts.

1          So, I began to fast when placed in the SHU on the

2    3rd.  The reasons I fasted was a new year, oppression had

3    revealed itself in front of my captors, and my ex-wife was

4    going before the Lord on 2/12/18 for a healing from a

5    long-time lung disease.  I had much to fast and pray over.  A

6    hunger strike is punitive, it's intended to make you eat, and

7    the fast is intended to refrain you from eating as part of a

8    spiritual relationship.  So, this is the kind of situation

9    that I found myself in with this particular unit.

10          I'm done with those documents, thank you.

11          In about ten seconds I will be able to get to the

12   next one.

13          I would like to bring up a document, this one here.

14          And, Mr. Self, this will be the next one, also.

15          MR. QUINLEY:  It needs to be marked as an exhibit.

16          THE CLERK:  Is this 7?

17          LAW CLERK:  7.

18          MR. JOHNSON:  So, I was blocked from my contacts and

19   was let out of the SHU -- I believe I was in the SHU for 85

20   days.  38 of those I managed to fast and lost a little weight.

21          So, upon coming out, I think, actually January

22   19th -- we will look at one of these documents -- my mother

23   and my father and my wife were all blocked contacts, and I no

24   longer have access to them and I still don't have access to

25   them at all.  That means no mail communication, no phone

1    communication, and no e-mail.

2         I just want to bring this to your attention.  These

3    apparently come from the Counter Terrorism Unit, and these are

4    advisories from Warden True to block some kind of contact or

5    to take some kind of action.

6         Mr. True testified that he rarely goes against these

7    recommendations.  In this particular situation he did not go

8    against them and did implement the recommendation.

9         We can go down a little bit.

10        "It is recommended Inmate Johnson be restricted from

11   sending correspondence to, receiving correspondence from, and

12   having telephone contact with the following for the reasons

13   listed above, and this is the e-mail address."

14        This was -- I believe Mr. Simmons testified to these

15   are the type of procedures that are used to block, and I

16   believe he's the one that initiates this particular

17   memorandum, and then Mr. True accepts it.

18        So, beginning on September 7, Inmate Johnson's

19   contact with Myrian Primera is what I'm bringing to your

20   attention.  The content of the e-mail appear to be addressing

21   a friend whom Inmate Johnson frequently refers to as *Buddy*.

22        The friend was Stephen Sherak.  This is my

23   circumvention attempt to be able to communicate and try to get

24   some business done without having my e-mails blocked.  And it

25   ends with this.

1          That's fine, we can go to the next one.

2          I don't need the back page.  We can move it up to

3   *It's Recommended*.

4          And, this again, it's recommended for basically all

5   my contacts, Fred Johnson, being my father; my mother, Nell

6   Leffel; and Deborah Welsh, my wife.  And, "Starting November

7   2016, Inmate Johnson and Sherak began colluding on various

8   sovereign processes in an effort to effectuate Johnson's

9   release from custody."

10         That's an opinion that I do not hold.  These are not

11  sovereign processes, these are treaty processes, and they

12  could effectuate my release from custody, but that's not their

13  sole intention.

14         "Specifically Johnson has been attempting to verify

15  fictitious judgments he claims to have with the International

16  Court."

17         Again, that is the position that I refute here today

18  in this court and continue to hold that position and have held

19  that position for years; that these judgments are real, and I

20  have my own independent belief of that.

21         So, that's all I have for those, thank you.

22         Another independent verifier for me that I hold out

23  that is one of those lights in the darkness that I have to

24  hold on to is the commercial value of these judgments.  When I

25  was out on the street I used to deal in commercial paper.  In

May of 2005, I was in Russia discussing with banks the purchase of commercial paper. Mr. Sherak has no knowledge of commercial paper. And *commercial paper* is a rather broad term. It can include stocks and bonds, various securities and debts.

Different types of debts have different types of values. Ones I was working with in Russia at the time were debts owed to me. They were secured on UCC financing statements. UCC financing statements were not something I picked up in prison. I had hundreds of them on the street.

And when I made the offer -- or presented it to the bank in Russia, the offer I received was 18 percent. The type of paper that I had was a decent offer and fair at the time, fair market value. When these were offered to banks -- And there was two judgments. I'm just dealing with the Joan Donoghue judgments -- there was one that was small, again 484, 486 million, and then the large one that was 15 billion. I asked Mr. Sherak, if his sister who happened to be involved in banking, would look -- after we had already got the judgments and everything, I asked him if she would take a look at the commercial value for these particular judgments.

Mr. Sherak has no knowledge of those type of procedures, and when they were presented, some offers came back to me. One of them was -- The first offer I received was for the 484, and it was roughly a 405 million offer from

1  Soffer (ph) Bank in Spain.  That didn't surprise me because of

2  the value of the commercial paper and the debtor that was

3  involved.  80 percent is a lot different -- Almost 80 percent

4  is a lot different than 18 percent.  The only thing that would

5  make that big disparity in commercial value would be the

6  debtor, and in this particular case it was the United States.

7  And, so, the United States' credit worthiness is very good on

8  the international market, and so 80 percent means that the

9  bank felt that the debtor was good and the judgment was good

10 and an offer was presented.  I never have received any

11 documentation of that particular offer.

12      The next offer was made by Deutsche Bank.  I have

13 learned that Hycolots was the employee that handled the

14 escrow.  This was for the large judgment, which is the one in

15 question.  At that time it was 17 billion, and an offer of

16 just -- Excuse me.  I think it was 19 billion at the time.  An

17 offer for just under 15 billion was made by Deutsche Bank.

18 They actually opened up an escrow and deposited $773 million

19 into the escrow to purchase this judgment.

20      If they would have purchased the judgment, obviously

21 there would be no bankruptcies, because the judgment, which

22 has been testified to, is a judgment that is jointly and

23 severally held, which means that the United States owes it,

24 William True owes it, and so does Kathy Hill and so do James

25 Massey, which we have testified to.  All of them owe the whole

amount.  And, if I collect it all from the United States, then
obviously I can't collect it from anybody else.  If I collect
it from everybody else, then I obviously can't collect it from
the United States.  It's one or all type thing.  So, if Kathy
Hill had $21 billion, the United States wouldn't owe anything,
and neither would Mr. True.  So, that's the way that the
judgment is written and that's the way that the judgment was
granted.

        So, that was a very significant offer.  A lot of
facts were provided as to the details of the escrow.  But
unfortunately, as fate would have it, Deutsche Bank got into a
lot of trouble, owing a lot of money to the United States for
potential fines in relationship to the mortgage crisis.  I
think they had a couple billion dollars worth of fines to
address in a very short order and they withdrew -- asked to
withdraw from the escrow and purchase.  They did settle with
an $8,000 payment back to Jackie for expenses related to the
escrow.

        Outside of that, the next offer that was received --
and these all took a couple of months to develop -- was an
offer from Abu Dhabi Commercial Bank, or ADCB.  This, again,
was for the small one.  It was a smaller one because of the
swiftness and because of the difficulties I was already having
with the Sherak family and my situation.  The offer was made
of $281 million.  That's still a very substantial offer of

over 50 percent, but for the type of paper it was, that would
be severely discounted.

Still, I would be happy to accept the offer, and
under the circumstances with the particular unit that I am in
I wouldn't be able to.  I wasn't able to do it because of the
communication issues.

I would like to offer these two letters that were
received, and it might be in a limited capacity, but I would
like to offer them again.  They were discussed with my mother,
and it's the two versions of the Abu Dhabi Commercial Bank
offer.

MR. QUINLEY:  Let me see and reconsider.

You know, Your Honor, I had an objection prior, but I
am going to withdraw that objection and ask that these go
ahead and be marked.  I have no objection to their admission.

THE COURT:  They will be marked and no objection to
their admission.  Okay.

MR. JOHNSON:  And so the commercial value of a
judgment is another reason that independently I hold that the
judgment does exist.  It's quite a different thing for
somebody to make an offer of hundreds of millions of dollars
for something that is paper that I have made up by an inmate
in a secret prison.  It's very improbable for a bank who has
the opportunity -- You can put either one of them up.  It's
highly improbable for a bank to make that kind of offer under

those circumstances. I have learned since discovery it's

impossible to try to negotiate these transactions from the

CMU. But, that's an independent credible verification that I

hold that's separate than having to depend on all the words of

my friend, Stephen Sherak, being true. Mr. Sherak knew

nothing about the commercial paper business which I was

familiar with. He wouldn't know facts, whether they were

valid or not valid, and even a liar needs to know a certain

set of facts to weave a yarn that's believable. And, so, when

he supplied these facts to me that I am familiar with without

him having knowledge, I'm comfortable that at least what I

know to be true or what I can discern to be in there is true,

and that is what I base my actions on.

This particular letter that you are seeing here is

from Byron Gashler who's testified as somebody that speaks

with my mother. Two versions of these have now been presented

to you, and are now marked as exhibits. This particular

version came from Byron Gashler and was mailed to the Court.

They are not identical, though substantively they are the same

letter, okay?

We can go to the next page.

And this is again from Abu Dhabi Commercial Bank.

It's addressed to Mr. Sherak who I was working with to try to

handle this. $281,033,000.21 was what they were willing to

pay. And, again, it's just under 486 million and would be

1    just over 50 percent, more like 60 percent.

2         You can go down a little bit.

3         This is the bank, impossible for me to try to reach.

4    There was testimony with my mother that I tried to get her to

5    help me on this to verify with the bank this particular

6    document, and the offer was real.

7         The difficulties with that has to do with Mr. Sherak,

8    and I believe a little bit, as lovely as my mother is, her

9    incompetence to handle these type of affairs without proper

10   guidance from myself and this ability of lack of communication

11   to properly guide and direct her, because of e-mails and

12   letters discussing transactions like this would easily be

13   viewed as effectuating criminal activity or the safety and

14   security of the facility or some kind of excuse to not let me

15   communicate.

16        You can take that down page, and I don't think the

17   third one is necessary on that particular one.

18        Go to the next one.

19        And this is my -- the one that my mother brought in.

20   The difference is it's color printed.  And you can go down to

21   the bottom.  And these are probably markings that appear to be

22   my mother's handwriting of phone numbers and how to try to

23   contact them and do the due diligence that I requested.  Other

24   than a couple of differences, there's a name missing and a

25   couple of words missing, which is probably a printing issue.

These particular exhibits are identical.  And that's it for
those.

So, again, I offer that as part of my personal belief
and experience of facts, real facts that I am trained in and
experienced with as a separate form of credibility than
another inmate that I believe my mother testified to is not
credible as a witness or credible as a personality.  And I
believe she made the statement that he's currently
incarcerated.  I have learned in discovery that he was
arrested Sunday night, the day before my trial.

Is that going in as an exhibit?

MR. QUINLEY:  I'm not objecting.  No objection.

MR. JOHNSON:  All right.

THE COURT:  It will be admitted.

MR. JOHNSON:  This is a DHO report, and that would be
my inmate copy.  And these are the type of experiences that we
have inside the unit.

Mr. Puckett testified as a disciplinary hearing
officer this would be the type of situation that would happen
before him.  And in this particular paragraph what I have
highlighted was Dr. Cook was what they call an inmate rep or
somebody to try to represent the inmate to any administrative
procedures.  And what I asked for to be supplied was the mail
handler's manual and the Universal Postal Treaty.  Again, the
Universal Postal Treaty is not in these big old documents, but

it's available, and further into this particular report they
said they were available, but they would not supply them to me
because they were too voluminous.

In the Universal Postal Treaty there's a section that
talks about registered mail and the United States has no
jurisdiction over registered mail.  That's an important legal
determination for me and it determined the way that I would
handle some of my mail situations with the CMU staff.  As
having no jurisdiction to the mail at all, I don't believe
they have the right to open it, examine it, determine what's
right and legal for my attorney to have, and so I started
using registered mail to address those situations on a legal
matter, and eventually had to do another World Court
proceeding regarding the Postmaster General and the mail
situation, and that was identified as the one that was $2.9
billion.

We can go to the next page.

I just want to point out, again, that I am trying to
prosecute certain things, and I had to file a Nonstandard Form
3949, an attempt to file with the IRS, and I wasn't successful
because I can't get it to the IRS.  But, the nonstandard form
is when I can't have access to the form.  They have testified,
I believe it was Mr. Simmons, also, that Form 3949 and a
FinCEN 101 were rejected even as blank forms to be provided to
me.  The standard 3949-A is to report crimes to the IRS about

1   tax crimes to the IRS.  That's to report crimes, it's not to

2   create crimes.

3          The FinCEN 101 is probably more famous known as a SAR

4   or Suspicious Activity Report.  That's to report financial

5   crimes or suspicious activity to the United States Treasury.

6   They are not to commit crimes, they are to report crimes.

7          So, this is some of the types of situations I was

8   running into.

9          In this particular DHO proceeding I filed an

10  affidavit which is detailed in the document.  I won't go over

11  that, but that's how I tried to address the crimes committed

12  to me and tried to keep a factual record, and over time these

13  are the type of documents that I hope represents my state of

14  mind.

15         That's good.  Thank you.

16         I would like to offer these as -- And I am just

17  dealing -- They are sealed envelopes.  And I don't mind if

18  they stay sealed.  I am just offering the envelopes at this

19  time.

20         MR. QUINLEY:  Okay.  Which ones do you want first?

21         MR. JOHNSON:  Either one of them could be put up.

22         THE COURT:  Are these admitted documents?

23         MR. QUINLEY:  I have no objection, Your Honor.

24         MR. JOHNSON:  You want to put them face down first,

25  or face up?

1          This is a particular sample of a registered mail that

2     never went out of the facility.  It was offered to go out in

3     the mail and rejected.  This was the one that was to actually

4     the Postmaster General.  You can flip it over, if you would.

5     You will notice in the contents that this is a Notice of

6     Administrative Dishonor and Default.  That would be the third

7     part of the four-part series, and it was very difficult.  I

8     couldn't even do the administrative procedures from this

9     facility anymore.  So, the document remains sealed, never

10    opened.  These were returned to me.  Sometimes they are

11    confiscated and not returned.  These particular ones were

12    returned to me.

13         You can go to the other one, please.

14         This is documents I tried to mail just to this Court,

15    and same situation.  They weren't able to go out.  And we can

16    go to the back of that.  This one was returned in processing.

17         Okay.  There was a 2241 Habeas Corpus, a 2241,

18    another 2241, a judicial review for a FOIA suit, which I was

19    never able to prosecute.  Neither of these habeases were I

20    able to prosecute.  This was an amended complaint against the

21    postmaster, and you can see the case number.  This is another

22    reference to the case number, and you will have that entire

23    case in evidence where basically I went to the Court, she gave

24    me an opportunity to be heard where she said you have to file

25    a complaint.  I let her know that I couldn't file the

complaint because of my circumstances.  She gave me a case

number, I conducted discovery immediately, and then I told her

I couldn't prosecute the case, and a year and a half later she

issued an order.  That's all part of that record.

        And that's it for this, thank you.

        And those envelopes also represent my continued

protest on the back with my notices, and there will be -- I'm

sure there was other envelopes admitted into evidence of the

same type of thing.

        I offer that again for another version of

restrictions.

        MR. QUINLEY:  14?

        LAW CLERK:  14.

        MR. QUINLEY:  No objection, Your Honor.

        THE COURT:  Okay.  It will be admitted.

        MR. JOHNSON:  This is a recent one, August 8, 2018.

This is me attempting to write Marilyn Welsh, which is my

mother-in-law.  It says, "Your correspondence contains a form

CV-950, Request to File Foreign Judgment for court filing in

Washington, D.C., therefore your correspondence is being

returned as it may facilitate criminal activity and is

detrimental to the security and orderly running of the

institution."

        I believe those were language that Jason Simmons

referred to.  The CV-1950 form, the Request to File a Foreign

1  Judgment was a blank form and, again, it comes down to their

2  position.  My position is I want to record this judgment in

3  any way I can in any particular public record so that I can

4  point to it and address any debt collection processes.

5        The inability to even get a form out makes it

6  impossible to file it, and I have got to start somewhere.  And

7  getting a judgment attached and put into the record is to me

8  one of the vital attempts that I was trying to make.  The

9  Request to File a Foreign Judgment requires that the judgment

10 be attached, so there's no way to report any criminal

11 activity.  There's nothing you can do.  Either the judgment is

12 going to be attached or it's not going attached.

13       I was trying to get through the limited communication

14 I have somebody to file the judgment, certified copy of the

15 judgment in Washington, D.C.  My first attempt to have it

16 filed was in the habeas proceeding.  Mr. Sherak will not do

17 this for me any longer, and so I was trying to get it done

18 through -- or asked that his family would do it, and they said

19 they wouldn't do it for fear of retaliation and different

20 issues related to that, which creates an obstacle for me.

21       Excuse me for one second.

22       The filing of it in Washington, D.C. is relevant,

23 because the United States is the debtor, and that's where it

24 would have to be filed and that's why I couldn't do it here in

25 a local court or any other court.  And this is just to address

1    the United States.  I figured if I can address the United

2    States, all the other judgment debtors, like Hill and True,

3    would be properly noticed about their situation.

4          The certified copies of a judgment to my knowledge

5    only cost $75 from the World Court.  My mother testified about

6    a check that she wrote to Faith Sherak, and I believe that was

7    already offered into evidence.  The check was for $574.  The

8    check was for six copies or certified copies of the judgments.

9          The number six comes from the three judgments that

10   were granted on December 16 times two.  The number in the

11   check being, I believe it was $574, comes out to like $82 per

12   copy of the judgment.  This is, again, my attempt to purchase

13   the judgments.

14         To my knowledge, the judgments were purchased, but

15   they were never provided to my family, and my family has

16   always attempted to obtain them on their own and try to obtain

17   them through the Sherak family.  The Sheraks' reluctance is

18   fear, threat, and duress associated with them.  And they went

19   -- Their names were attached to these documents, and on

20   February 8 of this year they had their names removed from

21   these judgments.  They called them recertification.  And it

22   was recertification by redactions to make just my mother and

23   myself the only parties on the judgment.  They did that

24   because of fear and retaliation from the United States.  They

25   took their names off.  They refused to file -- I mean, provide

1  anything because of that threat up until they could remove

2  their names.  Why they haven't provided it since February 8,

3  in my limited communications I'm not able to verify why it

4  hasn't yet been delivered.

5        My mother has testified that she tried to contact

6  Joan Donoghue and I don't know what all the difficulties are

7  out there in the world.  I know what the impossibilities are

8  for me, but no one has been successful at this point in

9  providing me the judgments.  I have to rely on my own working

10  knowledge of things and my own concrete understanding of truth

11  and what's valid.

12        I would like to just offer some e-mails and you can

13  take a look at all of them, please.

14        Most of these are e-mails where I am writing directly

15  to the Myrian Primera which we brought up there was rejected

16  contact where I was writing Steve Sherak as a circumvention

17  around the system.  So, I believe there's testimony now that

18  it's who it's directed to.

19        THE COURT:  Mr. Johnson, where are you going with

20  this?  What does this -- You have already established the

21  inability for you to get things out of the CMU.  We are here

22  on allegations that you committed the offense of bankruptcy

23  fraud and four counts.  How do these e-mails relate to that?

24        MR. JOHNSON:  They will relate to some of my beliefs

25  and state of mind in regards to the judgments and --

1          THE COURT:  Well, you have already testified to that.

2          MR. JOHNSON:  Right.  I think it shows a consistent

3    pattern of communication, it shows that my belief is

4    unwavering, that --

5          THE COURT:  And you have already testified to that.

6          MR. JOHNSON:  Okay.

7          THE COURT:  Well, if you want to put them on, but I'm

8    putting you on a time frame here.  You told me you would be

9    one hour.  That's 15 minutes from now.

10         MR. JOHNSON:  Okay.

11         THE COURT:  And I will give you a little more time,

12   but you're starting to repeat yourself and you're getting into

13   issues that are not related to the -- you are getting into

14   facts that's not related to the issues of this case.

15         MR. JOHNSON:  Okay.  I'll try to use the last 15

16   minutes --

17         THE COURT:  I will give you a little more than 15

18   minutes, but I don't want you to be talking all day, you

19   understand, because it's -- We will let the jury decide

20   whether or not it's relevant or not.

21         MR. JOHNSON:  Okay.  And if there's no objection, I

22   will offer them as a cumulative thought and just touch upon a

23   couple of them.

24         THE COURT:  That would be fine.

25         MR. QUINLEY:  I would ask they be individually

marked, Your Honor.

THE COURT:  They will be individually marked.  How about as a group exhibit?

MR. QUINLEY:  No, I would like them numbered, please. How many of them are there?

LAW CLERK:  17.

MR. QUINLEY:  There are 17 of them, self-serving statements of the Defendant, but I don't object to them being admitted.  I would ask that they be numbered.

THE COURT:  Why don't you pick out the ones that you want to show to the jury, although they will all go back to the jury during deliberations?

MR. JOHNSON:  Okay.  I will just pick one or two of the self-serving statements.

MR. QUINLEY:  Your Honor, while that's being done I would ask the indulgence of the Court.  I don't know if anyone else has the need --

THE COURT:  Okay.  We will take 15 minutes.

MR. QUINLEY:  Thank you.

THE CLERK:  All rise for the jury.

(Jury out).

(Following a recess, proceedings continue in open court; jury present).

THE COURT:  Okay, Mr. Johnson.

MR. JOHNSON:  If you want to put up Government

1  Exhibit 7, No. 4, Document 4, page eight, and then we will go
2  on and so on.
3         Can we put up -- I'm going to do the e-mails first.
4  Sorry.
5         THE CLERK:  That's okay.
6         MR. JOHNSON:  Government Exhibit 7, Document 4, page
7  eight.
8         I'm going to offer 17 particular e-mails.  I just
9  want to offer a couple for the jury, just of general import of
10  my state of mind or my belief what would be called, I guess, a
11  self-serving statement.  I have highlighted what I would like
12  to discuss.
13         "My buddy, you are very cruel.  You never did one
14  thing you said, lied every chance you had to tell the truth,
15  and then I'm the one fucked in the head," quoting him.  "I
16  just don't get it.  Obviously money doesn't mean something to
17  you, because you purposely withheld hundreds of dollars
18  promised and then lied, lied, lied.  You actually think you
19  behaved as the friend you profess to be?  You never supplied
20  one case number, you purposely withheld documents that are
21  needed and useful."
22         And I have also highlighted, "I am truthfully chasing
23  rabbits because of my lack of information.  You think it's
24  best to withhold the information that will help me know the
25  facts?  That is cruel, intentionally cruel."

1          Next one, please.

2          And I would ask that the dates be considered in this.

3    "It has been maddening sitting through all the prevarications,

4    but I'm going to understand this is an overwhelming habit that

5    cannot be broken even for friendship sake."  I said, "I

6    received the mail I sent to Elliot back."

7          Elliot Wiesner was the lawyer that I believe handled

8    the two judgments before the World Court with Judge Donoghue.

9    He's an active and practicing lawyer in New Jersey.  Because I

10   wasn't the direct client for him, I wasn't able to -- he

11   didn't receive this particular mail even though Mr. Sherak

12   said he had already made the arrangements on his end, and so

13   that explains the mail sent.

14         Next one, please.

15         MR. QUINLEY:  As we step through these, can the

16   exhibit number be referenced?

17         THE COURT:  Yes, what exhibit number is that?

18         MR. JOHNSON:  Exhibit for the first one was 15.

19         THE COURT:  Second one is?

20         MR. JOHNSON: 16.

21         MR. QUINLEY:  Thank you.

22         THE COURT:  Okay.  All right.  Any more?

23         MR. JOHNSON:  There's going to be five I just offer

24   real quick out of the 17.

25         THE COURT:  I thought you said two.  You changed your

1   mind?

2          MR. JOHNSON:  No, I didn't say two.

3          THE COURT:  Okay.  Go ahead.

4          MR. JOHNSON:  "All you have to do is append copies of

5   the certified judgment.  All your family names have been

6   redacted, so all excuses which prohibited its filing last year

7   are exhausted.  You keep playing into their hands when you

8   deny me these documents.  The reason they don't want you to

9   file them is because they know it will end their ability to

10  advance the false narrative."

11         Thank you.  Exhibit 17.

12         MR. QUINLEY:  Thank you.

13         MR. JOHNSON:  "You say you haven't lied to me, but I

14  can -- I can't find anyplace where I landed on the truth.  You

15  say you gave money back to my mother.  I take that as a fact."

16         And it goes, "You now -- Just now I hear a habeas is

17  filed, but I have to go through check after recheck to see if

18  the judgment was attached.  I would like to be on the same

19  view with you on this, but your lying made me start to

20  question everything.  I can't even trust the *I love you*.  The

21  judgment -- The judgment's real or not?  I have been told the

22  habeas is 13 pages.  There is no way that that number -- with

23  that number that the judgment is attached."

24         All right.  Next one.  That's Exhibit 18.

25         I believe this is the last one, correct?

1          LAW CLERK:  Yes.

2          MR. JOHNSON:  Okay.  "Months ago" -- This is a letter

3     directed to Faith Sherak.

4          "Months ago Stephen had my mother, Nell, send you a

5     check for $574 which you cashed on the pretense you would

6     supply certified copies of the World Court judgments issued to

7     me which he never intended to supply.  He has been withholding

8     them from me for nearly two years now.  However, I do maintain

9     a belief that you were very helpful in the court processes."

10         That's it for those, thank you.  Oh, that's Exhibit

11    19.

12         MR. QUINLEY:  Thank you.

13         THE COURT:  Okay.  That's all for those documents,

14    right?

15         MR. JOHNSON:  That's correct.

16         THE COURT:  Okay.

17         MR. JOHNSON:  I'm going to go to Government's Exhibit

18    7, Doc. 4.

19         THE COURT:  About ten more minutes Mr. Johnson, okay?

20         MR. JOHNSON:  Okay.  Page eight, please.

21         MR. QUINLEY:  It, of course, is only in paper form.

22    Your Honor.  No. 7 -- I mean, No. 3-8?

23         MR. JOHNSON:  Yes.  It's actually three documents,

24    four -- It says Government's Exhibit 7, Document 4, page

25    eight.

1           MR. QUINLEY: 7-4, page eight.  Thank you.

2           (Brief interruption in proceedings).

3           MR. JOHNSON:  These are already into evidence right

4  behind them, but I just wanted to show them and make reference

5  to them for later.  They start at page nine.  Is it coming up

6  on the screen?

7           Okay.  No, I mean, the -- Was this document going to

8  be coming up on the screen?

9           MR. QUINLEY:  For clarity of the record, this is

10  Exhibit 7-4, page nine.

11          THE COURT: Okay.

12          MR. JOHNSON:  Yes, that's what I have been saying.

13  Is that going to be pulled up on the screen, 7?

14          THE COURT:  It's on the ELMO.

15          MR. JOHNSON:  Then here.  That's not the --

16          This is already admitted into evidence.  As you can

17  see, it was Government's Exhibit 7, Document 4.  This was

18  addressed with Gary Burgess on the stand.

19          This is his notice about the mail situation and the

20  counter-notice and refusal of offer for contracting.  I just

21  wanted to bring that to your attention that the counter-

22  notices that were testified to actually did occur.  There was

23  also one that you will find in evidence for Mr. True.

24          I'm done with that.

25          Yeah, just front page.  This Affidavit of Truth --

1          MR. QUINLEY:  Your Honor, I'm going to object to

2     this.  Would you show it to the Judge, please?

3          MR. JOHNSON:  It's already into evidence.  I'm just

4     pointing it out.

5          MR. QUINLEY:  I'm going to object to its publication

6     on page nine.  I mean, this is a judicial proceeding, not a

7     biblical proceeding.

8          THE COURT:  Court understands that, but is going to

9     allow the publication of it.

10          MR. QUINLEY:  Very good, thank you.

11          MR. JOHNSON:  This is already offered into evidence,

12     or already into evidence, and I am just bringing it to your

13     attention that it's in the same -- Government's Exhibit 7,

14     starting on page nine.

15          You can go to the bottom of the page on this.  This

16     is page one of nine.  Then we can go to the next page.

17          And this is the Notice of Fault associated with the

18     Affidavit of Truth.  This is only two pages long, but they are

19     part of the exhibits that have been filed with the habeas

20     court as referencing my situation.

21          That particular exhibit references quite a few

22     documents that I have presented to the Court that I believe

23     represent -- more fully set out what I have testified to here.

24          That's it, Mr. Self.  Thank you.

25          THE COURT:  About ready to wrap it up?

```
 1          MR. JOHNSON:  Yeah, I'm going to wrap it up here.

 2          I understand that I have been indicted for bankruptcy

 3     fraud and that the fraudulent statement that has been waged

 4     against me is that there is no such judgment.  I truly believe

 5     there is a judgment.  I believe that self-referencing

 6     information that I have allows me to see the truth in all the

 7     smoke screen of lies that the judgments truly do exist.  I

 8     based my actions not on malice or retaliation or just to

 9     injure my captors; I base my actions on my belief that the

10     judgment exists.  I'm a qualified creditor according to the

11     law.  This is not a self-authenticating activity, it's not one

12     where I am the sole authority.  I relied on a treaty which is

13     the law of the land, and I didn't act until I knew or believed

14     those judgments to be true and I didn't express a right that I

15     didn't have until I believed I had it and could verify it the

16     best way possible under the circumstances that I had.

17          My intent was really legal.  It was not, again, an

18     illegal act.  I still believe it's legal.  I wish that the

19     judgment was here, I wish that Joan Donoghue was here, I wish

20     all of these things, and unfortunately that didn't happen.

21     But, regardless of all of that, that doesn't change my belief

22     or change my opinion about the facts.

23          The other charges that I have are making a false

24     declaration.  To me the false declaration is only relevant if

25     the judgment -- if the judgment is real or not and if my
```

intent on that particular judgment is -- or that particular
case is relevant.

So, I made the declaration, that is true.  I made the
declaration under oath to be true.  I still believe it to be
true.  I still believe in the judgment, I believe that the
evidence that I have to believe in the judgment is credible.
I understand that the Government has credible witnesses, they
all have their beliefs.  I don't count their beliefs as
redible as mine, because of my experience with commercial
paper and my experience with administrative procedures and my
experience with reading treaties and studying law.  That's
what I relied on, that's what I counted on, and I offer that
as my justification for my behavior.

THE COURT:  Okay.  Thank you.

Cross-examination?

MR. QUINLEY:  Thank you, Your Honor.


CROSS EXAMINATION

BY MR. QUINLEY:

Q.  Mr. Johnson, --

A.  Yes, sir.

Q.  -- you introduced before this Court an exhibit.  It's
Exhibit No. 6.  And do you have a copy of it with you?
Probably not.

But, the original is -- I think the original is still

1 up -- Is it in this stack, no?  The original should be seated

2 right there.

3          Now, this is styled -- it's addressed to the World

4 Court.  You have the number that you have handwritten on some

5 copies of the relevant judgment, --

6 A.  Yes.

7 Q.  -- I imagine handwritten by you on the copies that we have

8 of what you call a judgment -- of what you call a judgment.

9 A.  I am recalling the ones that you are addressing.

10 Q.  All right.  Very good.

11 A.  I don't recall whether that's my handwriting or not, but

12 there's a good chance that it could be.

13 Q.  Okay.  Very good.  By the way, all of these instruments

14 are instruments that you have typed up while confined, is that

15 correct?

16 A.  That's correct.

17 Q.  All right.  Now, this particular letter, did you send it?

18 A.  I didn't get an opportunity to send it.  I have testified

19 that I couldn't do it.

20 Q.  Well, did you -- Why?  Why couldn't you send it?

21 A.  Well, at that particular time I couldn't get the World

22 Court address in New York, and I did eventually get a New York

23 address which was the -- I thought was the United Nations

24 building, and I sent ten letters to Judge Donoghue that were

25 all returned without delivery, because the World Court doesn't

1  receive mail at the United Nations.  So, that's why I didn't

2  get an opportunity to mail that one.

3  Q.  So, now, you still have all of your papers, right?

4  A.  What papers?

5  Q.  The papers of all the legal -- what you call legal

6  processes that you have created.

7  A.  In regards to this particular judgment, I don't -- I

8  couldn't find any documents left in my cell regarding this

9  particular judgment.  I have gone through three legal boxes

10 trying to find the nine-page judgment.  I do have some other

11 processes, but I don't have that one anymore.

12 Q.  What about this letter that --

13 A.  June 6.

14 Q.  Yeah, on two pages that you dated June 6 of 2016.

15 A.  I did have this paper and supplied it.

16 Q.  In this condition?

17 A.  That's -- I believe that's my original one.

18 Q.  This is your original --

19 A.  Yes.

20 Q.  -- that has sat amongst your paperwork for over four years

21 now?

22 A.  It's two years; but, yes.

23 Q.  Well, it's dated -- Oh, you're right.  That's just two

24 years.  It's dated June 6 of 2016.

25 A.  Yes.

1    Q.  Mr. Johnson, when did you type this or when did you --

2    When did you type this?  That's how these are created, right,

3    on a typewriter?

4    A.  I did type that on a typewriter.

5    Q.  When did you type this?

6    A.  It would be remotely close to June 6, maybe June 5.

7    Q.  And it's your testimony to this Court that it has remained

8    in this condition that we see it right now today in the room

9    when you produced it out of your boxes where you say you don't

10   have everything in connection with this judgment?

11   A.  Yes, it was inside of a manila folder which would probably

12   keep it as pristine, if that's the issue.

13   Q.  Sir, you say that you did not have intent to harm, is that

14   right?

15   A.  That is true.

16   Q.  You said the only reason you filed an involuntary

17   bankruptcy against Warden Hill (sic) and Kathy Hill was to

18   gain access to discovery process, is that right?

19   A.  If I testified that was my only reason, I'm mistaken.  I

20   have multiple reasons for that.

21   Q.  You wanted to use the power of the Court to obtain what

22   you needed?

23   A.  That is a legitimate reason why I would do it.

24   Q.  Okay.  So, what was your legitimate reason for instructing

25   Monya Ballah to prepare IRS form 1099-Cs on numerous Bureau of

1    Prisons employees?

2    A.  The purpose of that is to cancel debt, and cancellation is

3    different than forgiveness.

4    Q.  Well, let me ask you this:  You say you have a belief that

5    you are entitled to by force of a law that no one using all

6    due diligence can find any evidence of in treaty, in

7    familiarity with procedures, legal procedures.  You are not an

8    attorney, right?

9    A.  No, sir.

10   Q.  Well, you have had a number of judges in this circuit

11   presiding, haven't you?

12   A.  I have.

13   Q.  Haven't every single one of the judges until this trial,

14   which is not yet completed, described your allegations as

15   absurd?

16   A.  They have.  I brought that up in opening arguments.

17   Q.  Didn't Judge Herndon find -- as you persisted upon

18   repeated requests for reconsideration of his dismissal of your

19   process, didn't he finally report that your claim that these

20   have been litigated between the parties is absurd?

21   A.  He did.  That was his ruling.

22   Q.  Well, didn't he also direct you -- In his very first

23   memorandum dismissing your suit, didn't he direct you to how

24   your claims could be raised?  Do you recall that?

25   A.  Yes.

1    Q.  And didn't he tell you that your claims are akin to those

2    raised by a federal prisoner in an action brought pursuant to

3    *Bivens*, and that he explained how he couldn't convert your

4    habeas to such a lawsuit?

5    A.  Yes, he did.  That was his opinion.

6    Q.  So, why haven't you filed a lawsuit raising all of your

7    claims against the CMU with a Court?

8    A.  Well, first off, his opinion was bad legal advice.  Two, I

9    put in a Motion to Reconsider based on that accusation and

10   addressed it and rebutted it therein.

11          This is not a *Bivens* action.  I haven't filed a

12   *Bivens* action about these issues.  I went to the World Court

13   and used a process that I was familiar with and that I

14   believed would be better suited for the situation.

15   Q.  If you had an entitlement to $21 billion, now $23 billion,

16   by your testimony and your filings with the Bankruptcy Court,

17   what motivated you to cancel or discharge $1 billion of that

18   judgment?

19   A.  I think what motivated me in that particular situation is

20   to have pressure for relief from my captors.

21   Q.  So, you wanted, using a mechanism designed to harm your

22   captors, to put pressure on them?

23   A.  Well, I believe that the pressure is an entitlement to the

24   judgment.

25   Q.  Ahh.  And, so, you were happy to use $1 billion of your

1  entitlement to put pressure, is that correct?

2  A.  I mean, that's close enough to the --

3  Q.  Sure.  And you felt entitled to lay that 1 billion on 30

4  different individuals all throughout the U.S. prison system,

5  right?  One billion each?

6  A.  Well, actually, I will be willing to do more than 30,

7  because I had 2,145 debtors.

8  Q.  Well, 30 -- Now, you at least in form have created $30

9  billion of income for 30 people, and I think you even said

10 it's only jointly and severally liable.

11 A.  Yeah, I think you're mistaken.  The $1 billion is jointly

12 and severally liable, and that's a question that will have to

13 be addressed with the IRS on the appropriate form.

14 Q.  At any rate, there's no discovery process, is there, in

15 filing a 1099?  It's pure harassment, isn't it?  As you said,

16 it was to put pressure on them?

17 A.  It's not a discovery issue.  A person can only file a

18 1099-C if they have an entitlement to cancel the debt.

19 Q.  And, by the way, would you acknowledge, that Mr. Stephen

20 Sherak or his mother, Faith Sherak, or perhaps a sister,

21 Jackie Sherak, that none of them created any of these

22 processes that you created?

23 A.  I'm aware that they didn't create any of these processes.

24 Q.  So, you are not trying to tell the ladies and gentlemen of

25 this jury, are you, that this is Stephen Sherak's smooth con

```
1   job, are you?

2   A.  No, I'm not attempting to do that at all.

3   Q.  In fact, wasn't he recruited by you to be your partner in

4   your smooth con job?

5   A.  No, and he wasn't recruited by me.  We were friends and he

6   offered to help me.

7   Q.  Well, you say that this was occurring through outside

8   help, and when he got out, his help, of course, the

9   proceedings that you claim were in 2016, he still in prison,

10  wasn't he?

11  A.  That's true.

12  Q.  All right.  Well, so, all through 2016, you corresponded

13  with your attorneys, right?

14  A.  The best I could under the circumstances --

15  Q.  Sorry.  But your attorney, Ray Sowards, he didn't deal

16  with any of this, did he?

17  A.  No, and I tried to get him to deal with it --

18  Q.  Sure.

19  A.  -- later on by being paid, yes.

20  Q.  Okay.  But, you're aware that on August 12, thereabouts,

21  you received from him his denial of any representation of you

22  any further, although he agreed to forward things to your

23  father?

24  A.  That's true.

25  Q.  Okay.  And, also, are you aware -- Well, and do you
```

1    acknowledge that you received, as recorded in all of these CMU

2    records of all your correspondence, that this Attorney Wiesner

3    in a communication dated on or about June 13 of 2016, that he

4    denied representation for you?

5    A.   That is true.

6    Q.   So, who's handling all of this through 2016 that, frankly,

7    Mr. Johnson, you've made up?

8    A.   Is that a question?

9    Q.   Yes.

10   A.   What's the question now?

11   Q.   Who's handling it?  It's a figment of your imagination,

12   but humor me and tell me who's handling this in 2016.

13   A.   In 2016, Mr. Sherak, being incarcerated with me, helped me

14   to deal with his family, which was Jacqueline Sherak, mostly.

15   Faith Sherak helped out a little bit.  Under my understanding,

16   Jacqueline Sherak looked up the treaty, found a copy of it,

17   had it mailed in by the Senator, which is a friend of the

18   family.

19   Q.   Mr. Johnson, I hate to interrupt, but I don't think you

20   are answering my question.  You are describing events after

21   2016.

22   A.   No, I'm not.  I'm describing events that are happening up

23   to it.

24          THE COURT:  Let him finish his answer.

25   Q.   Okay.

A.  These are happening in 2016, that Jacqueline Sherak was

taking care of the bank offers and that Elliot Wiesner was the

one attorney who did the due diligence.  There was another

attorney named Tom, that I don't know his last name, where he

worked for a law firm in New York.  There was another attorney

in London that had put up $25,000 to participate in the

processes and withdrew when the Government filed the appeal.

Q.  All right.  Thank you.

A.  That's all I know.

Q.  Well, let's talk about that appeal.

        Again, you say that it was an appeal decided by a

three-judge panel, right?

A.  Correct.

Q.  And, what, are there about 15 judges on the International

Court of Justice, if you know?

A.  Based on the web page and my references to it, there

appears to be 15.

Q.  Okay.

A.  Judge Donoghue being the only one from the United States.

Q.  And why don't you tell the ladies and gentlemen of this

jury what's the relevance of this request that you made to

Deborah Welsh on or about August 9 of 2016.

        MR. QUINLEY:  And I ask -- It is loaded, it is No.

48.  We can just look at the second page, which is really the

first page of the e-mail.  It's on our Trial Director, and

1  I'll ask Ms. Brazier to go to Mr. Johnson's writing on that

2  date and block that last paragraph, please, so we can all read

3  it.

4  Q.  (By Mr. Quinley) Mr. Johnson, here's my question to you,

5  and I am going to read this so there's no misunderstanding.

6        I would like you to go to the World Court web page

7  and find the names of three current judges and their e-mails.

8        My question to you, would any three names do?

9  A.  No, I have not offered any names.  I don't know the names

10 of the appellate judges, and I was seeking the names of any

11 judges at that time.  And I do not testify today that the --

12 that I know the names, and I haven't offered any names of the

13 appellate judges.  In fact, I don't even know the name of the

14 Judge that issued the rulings for my other three judgments

15 that happened on December 16, and I have offered no names for

16 that.

17        MR. QUINLEY:  Mr. Self, your assistance, please.

18        I would like to show the Defendant his own documents,

19 Government 59, 60 and 61, and then I have a question and I

20 will ask for their admission.

21        MR. JOHNSON:  I have no objection to their admission.

22        MR. QUINLEY:  Thank you, Your Honor; they may be

23 admitted.

24 Q.  (By Mr. Quinley) Do you acknowledge each one of them

25 documents of which you created.  We saw the 14-page document

1    in the case of the Postmaster General, right?

2    A.  Right.

3    Q.  We have the nine-page document that was the subject or the

4    support for your involuntary bankruptcy petition, right?

5    A.  That's the big one.

6    Q.  Right.  And then we have these three.

7    A.  Correct.

8    Q.  Now, can you explain to the ladies and gentlemen of the

9    jury why you were taking or creating a Notice of

10   Administrative Judgment Affidavit against the Clerk of this

11   court, Ms. Justine Flanagan, Exhibit No. 60?

12            MR. QUINLEY:  You can display it, please.  60.  Oh,

13   it's switching over.  Thank you.

14   Q.  (By Mr. Quinley) Do you see Ms. Justine Flanagan doing

15   business as Clerk of the Court?  That's our Clerk, or she was

16   until very recently.

17   A.  Okay.

18   Q.  Why in the world are you going after her?

19   A.  It was related to some business I had with her in regards

20   to doing some administrative -- being an administrative judge.

21   Q.  Why are you going after Judge Nancy Rosenstengel who

22   presided over your appeal of the bankruptcy and presided over

23   your appeal of the Postmaster General dismissing it?

24   A.  I did that because of the way that she handled the case.

25   Q.  Why did you go after the Magistrate Judges in California?

A.  Because of the way they handled my hunger strike lawsuits
in regards to a fast that I did in Lompoc.

        MR. QUINLEY:  Your Honor, I'm going to ask for the
admission of Government Exhibit 65.

        And, Your Honor, I think I'm going to meet your
limit.

        THE COURT:  Pardon?

        MR. QUINLEY:  I think I may be able to meet your
limit.

        THE COURT:  Good.

        MR. QUINLEY:  And it goes to?

        THE COURT:  Goes to 12:10.

        THE COURT: Okay.

        MR. JOHNSON:  I'm going to object to this one.  I
don't see how it comes into this particular action.

        MR. QUINLEY:  It's relevant to his credibility, Your
Honor.

        THE COURT:  The relevance of credibility, the Court
will admit it.

A.  Okay.

Q.  (By Mr. Quinley) So, I suppose that was also true belief,
right, that the Judge owed you, what was it, 10 million?  $10
million, right?

A.  Yes, that -- Are you going to display it or something?

Q.  Sure.  Isn't your various actions against judges in

1  California why you wound up in the CMU?

2  A.  I have no idea, but the seven-page judgment that you

3  brought up, brought up as your exhibit is the 484 or $486

4  million judgment that we have been discussing, and it's the,

5  what we will call small one, and it was the one that the $281

6  million and 4 and $500 million offers were made by the two

7  banks.

8          MR. QUINLEY:  I will object, Your Honor.  That's

9  filibustering.  If I may proceed to the next question.

10         THE COURT:  Overruled.  You may proceed to the next

11 question.

12 Q.  (By Mr. Quinley) We have an admitted exhibit that explains

13 why you were admitted to the CMU, right, Exhibit No. 47?  I

14 mean, have you taken the time to review it, you had no

15 objection to it.

16         THE COURT:  Can you show it to him?  Do you have it,

17 Mr. Johnson?

18         MR. QUINLEY:  It's one of the admitted exhibits.  He

19 was provided with a copy of each one, if he's kept them in

20 order.

21         THE COURT:  Give it to him now in the interest of

22 time.

23         MR. QUINLEY:  Again, in the interest of time, it's an

24 admitted exhibit.  I know that the Court will make

25 determinations of what exhibits go to the jury.

1    A.  I see that, but it doesn't reference what you are bringing

2    in right now.

3    Q.  (By Mr. Quinley) No, it references a lot more, doesn't it?

4    A.  Yeah, it does.

5    Q.  I mean, you've used these techniques to abuse people ever

6    since you got to prison, isn't that right?

7    A.  If you are trying to associate my prior techniques to this

8    one, they are not even remotely close.

9    Q.  Oh, okay.  But, they were harassing, weren't they?

10   A.  Well, the ones that I have done in the past I believe are

11   legitimate.

12   Q.  Well, let's --

13   A.  That's true, not related to the International Court of

14   Justice or treaty.

15   Q.  Let's go to the question of your honest belief before you

16   wound up in prison.  How many people did you persuade to give

17   you and your partners $3,000 upon the claim that their

18   mortgages were based on --

19            MR. JOHNSON:  Objection, Your Honor.

20   Q.  -- based on fake money?

21            MR. JOHNSON:  When did this come in?  I don't

22   remember him --

23            MR. QUINLEY:  It's relative to his credibility, prior

24   acts.

25            THE COURT:  Once you took the stand it addresses your

1    credibility.

2          MR. JOHNSON:  That's fine.  I'm just making the

3    objection.

4    A.  (By Mr. Johnson) Again, please.

5    Q.  (By Mr. Quinley) How many people did you persuade that

6    their mortgages were based on vapor money because wires were

7    used and persuaded them to give you $3,000?

8    A.  First off, the vapor money theory is not my theory.  That

9    was put on by the Judge and advanced by press releases of the

10   Government.  The vapor money theory is a false theory, I have

11   never professed to it, and I refute it and deny it even today

12   and I still maintain my innocence for the conviction of which

13   I am in prison.

14   Q.  How many people did you persuade to stop paying their

15   mortgages?

16   A.  I have no idea, but I will offer that I had probably over

17   2,000 clients.

18   Q.  Over 2,000 clients?

19   A.  Correct.

20   Q.  How much total damage did you do to them and to the banks?

21   A.  I ever no idea if any damage was ever asserted.

22         THE COURT:  Let's move on to something else.

23   Q.  All right.  Very good.

24         You had testified -- Well, you had made the statement

25   repeatedly that -- Well, I'm going to offer Exhibit 64.

```
 1          And Mr. Johnson, the question to you is whether or

 2    not that document establishes that, in fact, the SIS -- and I

 3    think you identified it by name as SIS -- had noticed that the

 4    use of involuntary bankruptcy petitions was a form of

 5    harassment to be stopped.

 6               MR. QUINLEY:  And, Your Honor, if it can be admitted.

 7               MR. JOHNSON:  No problem.  We talked about it.

 8               THE COURT:  It will be admitted.

 9               THE CLERK:  What's the exhibit number?

10               MR. QUINLEY:  We can just see what that is.

11               THE CLERK:  What exhibit number is it?

12               LAW CLERK:  64.

13               MR. QUINLEY:  Okay.  That's fine.  I think everybody

14    can see it.  Well, can you push it up a little bit?  Right in

15    the middle there, "The purpose of the involuntary bankruptcy

16    petitions is to harass, intimidate, place encumbrances on

17    properties, and harm individuals' credit standing."

18          At any rate, thank you.  I'm going to offer

19    Government Exhibit 66, I'm going to ask it be presented to the

20    Defendant.  It is a statement of the Defendant.

21               THE COURT:  Any objections?

22               MR. JOHNSON:  If it's a statement, I accept my own

23    statements.

24               THE COURT:  Any objections?

25               MR. JOHNSON:  No objection.  It's my own statements.
```

```
 1            THE COURT:  It will be admitted.
 2   Q.  (By Mr. Quinley) Before I ask this to be published,
 3   Mr. Johnson, have you had a fair trial?
 4   A.  Actually, I don't believe I have.
 5   Q.  Mr. Johnson, do you want to read this into the record
 6   yourself?
 7   A.  Sure.
 8   Q.  Go ahead.  You can pull the microphone closer.
 9   A.  You can hear me?
10   Q.  You found it, thank you.
11   A.  It's dated 9/25.  I said, "I wish I could say it's going
12   well.  The level of disadvantage the Government imposes is
13   beyond human expectation."
14            THE COURT:  Can you slow down a little bit?
15   A.  Okay.  "They have denied me all my witnesses that had any
16   exculpatory evidence.  The most important one besides Joan E.
17   Donoghue was Stephen Sherak.  He was arrested on Sunday night,
18   the night before my trial began.  I do not think this is a
19   coincidence.  The other witnesses they could not find.  Again,
20   I don't think this is a coincidence, either.  The furnace is
21   blazing, and as impossible as this seems I still have the
22   Lord."
23            Excuse me.
24            "They have used their coercive machine to steal the
25   truth.  Only the God of Truth can deliver me.  Fair trial I
```

did not have.  Sherak thinks his arrest now makes sense when
he discovered I wanted him to testify.  He knew nothing of it
until I spoke with him ten minutes before he testified.  I
could not use him, one, because he could no longer supply
documents and, two, because his lawyer advised him not to
testify.  He himself is going for a violation hearing in four
days where he thinks he will be get two more years.  If this
is all a conspiracy, they are masters of the game.  They
arrested him just to prevent his testimony and usefulness, and
they are really scared by my judgments which they know exist
and will do all within their power to prevent me possessing
them.  They know I know" --
Q.  Mr. Johnson, I don't mean to do that to you.

         THE COURT:  Okay.  It will be -- Go ahead.
Q.  All right.  I will finish for you, Mr. Johnson.

         "They are really scared of my judgments which they
know exist and will do everything within their power to
prevent me possessing them.  They know I know how to prosecute
my claim so they blockade me from rights, titles, and
interest.  If I had any of my witnesses I think this trial
would have been a breeze.  With none of it, it seems my
conviction is imminent.  I will go to the Lord in prayer and
ready myself for testimony tomorrow.  If I don't, my goose is
already cooked.  If I do, my chances would be between slim and
none.  Your prayers would be appreciated.  It is not the end

1  of the world, but certainly I am right back at the starting

2  blocks with needing a judgment with no one to help me obtain

3  it except for the person who has failed me for two years.

4  That's the update.  My love to all."

5         Now, Mr. Johnson, are you aware --

6         THE COURT:  You are not speaking into the mic.

7  Q.  Mr. Johnson, are you aware that your mom brought an

8  article to the Court saying when Mr. Sherak was arrested?

9  A.  No, I'm not aware of that.

10 Q.  All right.  It wasn't Sunday, it was the prior week.  And

11 you realize he's under indictment.  And I will offer No. 63,

12 in order to correct that.

13 A.  This appears to be what my mom testified to.

14 Q.  Right.

15        MR. QUINLEY:  And I am also going to offer 62, the

16 complaint filed in Federal Court against Mr. Sherak to also

17 correct that.  And I would move for their admission if there's

18 no objection.

19        THE COURT:  Any objection?

20        MR. JOHNSON:  No objection.

21        THE COURT:  They will be admitted.

22 Q.  (By Mr. Quinley) Now, again, Mr. Johnson, I don't mean to

23 be repetitive, but Mr. Sherak didn't create any of this

24 paperwork, did he?

25 A.  Mr. Sherak did not create any of the paperwork that is

1  under discussion here.

2  Q.  And when your mother and your wife of promise, Deborah

3  Welsh, told you after all the efforts that they undertook on

4  your behalf that they doubted that any such thing existed, did

5  you use your relationship with them and tell them that it

6  caused you to doubt their love for you, that they were telling

7  you that this all was absurd and unreasonable?

8  A.  I don't believe I have ever made that connection of my

9  doubts and love relationship with them.  And I believe they

10 both love me very much.

11 Q.  And, finally, Mr. Johnson --

12         MR. QUINLEY:  One minute, maybe.

13 Q.  (By Mr. Quinley) Have you pursued very consistently in all

14 of your communications your belief in your own process, these

15 judgments?

16 A.  Again, I didn't -- I created the paperwork.  I did not

17 create the rights that was created by the treaty, and that's

18 what I used.

19 Q.  And when you spoke to the Court and said, "And whether the

20 judgment exists or not is not really going to be the final

21 question," were you explaining to the Court that in your view

22 as a matter of law it didn't matter if the judgment existed or

23 not, because as long as you believed that it did you couldn't

24 be found guilty?

25 A.  Well, if we are going to talk about the law, first off, if

the judgment exists and was brought into this court this whole
thing would have been over conclusively probably without a
trial.  Having that not being made available and Judge
Donoghue not being able to come or even be contacted with all
the Government resources, I -- What was the last part of that
question I was trying to address?

Q.  Mr. Johnson, isn't it a fact that you have never admitted
any of your scams and that you have always professed total
belief in all of your scams to harm not only Bureau of Prisons
employees, but all manner of people involved in your life?

A.  As far as myself, I will repent of any sin or any error of
my ways.  I am bound by my relationship with God to tell the
truth and not to repent from anything that isn't -- that is
false.

        THE COURT:  Mr. Quinley, it is --

        MR. QUINLEY:  It is past, Your Honor?

        THE COURT:  It is past.  That's it.  No more

questions.

        MR. QUINLEY:  Last?

        THE COURT:  No.  No more.  No more.

        MR. QUINLEY:  It's rhetorical.

        THE COURT:  No more.

        MR. QUINLEY:  Thank you, Your Honor.

        THE COURT:  Mr. Johnson, anything else you wish to

say in Redirect of yourself, briefly?

1          MR. JOHNSON:  Yeah, the only thing I would probably

2     address is my prior conviction that was brought up.

3          THE COURT:  Okay.

4          MR. JOHNSON:  Okay.  In that prior conviction -- And,

5     again, I maintain my innocence, I do not repent of my actions

6     that were taken.  My partner and I, which was a co-conspirator

7     mentioned earlier in the trial -- Dale Scott Heineman and I

8     formed a company called the Dorean Group.  The Dorean Group

9     was a group intended to help people challenge the validity of

10    their mortgage.  It was not a debt elimination scheme, it was

11    a debt validation service.

12          The trial was based on vapor money theory, and the

13    theory very simply is that a person claims that they don't owe

14    a mortgage because the banks create money out of thin air, and

15    that's how the vapor money theory developed.  That is not my

16    theory at all and it had nothing to do with my documentations.

17    That's the public propaganda of the Government and was

18    instituted by the very Judge that referred me to criminal

19    prosecution and handled my criminal case.

20          THE COURT:  Okay.  Anything else?

21          MR. JOHNSON:  That's it.

22          MR. QUINLEY:  Nothing further.

23          THE COURT:  Okay.  Ladies and gentlemen of the jury,

24    we are going to stand in recess until 1:15.  When you come

25    back we will start the final phase of this trial, which will

be me reading the jury instructions to you and you will hear

the closing arguments of Mr. Quinley and Mr. Johnson.

Stand in recess for one hour.

THE CLERK:  All rise for the jury.

(Jury out.)

(Following a recess, proceedings in open court; jury

not present.)

THE COURT:  Okay.  We are on the record of the *United*

*States of America v. Kurt Johnson.*  We have heard all the

testimony in this case and are ready to go to read the jury

instructions and closing argument.  But, this morning the

Clerk of Court here, Mr. Johnson, received your Motion to

Dismiss Indictment.

MR. JOHNSON:  Yeah, I thought that was going to be

scanned to you a few days back.

THE COURT:  It wasn't.  This was the first time of

seeing it this morning.  It starts out by saying, "This motion

may be considered untimely," and then it goes through the

grounds false designation, merger, and Title 18.  The Court

has read it over.  Anything you wish to add in terms of

argument to your motion to dismiss the indictment?

MR. JOHNSON:  I will just say that I believe you have

already handled the false designation as part of procedures

before.  The other two issues have not been addressed.

THE COURT:  Do you wish the motion to speak for

```
 1   itself or do you wish to address the other two issues?

 2             MR. JOHNSON:  I believe it will speak for itself.

 3             THE COURT:  Mr. Quinley?

 4             MR. QUINLEY:  Your Honor, I do believe the Court

 5   actually did address the first issue and I think it's really

 6   the third issue, too, on Friday -- Your Honor, I can no longer

 7   remember the sequence in time, or maybe it was Monday.

 8             In the merger argument it was also raised by

 9   Mr. Johnson, even during these proceedings, and I think the

10   Court addressed that then and then can revisit it if it's

11   still an issue after the verdict.

12             I think basically the thing is that Mr. Johnson feels

13   like the two counts for both True and Hill --

14             THE COURT:  Should be bifurcated.

15             MR. QUINLEY:  Well, or that they really are charged

16   -- They are based upon the same conduct.

17             THE COURT:  Same conduct, yeah.

18             MR. QUINLEY:  So, and then we have to go through the

19   blockbuster test.  I have done the legal research, we were

20   ready to respond.  I don't think it's necessary.  I think that

21   can be reserved, because there's no prejudice in proceeding.

22   We will get to the question of whether it's two punishments

23   for the same thing if they return guilty verdicts on all the

24   counts.

25             THE COURT:  Okay.  The Court is going to deny the
```

motion to dismiss the indictment finding, first of all, that
it is untimely, but will reserve ruling -- I mean, will
possibly reconsider it depending upon the jury verdict, okay?

MR. JOHNSON:  Thank you.

THE COURT:  All right.

Okay.  Are we ready to proceed?  Do you understand
the rules; 30 minutes, and then ten?

MR. QUINLEY:  Yes, Your Honor, except I also thought
I had time to go to the bathroom.

THE COURT:  Go, go, go, go.  I thought you would have
done, that, too.

MR. QUINLEY:  Yes, I would have, but I was summonsed.

I'll hurry.

(Brief interruption in proceedings).

MR. JOHNSON:  Your Honor, do you want me to do
closing arguments from here?

THE COURT:  Yes, and he's going to do closing
arguments from there.

MR. JOHNSON:  Okay.

(Brief interruption in proceedings).

THE COURT:  Bring the jury in.

(Jury in).

THE CLERK:  Please be seated.

THE COURT:  Ladies and gentlemen of the jury, we are
now going to begin the final phase of this trial.  I'm going

1    to read the instructions to you.  Each of you will have a copy

                2    of the instructions in the jury room when you begin your

                3    deliberations and one copy of the verdict forms.

                4           After I read the instructions you are going to hear

                5    the closing arguments of Mr. Quinley and Mr. Johnson.

                6           I have allowed each of them 40 minutes.  Mr. Quinley,

                7    because the burden of proof is on the Government, has the

                8    opportunity to go first and last.

                9           And then after the closing arguments you will then

               10    retire to begin your deliberations on the verdict and you will

               11    have those exhibits that have been admitted into evidence and

               12    I have allowed to go back to the jury room.

               13           You will also see on your screen, I guess Mr. Self is

               14    going to be putting the instructions up on your monitor as I

               15    read them.

               16           Members of the jury, I will now instruct you on the

               17    law that you must follow in deciding this case.  I will also

               18    give each of you a copy of these instructions to use in the

               19    jury room.  You must follow all of my instructions about the

               20    law even if you disagree with them.  This includes any

               21    instructions I gave you before the trial, any instructions I

               22    gave you during the trial, and the instructions I am giving

               23    you now.

               24           As jurors you have two duties.  Your first duty is to

               25    decide the facts from the evidence that you saw and heard here

1  in court.  This is your job, not my job, or anyone else's job.

2           Your second duty is to take the law as I give it to

3  you, apply it to the facts, and decide if the Government has

4  proved the Defendant guilty beyond a reasonable doubt.

5           You must perform these duties fairly and impartially.

6  Do not let sympathy, prejudice, fear, or public opinion

7  influence you.

8           You must not take anything I said or did during the

9  trial as indicating that I have an opinion about the evidence

10 or about what I think your verdict should be.

11          You must make your decision based only on the

12 evidence that you saw and heard here in court.  Do not

13 consider anything that you may have seen or heard outside of

14 court, including anything from a newspaper, television, radio,

15 the internet, or any other source.

16          The evidence includes only what the witnesses said

17 when they were testifying under oath and the exhibits that I

18 have allowed into evidence.

19          In addition, you may recall that I took judicial

20 notice of certain facts that may be considered as accurately

21 and readily determined from sources whose accuracy cannot be

22 reasonably questioned.  You may accept these facts as proved,

23 but you are not required to do so.

24          Nothing else is evidence.  The lawyers' statements

25 and arguments are not evidence.  If what a lawyer said is

1  different from the evidence as you remember it, the evidence

2  is what counts.  The lawyers' questions and objections

3  likewise are not evidence.

4       A lawyer has a duty to object if he thinks a question

5  is improper.  If I sustained objections to questions the

6  lawyers asked, you must not speculate on what the answer might

7  have been.

8       If during the trial I struck testimony or exhibits

9  from the record or told you to disregard something, you must

10 not consider it.

11      Give the evidence whatever weight you decide it

12 deserves.  Use your own common sense in weighing the evidence

13 and consider the evidence in light of your own everyday

14 experience.

15      People sometimes look at one fact and conclude from

16 it that another fact exists.  This is called *inference*.  You

17 are allowed to make reasonable inferences so long as they are

18 based on the evidence.

19      You may have heard the terms "direct evidence" and

20 "circumstantial evidence."  Direct evidence is evidence that

21 directly proves a fact.  Circumstantial evidence is evidence

22 that indirectly proves a fact.  You are to consider both

23 direct and circumstantial evidence.  The law does not say that

24 one is better than the other.  It is up to you to decide how

25 much weight to give any evidence, whether direct or

1  circumstantial.

2        Part of your job as jurors is to decide how

3  believable each witness was and how much weight to give each

4  witness's testimony, including that of the Defendant.  You may

5  accept all of what a witness says or part of it or none of it.

6        Some factors you may consider include:  The

7  intelligence of the witness;

8        The witness's ability and opportunity to see, hear,

9  or know the things that the witness testified about;

10        The witness's memory;

11        The witness's demeanor;

12        Whether the witness had any bias, prejudice or other

13  reason to lie or slant the testimony;

14        The truthfulness and accuracy of the witness's

15  testimony in light of the other evidence presented; and,

16        Inconsistent statements or conduct by the witness.

17        Do not make any decisions simply by counting the

18  number of witnesses who testified about a certain point.  You

19  may find the testimony of one witness or a few witnesses more

20  persuasive than the testimony of a large number.  You need not

21  accept the testimony of the larger number of witnesses.

22        What is important is you how truthful and accurate

23  the witnesses were and how much weight you think their

24  testimony deserves.

25        If you have taken notes during the trial, you may use

them during deliberations to help you remember what happened
during the trial.  You should use your notes only as aids to
your memory.  The notes are not evidence.  All of you should
rely on your independent recollection of the evidence, and you
should not be unduly influenced by the notes of other jurors.
Notes are not entitled to any more weight than the memory or
impressions of each juror.

It is proper for an attorney to interview any witness
in preparation for trial.

You may consider evidence that the Defendant was
convicted of a crime only in deciding the believability of his
testimony.  You may not consider it for any other purpose.

You have heard testimony that the Defendant committed
crimes, acts, or wrongs other than the ones charged in the
indictment.  Specifically, you have heard evidence that
Defendant attempted to cause the filing of fraudulent
involuntary petitions under Title 11 bankruptcy proceedings
and fraudulent IRS Forms 1099-C, Cancellation of Debt.  Before
using this evidence you must decide whether it is more likely
than not that the Defendant did these crimes, acts, or wrongs
that are not charged in the indictment.  If you decide that he
did, then you may consider this evidence to help you decide
the Defendant's motive, preparation, plan, knowledge, and
intent to defraud in relation to the crimes charged in the
indictment.  You may not consider it for any other purpose.

1        The Defendant has decided to represent himself in

2   this trial.  He has a constitutional right to do that.  His

3   decision has no bearing on whether he is guilty or not guilty,

4   and it should not affect your consideration of the case.

5        Because the Defendant has decided to act as his own

6   lawyer you have heard him speak at various time during the

7   trial.  He may make an opening statement and closing argument,

8   he may ask questions of witnesses, make objections, and argue

9   to the Court.  I want to remind you that when the Defendant

10  speaks in these parts of the trial he is acting as his lawyer

11  in the case.  The only evidence in this case comes from

12  witnesses who testified under oath on the witness stand from

13  exhibits that are admitted and facts judicially noticed.

14       The Defendant wore prison clothes throughout this

15  trial.  You cannot infer the Defendant is guilty in this case

16  just because of a prior conviction that led to his current

17  wardrobe.  A prior conviction is not evidence of the

18  commission of a crime in this case.

19       The charges against the Defendant are in a document

20  called an indictment.  You will have a copy of the indictment

21  during your deliberations.  The indictment in this case

22  charges that the Defendant committed the crimes of bankruptcy

23  fraud and false declaration in bankruptcy.  The Defendant pled

24  not guilty to the charges.

25       The indictment is simply the formal way of telling

the Defendant what crimes he is accused of committing.  It is not evidence that the Defendant is guilty and it does not even raise a suspicion of guilt.

The Defendant has been accused of more than one crime.  The number of charges is not evidence of guilt and should not influence your decision.  You must consider each charge and the evidence concerning each charge separately. Your decision on one charge, whether it is guilty or not guilty, should not influence your decision on any other charge.

The Defendant is presumed to be innocent of the charge.  This presumption continues throughout the case, including during your deliberations.  It is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that the Defendant is guilty as charged.

The Government has the burden of proving the Defendant's guilt beyond a reasonable doubt.  This burden of proof stays with the Government throughout the case.

The Defendant is never required to prove his innocence.  He is never required to prove any evidence at all.

The indictment in Counts 1 and 2 charges the Defendant with bankruptcy fraud.  In order for you to find the Defendant guilty of this charge, the Government must prove each of the following elements beyond a reasonable doubt:

1          1, the Defendant devised or intended to devise a

2    scheme to defraud as described in the indictment; and,

3          2, the Defendant acted with the intent to defraud;

4    and,

5          3, the Defendant's act was material; that is, it had

6    a natural tendency to influence or was capable of influencing

7    the acts of an identifiable person, entity, or group, such as

8    creditors or credit reporting services; and,

9          4, the Defendant filed a fraudulent involuntary

10   petition under Title 11 bankruptcy proceeding to carry out or

11   attempt to carry out an essential part of the scheme.

12          It does not matter whether the scheme or plan was

13   successful or that any money or property was obtained.

14          If you find from a consideration of all the evidence

15   that the Government has proved each of these elements beyond a

16   reasonable doubt, then you should find the Defendant guilty of

17   that charge.

18          If, on the other hand, you find from your

19   consideration of all the evidence that the Government has

20   failed to prove any one of these elements beyond a reasonable

21   doubt, then you should find the Defendant not guilty of that

22   charge.

23          A scheme is a plan or course of action formed with

24   intent to pleasure some purpose.

25          A scheme to defraud is a scheme that is intended to

cheat another and cause the potential loss of money or property to another by means of materially false representations.

A person acts with intent to defraud if he acts knowingly with the intent to cheat the victim by attempting to cause the potential loss of money or property to the victim.

A material matter is one that is capable of influencing the Court, any creditor, or any credit reporting service.

The Government is not required to prove that the statement actually influenced the Court, any creditor, or any credit reporting service.

The indictment in Counts 3 and 4 charges the Defendant with false declaration in bankruptcy.  In order for you to find the Defendant guilty of this charge, the Government must prove each of the following elements beyond a reasonable doubt:

1, there was a bankruptcy proceeding as described in the indictment;

2, the Defendant made a declaration in relation to the bankruptcy; and,

3, the declaration related to some material matter; and,

4, the declaration was false, and,

5, the Defendant made the declaration knowingly and

1    fraudulently.

2         If you find from your consideration of all the

3    evidence that the Government has proved each of these beyond a

4    reasonable doubt, then you should find the Defendant guilty of

5    that charge.

6         If, on the other hand, you find from your

7    consideration of all the evidence that the Government has

8    failed to prove any of these elements beyond a reasonable

9    doubt, then you should find the Defendant not guilty of that

10   charge.

11        A person acts knowingly if he realizes what he is

12   doing and is aware of his nature and conduct and does not act

13   through ignorance, mistake, or accident.  In deciding whether

14   the Defendant acted knowingly, you may consider all of the

15   evidence, including what the Defendant did or said.

16        The indictment charges that the crimes happened on or

17   about January 8, 2018.  The Government must prove that the

18   crimes happened reasonably close to that date.  The Government

19   is not required to prove that the crime happened on that exact

20   date.

21        Once you are all in the jury room, the first thing

22   you should do is choose a foreperson.  The foreperson should

23   see to it that your discussions are carried on in an organized

24   way and that everyone has a fair chance to be heard.  You may

25   discuss the case only when all jurors are present.

1    Once you start deliberating, do not communicate about

2    the case or your deliberations with anyone except other

3    members of your jury.  You may not communicate with others

4    about the case or your deliberations by any means.  This

5    includes oral or written communication, as well as any

6    electronic method of communication, such as telephones, cell

7    phone, smart phone, iPhone, Blackberry, computer, text

8    messaging, instant messaging, the internet, chat rooms, blogs

9    websites, or services like Facebook, MySpace, LinkedIn,

10   YouTube, Twitter, or any other method of communication.

11   Verdict forms have been prepared for you.  You will

12   take these forms with you to the jury room.  When you have

13   reached a unanimous agreement, your foreperson will fill in

14   the verdict form and each of you will sign it.

15   The verdict must represent the considered judgment of

16   each juror.  Your verdict, whether it would be guilty or not

17   guilty, must be unanimous.  You should make every reasonable

18   effort to reach a verdict.  In doing so you should consult

19   with each other, express your own views, and listen to your

20   fellow jurors' opinions.  Discuss your differences with an

21   open mind.  Do not hesitate to reexamine your own view and

22   change your opinion if you come to believe it is wrong.  But,

23   you should not surrender your honest belief about the weight

24   or effect of evidence just because of the opinions of your

25   fellow jurors or just so there that can be a unanimous

```
 1  verdict.
 2          The 12 of you should give narrow and equal
 3  consideration to all the evidence.  You should deliberate with
 4  the goal of reaching an agreement that is consistent with the
 5  individual judgment of each juror.
 6          You are the impartial judges of the facts.  Your sole
 7  interest is to determine whether the Government has proved its
 8  case beyond a reasonable doubt.
 9          Then you have four verdict forms.
10          The first reads, We, the jury, find Kurt F. Johnson"
11  -- you write in *guilty* or *not guilty* -- "of bankruptcy fraud
12  as charged in Count 1 of the indictment."  Again, you will
13  have the charge with you in the jury room.
14          The second verdict form relates to Count 2 of the
15  bankruptcy fraud.  Again, you put in *guilty* or *not guilty*.
16          The third verdict form relates to Count 3, the false
17  declaration of bankruptcy.
18          And then the last verdict form charges -- relates to
19  Count 4, the false declaration of bankruptcy.
20          So, those are the instructions.  Each of you will
21  have a copy of the instructions along with one copy of the
22  verdict form when you begin your deliberations.
23          We are now going to hear the closing arguments of
24  Counsel.
25          Mr. Quinley, you may proceed.
```

1      MR. QUINLEY:  Thank you, Your Honor, Mr. Johnson.

2      It's a little bit hard to know where to begin, but I

3 am simply going to go through the indictment and through what

4 we call the Verdict Directors in the instructions and a few of

5 the other instructions and try to relate them to the evidence

6 that you have heard in this case and I hope in that process be

7 helpful in your deliberations.

8      But, I really do feel like I also have to begin

9 before going through that process with you over the next 30

10 minutes -- And it may take 30 minutes, so please bear with me.

11 But, I want to thank you for your patience and your attention.

12 This has not been the easiest trial.  We are here now on the

13 third day, so not in the regular run of things a long trial,

14 not something that would fill Exhibit 3.  And, as you heard in

15 testimony, there's another 4 that would have been the same

16 size, basically all the same documents, one court filing and

17 court proceeding for William True in Bankruptcy Court; not

18 this court, but the Bankruptcy Court across the hall or in

19 East St. Louis.  Judge Grandy, Laura Grandy presided over this

20 proceeding in that bankruptcy matter.  Not even as many

21 documents as were filed with Judge Herndon in the Defendant's

22 habeas proceeding that he filed in 2017.  The two appeals

23 taken from the dismissal of the bankruptcy certainly were much

24 briefer, and Judge Rosenstengel disposed of the Defendant's

25 case against the Postmaster General of the United States in

pretty quick order, and so it's a very thin file.

        But, you have had to listen to all of this about all these proceedings to render judgment on this criminal case. But, again, thanking for your patience and your attention, I feel like I need to mention that really it seems as if there should be a jury for all the Defendants' complaints sitting on his civil *Bivens* lawsuit as Judge Herndon directed him to, to have a Court and a jury determine the truthfulness about the complaints of his confinement and to determine whether he's entitled to any damages at all.

        But, you are not a jury sitting on that. You are a jury sitting on the trial of criminal charges against this Defendant. And, why? Why are we here in this proceeding? Because Mr. Johnson doesn't want a process that is fair, he doesn't want the people that he's charging, whether it's the United States Bureau of Prisons or its warden or its employees, in a lawsuit against them where they do get to answer his allegations, because there's a Court presiding over the process where they do get to have a jury determine the validity of those allegations and to get a jury to assess. Is it worth a $1 if they find in his favor, or maybe more? Not 20 billion or 21 billion or 23 billion or millions, or what have you and, frankly, then there would be a Judge to control whether or not that was reasonable. But, that's not a process Mr. Johnson wants. No, he has a belief that is so useful to

him, a weaponized belief.

Who can respond to his processes that he is in complete control of since they are products of his own imagination and as much as he can type, and his remedies and his demands for answers without any legal process at all, without any Court, without any proceeding, without any appeals? And if he just keeps repeating it he can't even be held accountable in his mind, because he believes it.

Well, just as Mr. Adam Hanna said when he was being cross-examined by the Defendant and the Defendant was talking about his imaginary administrative processes, Mr. Johnson, it just doesn't work that way, and you all know that as a matter of common sense. So, now you are sitting there thinking, *yeah, but does he believe it?* Well, I'm going to submit to you, ladies and gentlemen, first, it doesn't matter, and, then, two, that it doesn't matter. Because this supposed belief -- And in reality it is a supposed belief. But he's a smooth con man, because he will never relinquish it in any of his communications, but it's so useful to him because at least he thinks, completely immunized, he can pressure and punish his captors and he can pressure and punish Courts that have had to deal with him and he can even try to pressure and punish the Clerk of this Court, Justine Flanagan.

And you saw his communication with Agent Jeschke. I mean, if you get a chance in the jury room, look at it again.

It's the second letter to him, No. 45.  And the style of the
communication to Mr. Jeschke -- I will suggest to you you just
read it.  It's kind of like, "Stay on my good side or I will
come after you, too."

You know, again, I think I need to thank you and His
Honor and everyone in this courtroom for their patience.

Mr. Johnson uses legitimate legal processes, the
habeas, and once he's in a process he uses that to continue
the harassment.

You know, and he's treated with dignity and respect
as he should be, as every human being should be, but just
think about the damage he's able to accomplish.  And, you
know, he complains about this secret prison.  Well, heck, you
have Exhibit 50, and I think I already pulled it out, you
know, we are going to do this in connection with, because I do
want to get into the indictment and the charges.  We will do
this in connection with Exhibit 1.

And, Your Honor, I'm going to ask Mr. Self to stay so
that he can show the items as we go through this.

And may I ask, Your Honor, I don't know how long I
just spent in introductory remarks.

THE COURT:  Well, I'll tell you how long you spent.
About ten minutes.

MR. QUINLEY:  And the deadline would be, then --

THE COURT:  20.

```
 1            MR. QUINLEY:  Right.

 2            THE COURT:  And if you want to encroach into your

 3    last ten minutes, you can.

 4            MR. QUINLEY:  All right.  Well, appreciate that, Your

 5    Honor.

 6            You know, in this secret prison they had this

 7    petition filed, and you know it was filed by the mother on

 8    Mr. Johnson's behalf.  There's no dispute about that.  But,

 9    just think how his mother was able to file it first without

10    the forms.  You saw that at the beginning of the civil matter

11    opened in error.

12            I pulled 50 out.

13            You will see it in the evidence.

14            Oh, great.

15            So, you know, bless Officer Simmons.  What an

16    incredible job to have to monitor every piece of mail incoming

17    and outgoing and all the conversations in realtime and all the

18    e-mail just trying to prevent harm, but also balancing.  And

19    we know from the evidence, Exhibit No. 50, Ms. Nell Leffel

20    testified to it, you know, her son addressed it, he put in it

21    in an envelope and he sent it to her.

22            Now, what's the basis for the indictment of the

23    Defendant, the actual charge?  Well, if we turn to the second

24    page, there it is.  There's the claim, this nonexistent

25    judgment.
```

1       By the way, the Court has taken judicial notice it

2  doesn't exist from publications of a public authority.

3  There's no question about that.

4       Now, Mr. Johnson is only left with "Ahh, but I

5  believe."  So, at any rate, he succeeds in the crime, it does

6  actually get filed using Form 105.  This actually gets filed

7  as an action in Bankruptcy Court, gets opened and gets noticed

8  by creditors or potential creditors or people who want to

9  provide credit services, and it sure as heck would have been

10 picked up by the credit reporting services.  Thankfully, from

11 the witnesses, it has not been picked up on their credit

12 reports, but this had the potential of harm for them.

13      Now, how did Ms. Nell Leffel get this to attach it to

14 a petition?  It went right in the mail.  Here is Exhibit 50,

15 here's the envelope.  And if you just take a look at what was

16 sent, signed by Mr. Johnson, again penalties of perjury as

17 referenced, you can see it's the exact same document.

18      And we can go down to the bottom of it, please.

19      You can see the reference to 28 U.S.C. Section 1746,

20 and that's Mr. Johnson's signature.

21      So, you know, it goes right through the system.  Why

22 did it go through the system?  Because it didn't have a Form

23 105 attached to it.  And apparently he's got this friend up in

24 Iowa, Mr. -- what was it -- Gashler, who apparently helped the

25 mother get the Form 105s and, in fact, probably filled them

out, according to his mother, that she just mailed them.

First she only mailed this, and that's why it got opened up as a civil matter, but then she messed up and her son communicated to the Court and said that she messed up and asked that it be opened up as a bankruptcy, and it was.

Now, perhaps that could have been prevented, but there isn't any question that that's what Mr. Johnson was attempting to do and he succeeded. And, as soon as he succeeded, now his attempt to harm has gone beyond his own fantasies and his own creations and his own endless writing to something that has real consequences. I think, as Mr. Simmons tried to tell you, they cannot control all the imaginations of the inmates. They just try to control UCC forms, tax forms, like the 1099-C, the 105 once they discovered that this was a weapon that inmates would try to use. And not just inmates; people outside the prisons, too. So, but, of course, then they are not in a Communications Management Unit.

So, one of the things you have to do is you have to assess the credibility of Mr. Johnson. I think you can assess it in the context of all these facts. In fact, you can consider on his plan and his motive and his intent to defraud and all of those mental elements, you can consider his efforts to get this out in November of 2016 through Mr. Sherak in order to begin his campaign against his captors and that he would escalate to bigger fish if he didn't get the results

that he wanted and that Washington might just want to get rid

of him because all heck was going to break loose.  And he even

tells his father, "If all goes well, I will be out by

February."  And, I actually do think that's delusional, but

all the rest of this is his weapon.  And why would he stop

using this weapon, ever?  It serves his purposes, he gets what

he wants, he gets to punish his captors.  Can you just imagine

through this entire trial -- And we will continue for as long

as he's there.  Kathy Hill, as long as she continues to work

there, Kathy Hill has to be there every single day to work

with this guy, and yet she does it and yet her harassment

continues.  But, here with these filings he's crossed the line

into a crime, a prosecutable crime, a crime for which you on

the evidence and under these instructions of law can hold the

Defendant to account.  He believes -- He believes that he

should walk free.  And I would just ask -- And I don't think

anyone is.  But, I would just ask if anyone is tempted at all

to just consider whether or not he's trying to con you.  And

don't be a victim, another victim of his con, because he has

some.

          Monya Ballah, who sends out these 1099s, bless her,

is a victim of his con.  His mother, instinct of a mother, but

to some extent also is victimized by his con.  His wife of

promise running his errands is a victim of his con.  I mean,

it's -- And no surprise that his quote/unquote friend, Stephen

Sherak, would even use everything that Mr. Johnson has created

to do some more conning, particularly of Johnson's mother.

At any rate, let's take a quick look. And, again, I

know I only asked for a two-minute warning, but what was the

end time for the first 30?

THE CLERK: 2:04.

MR. QUINLEY: 2:04. Okay, that's good. So, you have

got the indictment and the statement there. Let's take a

look, if we can turn to the first Verdict Director. And the

indictment is here.

Okay. So, in the indictment, which you will have and

we displayed this on opening, the first six paragraphs of the

indictment described the scheme. Of course, you know that

there is evidence beyond the scheme derived here, because it's

all relevant to the larger scheme that shows his motive and

his intent to defraud.

So, did he devise a scheme? Well, I think it's

pretty clear. The indictment says that he was going to -- he

decided he was going to use involuntary bankruptcy petitions

on Hill and True, and we know that this is a long-term plan.

I mean, he had Kathy Hill as name number one amongst the

documents seized from Stephen Sherak before he was getting out

that he tried to sneak out of the prison then. I mean, we

know that as least as of November of 2016, he's beginning to

try to execute his plan and the communications that are

contained in there.  And, we also know that even though these
1099-Cs -- You know, this actually got filed and this actually
had real consequences.  The 1099-Cs are right in there with
the same plan that, you know, Hill cancelled that.  It's
pretty easy to cancel a billion dollars that isn't real, but
he thinks he can create havoc and pressure, and I think he
just acknowledged it on cross-examination amongst his captors.

So, it describes the scheme.  It says, "An
involuntary bankruptcy proceeding is a costly use of time and
resources."  Obviously.  Obviously.

And, they could have had their consumer credit
negatively impacted, both the warden and Ms. Hill.

And, as part of this scheme he's going to use this
false claim about a judgment of the World Court that doesn't
exist, they don't hear individual grievances, the Court took
notice that.  But then he says, "Well, it's somewhere else.
They don't publish my kind of proceedings."  And, of course,
these are proceedings that he's in prison, but some unnamed
person is there or he gives you names.

Judge Donoghue is real, but it's pretty hard to take
all these fictitious names or make-believe names or names just
pulled out of a book or some unknown source.  There's not much
you can do with that.

And, Mr. Massey.  Isn't it wonderful that he's
discharged Mr. Massey completely, some strange document, again

his creation.  Where is Mr. Massey's signature on that
document?  It's all unilateral, it's all his own creation, his
own devices.

So, at any rate, there is no creditor/debtor
relationship.  He can't do it, but he's going to file these
things anyway because he knows if he can succeed in filing
them that it will damage them, and that's the intent.

So, but the elements are that he acted with this
intent to defraud.  Now, again, he doesn't have to have any
expectation he's going to get any money.  By the way, if you
want to enforce a judgment, you can file a lawsuit to enforce
a judgment.  There are collection procedures.  You don't go to
an involuntary bankruptcy to enforce a judgment.  And, of
course, there is none.  And, of course, it's material, because
it does have a natural tendency if there's a public filing,
yes, credit agencies, creditors, that is public, it will come
to their attention.  It did come to their attention that we
saw from all the mail received by each of the two victims.
And, of course, it's the filing of the petition that was
necessary to attempt to carry out this part of his scheme.

So, I think -- I think the Government has met its
burden.  Of course, you are the people who will determine
that, but that each of these elements is proven beyond a
reasonable doubt.

Let's take a look at next what I call the Verdict

Director.  But, let's go through it, the next one, because

there are some important definitions here.

You know, these terms, it's kind of like what do they

mean?  Well, the Court provides some assistance on what they

mean.  Clearly a scheme is a demand.  But, a scheme to defraud

is a particular kind of scheme.  And in this instance many

particular types of schemes are to get something.  But in this

case a scheme is intended to cheat another and cause the

potential loss of money or property to another by means of

materially false representations.  And that's exactly what we

have here, the potential loss and credit and credit worthiness

that would result.

The next instruction, please?

"A person acts with intent to defraud if he acts

knowingly."  So, that's without mistake or accident, right?

He knows exactly what he's doing and he uses this weapon of

his professed belief and what's unbelievable.  If he acts

knowingly with intent to cheat the victim by attempting to

cause the potential loss of money or property to the victim.

He knows what he's doing and he thinks he has this ironclad

shield to protect him from any consequences.

Next.

Remember, he doesn't like the fact that he gets

disciplined within the prison, because he said, "I have a

right to file an involuntary bankruptcy against all my

debtors." He doesn't have any debtors; he only has people
he's trying to cheat or harm.

A material matter is one that is capable of
influencing the Court or any creditor or any credit reporting
service. It's clear by this bankruptcy when they look at the
back of the filing, and that's enough to get included on the
report. They can't go behind it, can't delve into it and
figure out, "Oh, but it's just a prisoner trying to create
havoc." No, the damage will be done and was done. And we are
not required to prove that the statement actually influenced
the Court, any creditor, or any credit reporting service. A
lot of businesses wasted some time sending it to Kathy Hill
and William True. Remember what Kathy Hill said? You know,
this is continuing. She doesn't discuss this with the
corrections officers or the other people who are not involved,
and yet all this mail keeps coming into the prison mail room
and it's embarrassing.

Next. So, now we get to the other two counts of the
indictment. And you might say, "Isn't this the same thing?"
And I tend to agree that it's very, very similar, because it's
based upon exactly the same conduct. But, here, instead of
punishing the scheme which is charged under 157, now we are
actually punishing the false declaration itself, and it's
because it's in the bankruptcy proceeding. That's this
Section 152.

1        And, so, what are the elements?  You have to have a

2   bankruptcy proceeding.  18-BR -- that's bankruptcy -- 40014,

3   that's for Mr. True.

4        Exhibit 4, which we did not recreate the entire

5   binder, is 18-BR-40015-LTG.  Now, we do have -- And, here it

6   is.  We do have the initiating document marked as its own

7   Exhibit 2.  So, we have -- And the bankruptcy number is right

8   up there at the top of the document.  So, you will see in the

9   document that Count 3 refers to the first against Mr. True and

10  then Count 4 refers to second against Ms. Hill.

11       And, of course, you will see right at the top if we

12  pull it down -- It's at the very top; the very, very, very

13  top.  There you go.  There's the case number.

14       Now, it does get sealed later, but it's a day later.

15  Not the same day, it's the next day.  And that's why they are

16  getting all this mail.  It was out in the public overnight.

17  You know, it's filed on the 8th, it doesn't get sealed until

18  the 9th, and you have heard that in testimony.

19       So, what about the other elements?  Obviously his

20  declaration that he puts in Appendix A that there's this $20

21  billion debt to him, that's a declaration in relation to the

22  bankruptcy, it's what it's based on, and, in fact, later he

23  even incorporates what he calls a judgment in which Judge

24  Grandy told him, "That's not a judgment."  You know, obviously

25  these are declarations in relation to the bankruptcy

proceeding and, of course, they are material.  It's the debt

he claims that doesn't exist, and it's false.

And then, most importantly, 5.  The Defendant made

the declaration knowingly and fraudulently.  Well, you have

had the definition of knowingly and so he doesn't act with

mistake or accident.

Let's go to the next one and see if we get any

additional definition.  There we go.

"A person acts knowingly if he realizes what he is

doing and is aware of the nature of his conduct and does not

act through ignorance, mistake, or accident."  Nothing about

honest belief.  And, frankly, it's a dishonest belief.  It's

not ignorance.  This is obviously an intelligent man, a clever

man, a manipulative man.  It's not a mistake.  It's his

purpose, it's not an accident.  He goes to great lengths to

accomplish it.  He acts knowingly.

In deciding whether the Defendant acted knowingly you

can consider all the evidence, including what the Defendant

did and said, and he did and said plenty.

THE CLERK:  2.

MR. QUINLEY:  Thank you.  The, *on or about*, I think

that just makes sense.  But, the date of the filing was the

8th, or that it was transferred and opened in the Bankruptcy

Court.

Next instruction, please.

1            All right.  Well, we are past that.

       2            Well, what's fraudulent?  I think you can go right

       3     back to the definitions for attempt to defraud, all right?

       4     You know, so really in that fifth element -- not enough for it

       5     to be false.  That was the fourth element.

       6            Can we back up to that instruction?

       7            It has to be knowingly and fraudulent.  Well,

       8     fraudulent is simply done with the intent to defraud, all

       9     right?  That's what fraudulent is.  In other words, not only

      10     is it false, but you want to accomplish harm.  Now you are

      11     acting not only knowingly, but fraudulently.  And, his

      12     professed belief doesn't matter at all.

      13            Well, I think that might be the 30 minutes.

      14            THE COURT:  Okay.

      15            MR. QUINLEY:  All right.  I will wait to speak after

      16     the Defendant has.

      17            THE COURT:  Okay.  And we are going to take just a

      18     five-minute recess before we begin Mr. Johnson's closing

      19     argument.

      20            THE CLERK:  All rise for the jury.

      21            (Jury out).

      22            (Following a recess, proceedings continue in open

      23     court; jury present).

      24            THE CLERK:  Court is now in session.  You may be

      25     seated.

1          THE COURT:  Ladies and gentlemen, of the jury you may

2    be seated.

3          MR. JOHNSON:  Ladies and gentlemen of the jury, I do

4    first want to thank you for your time and the inconvenience.

5          In the beginning of my opening statement I told you

6    that truth mattered and I told you that I thought there would

7    be a lot of lies in this proceeding.

8          Again, I want to go over that truth has its own way

9    to be found.  And the empirical certainty that I would like to

10   deliver to you in this trial has not happened.  If you have

11   all seen the Wizard of Oz, the wizard was always behind the

12   curtain, and truth of the matter is there's a man pulling

13   levers, but the curtain disguises that truth.

14         I haven't been able to pull that curtain down,

15   because that would be the judgment that is right here or the

16   judgment is filed here and/or that Judge Donoghue was here to

17   testify.  These would be empirical certainties.  The only

18   thing I was able to do, honestly, is to crack open that

19   curtain.  And hopefully you can peer in with the small glimpse

20   that you were given and with the God-given grace that you can

21   use logic and logical consistency and your experience or

22   relevance and try to come up with a correspondence to the

23   reality that's been presented here that certain facts are

24   true.

25         I would also ask you to consider the vacuum that's

1   here in this particular proceeding.  There was no -- A web
2   page is all that was used to say that the judgment does not
3   exist.  The Government, with all its resources, did not
4   contact Judge Donoghue to say, "Does the judgment exist or
5   does it not exist?"  I'm prevented from doing the same thing.
6   That would be empirical evidence where she said it exists or
7   doesn't exist.
8           There was also Mr. Massey brought up in the closing
9   arguments of the prosecution.  He also wasn't present, and he
10  was a gentleman that used to work at this facility and left
11  because of his own ethical choices and concerns about the
12  crimes that were committed in there.  I was told that I have
13  to provide contact information in order for him to be found,
14  and he was not here.  This document that he referenced in his
15  closing arguments is not self-authenticating.  I asked him to
16  bring -- I would like him to come to this court and bring his
17  own copy, because we each had a copy of that document.
18          So, they keep saying that everything I am doing is
19  self-authenticating because I write my own documents.  You can
20  see I didn't even choose a lawyer.  And I am the type of
21  personality where I can't work with lawyers.  Nothing -- and
22  no offense across the table -- but I'm not a fan of lawyers, I
23  don't like lawyers at all.  I think their first duty is to
24  represent the Government and not their clients, and so I don't
25  even have a choice to accept a lawyer.

1        The other thing that came up in the beginning of this
2   trial is that you were all asked the type of associations that
3   you have, and I would like to mention that, you know, one of
4   the biggest associations that I think we share, even though I
5   am incarcerated and you are not, is *We, the People*.  And, we
6   the people, are the ones who created this Government, we are
7   the ones who wrote the constitution.  And I appreciate that
8   association, I appreciate what you guys are doing in
9   relationship to that association, but I don't believe this is
10  the type of Government that we intended to have.  I think this
11  is very much the deep state that Donald Trump has experienced,
12  and I certainly don't have his resources to take it on, but
13  everything that they do is to control the evidence, control
14  the way that things are presented, and to make their own
15  self-authenticating point of view.
16        I believe that I have presented enough evidence in
17  this trial based on some of the choices that you have to infer
18  that the judgment exists.  Banks don't offer $281 million for
19  the fanciful imaginations.  Even if it's generated on an
20  inmate's typewriter, they don't offer $281 million for that.
21  No bank will offer that kind of money without losing.  Whoever
22  makes that offer, that's a career ender if you don't do your
23  due diligence and validate the judgment which they were able
24  to do from the outside.
25        And, the other choice you have is circumstantial

evidence.  And, there's plenty of circumstantial evidence that judgment exists.  I have been consistent in all my representations and unwavering of my position for a couple of years.  That is not a scheme.  And to make your job easier, that was knowingly.  I am not arguing that I didn't do it knowingly; I had every knowledgeable intent to do it.

Where I think that I differ with the Government is that I intended to cheat somebody.  There's no fraudulent intent.  I believe I am executing with rightful authority the rights of a creditor, and a creditor doesn't cheat his debtors by trying to collect a debt.

The Government makes a lot of statements about the legal options that are available to me.  Those are not all the legal options, nor are they my favorite options.  Quite frankly, they are all Government-controlled options.  And I don't believe I have to choose a particular form of law.  I should be able to use the one that I think is available.  The treaty process is governed by the treaty, it's not self-authenticating.  You never see any opportunity for me to place my own signature to authenticate these judgments.  It was required by a hearing officer and then a judicial review.  That has nothing to do with me even though I created every document and tried to follow the treaty enough to get it approved.

What is the law?  To me, man doesn't make the law.

1    It started out a long time ago with 613 laws by Moses and was

2    later reduced down to 515 by David, and reduced down to 11 by

3    David, was reduced down to six by Isaiah, and three down by

4    Micah.  And, finally, you know, the three that Micah brought

5    up were to do what's right; love, mercy, and to walk humbly

6    before your God.  And even on those three laws, you know, I

7    would charge the Government -- I mean, the jury to consider

8    those.  Just do what's right.  And truth is required, because

9    the truth -- to know the truth, the truth will set you free.

10   The truth was that you are free, is the most quoted, but

11   that's not the most important part.  The most important part

12   is to know the truth.  And this particular trial was to test

13   the truth.  And I hope, regardless of what happened, that you

14   are able to see the truth in this very clouded room where

15   there's a lot of lies.

16          Jesus ultimately reduced it down to two laws; love

17   God with all your heart and love your neighbor as yourself.

18   Those are the laws that govern me, and I do not believe I

19   violated those laws at all for trying to enforce a right that

20   I collected in a legal process.  It may not be a legal process

21   that these people are familiar with, it may not be a legal

22   process they like or that they can validate or they choose not

23   to validate.  In either case, that's what I relied on as a

24   right, and I can't do what's right without a right, and so I

25   need a right to do what I did, and I believe I had that right.

1          That's where I think the line delineates.  If I could

2   show you the judgment, which I wish I could, if I could have

3   Judge Donoghue here, which I wish I could, that would be

4   certain what my right is and then you would know that I had

5   that right.  But, absent that I had to go with -- had to go

6   with the truth of the matter.  And I did act knowingly, but I

7   never intend to cheat anybody.  And even if there's harm

8   that's caused and consequences associated with it, it's not a

9   cheat to exercise a right.

10          The Government seems to think I should continue to

11  stay in their forms, and you can see that I have had no

12  success.  There's plenty of forms here.  I have tried to make

13  my point, I have tried to address all these claims and to get

14  in any court an opportunity to be heard.  And I actually

15  thought this might be my best opportunity with the power of

16  the Court to get the documents necessary, though this is the

17  hardest way to do it.  And, still, I don't feel I had a fair

18  trial in that regard.

19          So, I don't have to choose a civil jury and I don't

20  have to choose a *Bivens* action.  If a treaty provides a

21  remedy, the treaty is the supreme law of the land according to

22  the constitution, which makes it equal to the constitution,

23  and as I am entitled and you are entitled, which you are

24  doing, we are both doing, to rely on the constitution we can

25  rely on the supreme laws of the land, and I did, I relied on a

treaty.  And to exercise a right created by law is not a
weapon; it's a right.  And it's not a weapon for me to pick a
jury instead of a Judge's trial; it's a right.

And the Government keeps arguing that my belief is
self-authenticating and that I believe that their entire case
self-authenticating.  These people that you saw testify are
credible in their jobs, I'm sure.  They're probably even nice
people, but at the end of the day their points of view and
opinions are no different than mine except they can
authenticate them with Government after Government after
Government memo, this and that.  And all I had was a treaty
and a few documents to present.  But, fortunately for me, the
Judge, Judge Joan E. Donoghue, granted me relief.  If she
didn't grant me relief and grant the judgment you would have
never seen any of these documents, I would never be here,
because I'm not that person that would do these bankruptcies
without a judgment, without qualifying for 11 U.S.C. 303(b).

The argument is is it a legitimate process?  I say
absolutely it is.  It's not a process that any of these
lawyers are familiar with, probably this Judge is not even
familiar with it, but it's legitimate.  And they offered the
web page for you as evidence that the judgment does not exist.
I wanted to make it clear that the judgment is not going to be
found on the web page.  It's the administrative side of the
courts, it's not the judicial side.  And the judicial side is

state to state.  I have never claimed anything different than

that.  I'm not trying to twist words or twist opportunities,

and it's not fiction or fable or fabrication in my mind.  And

I have been very consistent and I think if you look at the

records, more than I testified here, I have testified in all

these documents consistently and voluminously about the rights

that I had and how I obtained them and how I got it.  And I

have never changed my tune.  I didn't have to look at

documents to tell you the dates; I have always been consistent

with that.  The Government has even testified to that.

A scheme is a scheme if there's an intent to defraud.

We all have a scheme to drive in our cars or go out and get a

hamburger.  A scheme is not that big of a deal.  And the

scheme for me was to execute a right without any intention to

defraud, without any criminal intention at all.  I can't cheat

my debtor.  And when the Government can put all this power

against you to hide the truth -- And what happens is they

cheat the creditor, which is what I have been saying all

along, is that I am the one getting cheated.  And that to me

is a scheme to defraud with intent.

As far as the 1099s, again that's not available to

anybody but a creditor.  They are a part of the scheme, but

they are not any different than the intent that goes along

with the judgments and the international treaty process.

Other than that, I would like -- might just charge

you to be sincere in your pursuit of truth.  I can't determine

what you are going to do.  This is the best case I was able to

put on under the circumstances, and whatever you do is right.

If you can follow the laws that really matter, the truth will

set me free.  I will leave it at that, and I thank you for

your time.

THE COURT:  Thank you, Mr. Johnson.

Mr. Quinley?

MR. QUINLEY:  Your Honor, and, again, Mr. Self, if

you could bring over the two treaties in force, perhaps 11 and

12.

Ladies and gentlemen, I don't know how much time you

want to spend.  Mr. Adam Hanna went through these.  The Court

took judicial notice there is no such treaty.  Mr. Johnson

helped us all to understand that this Uniform Postal Treaty --

Union Treaty also doesn't exist.  If the United States isn't a

party to it, then it is not the supreme law of the land.  You

can spend all the time you want both for 2017, well, and maybe

if it was amended in 1998, well, maybe we better look in 2000

all the treaties so that, you know, would have been in force

in 2014, 2015, 2016.  It doesn't exist.

And, you know, he has a photographic memory, he's

able to keep his cons facts.  He thinks it gives it greater

weight if he can recite dates and recite names.  He's got it

all memorized.  He's a very intelligent man.  There's no

ignorance there; there's just willfulness, plenty of willfulness. But, there is no treaty and the Court took judicial notice of the fact that there is no such treaty, and yet he says it's not cheating to exercise a right. But, there is no such right.

And, you know, this is the quandary he puts people in is, because he's in total control of his reality. There's nothing to test it against, because he has the imaginary processes, which, by the way, don't make any sense. It's just not the way any legitimate judicial system or administrative system, or whatever you want to call it, the way it would work. You don't get to name your own damages. You get to say, "I would like the jury to give me $20 billion," but you don't get to just declare it, or the 400 million or what have you. I mean, of course it's nonsense and it's not a treaty. There is no treaty, the Court took judicial notice of that.

He said he's not the type of person who would do this without a legal right. He's exactly the type of person who does this without a legal right, and he just uses all this claim, all these words in writing and verbally as a shield, as his defense.

And I'm sad to say, ladies and gentlemen, he even tries to appeal to our religious sensibilities. Shame on him. Shame on him of trying to use our faith to interfere with justice under our laws.

1          You know, he says, "Oh, yeah, there's many avenues."
2     You know, he knows of *Bivens* action.  But, what does he just
3     tell you?  He says, "Those aren't the legal options that I
4     want.  They are not my favorite options."  No, because he
5     would actually have to prove something.  He would actually get
6     a decisionmaker to say, "Mr. Johnson, that doesn't amount to
7     anything that warrants damages for you.  You know, you don't
8     have certain remedies because you have committed certain
9     crimes that have put you in prison for a good long time, and
10    now you are trying to commit crimes against the people charged
11    with taking care of you and protect the rest of us from you
12    and have to do it every day and have to treat him with dignity
13    and respect, but under rules that he cheats under that he
14    complains."  And so if he can do something with his claim of
15    right, which is no right whatsoever, to pressure them, to harm
16    them, he will enlist older ladies, his mother, his wife of
17    promise, his friends, who are also criminals to aid him in
18    these endeavors.

19         You know, all I can say -- and, Mr. Johnson chose to
20    represent himself -- that the con continues and it will go on
21    long before -- long after your verdict.  Banks don't offer
22    $281 million for something that's not real.  Well, what's real
23    about that?  The Deutsche Bank hasn't created any escrow
24    account, nor the bank of Abu Dhabi; I mean, fictions that
25    Mr. Johnson thinks can't be disproven, so he can simply assert

them and allege them.  And Sherak creates a letter?  Heck,

Sherak somehow got the IRS to cut a check for $3 million and

he's back in prison.

You know, all I can say is we, the people -- I kind

of like that, actually.  It begins our constitution.  We, the

people also serve on juries and have the awesome

responsibility to follow the law, to assess the evidence, and

then to render a verdict.  And it's not a pleasant task,

because all you can do is that job.  And, you know that that

has consequences, the Judge will be in charge of that.  But,

that's part of *We, the People*.

You know, he thinks he can choose what laws he likes,

what options he wants to pursue, and if the ones provided for

all the rest of us are not his favorite options, he's going to

create a superior one that he's in control of.

Well, just don't let him get away with it, because in

this instance he used that to harm Warden True and to harm

Kathy Hill.  Now, thank God, the harm was not extensive, but,

boy, it could have been, and he's going to keep this up.  But,

any time he actually succeeds, then it's the job of the United

States of America to prosecute him and for the Court to hear

the case and for a jury to render its verdict.

Thank you.

THE COURT:  Thank you, Mr. Quinley.

Okay.  Ladies and gentlemen of the jury, you have

heard all the evidence in the case.  I'm now going to ask you

to retire to begin your deliberations.  You will have the

exhibits that I have admitted into evidence and will be back

in the jury room.  It might take some time to get them all

back there.

    Would the Court Security Officer please stand to be

sworn?

    (Court Security Officer sworn).

    THE COURT:  Okay.  Please rise.

    (Jury out at 2:35 for deliberations).

    THE COURT:  Mr. Quinley, don't leave the courthouse

unless you let us know where you can be reached, okay?

    MR. QUINLEY:  (Nods).

    MR. JOHNSON:  Is that the same for me?

    THE COURT:  Yes.  Don't you leave the courthouse

unless we can reach you, okay?

    MR. JOHNSON:  Okay.  Sounds good.

    THE COURT:  All right.  That will be all.

    THE CLERK:  All rise.

    (Court in recess).

    (Jury notified of a verdict at 3:20 p.m.)

    THE COURT:  I have been informed that the jury has a

verdict, is that correct?

    Bring the jury in.

    (Jury in).

1          THE COURT:  It's my understanding the jury has

2   reached a verdict, is that correct?  Who's the foreperson?

3          VENIREPERSON 3:  I am.

4          THE COURT:  Robyn, do you want to get the verdict

5   form from the foreperson?

6          Okay.  Mr. Johnson, will you please stand?

7          Based upon return of a jury verdict, Verdict Form 1

8   states that, "We, the jury, find the Defendant, Kurt F.

9   Johnson, guilty of bankruptcy fraud as charged in Count 1 of

10  the indictment."

11         The next verdict reads, "We, the jury, find the

12  Defendant, Kurt F. Johnson, guilty of bankruptcy fraud as

13  charged in Count 2 of the indictment."

14         The next verdict form states that, "We, the jury,

15  find the Defendant, Kurt F. Johnson, guilty of false

16  declaration in bankruptcy as charged in Count 3 of the

17  indictment."

18         And then last verdict form reads, "We, the jury, find

19  the Defendant, Kurt F. Johnson, guilty of false declaration of

20  bankruptcy as charged in Count 4 of the indictment."

21         Each of these indictments are signed by the

22  foreperson, and the 11 other jurors.

23         Ms. Gray, will you poll the jury?

24         Juror #1, was this then and is this now your verdict?

25         JUROR #1:  Yes, it is.

THE CLERK:  Juror #2, was this then and is this now
your verdict?

                JUROR #2:  Yes.

                THE CLERK:  Juror #3, was this then and is this now
your verdict?

                JUROR #3:  Yes.

                THE CLERK:  Juror #4, was this then and is this now
your verdict?

                JUROR #4:  Yes.

                THE CLERK:  Juror #5, was this then and is this now
your verdict?

                JUROR #5:  Yes.

                THE CLERK:  Juror #6, was this then and is this now
your verdict?

                JUROR #6:  Yes.

                THE CLERK:  Juror #7, was this then and is this now
your verdict?

                JUROR #7:  Yes.

                THE CLERK:  Juror #8, was this then and is this now
your verdict?

                JUROR #8:  Yes.

                THE CLERK:  Juror #9, was this then and is this now
your verdict?

                JUROR #9, yes.

                THE CLERK:  Juror #10, was this then and is this now

1  your verdict?

2         JUROR #10:  Yes.

3         THE CLERK:  Juror #11, was this then and is this now

4  your verdict?

5         JUROR #11:  Yes.

6         THE CLERK:  Juror #12, was this then and is this now

7  your verdict?

8         JUROR #12:  Yes.

9         THE COURT:  Ladies and gentlemen, we want to thank

10  you for your service during this trial.

11         You may be seated, Mr. Johnson.

12         MR. JOHNSON:  Thank you.

13         THE COURT:  I am now going to excuse you to go back

14  to the jury room.  I want to come back and speak to you

15  briefly before you are allowed to go home.  There is -- I do

16  have another trial next week, but you do not have to -- If you

17  are still on the panel, you folks do not have to call in for

18  next week, if you are still on the call list for jurors next

19  week, because I do have a trial next week.

20         So, again, I want to thank you for your service on

21  behalf of the Government and the Defendant in this case, and

22  you are now excused.

23         THE CLERK:  All rise for the jury.

24         (Jury out).

25         THE COURT:  Mr. Johnson, based upon the return of the

jury verdict, the Court hereby adjudges you guilty of
bankruptcy fraud as charged in Count 1 of the indictment; the
Court hereby adjudges you guilty of bankruptcy fraud as
charged in Count 2 of the indictment; the Court hereby
adjudges you guilty of false declaration in bankruptcy as
charged in Count 3 of the indictment; and the Court hereby
adjudges you guilty of false declaration in bankruptcy as
charged in Count 4 of the indictment.

Sentencing will be set for January 3rd at 10:00;
January 3 of next year.

A written Presentence Investigation Report will be
prepared by Probation to assist me in sentencing you.  It's
possible we may be able to move that sentencing date up
earlier, because I assume there's already a presentence report
done by previous a Federal Court, and our Probation will
probably try to snatch that, get a copy of that, and just
update it.

But, right now it's set for January 3, but it could
be moved up if Probation gets the presentence report done.
You will have an opportunity to give information for that
report.  Along with the report will be a document entitled
*Recommended Conditions of Supervised Release*.  You will have
an opportunity to read and review and go over that document
with your attorney -- an opportunity to read and review and go
over that document and make any objections to those

1     recommended conditions at the time of sentencing.

2              Do you understand that?

3              MR. JOHNSON:  Yes.

4              THE COURT:  Anything further, Mr. Quinley?

5              MR. QUINLEY:  No, Your Honor.  I have already

6     executed the receipt for the Government's exhibits.

7              THE COURT:  To return the exhibits.

8              THE CLERK:  He needs to move to withdraw.

9              MR. QUINLEY:  I make an oral Motion to Withdraw the

10    exhibits.

11             THE COURT:  And maintain them in the event of appeal?

12             MR. QUINLEY:  Yes, the Government's numbered and

13    admitted exhibits, and I have an understanding that because

14    Mr. Johnson is here *pro se* that his original exhibits admitted

15    into evidence are going to be maintained by the Court.

16             THE COURT:  By the Court; that's correct.

17             MR. QUINLEY:  Thank you.

18             THE COURT:  Okay.  Anything further, Mr. Johnson?

19             MR. JOHNSON:  I have one statement to make to you off

20    the record, if that's fine, or if you want it on the record.

21             THE COURT:  On the record.

22             MR. JOHNSON:  Okay.  I just wanted to say even though

23    I didn't feel I had a fair trial, I thought the proceedings

24    were handled very well and I appreciate the way you handled

25    it.  And, probably the nicest thing that anybody has done for

1  me in a long time is letting me hug my mother, and I really

2  appreciate that.

3          THE COURT:  Thank you.  Okay.  That will be all.

4          THE CLERK:  All rise.

5          (Court is adjourned.)

6

7

8                    *   *   *   *   *   *   *

9

10 I certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.

11

12 /S/ Stephanie K. Rennegarbe              10/18/2019
   Certified Shorthand Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25